OFFICES OF

# PAVONE &  FONNER, LLP

### A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ.**
**STATE BAR NUMBER 181826**
600 WEST BROADWAY, SUITE 700
SAN DIEGO, CALIFORNIA  92101
TELEPHONE: 619 224 8885
EMAIL: bpavone@cox.net

### ATTORNEYS FOR PLAINTIFFS

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | |
|---|---|
| **WILLIAM MILTON,** <br> an individual; <br> **VICKTER ESTRADA,** <br> an individual; <br> **WILLIAM PARDUE,** <br> an individual on behalf of himself <br> and the Estate of Raemon Pardue; <br> **SAUL PELAYO,** <br> an individual; <br> **ADAM SANFORD,** <br> an individual; and <br> **ROBERT CLARK,** <br> an individual, <br><br>       Covid-19 Class Representatives, <br><br> *v.* <br><br> **CALIFORNIA DEPARTMENT OF** <br> **CORRECTIONS & REHABILITATION,** <br> an Agency of the State of California; <br> **CRAIG ALAN KOENIG,** <br> the former CTF warden; <br> **BLAKE R. BARRON,** <br> a CDCR correctional officer; <br> **JESUS PEDRO BOJORQUEZ,** <br> a CDCR correctional officer; <br> **CESAR S. BRAVO,** <br> a CDCR officer; <br> **ZACHARY SCOTT BROWN,** <br> a CDCR commanding officer; <br> **RICHARD CAVAGNOLO,** <br> a CDCR correctional officer; | **CASE NO.:** <br><br> **CLASS ACTION COMPLAINT FOR:** <br><br> **I.**    **VIOLATION OF THE BIOLOGICAL** <br>        **WEAPONS ANTI-TERRORISM ACT** <br>        **(18 U.S.C. § 175)** <br><br> **II.**  **VIOLATION OF THE CALIFORNIA** <br>        **PREVENTION OF TERRORISM ACT** <br><br> **III.** **CIVIL RICO (18 U.S.C. § 1961)** <br><br> **IV.** **CONSPIRACY TO COMMIT CIVIL RICO** <br><br> **V.**  **VIOLATION OF EIGHTH AMENDMENT -** <br>        **INFLICTION OF DISEASE (42 U.S.C. 1983)** <br><br> **VI.** **CIVIL RIGHTS TERRORISM** <br>        **(18 USC 175 / 42 USC 1983)** <br><br> **VII.** **CONSPIRACY TO COMMIT TERRORISM** <br>        **BY INFLICTING DISEASE (42 U.S.C. § 1985)** <br><br> **VIII.** **RACIAL DISCRIMINATION IN THE** <br>        **COMMISSION OF FEDERALLY-SPONSORED** <br>        **TERRORISM  (42 U.S.C. § 2000d)** <br><br> **IX.** **VIOLATION OF RALPH ACT –** <br>        **COMMISSION OF RACIST VIOLENCE** <br><br> **X.**  **VIOLATION OF STATE BANE ACT** <br><br> **XI.** **STATE LAW MASS BATTERY** <br><br> **XII.** **STATE LAW NEGLIGENCE** <br><br> **XIII.** **STATE LAW NEGLIGENT** <br>        **SUPERVISION** |

**BRANDON NELSON COPE**,
    a CDCR correctional officer;
**JEFFREY DANE DeANZO**,
    a CDCR sergeant;
**ENRIQUE GALVAN**,
    a CDCR correctional captain;
**V. GARCIA**,
    a CDCR correctional officer;
**M. HERNANDEZ**,
    a CDCR correctional officer;
**J. HUNTER**,
    a CDCR correctional lieutenant;
**JAVIAR G. LOPEZ**,
    a CDCR correctional officer;
**RODOLFO S. LUNA**,
    a CDCR correctional lieutenant;
**DERRICK THOMAS MARION**,
    a CDCR Chief;
**YONATAN U CERNA MARTINEZ**,
    a CDCR commanding officer;
**PATRICK A. MCDONALD**,
    a CDCR correctional sergeant;
**NATHAN S. McDOWELL**,
    a CDCR commanding officer;
**CHRISTIAN EUGENE MELL**,
    a CDCR correctional officer;
**KEITH E. MENSING**,
    a CDCR assistant warden;
**DONALD G. METCALFE**,
    a CDCR correctional captain;
**SERGIO MORA**,
    a CDCR correctional officer;
**JASON C. MUSSELMAN**,
    a CDCR correctional officer;
**HECTOR JAVIER OROZCO**,
    a CDCR correctional officer;
**JOSHUA KURT PEFFLEY**,
    a CDCR correctional sergeant;
**ISIDRO PANTOJA PEREZ**,
    a CDCR correctional officer;
**CORY D. PERRYMAN**,
    a CDCR correctional sergeant;
**JUSTIN D. PIERCE**,
    a CDCR correctional sergeant;
**JEFFREY JOHN REED**,
    a CDCR correctional officer;
**ROBERT O. SALAS**,
    a CDCR correctional officer;
**LEIGHTON ST. EDISON SCOTT**,
    a CDCR correctional officer;
**ALEX B. SERRATO**,
    a CDCR commanding officer;

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**JESSE DANIEL SESMA,**
    a CDCR correctional officer;
**STEVEN T. SLIMP,**
    a CDCR correctional officer;
**D. THOMPSON,**
    a CDCR correctional officer;
**HUMBERTO VERA,**
    a CDCR correctional sergeant;
**CARLOS A. VERGARA,**
    a CDCR correctional officer;
**RUSSELL VILLALBA,**
    a CDCR correctional officer;
**ARTURO VILLALOBOS,**
    a CDCR correctional sergeant;
and an unknown number of
additional state officers identified
as Does 1-30,

                    Defendants.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE 700
SAN DIEGO, CALIFORNIA 92101

# TABLE OF CONTENTS

**INTRODUCTION** ...................................................................11

    **Figure 8**: CTF Infections July-Dec 2020 ...........................13

**JURISDICTION** ..................................................................14

**PLAINTIFF CLASS REPRESENTATIVES** ...........................14

    **Class Representative 1**: William Milton...........................14

    **Class Representative 2**: Vickter Estrada...........................14

    **Class Representative 3**: William Pardue,
    for Raemon's Estate and Individually ..............................14

    **Class Representative 4**: Saul Pelayo ...............................15

    **Class Representative 5**: Adam Sanford ............................15

    **Class Representative 6**: Robert Clark ..............................15

**DEFENDANTS** ....................................................................15

    **ENTITY DEFENDANTS**...................................................15

    **Defendant 1**: California Department of Corrections & Rehabilitation .................15

        Hierarchy Chart 1 .....................................................16

    **INDIVIDUAL DEFENDANTS** ...........................................17

    **Defendant 2**: Craig Alan Koenig.....................................17

    **Defendant 3**: Blake R. Barron .......................................18

    **Defendant 4**: Jesus Pedro Bojorquez ..............................18

    **Defendant 5**: Cesar S. Bravo ........................................19

    **Defendant 6**: Zachary Scott Brown ................................19

    **Defendant 7**: Richard Cavagnolo ...................................19

    **Defendant 8**: Brandon Nelson Cope ................................20

    **Defendant 9**: Jeffrey Dane DeAnzo ................................20

    **Defendant 10**: Enrique Galvan ......................................21

    **Defendant 11**: V. Garcia ..............................................21

    **Defendant 12**: M. Hernandez ........................................21

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**Defendant 13**: J. Hunter ........................................................................................ 22

**Defendant 14**: Javiar G. Lopez ............................................................................. 22

**Defendant 15**: Rodolfo S. Luna ........................................................................... 23

**Defendant 16**: Derrick Thomas Marion ............................................................. 23

**Defendant 17**: Yonatan U Cerna Martinez ......................................................... 24

**Defendant 18**: Patrick A. McDonald ................................................................... 24

**Defendant 19**: Nathan S. McDowell .................................................................. 25

**Defendant 20**: Christian Eugene Mell ............................................................... 25

**Defendant 21**: Keith Mensing ............................................................................ 26

**Defendant 22**: Donald G. Metcalfe .................................................................... 26

**Defendant 23**: Sergio Mora ................................................................................. 27

**Defendant 24**: Jason C. Musselman ................................................................... 27

**Defendant 25**: Hector Javier Orozco ................................................................. 27

**Defendant 26**: Joshua Kurt Peffley .................................................................... 27

**Defendant 27**: Cory D. Perryman ....................................................................... 28

**Defendant 28**: Isidro Pantoja Perez .................................................................... 29

**Defendant 29**: Justin D. Pierce ........................................................................... 29

**Defendant 30**: Jeffrey John Reed ....................................................................... 30

**Defendant 31**: Robert O. Salas ........................................................................... 30

**Defendant 32**: Leighton St. Edison Scott .......................................................... 30

**Defendant 33**: Alex B. Serrato .......................................................................... 31

**Defendant 34**: Jesse Daniel Sesma ..................................................................... 31

**Defendant 35**: Steven T. Slimp .......................................................................... 32

**Defendant 36**: D. Thompson .............................................................................. 32

**Defendant 37**: Humberto Vera .......................................................................... 33

**Defendant 38**: Carlos A. Vergara ...................................................................... 33

**Defendant 39**: R. Villalba .................................................................................. 33

**Defendant 40**: Arturo Villalobos ....................................................................... 33

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**TRUE NAMES AND DEFENDANT DOES 1-30**..........................................34

**AGENCY/EMPLOYMENT/CONSPIRACY ALLEGATIONS**................................35

**ADMINISTRATIVE EXHAUSTION**..........................................................37

   **Table 1** – 602 Exhaustion ..........................................................37

   **Table 2** – DGS Exhaustion ........................................................38

**STATEMENT OF FACTS**..........................................................................38

   A.  General Information about CTF Soledad ..........................................38

   B.  History of Racial Animosity Between Guards and Blacks ........................39

   C.  The Harris Stabbing ................................................................44

   D.  The Black Lives Matter (BLM) Movement ......................................47

   E.  Attack on Black Inmates at Three in the Morning. ............................53

     Table 3 – Racist Vitriol by Guards ..............................................54

     Drawing 1 – Cell Sketch ..........................................................58

   F.  Defendants Announce and Implement Their Plan
     To Infect CTF's Black Population with Covid-19................................58

     Table 4 – Covid Vitriol ............................................................59

   G.  CDCR's Pathologically False Explanations for the Raid........................63

   H.  Individual Perceptions ............................................................65

     **Witness/Victim**: Shelton Adams ................................................66

       1. Background and History............................................66

       2. Attack on Adams During the Raid ................................66

       3. Contraction of Covid-19............................................68

     **Witness/Victim**: Frederick Brinkley................................................69

       1. Background and History............................................69

       2. Attack on Brinkley During the Raid ................................69

       3. Contraction of Covid-19............................................70

     **Witness/Victim**: Lawrence Brown................................................70

       1. Background and History............................................70

       2. Attack on Brown During the Raid ................................70

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

3. Contraction of Covid-19..................................................................72

**Witness**: Berlan Dicey.........................................................................72

    1. Background and History..................................................................72

    2. Attack on Dicey During the Raid..................................................72

**Plaintiff/Class Representative 1**: William Milton........................................73

    1. Background and History..................................................................73

    2. Perception of Events on July 20, 2020........................................74

    3. Contraction of Covid-19................................................................75

**Plaintiff/Class Representative 2**: Vickter Estrada.......................................76

    1. Background and History..................................................................76

    2. Contraction of Covid-19................................................................76

**Plaintiff/Class Representative 3**: William Pardue, on behalf
of himself and the Estate of Raemon Pardue.................................................77

    1. Background and History..................................................................77

    2. Raemon's Contraction of Covid-19 and Death............................77

**Plaintiff/Class Representative 4**: Saul Pelayo.............................................78

    1. Background and History..................................................................78

    2. Contraction of Covid-19................................................................78

**Plaintiff/Class Representative 5**: Adam Sanford .......................................79

    1. Background and History..................................................................79

    2. Contraction of Covid-19................................................................79

**Plaintiff/Class Representative 6**: Robert Clark...........................................80

    1. Background and History..................................................................80

    2. Administrative Exhaustion.............................................................80

    3. Contraction of Covid-19................................................................80

I.  The Nighttime Attack Catalyzes a Covid-19 Epidemic Throughout
the Prison Killing 19 Inmates and Infecting 2,700 Others ...........................80

**Figure 1**: July 2020 Infections ....................................................................81

**Figure 2**: July 2020 Infections (Blow-up) .....................................................81

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

Diagram 1 ...................................................................84

**Figure 3**: July/August 2020 Infections ..................86

**Figure 4**: July/August 2020 Infections (Blow-Up) ..................87

**Figure 5:** July-September 2020 Infections ..................87

**Figure 6**: July-October 2020 Infections ..................88

**Figure 7**: July-November 2020 Infections ..................90

**Figure 8:** July-December 2020 Infections ..................91

J.    Causation Analysis...................................................................92

    1.    The Raid is the Exclusive Source of All Covid-19 Infections in Central CTF through November 4, 2020 ..................93

        Table 5 – CTF Covid Cases by Month ..................93

        a.    The Timing of the First Infections Correspond to the Raid. ..................94

        b.    No Credible Second/Independent Source Reporting. ..................95

        c.    The Lack of Any Gap Between Infections. ..................95

        Graph 1 – Gaps Between Infections ..................96

        d.    A Single Source Can Easily Account for All Central Infections. ..................97

    2.    The Raid is Either the Exclusive or a Concurrent Cause as to the 2,500 Additional Covid-19 Cases as of November 5, 2020. ..................98

        a.    The Porous Barrier Between CTF Central and CTF North Suggests that the Virus Spread from D-Wing, Through Central, and then Moved to North from Central. ..................98

        b.    The Disproportionate Magnitude of CTF North's Covid Experience Relative to CDCR's Average Reporting Suggests that Operation Akili Is Equally Responsible for North's Cases. ..................99

        Table 6 – CDCR Covid Cases 2020-2021 ..................100

**CLASS ACTION ALLEGATIONS**...................................................................103

  A.  Class Action Allegations ..................103

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

1.  Class Definition................................................................103

2.  Ascertainable Class......................................................103

3.  Numerosity .....................................................................103

4.  Commonality ....................................................................104

5.  Typicality ........................................................................105

    a.  Table 7 – Covid-19 Accounts.................................107

6.  Adequacy of Class Representatives.............................115

7.  Adequacy of Class Counsel..........................................115

8.  Risk of Inconsistent or Dispositive Adjudications .................115

9.  Common Questions of Fact and Law Predominate....................116

**COMPENSATORY DAMAGE MODELS** ...........................................117

    Schedule 1 ............................................................................120

**PUNITIVE DAMAGES** ...............................................................121

**CAUSES OF ACTION** .................................................................122

I.    **FIRST CAUSE OF ACTION** – 42 U.S.C. § 1983 –
MASS INFLICTION OF COVID-19 DISEASE .................................123

    A.    History of Use of Biological Weapons for Warfare .................123

    B.    The Recoil from Use of Chemical
and Biological Weapons in WWI ..................................................124

    C.    Use of Chemical Weapons During World War II .................125

    D.    Cold War ............................................................................126

    E.    Application of 175's Elements including Conspiracy.................130

II.   **SECOND CAUSE OF ACTION** – VIOLATION OF THE
HERTZBERG-ALARCON CALIFORNIA PREVENTION
OF TERRORISM ACT ..................................................................132

III.  **THIRD CAUSE OF ACTION** – CIVIL RICO.................................135

    A.  Factual Summary ...................................................................135

    B.  Factual Application of Civil RICO Elements.................................138

        1.  Civil RICO "Enterprise" ....................................................139

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

2.   Interstate Nexus ...........................................................139

3.   Conduct Element ..........................................................140

4.   "Through" Element .......................................................140

5.   Pattern of Racketeering Activity .................................140

6.   "Business or Property" Injury .....................................141

IV.   **FOURTH CAUSE OF ACTION** - CIVIL RICO CONSPIRACY ..................142

V.   **FIFTH CAUSE OF ACTION** – EIGHTH AMENDMENT VIOLATION .....143

VI.   **SIXTH CAUSE OF ACTION** – BIOLOGICAL TERRORISM ....................144

VIII.   **SEVENTH CAUSE OF ACTION** – CONSPRIRACY TO COMMIT BIOLOGICAL TERRORISM ........................................144

IX.   **EIGHTH CAUSE OF ACTION** - RACIAL DISCRIMINATION IN THE COMMISSION OF FEDERALLY-SPONSORED STATE TERRORISM.......................................................................145

IX.   **NINTH CAUSE OF ACTION** – RALPH ACT ...............................................147

X.   **TENTH CAUSE OF ACTION** – BANE ACT .................................................150

XI.   **ELEVENTH CAUSE OF ACTION** – MASS BATTERY...........................152

XII.   **TWELFTH CAUSE OF ACTION** – NEGLIGENCE...................................154

XIII.   **THIRTEENTH CAUSE OF ACTION** – NEGLIGENT SUPERVISION .....155

**PRAYER**.................................................................................................157

**SIGNATURE BLOCK** .....................................................................162

**REQUEST FOR TRIAL BY JURY**.................................................162

**EXHIBITS**.............................................................................................163

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## **INTRODUCTION**

1.     In what can only be described as one of the most eye-popping, racist attacks by prison officials on inmates in modern history, on July 20, 2020, the warden of the California Correctional Training Facility (CTF) in Soledad, California, along with approximately 40 guards, executed a 3 am raid dubbed "Operation Akili" with the intent and effect of sadistically injuring, terrorizing, and humiliating approximately 100 sleeping African-American inmates.

2.     Not satisfied to merely engage in the nighttime, KKK-style attack, CDCR agents at the same time elected to biologically weaponize the Covid-19 virus by intentionally infecting their Black targets with it, then exposing these inmates to non-infected inmates in close quarters in order to maximize the spread, and thereby use Covid as a weapon of mass destruction.  In this regard, state and federal criminal law legally defines Defendants as terrorists.

3.     Incredibly, and as reported in numerous similar accounts of the language invoked by CTF prison officials, they openly confessed their vicious intentions to their victims, while committing the crime:

   *"By the time this ordeal is over, you niggers will have Covid-19!"*

4.     Apparently still stewing from race-based conflicts their predecessors incited 50 years ago in the late 1960's, which started with guards murdering 5 Black inmates, modern CTF officials renewed their now unilateral race war against Black inmates by committing another murder in 2015, and then in 2020, using a gang raid as a pretext to commit biological terrorism and murder 18 additional inmates, while also infecting still 2,700 others.

5.     However, after the series of murders by guards, and counter murders by inmates, in the 1970's, Black inmates had internalized the counter-productive nature of battling guards with violence and stopped retaliating in kind.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

6.      Black inmates instead graduated to fighting their battles using normative American methods – peacefully, in the California administrative and civil justice system – while guards continue to engage in homicidal bio-terrorism, perpetuating their unilateral race war.

7.      Indeed, Black gang activity – the putative justification for the instant raid – is entirely absent as a concern from the daily reports of CTF's prison chronicle.

8.      Instead, gang activity was invoked as a pretext for CTF prison officials to ventilate their anger, and engage in violence, against Black inmates for various race-based grievances, *none of which had anything to do with CTF's Black inmates*.

9.      True to their commitment to put CTF's "niggers" through an ordeal, Operation Akili predictably and by design became a super-spreader disease event and ultimately resulted in over 2,700 cases of Covid-19 infection traceable to it.

10.     This reality is illustrated by the following dot map aggregated from compiling about 700 individual contraction dates (about 25% of the available data) from the infected CTF population.

11.     It shows how the initial exposure to Covid-19 on July 20, 2020 resulted in the first cases in D-Wing in July (shown in green), how the spread continued in D-Wing and into E-Wing in August (in teal blue), continued through September (royal blue), continued in October by spreading to C-, G-, F- and G-Wing (in yellow), and then with a dozen active cases still burning by early November, exploded throughout the entire prison in November and December 2020 (red and orange, respectively).

**Legend**: July  August  September  October  November  December



12.    Plaintiffs' best and current calculation of the statistical number of Covid cases directly attributable to Operation Akili (sometimes referred to as "the raid") is 1,477.  Given the broad rules of intentional causation, Akili is legally responsible for all 2,700 cases as the dominant cause of cases in Central CTF (about 550) and a co-equal cause for the cases in CTF North (about 2,200).

13.    Given this epidemiological reality, Defendants' decision to vent their unilateral race grievances against sleeping Black prison inmates also – easily – satisfies the elements of two serious crimes: (1) the Biological Weapons Anti-Terrorism Act of 1989, which punishable by imprisonment for life; and (2) the Hertzberg-Alarcon California Prevention of Terrorism Act, which in the situation where a death was

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

caused, as was certainly the case here, requires a punishment of imprisonment for life without the possibility of parole.

14.    Given the plainly conspiratorial nature of this mass murder and criminal bio-terrorism event, all Defendants involved in Operation Akili face the prospect of incarceration, apart from the fact that they are obviously liable as a civil matter.

## JURISDICTION

15.    The Northern District of California has jurisdiction over this action pursuant 28 U.S.C. §§ 1331 and 1343 because this action involves the infringement of Plaintiffs' federal constitutional rights, and the Correctional Training Facility in Soledad sits within its jurisdictional perimeter.

16.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because at least one of the defendants resides in this district and all defendants reside in the State of California.

## PLAINTIFF PARTIES IDENTIFIED

17.    The following plaintiffs are Covid-19 class representatives with respect to the larger pool of infected inmates, pursuant to Federal Rules of Civil Procedure, Rule 23, as set forth in more detail in the claims pertaining to contraction of that disease.

18.    **William Milton**.  William Milton is a 56-year-old African-American inmate, identified by CDCR Number P38650, currently housed at CTF.  He caught Covid-19 at CTF in November 2020 and serves as class representative.  Milton was also present for the raid on July 20, 2020 and was a witness to several of the extractions.

19.    **Vickter Estrada**.  Vickter Estrada is a 39-year-old Hispanic-American inmate, identified by CDCR Number G67609, currently housed at CTF.  He caught Covid-19 at CTF in December 2020 and serves as a class representative.

20.    **William Pardue**.  Raemon Pardue was a 50-year-old African-American inmate, identified by CDCR Number K87654, formerly housed at CTF.   He caught Covid-19 in July 2020 and died on August 20, 2020.  Through Operation Akili, CDCR

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

officials murdered him, a man entirely innocent of any prison-related wrongdoing and one not even identified as a potential gang affiliate.

21.     Raemon's estate is represented by William Pardue, his father, who brings an action on behalf of the estate and on behalf of himself individually.  William is a resident of California City, California.  William serves as a Covid class representative in his estate role and brings an individual survivor action.

22.     **Saul Pelayo**.  Saul Pelayo is a 49-year-old African-American inmate, identified by CDCR Number P61090, currently housed at CTF.  He caught Covid-19 in November 2020 and serves as a class representative.

23.     **Adam Sanford**.  Adam Sanford is a 39-year-old inmate, identified by CDCR Number AZ7450, currently housed at Folsom.  He caught Covid-19 in October 2020 at CTF.  He serves as a class representative.

24.     **Robert Clark**.  Robert Clark is a 58-year-old African-American inmate, identified by CDCR Number AP7204, formerly housed at CTF.  He caught Covid-19 at CTF in August 2020 and serves as class representative.

## DEFENDANT PARTIES
### ENTITY DEFENDANT
### DEFENDANT 1
## CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION

25.     Defendant California Department of Corrections and Rehabilitation is an agency within the State of California.  CDCR had custody over the Plaintiffs at the time of these events and therefore had a series of protective obligations toward them.

26.     CDCR is responsible on a vicarious basis for the actions of its individual agents, who to the best of Plaintiffs' knowledge were comprised of officers from both inside CTF and outside CTF (including correctional facilities in other parts of California, OCS HQ in Sacramento, etc.).  Few were wearing their identifying badges and those that were had covered them up.  Some are almost certainly members of core CDCR sub-agencies, including the following:

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

(1)  Office of Correctional Safety (OCS)

(2)  Special Services Unit (SSU, thought to be a sub-agency of OCS)

(3)  Gang Intelligence Operations (GIO, a specialist branch of SSU frequently referred to as "SSU Gang Intel Ops")

(4)  Investigative Service Unit (ISU) of CTF, but joined by individual members of Salinas Valley State Prison (SVSP) ISU and Pleasant Valley State Prison (PVSP) ISU.

(5)  Institutional Gang Investigators (IGI) and Assistant Institutional Gang Investigators (AIGI) of CTF, but joined by individual IGIs and AIGIs from both SVSP and PVSP.

27.    The following hierarchy chart sets forth a tentative assessment of the Operation-Akili-involved agencies' relationship to one another, membership of certain defendants in various of the relevant subagencies, and their larger relationship to CDCR.

## CHART 1 – CDCR HIERARCHY



PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

28.     Defendants Members of the various units and sub-units of CDCR include, but are not limited to, the persons identified above in **Chart 1**.

29.     All other named individual Defendants are CTF correctional officers who may or may not belong to one of the agencies noted above, but whose principal responsibilities involve day-to-day operations within CTF.

30.     These individuals range from CTF's top correctional officer at the time of the raid on July 20, 2020 – former warden Craig Koenig – to general security staff assigned to different areas of the prison.

31.     To the best of Plaintiffs' knowledge, all individual agents were CDCR employees at the time of the raid.

## INDIVIDUAL DEFENDANTS

32.     Given the fact that all individual agents were CDCR agents on July 20, 2020, the date of Operation Akili, Plaintiffs believe and allege that individual agents were acting within the scope of their employment with the State of California when they carried out Akili.  All individual defendants are sued in both their individual and official capacities.

33.     **Defendant 2: Former Warden Craig Allen Koenig**.  Defendant Craig Koenig was Warden of CTF Soledad between 2019 and 2022 and thus was the senior CTF official at the time of the raid on July 20, 2020.

34.     Koenig was present when the raid occurred.  He was observed in the Dining Hall by various inmates who noted that he appeared to "high-five" at least one and perhaps several of the officers who had violently removed prisoners from their cells.

35.     Other reports indicate that he shook hands with the various personnel who had abused the prisoners and told them, "Good job guys."  Defendant Koenig undoubtedly planned Operation Akili and then strove afterward to conceal or deny the fact that it was driven by racial animus, in infecting as many Black inmates as possible to Covid-19.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

36.     Defendant Koenig is believed to be a resident of this judicial district, or possibly Madera County (Eastern District), or is otherwise subject to the personal jurisdiction in this court.

37.     Notably, Plaintiffs filed the original version of this lawsuit on November 3, 2021.  Notice of the suit was circulated to CDCR's litigation coordinator on November 8, 2021.  To the best of Plaintiffs' information, Warden Koenig was terminated as a CDCR employee that same month.

38.     **Defendant 3: Correctional Officer Blake R. Barron**.  Defendant Blake R. Barron, a CTF correctional officer and Assistant Institutional Gang Investigator (AIGI) at CTF, played a prominent role in the raid.

39.     The interrogation work of Barron and his fellow gang investigators resulted in unjustified validations but, more importantly in the short term, it contributed to the spread of Covid-19 through CTF's Central Facility.

40.     Officer Barron is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

41.     **Defendant 4: Correctional Officer Jesus Bojorquez**.  Defendant Jesus Pedro Bojorquez is an agent of CDCR and was, at the time of Operation Akili, a correctional lieutenant at CTF.

42.     Bojorquez participated directly in the raid in the morning hours of July 20, 2020.  He is named in at least one 602 filed after the raid that accuses him of having used unnecessary and excessive force and of having engaged in race-based discrimination.  The same inmate who filed this 602 alleges civil rights violations on the part of Bojorquez and a broader conspiracy (along with CTF Central Lieutenant Reed and Captain Metcalfe) to engage in such violations.

43.     Officer Bojorquez is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

44.    **Defendant 5: Correctional Officer Cesar S. Bravo**.  Defendant Cesar S. Bravo, an agent of CDCR and a member of CTF's Investigative Services Unit (ISU), has been identified by CTF inmates as an active participant in Operation Akili.

45.    Bravo's name, handwritten, is visible on several Security Squad Receipts that were issued after CTF employees seized inmate materials during the operation, with the apparent intent of using these materials to support pretextual gang validations.

46.    At least one of these receipts was discovered afterward in Z-Wing.  In 2018, Bravo was accused of raping an inmate, Shai Alkebu-Lan.

47.    Officer Bravo is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

48.    **Defendant 6: Commanding Officer Zachary Scott Brown**.  Defendant Zachary Scott Brown is a CDCR agent currently employed as a Commanding Officer at CTF.

49.    Brown has been identified by inmates as being an active participant in Operation Akili.  At least one inmate noted Brown's role standing guard in the Dining Hall, where more than 100 Black inmates waited to be interviewed following violent extraction from their cells.

50.    Like Defendant Bravo, Officer Brown was accused of raping an inmate in the same 2018 case.

51.    Officer Brown is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

52.    **Defendant 7: Correctional Officer Richard Cavagnolo**.  Defendant Cavagnolo, a CDCR agent, correctional lieutenant with the Office of Correctional Safety (OCS), and a member of Gang Intelligence Operations (GIO), was involved in the gang interrogation of inmates.

53.    At least one document places Lieutenant Cavagnolo at CTF during the raid itself.  Like others involved in validation efforts, Defendant Cavagnolo's actions were not only part of a program aimed at brutalizing CTF's Black population, they

PAVONE & FONNER, LLP
660 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

contributed to the spread of Covid-19 in the Central Facility by forcing inmates to wait interminably for interviews.  While waiting, they were shoulder-to-shoulder, in pain, and unprotected against the virus.

54.    Officer Cavagnolo is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

55.    **Defendant 8: Correctional Officer Brandon Cope**.  Defendant Brandon Nelson Cope is an agent of CDCR and, as a correctional sergeant, he was actively involved in Operation Akili on July 20, 2020.

56.    Not only has Cope been identified by more than one inmate as a raid participant, he has been identified as an officer who helped to carry out the violent cell extractions and one who inflicted significant physical abuse personally.

57.    Cope also participated in seizing materials that were later used to help validate various inmates.  He signed at least one item receipt personally.

58.    Officer Cope is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

59.    **Defendant 9: Correctional Sergeant Jeffrey Dane DeAnzo**.  Defendant Jeffrey Dane Deanzo, an agent of CDCR and a commanding sergeant with Gang Intelligence Operations (GIO) and has been identified by inmates as an active participant in Operation Akili.

60.    On July 20, 2020, Defendant Deanzo conducted interrogations and collected (and produced) materials to help with pretextual gang validation efforts.  More broadly, he was responsible for investigating Security Threat Groups (STGs, aka, gang members) and producing STG Chronos.

61.    His efforts on July 20, 2020 involved the infliction of significant physical violence as inmates were forced from their cells; longer term, however, the efforts of DeAnzo and colleagues created and sustained an environment that allowed Covid-19 spread rapidly through Central Facility.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

62.     Sergeant DeAnzo is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

63.     **Defendant 10: Correctional Officer Enrique Galvan**.  Defendant Enrique Galvan is an agent of CDCR.  At the time of the raid, he was employed at CTF as a captain and litigation coordinator and was also a member of the Investigative Services Unit (ISU) (Chairperson).

64.     Defendant Galvan has been identified by CTF inmates as an active participant in Operation Akili, which took place on July 20, 2020.  He appears to have been primarily involved in validation efforts, in the form of interviews and seizure of personal property after inmates were forced from their cells.

65.     The slow pace and manner of questioning also had the effect of isolating more than a hundred CTF inmates (all Black and all maskless) in Central Facility's Dining Hall, which accelerated the spread of Covid through the inmate population.

66.     Officer Galvan is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

67.     **Defendant 11: Correctional Officer V. Garcia.**  Defendant Garcia is an agent of CDCR and was employed as a sergeant at CTF at the time of the raid.  He was a member of CTF's Investigative Services Unit (ISU) and has been identified by CTF inmates as an active participant in Operation Akili.

68.     His signature appears on a Security Squad Item Receipt left for one inmate after materials were seized from his cell.  Complaints regarding Sergeant Garcia's behavior on July 20, 2020 were made after the raid, and at least one 602 was also filed highlighting his misconduct.

69.     Officer Garcia is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

70.     **Defendant 12: Correctional Officer M.  Hernandez.**  Defendant Hernandez is a CDCR agent and is, or was, an Assistant Institutional Gang Investigator (AIGI) at Salinas Valley State Prison (SVSP).

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

71.    As an AIGI, Defendant Hernandez is tasked with pursuing gang investigations and obtaining gang intelligence, helping decide how STG affiliates should be classified, and updating the local criminal gang database system.

72.    It appears that Hernandez was an active raid participant and came over from SVSP specifically for this purpose.  He interrogated and photographed a number of inmates on July 20, 2020 and is accused by at least one of those inmates of having falsified information that led to the inmate's validation at a later date.

73.    Hernandez's activities are associated with the violent cell extractions that occurred a short time before, and they contributed to the rapid spread of Covid through CTF by forcing inmates together in Central Facility's Dining Hall and making them wait hours for questioning – shoulder-to-shoulder and without access to protective masks.

74.    Officer Hernandez is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

75.    **Defendant 13: Correctional Lieutenant J. Hunter**.  Defendant Hunter, a CDCR agent and CTF lieutenant, was actively involved in the raid on July 20, 2020. Hunter signed at least one Security Squad Item Receipt.  This demonstrates his involvement in the collection of materials from inmates' cells on July 20, which was carried out after the inmates themselves had been violently extracted and removed *en masse* to Central Facility's Dining Hall.

76.    Hunter may have been a party to the violent extractions.  The materials he was collecting contributed to the large number of pretextual validations that followed the raid.

77.    Lieutenant Hunter is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

78.    **Defendant 14: Correctional Lieutenant Javiar G. Lopez**.  Lieutenant Lopez is an agent of the California Department of Corrections and Rehabilitation and a CTF employee who played a prominent role in the raid of July 20, 2020.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

79.     A member of CTF's Investigative Services Unit (ISU) and an Institutional Gang Investigator (IGI), Lopez was regarded by at least one inmate as the "overseer of cell extractions" during the July 20 raid.

80.     Lopez has suggested that there was no mistreatment of inmates during the raid because he was able to observe each and every interaction between inmates and the extraction team from a single vantage point, which is obviously not possible, apart from the reality that numerous inmates were physically injured.

81.     Lopez was evidently involved in planning Operation Akili, but his main responsibility was ensuring that the extraction element of the raid unfolded as intended. Lopez bears direct responsibility for the many abuses, physical and psychological, that were meted out to inmates on July 20, 2020.

82.     Lieutenant Lopez is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

83.     **Defendant 15: Correctional Lieutenant Rodolpho S. Luna.**  Defendant Luna is an agent of CDCR and, as a sergeant at CTF, was an active participant in Operation Akili on July 20, 2020.

84.     Luna is named by at least one inmate as having been present during the raid.  He is named alongside Officers I. Perez (below), Brown (Zachary Scott Brown, (above) and McDowell (below).  Sgt. Luna has been the subject of previous formal complaints by CTF inmates and was found, in one instance at least, to have falsified reports.

85.     Lieutenant Luna is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

86.     **Defendant 16: OCS Chief Derrick Thomas Marion.**  **D**efendant Marion is Chief of the Office of Correctional Safety (OCS) and held that position at the time of Operation Akili.

87.    He was involved in approving and setting in motion an operation that subjected CTF's Black inmates to extreme violence and psychological abuse ,and contributed to a protracted Covid outbreak among the inmates.

88.    OCS Chief Marion is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

89.    **Defendant 17: Commanding Officer Yonatan U Cerna Martinez**. Defendant Martinez is an agent of the California Department of Corrections and a Commanding Officer at CTF who was directly involved in the July 20, 2020 raid.

90.    Martinez served as Third Watch Building Officer.  He was known among the inmates as an officer with racist tendencies and a penchant for stirring up conflict between Black and Latino inmates.

91.    During Operation Akili, he was dressed like a member of the extraction team.  At least one inmate filed a 602 against Martinez relating to the treatment he had received from the officer during the raid.

92.    When an inmate encountered Martinez in the corridor outside of G-Wing during the raid and asked him if he could retrieve some of his clothes – and why Martinez was not wearing a mask – the officer responded with racial epithets and general menace: "I'm not getting shit for you niggers.  We don't care about Covid."

93.    Defendant Martinez is criminally liable for committing bio-terrorism under state and federal law, along with the other defendants, in addition to being subject to civil liability.

94.    Martinez is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

95.    **Defendant 18: Correctional Sergeant Patrick A. McDonald.** Defendant McDonald is an agent of CDCR and is, or was, a Correctional Sergeant at CTF.  Sergeant McDonald was an active participant in Operation Akili.  Plaintiffs believe Sergeant McDonald's first name is Patrick, but are still confirming this.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

96.    At least one inmate identified Sergeant McDonald in the Dining Hall after the inmates had been extracted from their cells.  According to the inmate, Sergeant McDonald entered the Dining Hall and proceeded to fist-bump "all the IGI officers" – thereby expressing approval of the way the raid had unfolded and the crimes they had committed.

97.    Commanding Officer McDonald is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

98.    **Defendant 19: Commanding Officer Nathan S. McDowell.**  Defendant McDowell is an agent of CDCR and a Commanding Officer at CTF.

99.    McDowell is identified by at least two inmates at CTF as having been an active participant in the July 20, 2020 raid.  His name is mentioned alongside those of C.O. I. Perez, C.O. Sgt. Luna, and C.O. Brown.

100.    McDowell was involved in escorting prisoners to the Dining Hall following extraction from their cells in the early morning hours of July 20, 2020.  As such, he was involved in the most violent part of the raid.

101.    In delivering prisoners to the Dining Hall – to wait interminably for questioning – he contributed to the spread of Covid-19 among Central Facility's inmate population.

102.    Commanding Officer McDowell is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

103.    **Defendant 20: Correctional Officer Christian Mell**.  Defendant Mell is an agent of CDCR and is, or was, a Correctional Officer at CTF and a member of its Investigative Services Unit (ISU).

104.    He was present on July 20, 2020, the date of Operation Akili.  Mell's presence has been confirmed by CTF inmates.  At least one inmate accuses Mell of having engaged in violent conduct on July 20, 2020 while in the company of ISU colleague Officer L. Scott.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

105.    A number of inmates have submitted Security Squad Receipts or Item Receipts with Mell's name on them, revealing that he was also involved in seizing inmates' property during the raid.

106.    As noted, such material was used to help pretextually validate a large number of African-American prisoners for whom proof of gang membership was otherwise absent.

107.    Officer Mell is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

108.    **Defendant 21: Assistant Chief Deputy Warden Keith E. Mensing**. Defendant Mensing is a CDCR agent and CTF's Assistant Chief Deputy Warden.

109.    In his capacity as Assistant Chief Deputy Warden, reporting to Warden Koenig, Defendant Mensing was aware of Operation Akili and contributed to its planning, organization, and execution.

110.    He is responsible for the way large numbers of African-American inmates were brutalized during the raid – and also for the damage wrought by Covid-19 – which the raid introduced and spread.

111.    Assistant Chief Deputy Mensing is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

112.    **Defendant 22: Captain Donald G. Metcalfe**.  Defendant Metcalfe is an agent of CDCR and a Central Facility Captain at CTF.  Metcalfe has been identified by multiple inmates as a participant in the events of July 20, 2020.

113.    At least one inmate accuses Metcalf of having used excessive force on July 20, 2020 and of having engaged in racial discrimination.  The same inmate alleges civil rights violations on the part of Metcalfe and a broader conspiracy (along with CTF Central Lieutenants J. Reed and J. Bojorquez) to engage in such conduct.

114.    Captain Metcalfe is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

PAVONE & FONNER, LLP
660 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

115. **Defendant 23: Correctional Officer Sergio Mora.** Defendant Mora is a CDCR agent and a member of CTF's Investigative Services Unit (ISU). Several inmates have identified him as being present during Operation Akili.

116. Mora was known to work closely with Sergeant J. Peffley, ISU-AIGI, and C.O. Blake Barron, also ISU-AIGI.

117. Officer Mora is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

118. **Defendant 24: Correctional Officer Jason C usselman**. Defendant Musselman is an agent of CDCR, a Correctional Lieutenant with the Office of Correctional Safety (OCS) and a member of Gang Intelligence Operations (GIO) (Fresno) and is believed to have been present on July 20, 2020.

119. Officer Musselman is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

120. **Defendant 25: Correctional Officer Hector Javier Orozco**. Defendant Hector Orozco is an agent of CDCR and a Correctional Officer at CTF employed as an Assistant Institutional Gang Investigator (AIGI).

121. Orozco was an active participant in Operation Akili. His name appears on Item Receipts left behind for inmates after their personal property had been seized for inspection (for the purpose of pretextually validating them as gang members).

122. During and/or after the raid, Officer Orozco was involved in the broader effort to pretextually investigate supposed gang activity among CTF's Black population and validate individual inmates whenever and wherever possible.

123. Officer Orozco is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

124. **Defendant 26: Correctional Sergeant Joshua Kurt Peffley**. Defendant Joshua Peffley is a member of CTF's Investigative Services Unit (ISU) and an Assistant Institutional Gang Investigator (AIGI). Sergeant Peffley was present when Operation Akili was launched.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

125.    His name (subsequently scratched out) is visible on one of the Item Receipts left behind for an inmate whose personal possessions were confiscated for inspection during the raid.  Sergeant Peffley was present when individual inmates were extracted from their cells, and on at least one occasion greeted them as they were extracted.

126.    He personally searched inmate materials during and after the raid, looking for opportunities to have Black inmates validated.  Officer Peffley, who became a Sergeant relatively recently, works closely with fellow gang investigators Blake Barron and Sergio Mora.

127.    Sergeant Peffley, perhaps more than any other officer at CTF, is named in 602 submissions from inmates and in other types of complaints – all suggesting that his behavior is biased and his actions both tortious and criminal.

128.    He is frequently accused of engaging in retaliatory actions against inmates, including in 2015 to have lit inmate Josh Soto on fire for his own entertainment.

129.    Sergeant Peffley is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

130.    **Defendant 27: Correctional Officer Isidro Pantoja Perez**.  Defendant Isidro Perez is an agent of CDCR and a Correctional Officer at CTF.  Officer Perez has significant responsibility at CTF and during Operation Akili it appears that he was responsible (in whole or in part) for the extractions from D-Wing—and possibly E-, F-, and G-Wings.

131.    Officer Perez was present during the raid and was identified as present by a number of inmates.  One inmate suggests that Perez is a "D-Wing floor staff [member]" who typically works Second Watch, not First Watch (when the raid took place).

132.    The inmate in question was therefore surprised to see Perez, whom he saw standing and staring silently into D-Wing after it had been forcibly evacuated.  This

suggests that Perez's schedule was changed to ensure his presence during Operation Akili.

133.    Some have suggested that the racism of Officer Perez was a major impetus for the raid.  He is well-known among inmates for his racist tendencies.  Like Defendant Peffley, Perez has been the subject of an inordinate number of formal complaints by CTF inmates, usually via 602 submissions, and Perez has sometimes been accused of homosexual sexual harassment accusations by inmates.

134.    Officer Perez is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

135.    **Defendant 28: Correctional Sergeant Cory D. Perryman**.  Defendant Perryman is, or was, a Correctional Sergeant who was present at CTF for the duration of Operation Akiri on July 20, 2020.

136.    One inmate has referred to him as an Office of Correctional Safety (OCS) Officer.  Officer Perryman was an active participant in the raid.  The inmate noted above recalls encountering Officer Perryman in G-Wing after the cell extractions had concluded.  Perryman then delivered the inmate in question to Sgt. Slimp, another OCS officer and Gang Intelligence Operations (GIO) member.

137.    Sergeant Perryman is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

138.    **Defendant 29: Correctional Sergeant Justin Pierce.**  Correctional Sergeant Justin Pierce is an agent of CDCR and an officer with the Office of Correctional Safety (OCS).  He also serves as a Gang Intelligence Officer (GIO) (HQ – Fresno).

139.    Sergeant Pierce was an active participant in Operation Akili and was involved in interrogating inmates who had been removed from their cells.  A number of inmates describe their interactions with Sergeant Pierce, and at least one claims that Sergeant Pierce questioned him for roughly 20 minutes about Black Lives Matter – despite the fact that Operation Akili was ostensibly focused on gang activity.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

140.    Sergeant Pierce was a key part of the broader gang validation effort that began with the raid on July 20, 2020.  This effort continued in the days and weeks that followed as the materials assembled on July 20 (interviews, personal property, photographs, etc.) were processed and conclusions were drawn.

141.    Sergeant Pierce is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

142.    **Defendant 30: Correctional Lieutenant Jeffrey John Reed**.  Lieutenant Reed is, or was, an agent of CDCR and a Correctional Lieutenant at CTF who participated in Operation Akili.

143.    Lt. Reed was named in a 602 filed by at least one inmate following the raid.  He has a history of being named in complaints filed by inmates.  (He was named as a Defendant in a case filed by an aggrieved inmate less than a year after Operation Akili (*Smith v. Zavala*)).  Reed may no longer be employed by CDCR.

144.    Officer Reed is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

145.    **Defendant 31: Correctional Officer Robert O. Salas.**  Defendant Salas is an agent of CDCR and a Correctional Officer with CTF's Investigative Services Unit (ISU).  Officer Salas was an active participant in Operation Akili on July 20, 2020.  Salas' name appears on Security Squad Receipts left for (extracted) inmates after their personal possessions had been seized.  At least one receipt indicates that Officer Salas was present in F-Wing during the raid on July 20, 2020.

146.    Officer Salas is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

147.    **Defendant 32: Correctional Officer Leighton St. Edison Scott**.  Defendant Scott is, or was, an agent of CDCR, a Correctional Officer at CTF, and a member of CTF's Investigative Services Unit (ISU).

148.    Scott was an active participant in the July 20, 2020 raid.  His name appears on Security Squad Receipts left for (extracted) inmates after their personal

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

possessions had been seized.  Officer Scott is accused by inmates of having engaged in excessive use of force, often in the company of his ISU colleague Officer Christian Mell.

149.     Officer Scott is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

150.     **Defendant 33: Commanding Officer Alex B. Serrato.**  Defendant Serrato is, or was, an agent of CDCR and a Commanding Officer at CTF.  Serrato was an active participant in the July 20, 2020 raid.  Plaintiffs believe his first name is Alex, but it is possible it is Arthur or another first name.

151.     Defendant Serrato was identified by an inmate.  According to the inmate, after being extracted from his cell violently and escorted to the Dining Hall, the plastic cuffs that had been used to restrain him, which were too tight, began to cause him immense pain.

152.     When he appealed to Officer Serrato for relief – that is, for the cuffs to be loosened and to be sent to Medical for treatment – he was told simply, "Stop complaining and sit down."  Officer Serrato made no effort to help the inmate, who suffered in terrible pain for another 45 minutes until a second C.O. took it upon himself to loosen the restraints.

153.     Officer Serrato is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

154.     **Defendant 34: Correctional Officer Jesse Daniel Sesma**.  Defendant Sesma, a member of OCS' Special Services Unit (SSU) and Gang Intelligence Operations (GIO), was present during Operation Akili on July 20, 2020.

155.     At least two inmates have named Sergeant Sesma in a 602 filed after the raid.  One inmate accuses Sergeant Sesma of assaulting him by rushing into his cell and jumping on his back and injuring his neck, while the other inmate also accuses Sergeant Sesma of extracting him from his cell using extreme and unnecessary violence.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

156.    Officer Sesma is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

157.    **Defendant 35: Correctional Sergeant Steven T. Slimp**.  Officer Slimp is a CDCR agent and holds the rank of Sergeant with CDCR's Office of Correctional Safety (OCS).  He is also a Gang Intelligence Officer (GIO).

158.    Sergeant Slimp was an active participant in Operation Akili.  At least one inmate recalls meeting Sergeant Slimp after encountering Officer Perryman in G-Wing; Perryman escorted the inmate a short distance and then handed him off to Sergeant Slimp.

159.    The inmate is adamant about the name, recalling "Slimp" specifically. Sergeant Slimp is otherwise responsible for monitoring gang activity and specializes in the Aryan Brotherhood (AB).

160.    Sergeant Slimp is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

161.    **Defendant 36: Correctional Officer D. Thompson.**  Defendant Thompson is a CDCR agent and an Assistant Security Threat Group Investigator (ASTGI) at Pleasant Valley State Prison (PVSP). (ASTGI is a relatively recent, revised title for the position of Assistant Institutional Gang Investigator (AIGI)).

162.    Like some defendants who were involved in Operation Akili but who may not have been present on the date of the raid, ASTGI Thompson was involved in pretextual gang validation work – that is, false validation of peaceful Black inmates as gang members – in the days, weeks, and months that followed the raid.

163.    Defendant Thompson signed a document on July 20, 2020 that describes in detail various tattoos and other markings belonging to CTF inmate Kevin Jackson that, in Defendant Thompson's opinion, identify Mr. Jackson as an active gang member.

164.    The document suggests that Defendant Thompson was at CTF during Operation Akili and was an active participant in (and possibly a planner of) the operation.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

165.    Defendant Thompson's name shows up frequently in documents that falsely associate Black inmates at CTF with gang activity.

166.    **Defendant 37: Correctional Sergeant Humberto Vera**.  Defendant Vera, a CDCR agent and Sergeant in CTF's ISU, was an active raid participant.  Vera is accused by at least one inmate of having used unnecessary violence in order to remove him from his cell on July 20, 2020.

167.    Sergeant Vera is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

168.    **Defendant 38: Correctional Officer Carlos A. Vergara**.  Officer Vergara is an agent of CDCR and a member of the Investigative Services Unit (ISU) at CTF.  It is alleged that he was an active participant in Operation Akili, principally in Y-Wing.

169.    Officer Vergara is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

170.    **Defendant 39: Correctional Officer Russell Villalba**.  Officer Villalba is an agent of CDCR and an OCS Gang Intelligence Officer (GIO) based at GIO's field office in Fresno.  Officer Villalba was an active participant in Operation Akili.  Plaintiffs believe his first name is either Russell or Roberto.

171.    Officer Villalba is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

172.    **Defendant 40: Commanding Sergeant Arturo Villalobos**.  Defendant Villalobos is a CDCR agent and Correctional Sergeant at CTF.  He serves as Crisis Response Team (CRT) Commander (*i.e.*, a specialist in tactical operations and negotiations).

173.    Sergeant Villalobos was present during the raid and is accused by at least one inmate of having meted out extreme – and unjustified – physical violence during the event.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

174.    The same inmate suggests that Sergeant Villalobos attacked him after he complained about the way the Black inmates at CTF were being treated as Operation Akili unfolded.

175.    Defendant Villalobos kicked the inmate's ankle, then pressed his elbow and drove his weight into his back while another officer struck the inmate with his fist. Sergeant Villalobos is named in a number of 602s that were filed after the raid.

176.    Sergeant Villalobos is believed to be a resident of this judicial district or otherwise subject to personal jurisdiction in this court.

## TRUE NAMES AND DEFENDANT DOES 1-30

177.    Plaintiffs have attempted to identify Defendants by their full and complete name, to the best of Plaintiffs' ability.  This process is difficult because CDCR guards often do not use their full name when dealing with inmates.  Rather, they often use abbreviated forms of their name.  "John Smith," for example, would likely become "J. Smith," and "Bill P. James" – another example – might be shortened to "P. James."

178.    Accordingly, it is not always easy to identify the correct defendant by his full name, since – at CTF on July 20, 2020 – certain common surnames and first initials were frequently shared by multiple people.

179.    It is possible that a guard identified in this litigation as "P. Smith" is thought by Plaintiffs to be "Peter Smith," and "Peter Smith" is thereby named as the defendant, but the correct defendant turns out to be "Paul Smith."  Plaintiffs will seek leave to amend, correct and/or substitute the true, correct, full and complete names of each defendant as they are ascertained for certain in due course.

180.    Many defendants also masked their identity by shielding or removing their nametag, especially if they directly committed violent acts against Plaintiffs.  These defendants may not be identifiable without discovery.

181.    During the raid, Defendant guards actively removed, covered, or concealed their nametags so as to prevent their identification, thereby delaying Plaintiffs' ability to identify them.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

182.    Defendant Does 1-30 are an unknown number of additional persons involved with Operation Akili, presumably state guards or other CDCR state law enforcement agents, but not necessarily.  This complaint will be amended to name said defendants when their identity is ascertained.

## AGENCY/EMPLOYMENT/CONSPIRACY ALLEGATIONS

183.    Plaintiffs are informed and believe, and thereon allege, that each of the defendants and 30 fictitiously-named defendants is responsible in some manner for the claims, obligations, and damages sued upon herein.

184.    Plaintiffs are informed and believe, and thereon allege, that at all relevant times, unless specifically otherwise alleged, each of the defendants was the agent, servant, and employee of each of the remaining defendants and was at all relevant times acting within the course and scope of his authority as agent, servant, and/or employee and with the permission and consent of each of the other remaining defendants.

185.    As detailed by the facts herein, Defendants were also in a conspiracy with each other and acted within the larger strategic plan denominated as "Operation Akili," and as such, each are liable for the entire misconduct of the whole operation as co-conspirators, whether or not each understood the full extent and objectives of the plan.

186.    Defendants shared a common plan and scheme to carry out a raid exclusively targeting African-Americans, and in doing so, committed a series of racist torts upon them including to personally injure them and infect them with Covid-19.

187.    They acted in concert, per a plan.  Each was involved in the process of raiding and extracting individual Black inmates, exposing them to Covid-19, rounding them up in a common area and then interrogating them.

188.    Each of the extracted inmates was subjected to the similar experience of being dragged out of bed, brutalized in his cell, attacked on some level while being forcibly transported to the central Dining Hall, required to strip, intentionally threatened and/or exposed to disease directly, and/or through the abandonment of safety protocols, and then interrogated while his cell was being tossed.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

189.    This is what Operation Akili was – a racist, violent terrorism attack that marshalled Covid-19 as a weapon of mass destruction against CTF's Black inmates (and as it turned out, against the larger inmate population).  It was conducted under a color of law pretext, that pretext being a supposedly necessary gang investigation seeking items of validation evidence, possibly pursuant to certain regulations adopted in 15 CFR 3378.2.  Defendants knew Black inmates had not been engaged in any gang or violent behavior.

190.    Defendants each came to a mutual understanding of the basic idea of the plan, and while perhaps not every defendant knew the full scope of Operation Akili or every detail, one or more of them committed an overt act, and often countless overt acts, to further their unlawful plan to terrorize, injure and murder Black inmates and ultimately to infect thousands of CTF inmates.

191.    It appears from various inmate reports that the most directly assaultive defendants were the ones who took the most care to obscure their identities, while the easier-to-identify defendants (typically, known CTF employees) were less involved in the directly assaultive conduct committed during the cell extractions or served a supervisory function.

192.    Some number of days, weeks or maybe even months before July 20, 2020, Defendants formed, planned, and agreed-on the strategic attack of Operation Akili: a mass, gratuitously-violent kidnapping operation on the inmates without Covid-19 safety protocols that resulted in numerous needless direct physical injuries and resulted in a Covid-19 epidemic that spread throughout CTF's entire prison.

193.    On information and belief, the operational plan of Operation Akili is supported by written detail that outlines Defendants' meeting of the minds to its objectives, plan, execution, and infectious outcome.

194.    Defendants' coordinated action, and infectious results obtained, reflects their meeting of the minds in terms of the purpose and objective of the raid and conspiratorial nature of the raid.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

195.    Defendants acted under color of state law in that Defendants are state employees, operate the state prisons, and carry out the acts, omissions, policies, and practices described herein as California CDCR state agents.

## ADMINISTRATIVE EXHAUSTION

196.    Plaintiffs satisfied parallel administrative exhaustion requirements prior to filing suit, as reflected by **Table 1** below (for Title 15 CCR § 3480, *et seq.* (aka "602") prison grievance exhaustion), and for **Table 2** Government Code section 910 *et seq.* (aka "DGS") claim exhaustion.

| TABLE 1 – 602 ADMINISTRATIVE EXHAUSTION | | | | | | |
|---|---|---|---|---|---|---|
| No | Plaintiff | CDCR # | 602 | Log | 602 Filing Date | Ex. |
| 2 | William Milton | P38650 | 2L Disapp'd | 70852 | 1/20/2021 | 15 |
| 2 | Vickter Estrada | G67609 | 3L Rejected | 10665 | 09/21/2021 | 14 |
| 3 | Pardue Estate/Survivor | K87654 | Deceased. | | | |
| 4 | Saul Pelayo | P61090 | 2L Disapp'd | 37588 | 10/20/2020 | 16 |
| | | | 2L Rejected | 60938 | | |
| | | | 2L Disapp'd | 20808 | 09/04/2020 | |
| 5 | Adam Sanford | AZ7450 | 3L Expired | 72535 | 12/29/2020 | 17 |
| 6 | Robert Clark | AP7204 | 2L Expired | 40562 | 08/00/2020 | 9 |

197.    **Table 2** below alleges that Plaintiffs complied with the DGS administrative exhaustion requirements, as follows:

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| TABLE 2 – DGS CLAIMS EXHAUSTION | | | |
|---|---|---|---|
| No. | Plaintiff/ DGS Claim No. | DGS Filing Date | Ex. |
| 1 | Milton, William Claim; 21002734 | 03/02/2021 05/27/2021 | 11, 13 |
| 2 | Estrada, Vickter Claim: 21004971 | 05/27/2021 | 13 |
| 3 | Pardue Estate/Survivor Claim: 21002734 | 05/27/2021 | 13 |
| 4 | Saul Pelayo Claim: 20010657 | 11/20/2021 | 19 |
| 5 | Sanford, Adam Claim; 20010619 | 05/27/2021 | 12, 13 |
| 6 | Robert Clark | | 13 |

## STATEMENT OF FACTS

### A.  General Information about CTF Soledad

198.    Correctional Training Facility is one of 35 adult correctional facilities operated by California Department of Corrections and Rehabilitation.  CTF is located in Soledad, California adjacent to Salinas Valley State Prison.  It is currently comprised of two facilities: Central and North.  A third facility, South, closed in 2021.

199.    According to internal CDCR documents in 2021, each facility operates independently of the others and has its own medical/dental/mental health services, kitchen, dining hall, canteen, library, chapel, clothing distribution, visiting areas, educational and vocational programming, and outside recreation.

200.    As of April 2020, just before the raid, CTF's reported population was 4,801.  The South facility was the original facility and opened in 1946 followed by Central Facility in 1951 and North Facility in 1958.

201.     According to internal CDCR documents, Central Facility is a Level II General Population unit consisting of nine three-tier housing units of two-person cells, with a total bed capacity of 2,496.  Each housing unit is ordinarily supervised by two custody officers.  The housing units are similar, having wet cells, an officer station outside the gate, a shower room on each tier with a metal screen blocking the door, a toilet area, two inmate phones, a laundry area, and a barbershop.

202.     Central Facility contains two dining halls and a kitchen.  Within Central Facility is the Prison Industry Authority Health Care Facilities Maintenance training area.  Central Facility also offers medical, medical triage, infirmary and dental.

**B.  History of Racial Animosity Between CTF Guards and Black Inmates**

203.     There is a 50-year history of animosity by CTF guards toward African-American inmates.  This violence was started by the guards – through a series of murders of Black inmates beginning in 1968 – and re-ignited more recently when they murdered 19 inmates as a product of infecting them with Covid-19 during Operation Akili.

204.     Prison officials generally murder inmates through one of four methods:

(1)  They arrange for a target to be isolated in a contained area in the presence of his enemies, and the enemies then murder the target using various homemade weapons—most commonly a shank of some sort.

(2)  They execute inmates from afar (usually by rifle) after arranging for conflicting groups to interact on the yard, which provides the homicidal guard a putative basis to claim there was a potentially fatal event in progress and that he fired to protect human life.

(3)  They beat inmates to death, in close encounters, usually near the inmates' cell.

(4)  They infect inmates with deadly diseases.  This represents a more recent addition to their "murder toolbox."

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

205.   In April 1968, CTF guards arranged for the murder of Black inmate Clarence Causey, using the first method.  Guards set Causey up to be trapped in the presence of six rival Hispanic inmates who stabbed him to death.

206.   Six months later, in December 1968, CTF guards murdered William Powell.  When he would not leave his cell, guards dragged him out the cell and beat him to death, using method #3.

207.   Seven months later, in the summer of 1969, W.L. Nolen, a twenty-year-old inmate, began circulating a petition seeking to file a lawsuit against the prison's superintendent, Cletus Fitzharris, charging that prison officials were creating racial tensions and thereby putting inmates in harm's way.

208.   Six months later, on January 13, 1970, CTF corrections officers arranged for rival Black and White groups to be in the same prison common area, thereby invoking method #2 (execution from afar).  Both sets of inmates thought that guards expected them to fight in order to settle disputes between them, as this was the insinuation of a CTF prison memo circulated before the event.  Some inmates, inferring a sinister plan from the memo, wrote farewell letters to family members.

209.   On the 13th, Corrections Officer Opie G. Miller, employing method #2, murdered three Black inmates by rifle: W. L. Nolen, Cleveland Edwards, and Alvin Miller.

210.   One of the White opposing members, Billie ("Buzzard") Harris, was also shot, but he lived.  This marked CTF guards' fifth murder of a Black inmate in less than two years.

211.   This was the last straw for Black inmates.  Three days later, on January 16, 1970, they murdered CTF guard John V. Mills by throwing him out of a window. The leader of this response was thought to be George Jackson, who was also a noteworthy scholar and founder of the resistance organization "Black Guerrilla Family," or BGF.  Black inmates left a note at the scene of Officer Mills' murder, "one down, two to go," evidently referring to Officer Miller's triple murder on January 13, 1970.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

212.    Six months later, on July 23, 1970, Black inmates murdered Officer William Shull as their second installment of retaliation.

213.    A month after that, on August 7, 1970, George Jackson's little brother, Jonathan P. Jackson, stormed into a Marin County courthouse during the criminal trial of James McClain, who was himself on trial for murdering a white guard.

214.    Jonathan, with two others, attempted to free McClain and took hostages as leverage to potentially negotiate George's release.  However, they were gunned down as they fled the courthouse in a van.  They murdered one of their hostages (notably, the judge presiding over McClain's case, Hon. Harold Haley) just before they themselves were killed.

215.    Seven months later, on March 4, 1971, Officer Robert McCarthy was murdered by Black inmate Hugo Pinell, known by the moniker "Yogi Bear."[1]

216.    Five months later, on August 21, 1971, as George Jackson's trial approached for Mills' murder, George was involved in either an escape attempt or another frame-up by guards (that is, method #2).  Either way, three guards, two White inmates and George Jackson were all killed during the melee.

217.    Over the span of nineteen months from the time of the January 13, 1970 murder of Nolen, approximately forty people died, and 19 of these killings were directly traceable to Nolen's murder, a roughly even split between guards and inmates.[2]

218.    On the inmate side, 23 inmates were charged with crimes, 21 of whom were Black.

219.    No guards were ever charged.

220.    One might assume that murders that occurred 50 years ago would have faded from memory, but any belief in the power of forgiveness or forgetfulness is dispelled by CDCR's own conduct and admissions in the present.

---

[1]    Exhibit 2.
[2]    Exhibit 3 (Yee, Min, The Melancholy History of Soledad Prison, Harper's Magazine Press, New York (1973).)

PAVONE & FONNER, LLP
660 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

221.    On July 5, 2019, CTF officials held a memorial service for guards killed in the line of duty and chose to specifically honor Shull and McCarthy – both of whom, again, were murdered more than 50 years ago as part of series of tit-for-tat, race-based killings – by naming a pair of local streets after them.[3]

222.    Former Warden and current lead individual defendant Koenig presided over the event.  According to an article published at CDCR's website on the date of the memorial, "Acting Warden C. Koenig addressed staff and guests and paid his respects to the fallen officers and their families.  *Their sacrifice impacts our staff today.  The staff was challenged and encouraged to never forget these fallen officers.*"[4]

223.    A photo taken of the event appears to depict Koenig (third from the right) with other CTF staff, along with mock-ups of the street signs for McCarthy and Shull (and another guard, Conant).



---

[3]    It is not clear why Officer Mills was not also honored with a street.  A third street was named for Kenneth Conant, a CTF staff member murdered in 1971 by two White inmates. This killing, while not explicitly race-related, took place in the context of a chaotic, confrontational environment fomented by racist policies aimed at the Black population of CTF.  Prisoners of all races during this period were on a hair trigger and violent outbursts were the inevitable result of top-down racism and abuse.

[4]    Exhibit 8 (Koenig, Craig, CTF Announcement, "*Street Signs Honor Fallen Correctional Training Facility Staff,*" Website: www.cdcr.ca.gov (July 5, 2019)).

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

224.    It is practically impossible for current CTF staff to forget these historical events given that they are confronted with physical memorials to the officers as they drive to and from the prison and also within prison grounds.

225.    Public memorials like these highlight the officers' deaths in the present and give these events prominence, relevance and context that they would not have otherwise.  Particular emphasis is placed on the loss suffered by spouses and children, no doubt generating contempt for the rival group among CTF guards in the present. Current staff are expressly instructed to "never forget."

226.    Hugo Pinell, the Black inmate who murdered Robert McCarthy, was permitted to stay in solitary confinement for approximately 45 years, putatively with his consent or at his request, as a safety precaution to himself avoid being murdered, by method #1.[5]

227.    But in 2015, now housed at nearby Folsom Prison, Pinell was released by CDCR officials into the general yard and was promptly murdered by members of the Aryan Brotherhood.

228.    CTF and/or Folsom officials evidently invoked method #1 to murder Pinell, even though by 2015 he was an old man and he had been punished by having to live in solitary confinement for over 40 years, a punishment that reportedly drove him to, or past, the point of insanity.

229.    Consequently, the history of animosity between CTF guards and Black inmates was still at the forefront of CTF officials' institutional memory when, after many years of relative peace (inasmuch as after 1971 the string of tit-for-tat murders seemed to subside), CDCR officials murdered Pinell in 2015.

---

[5]    Exhibits 5-7 (Azikiwe, Abayomi, "*Former Black Panther Killed in California Prison*," Worker's World (https://www.workers.org) (August 12, 2015); *Estate of Hugo Pinell v. State of California*, Case No. 2:16-cv-02309, Dkt. 1 (N.D. Cal. 2015); Cahill, Nick, "*State Sued Over Murder of 'San Quentin 6' Inmate*," Courthouse News (www.courthousenews.com) (September 27, 2016).

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## C. The Harris Stabbing

230.   Five years after Pinell's murder, on July 13, 2020, a Black inmate named Michael Gregory Harris stabbed two guards at Folsom.[6]

231.   This was just seven days before Operation Akili.

232.   However, to the best of Plaintiffs' information, although Harris was Black and although he was a Los Angeles gang member,[7] he was not part of BGF or any resistance movement by Folsom Black inmates intending to retaliate for Pinell's murder.

233.   To the best of Plaintiffs' information, Harris suffers from mental issues and is reportedly housed on an EOP (Enhanced Out-Patient) yard.  EOP yards, as described by CDCR, are for inmates with "chronic symptoms of mental illness."

234.   CTF Black inmates in the present have internalized the inadvisable risk of violent retaliatory behavior.  As related by Talib Williams in a 2020 article published in the *San Francisco Bay View* in the wake of Operation Akili:

> The reality is, there has been no Black STG activity here at Soledad whatsoever.  In fact, ask CDCR and Soledad CTF officials to release a report stating how many weapons Black incarcerated people have been found in possession of and how many STG related incidents in the last 10 years have Black incarcerated people been involved in, and I guarantee the answer will shock you.
>
> I was able to obtain every single Program Status Report (PSR) from 2017 to 2020 and not one single report refers to a single STG activity involving the population of incarcerated Black people, not even in the days surrounding the raid.  But herein lies the reason why: CDCR officials can't wrap their heads around the fact that incarcerated Black people throughout the entire state of California aren't involved in any STG gang activity.

---

[6]   Exhibit 10 (Associated Press, "*Two guards stabbed at high-security prison in Folsom*," Fox 40 News, Website: https://fox40.com (July 13, 2020)).

[7]   Exhibit 4 (*Finister v. R.T.C. Grounds*, 2015 U.S. Dist. Lexis 178861, Case No. CV 12-3717-SVW (PJW) (C.D. Cal. October 28, 2015)).

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

> As I've been highlighting in my writing these past couple of years, the criminal mentality of old that most people have been conditioned to associate with prison does not exist. Incarcerated people throughout California realize that the days of languishing in prison until one is useless and unable to contribute to society are over. …
>
> … incarcerated people know that it is counter-productive to commit acts that justify one's incarceration. Not only are incarcerated people politically aware of the effects of violence, but thanks to Black resistance authors such as Bell Hooks, we are aware of the effects of violence in a more holistic way to where non-violence becomes a lifestyle as well as a rock to be used against a system that bases its very existence on our dysfunction. It is incarcerated people who promote non-violence that make prisons obsolete.[8]

235.   This reality, however, did not stop CTF guards from interpreting the Folsom stabbing by Harris as a response to Pinell's murder and plotting their own retaliation.

236.   As reflected by a declaration filed in the *Armstrong* case, an anonymous inmate subjected to Operation Akili reports: "They asked me if I was part of the gang 'BGF' or 'Black Guerrilla Family,' which was a group in the 1970s. I do not know if that gang exists anymore. *They asked me if I knew anything about an incident at Folsom State Prison, where an officer was attacked by a Black incarcerated person*. I said that I knew nothing about the incident."[9]

237.   CTF guards are obviously still emotionally invested, and at times engulfed by the murderous events, of the 1970's. They are still committing murders and other violent attacks in the present to "never forget" these conflicts.

---

[8]  Exhibit 22 (Williams, Talib, "*They Came for Us in the Morning*," San Francisco Bay View, Website: https://sfbayview.com (September 2, 2020).)

[9]  *Armstrong v. Newsom*, N.D. Cal. Case No. 4:94-cv-02307-CW, Dkt. 3227, pdf p. 77, ¶ 18 (italics added).

238.   While Black inmates have elevated beyond this history toward normative American methods of peaceful dispute resolution, CTF guards have retreated to the tactics of the 1860's.

239.   A hallmark of KKK tactical history is the nighttime attack by White men in disguise.  In its most active phase during the 1860's, White men routinely murdered Black people at night, using white hoods to disguise their identity and thereby avoid accountability.[10]

240.   Operation Akili's nighttime attack by men in disguise shares many of the same tactical features, tone, and advantages used by Civil-War-era KKK members.

---

[10]   *See, e.g.* Poland, Senate Report, "*Affairs in the Late Insurrectionary States*," pp. 2, 7, 20, 22, 46, 57, 61, 62, 67-68, 72, 75, 77, 83, 99, 268, 369, 378, 448, 463, 474 477 (February 19, 1872) (referencing various acts of violence by KKK members in disguise, for example:

- **Page 2**: "The proceedings and debates in Congress show that, whatever other causes were assigned for disorders in the late insurrectionary States, the execution of the laws and the security of life and property were alleged to be *most seriously threatened by the existence of acts or organized bands of armed and disguised men*, known as Ku-Klux");
- **Page 20**: "There can be no doubt of the existence of numerous *insurrectionary organizations known as "Ku-Klux Klans," who shielded by their disguise*, by the secrecy of the movements, and by the terror which they inspire, perpetrate crimes with impunity."
- **Page 99**: "The law of 1871 has been effective in suppressing for the present, to a great extent, *the operation of masked and disguised men* in North and South Carolina."

*Monroe v. Pape*, 365 U.S. 167, 175 (1961) (quoting Sen. Lowe of Kansas during Congressional debates for precursor to today's 42 U.S.C. 1983 civil rights law, "While murder is stalking abroad in disguise, while whippings and lynchings and banishment have been visited upon unoffending American citizens, the local administrations have been found inadequate or unwilling to apply the proper corrective.  Combinations, darker than the night that hides them, conspiracies, wicked as the worst of felons could devise, have gone unwhipped of justice.")

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

241.   True to Williams' observation, Plaintiffs' review of CTF's "Daily Program Reports" between 2018 and the present, effectively the institution's daily diary for the period in question, reveals zero entries related to Black gang activity.

242.   Indeed, a search of over 500 daily reports from 2018 to the present returned not a single hit for "BGF," "guerilla,", "black," "Black Lives Matter" or "BLM."

243.   In the lead-up to Operation Akili, a review of the same reports consistently indicates that CTF guards *were* concerned about two events entirely *unrelated* to Black inmates that were at the center of their daily policy decisions:

(1)   An October 16, 2018 "mass disturbance … involving STG-11 Fresno Bulldogs, Surenos, and STG-1 Mexican Mafia."

(2)   An August 14, 2019 "large scale riot involving STG-11 Fresno Bulldogs, Surenos. Paisa and STG-1 Mexican Mafia."

244.   According to the daily reports, some of these Hispanic groups were placed on a modified program. This means the prison activity by these groups was restricted in various particulars.

245.   Regardless, it is clear from a review of CTF's daily journal that there was no Black gang activity raising concerns; therefore, the idea that Operation Akili was a necessary response to Black gang activity or BGF activity, Black violence, or other Black misconduct is simply and plainly fiction – a pretext for guards to commit racist violence on Black inmates to retaliate for the Harris stabbing, which CTF Black inmates had nothing to do with.

**D. The Black Lives Matter (BLM) Movement**

246.   The Black Lives Matter (BLM) movement grew rapidly through the spring and summer of 2020 following the murder of George Floyd by police officers in Minneapolis, Minnesota on May 25, 2020.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

247.    The perspective of CTF's officers and administrators on the movement in the run-up to Operation Akili was wildly distorted and undeniably wrong in almost every respect.

248.    To CTF authorities, BLM represented a threat to their authority, and in a larger sense, to the prison-industrial complex that keeps them employed.

249.    Over the seven or eight weeks between George Floyd's murder and Operation Akili, BLM dominated the news.  By the summer of 2020 an estimated 20 million people had joined protests throughout the United States.[11]

250.    Protests erupted in Los Angeles less than two days after George Floyd's death,[12] and almost every city in California saw significant protests at some point in May and June, 2020.

251.    The Los Angeles and San Francisco Bay Area each hosted dozens of major protests, some involving tens of thousands of people, and there were protests in mid-June in both Soledad and Gonzales, the two communities on either side of CTF.[13] [14]

252.    The notion that BGF and other prison gangs were the principal motivation for Operation Akili is nonsense.  Officials at CTF lived a daily life of being eager to punish CTF Blacks for any transgression by anyone Black, were enraged over the Harris stabbing, and were anxious to retaliate against the Black Lives Matter Movement – none of which had anything to do with CTF Black inmates own conduct – who were themselves peacefully programming.

---

[11]    Buchanan, L., *et al.*, "*Black Lives Matter May Be the Largest Movement in U.S. History,*" New York Times (July 3, 2020).

[12]    Sergent, Jim, *et al.*, "*George Floyd protests: How did we get here*?" USA Today (June 1, 2020).

[13]    Wolfson, Aaron *et al.*, "*BLM State Spotlight: California,*" Website: https://acleddata.com (June 16, 2021).

[14]    Roney, Sean, "*Protestors March for George Floyd in Soledad*" Salinas Valley Tribune (June 15, 2020).; Tortorich, Michael, "*Protestors March, Hold Rally in Gonzales,*" Gonzales Weekly Citizen (June 16, 2020).

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

253.   The focus of officers on ostensible markers of gang membership and involvement – tattoos, books, writings, drawings, communications, etc. – testifies to the false claim that Black gangs at CTF actually posed a threat.

254.   CTF guards knew such a threat simply did not exist, but they were determined to remind CTF Black inmates in blood, disease, and death that inmates had no power whatsoever to defy their absolute authority over them, even if there were legitimate BLM protests occurring across the country.

255.   Most of the targeted inmates targeted were older.  Their tattoos, if they did indeed once mark themselves as gang members, were typically decades old.  The books, drawings, and other materials that were supposedly gang-oriented were explainable in less incriminating ways.

256.   Prior to their incarceration, some of these men, now in their 50s, 60s, and 70s, had been involved with factions of the Crips and the Bloods, but had long severed their connections to these gangs, years and sometimes decades before.

257.   BGF and similar groups pre-date them by almost a generation, and the notion that – today – CTF Black inmates were involved with BGF and other Black prison gangs does not hold up to scrutiny.

258.   It is clear from declarations, correspondence, and other materials collected from younger Black inmates that their knowledge of BGF and other traditional prison gangs is limited.  This makes sense, given that BGF was most relevant in the 1960s and 1970s, decades before they were born.  BGF still has a presence on the East Coast, in Maryland, but the idea that it is a major force in the lives of Black inmates at CTF is untenable.

259.   BLM is principally a political organization.  It is neither a gang nor a terrorist group.  It advocates significant policy changes, but it seeks change within the existing political and legal structure.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

260.   Almost all of the Black inmates targeted by Operation Akili were questioned extensively about Black Lives Matter and about the power and reach of BLM among Black inmates at CTF.

261.   Prisoners interrogated by Gang Intelligence Officers (GIOs) describe BLM as a point of discussion, raised in a somewhat tentative way, as if authorities were not quite sure how to proceed.  Inmates were asked if they had heard of the movement, how they felt about it, whether BLM had support, and a variety of other questions designed to trap inmates into saying something they could exploit against them.

262.   Class member Alexander Moss, for example, took note of how quickly his post-raid interview on July 20, 2022 switched from one focused on traditional street and prison gangs to Black Lives Matter.

> The interview then shifted… It quickly became what seemed to me, as an interrogation about Black Lives Matter.  Sgt. J. Pierce [Gang Intelligence Officer] asked and made statements such as: "Do you support Black Lives Matter?  You know it's a really big thing out there right now!  If I search your cell, will I find anything related to BLM?  We don't want Black Lives Matter in our institution!"  After approximately 20 minutes or so of being interrogated about Black Lives Matter, I was allowed to return to my assigned cell.

263.   Talib Williams' complaint, filed on November 30, 2022 (*Williams, et al. v. CDCR, et al.*) highlights his own experience with intensive BLM-related interrogation.

264.   Notably, Williams was asked about BLM *first*, and it was only after he provided apparently unsatisfactory answers on that topic that the interrogation focus shifted to BGF.  As his complaint puts it,

> [Asked]: "How do you feel about what happened to George Floyd?" ...  After discussing his opinions on police brutality and racial bias, Mr. Williams asked the officers if the Raid was a reaction to the Black Lives Matter movement and George Floyd.  One of the officers responded, "You have some tattoos on you

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

that indicate you're BGF." The officers then interrogated Mr. Williams about his tattoos and BGF affiliation. Mr. Williams repeatedly told the officers that he is not a member or affiliate of BGF.[15]

265.    The *Williams* complaint makes clear that Williams' experience was not unique. His fellow inmates were asked virtually the same questions, all of which prioritized information related to the Black Lives Matter movement.

266.    Class members Chris Robinson, Gary Sasser, Damon Terrell, Willie Underwood, and Clifford Williams all report being interrogated at length about BLM. Terrell was told directly that BLM was creating a "potentially hostile" environment at CTF.

267.    Robinson describes being bombarded by BLM-related questions. When class member Daniel Colvin queried, "What's up?" upon being brought into the interrogation room following his extraction, he was told directly, "Black Lives Matter. That's what the fuck is up."

268.    The list of insults directed toward the movement is seemingly endless, ranging from "Fuck Black Lives Matter!" and "Fuck BLM!" to "Black Lives Don't Matter!" and phrases like, "That Black Lives Matter bullshit don't matter here," and "BLM don't apply here."

269.    The guards often laughed after delivering one of these BLM-themed insults, telegraphing their eagerness to racially dominate CTF Black inmates in response the emergence of a Black protest movement, all of it unrelated to CTF inmates' own conduct.

270.    In summary, the evidence that Operation Akili was a product of not only racial animus, *but entirely unwarranted racial animus*, is compelling:

      (1)    Guards initiated the raid just 7 days after a stabbing of two guards at Folsom by a Black inmate, even though this was a random event by a mentally disturbed prisoner at a different prison and not a

---

[15] *Williams, et al. v. CDCR, et al.*, Case No. 3:21-cv-09586, Dkt. 51-1, pp. 20-21.

PAYONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

response or retaliation by anyone, much less the targeted Black inmates at CTF;

(2)   CTF guards harbor, perpetuate and relive murders from 50 years ago, even though the guards themselves – at that time – started the violence, murdering five Black inmates between 1968 and 1970, using methods 1-3 in their murder toolbox.  The Black inmates only responded in kind after this quantum of bloodshed.  Today's Black inmates at CTF have no affiliation with BGF or any violence it may philosophically authorize; CTF's daily record proves this.

(3)   Still aggravated by these murders, guards in 2015, 45 years after the murder spree on both sides in the early 1970's, turned to murder method #1 to finally rid themselves of Hugo Pinell, who was by then an old man and not a threat to guards.  Black inmates at CTF had no connection to these events.

(4)   Operation Akili exclusively targeted Black inmates, even though CTF's Black inmates have no recent history of gang activity and have been peacefully using the 602 administrative system and the civil justice system to address their disputes, as does mainstream America.  This seems to infuriate the guards in a different way, because the absence of Black violence results in the deterioration and incremental disempowering of CDCR's white-power, prison-industrial complex;

(5)   The raid itself contained a singularly shocking quantum of racist vitriol, as partly depicted in **Table 3** (below), reflecting guards' open willingness to violate taboo social norms and openly express their deep-seated racism toward Black inmates.

271.   In short, Defendants seem to eagerly embrace any opportunity to punish CTF Black inmates, including by murdering them: for wrongs in the 1970's that these inmates did not commit; for wrongs in 2020 that these inmates did not commit; and for BLM protest activity that these inmates also did not commit.[16]

272.   In fact, CTF guards seem to interpret any act of violence by a Black person against any White person as cause to attack *CTF* Black inmates, which is a

---

[16]   Exhibit 18 (Chart: "Tit-For-Tat Murder Chronology")

profoundly disturbing and plainly illegal philosophy undergirding an equally illegal practice of CDCR vigilantism.

273.    CTF guards seem to be fighting a unilateral racial vigilante war against Black inmates.  In contrast, if Black inmates are fighting any war it all, it is a philosophical and legal (paper) war that is non-violent and complies with the recognized methods that all U.S. citizens are permitted to utilize to fight their battles.

274.    It goes without saying that official vigilantism by CDCR's habit of murdering Black inmates (and/or physically debilitating them), here by the technique of attacking them and infecting them *en masse* with disease, and especially based on imagined provocations, merits uniquely harsh consequences by the civil justice system.

275.    Indeed, on a straight application of the elements of state and federal criminal laws prohibiting biological terrorism, Defendants are terrorists.

276.    Having murdered Raemon Pardue, and at least 17 other inmates using method #4 by infecting them with Covid-19, they qualify for LWOP prison sentences.

### E.  Attack on Black Inmates at Three in the Morning

277.    As mentioned above, a hallmark of KKK tactical history is the nighttime attack by White men in disguise.

278.    Denominated "Operation Akili," on July 20, 2020 in the middle of the night (around 3 am), while dressed black tactical gear, now-terminated former warden Koenig about 40 other CDCR officers conducted a coordinated raid exclusively targeting African-American inmates, injuring and murdering them in the process, in much the same way nighttime KKK murders were committed by during the 1860's insurrectionary years.

279.    Many guards shielded their identities by disguising their nametags.

280.    The guards woke the inmates up in the middle of the night, by forcefully removing them from their beds (by pulling them off it), beating, kicking, choking, striking, and/or otherwise attacking them, and then assembling them closely together nude or partially nude in a dining hall, notably without any Covid-19 disease protection

PAVONE & FONNER, LLP
660 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

or social distancing safety protocols applied, despite the fact that CDCR Covid safety policies and protocols had been in effect for over three months.

281.    Approximately 100 prisoners within the Central Facility were subjected to the raid, one that delivered innumerable injuries, both physical and psychological.

282.    Those who carried out the raid, a motley group of correctional officers and prison gang investigators recruited from both inside and outside CTF, victimized the prisoners in both word and deed, delivering horrific and near-constant racial epithets and physical blows while also applying painful zip-tie restraints.

283.    Table 1 below offers a sampling of the language prison officials utilized over the course of the operation.  It highlights the open racism, as well as an obvious desire to demean, humiliate and dominate the Black inmate population.

284.    The comments listed here were repeated multiple times over the course the operation by officers participating in the raid.

| No. | WITNESS | EVIDENCE |
|-----|---------|----------|
| \multicolumn| | |

| \multicolumn{3}{c}{**TABLE 3 – RACIST INVECTIVE**} | | |
|-----|---------|----------|
| No. | WITNESS | EVIDENCE |
| 1 | Shelton Adams | They told us (Black prisoners): "By the time this ordeal is over, you niggers will have Covid-19!" |
| 2 | Shelton Adams | One of the guards grabbed my hair and put me in a headlock while another guard grabbed my arms, pushing them up and calling me a "bitch ass nigger." |
| 3 | Shelton Adams | When I screamed in pain, one of the assailants mocked, "You niggers are soft." |
| 4 | Anonymous | They were screaming, "You assholes, your families are out there marching.  Screw Black lives! Fuck you!" and "[Nigger] lives don't matter."[17] |
| 5 | Robert Blackwell | When we were asking for masks, we were told, "You niggers ain't getting no masks, I hope you niggers catch COVID and we don't give a fuck about you, your freedom or ya'll lives." |

[17]   *Armstrong v. Newsom*, N.D. Cal. Case No. 4:94-cv-02307-CW, Dkt. 3227.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | TABLE 3 – RACIST INVECTIVE | |
|---|---|---|
| **No.** | **WITNESS** | **EVIDENCE** |
| 6 | Robert Blackwell | We heard them saying, "You niggers ain't shit, I hate you niggers, I hope you niggers die. You gangbangers supposed to be tough… This is what you get, you gangbangers are soft as tissue." We all heard other inmates asking for masks, and they would say, "You niggers don't need shit, you supposed to be tough and I hope we kill off your population." |
| 7 | Fred Brinkley | I asked [a guard], can I get some clothing and why were his colleagues not wearing masks and he responded by saying, "I'm not getting shit for you niggers, we don't care about Covid." |
| 8 | Fred Brinkley | "We're here to infect you niggers [and] you don't need a fucking mask!" |
| 9 | Terrence Brownlee | The door swung open and the officers were calling me nigger. I'm six foot three so the officers had a hard time throwing me on the ground but I was not resisting. They were stepping on my neck and head. I was being punched, kicked and called a "nigger." |
| 10 | Dwain Campbell | They said "Shut up, you nigger." |
| 11 | Maurice Caples | "Shut up motherfuckers! Black Lives Don't Matter today…" |
| 12 | Chris Cox | They called me a nigger and said "Fuck you, black gangbangers." |
| 13 | Chris Cox | While walking us to the Chow Hall where we were held, staff shouted, "I hope all you Black gangbangers catch Covid and die." |
| 14 | Rickey Duncan | A masked CDC Officer said to me, "Do Black Lives Really Matter?" He said, "No!" while laughing… |
| 15 | Rickey Duncan | An inmate asked… an officer coughing… to put his hand over his mouth. He replied by saying, "Shut up before I cough on your ass!" |
| 16 | Rahsaan Fitzgerald | While being escorted…to the dining hall, officers were saying, "Fuck Black Lives Matter!" as if it was a joke, and in the Dining Hall I could hear officers saying, "Fuck you niggers!" |
| 17 | Ricky Fontenot | I heard, "Shut the fuck up nigger, don't move nigger," [and], "You don't need a mask or shoes, we don't give a shit about [you] getting infected." |
| 18 | Marvin Foster | I heard, "It was you monkeys that gave us Covid," [and] I heard an officer say, "I hope all you motherfuckers catch Covid." |
| 19 | Marcelle Franklin | "Black Lives Don't Mattter… We control CTF." |
| 20 | Eric Frazier | I was told I was going to have Covid after this (raid) was over. [I was] called the N-word (nigger). |
| 21 | Santiago Grajeda | Brownlee was screaming in pain and one of the officers called |

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | **TABLE 3 – RACIST INVECTIVE** | |
|---|---|---|
| **No.** | **WITNESS** | **EVIDENCE** |
| | | Brownlee a "nigger" and told him to "Shut the fuck up!" |
| 22 | Johnathan Hamilton | They just said, "Shut up nigger," and escorted me around with no mask, shoes. I was in my boxers, and they beat me up. |
| 23 | Johnathan Hamilton | I asked them "What is this about?" And they said, "Shut up! You niggers want to play games." |
| 24 | Bernard Harris | When I asked an officer why a face mask was not being worn, he told me, "Black Lives Don't Matter to us!" |
| 25 | Erwin Harris | I was called a "nigger" over and over as they abused me. It was crazy. I heard a lot of yelling about, "All you Black motherfuckers have Covid!" |
| 26 | Mark Harris | "Black Lives Don't matter!" |
| 27 | Nathaniel Johnson | It was said by many C/Os that, "You Blacks don't run nothing and we run shit." |
| 28 | Nathaniel Johnson | It was constantly said, "Fuck them!" and "Who cares?" … "They're just dumb monkeys without a clue." |
| 29 | Antoine Keil | They kept calling us niggers, motherfuckers, and assholes. |
| 30 | Anthony King | "Fuck you niggers! Fuck Black Lives Matter! And fuck your family if they're out there protesting!" |
| 31 | Gary Lawless | They just called me and my cellie niggers. We were singled out because we're Black. |
| 32 | Michael McCurty | While being escorted, I observed other inmates being told that "Black Lives Don't Matter Here at CTF" and "All you niggers will learn that sooner or later." |
| 33 | Alexander Moss | "You niggers are soft! You niggers are weak!" |
| 34 | Joe O'Neal | "We finally got these coons. Don't move nigger." |
| 35 | Anthony Oliver | "Don't move Nigger, Black Lives Don't Matter." |
| 36 | Ronald Patterson | "By the time this is over, you niggers will have Covid-19!" |
| 37 | Saul Pelayo | "Put your nigga ass hands behind your back." |
| 38 | Michael Rhines | "Blacks always complain and are unworthy of respect," [and], "You deserve Covid, it was made for you, you don't need any mask!" |
| 39 | Marquise Richardson | As I was watching [the raid] from my cell the guard told me "Get the fuck on your bunk nigger or else you will be next." |
| 40 | Chris Robinson | "Black Lives Don't Matter," "You can die," "The sooner you guys get infected the better [because] you will die and not have to worry about prison!" |

| TABLE 3 – RACIST INVECTIVE | | |
|---|---|---|
| No. | WITNESS | EVIDENCE |
| 41 | Ronald Smallwood | "Several of them yelled out, "Fuck BLM! Fuck all of them, I hope they call get Covid!" |
| 42 | Damon Terrell | "I hope you Black motherfuckers get Covid-19!" |

285.    Authorities claimed, and continue to claim, that the raid was a necessary response to rising gang activity within CTF.  They claim that the prisoners targeted during the raid were involved in such activity.

286.    As detailed above, this justification was unadulterated fiction.

287.    After being pulled from their beds in the middle of the night and subjected to violence, humiliation, race-based insults and forcible and painful restraint, inmates from the various wings of Central Facility were herded together in the facility's cafeteria (or Chow Hall) for processing and interrogation in rooms between D-Wing and E-Wing about their supposed ties to gangs like Black Guerrilla Family (BGF).

288.    Most of the victims describe this experience as deeply traumatic, with accounts focus on the shock of waking up to find men in riot gear entering their cells, and also on the sharp physical pain and psychological humiliation delivered by these "wannabe commandos."

289.    An inmate sketch of a typical prison cell at CTF (*see* **Drawing 1** below) highlights just how small these spaces really are, and how terrifying it would be to wake up to attackers in it, in the middle of the night, while they simultaneously spewed hateful racist vitriol and a confusing amalgam of threats and orders.

### DRAWING 1 – INMATE TW0-BUNK CELL



290.    Simultaneously, officials ransacked the prisoners' cells, seeking evidence that supported their claimed belief that the targets of the raid were gang-members.

**F.    Defendants Announce and Implement Their Plan
To Infect CTF's Black Population with Covid-19**

291.    At a moment when the Covid pandemic was exploding, and when prisoners were barred from receiving visitors, prison authorities had no problem requiring approximately 100 prisoners to wait hours, face-to-face and shoulder to shoulder, often in their underwear and without shoes, for their turn to be interrogated.

292.    Virtually no Covid safety protocols were employed.  The prisoners who asked to retrieve a protective face mask or other protective items from their cell before their transfer to the Chow Hall were denied.

293.    Correctional officers were slack in their own use of face masks, either avoiding the masks altogether or wearing them around their neck or chin as they spoke with other officers and issued instructions to prisoners.  Certain officers openly expressed their hope that the inmates present would contract Covid.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

294.    At the same time, the prisoners – a majority of whom were barefoot – had no choice but to make use of a single filthy bathroom with insufficient soap and paper towels.

295.    There was patently no need to first gather inmates in close proximity in one location (the dining hall) in order to interrogate them about their gang affiliations.  If Operation Akili were necessary at all – the daily reports contradict this – CTF prison officials could have obtained the information they wanted from the relevant inmates in countless other ways, without risking a superspreader disease event.

296.    The same sinister blend of indifference, ignorance and affirmative malice continued in the interrogation rooms positioned between D-Wing and E-Wing, in the southeast corner of CTF Central Facility (see Figure 1).

297.    It was here that CTF authorities and gang investigators interrogated the men they had yanked from their beds without warning only several hours before.  There was no insistence on face masks, on social distancing, or on the sanitization of surfaces.

298.    Prison authorities weaponized the Covid-19 virus.  They conducted an in-person, close-proximity event in the middle of the worst pandemic in living memory, in circumstances that maximized the chance that the targets of the raid, nearly all of whom, again, were African-American.  Some would contract the virus that day, and days later, become infected.

299.    There was no necessary reason for the raid in the wake of the larger disease dangers.  Evidence of supposed gang affiliation was certainly not the kind of institutional emergency as compared to avoiding a disease epidemic.

300.    Defendant's indifference and hatred toward inmates is partially captured by the following table of Covid vitriol:

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| TABLE 4 – COVID VITRIOL | | |
|---|---|---|
| **No.** | **WITNESS** | **EVIDENCE** |
| 1 | Shelton Adams | They told us (Black prisoners): "By the time this ordeal is over, you niggers will have Covid-19!" |
| 2 | Fred Brinkley | I asked [a guard], can I get some clothing and why were his colleagues not wearing masks and he responded by saying,  "I'm not getting shit for you niggers, we don't care about Covid." |
| 3 | Terrence Brownlee | The officers ... didn't have any masks on.  They told us we were going to get Coronavirus. |
| 4 | Marvin Foster | Guard: "'I hope you get COVID.'" |
| 5 | Antoine Keil | When I was in the chow hall they told us we were going to get Covid-19. |
| 6 | Anonymous | One officer said, "You [Niggers] will all have COVID when we're done with this.  I was very confused."[18] |
| 7 | Gary Lawless | They told us to shut the fuck up and we were not allowed to put our masks on.  When we were in the kitchen after being kicked in the nuts and dragged down the stairs, we have Covid now. |
| 8 | Gary Lawless | I had no shoes or mask on as I was dragged down the stairs in my boxer briefs.  I asked for my mask and was told I don't need it, "everyone gonna catch coronavirus anyway." |
| 9 | Antwyone Lynch | I asked if I could wear a face mask or covering and they responded to me by saying, "no, we don't care if you catch COVID, you're a tuff crip!'" |
| 10 | Joseph O'Neal | The Supervising Sergeant was coughing and everybody started yelling for the Sergeant to put on a mask and he refused!  I believe this incident was also to infect us (race) with COVID-19. |
| 11 | Clifford Williams | I was not provided adequate protection for COVID-19, when they placed me and two hundred other black inmates in a confined area without a mask or our face, for over 5 hrs.  Unable to social distance." |

301.    The raid's timing was perfectly disastrous, the successful deployment of a weapon of mass destruction in a confined space, precisely as CDCR prison officials intended.

---

[18]    *Armstrong v. Newsom*, N.D. Cal. Case No. 4:94-cv-02307-CW, Dkt. 3227.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

302.    The raid offered guards the ideal opportunity to inflict significant pain and suffering on a part of the prison that they wanted to decimate. Overwhelmingly Black, and with a history of standing up to arbitrary mistreatment through use of the peaceful 602 system, key wings of Central Facility, like D-Wing, were viewed by authorities as areas that needed to be taught a lesson in violence.

303.    Commanding officers openly claimed that they had to "take back" these areas by breaking the spirit of the residents. The raid thus gave authorities a pretext to beat the inmates in close contact encounters and thereby vastly increase the chances that the inmates would contract a serious illness – and they did.

304.    Many of the inmates who survived their contraction and infection continue to wrestle with significant medical problems.

305.    The raid introduced the Covid-19 virus into a closed environment that facilitated its rapid spread. Prisoners live in close quarters, but the prisoners in CTF's Central Facility live in especially close quarters, typically a 5 x 10 cell, as reflected by Drawing 1.

306.    On July 20, 2020, CTF guards made sure to maximize physical contact with the inmates, by hitting them, choking them, pulling them, and screaming into their faces. They attacked at night, when the inmates' natural defenses were down, when they were fatigued and confused, and when they were more fearful and less resistant to authority.

307.    Authorities prevented inmates from retrieving masks, clothes, and shoes prior to their removal to the Chow Hall. Masks were the best tool available at the time to combat Covid transmission, so it makes no sense – if officials' putative evidentiary objectives were legitimate – to prevent inmates from taking basic safety precautions.

308.    During the process of extracting inmates from D-Wing, one contagious guard infected Lawrence Brown. Brown awoke to a guard screaming profanities in his face ("Don't fucking move! Don't fucking move!"). Brown asked the officers what was going on and was simply told to "shut [his] fucking mouth" and "shut the fuck up."

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

309.    This yelling occurred while guards were "standing inches from [his] face," effectively spitting infected respiratory droplets directly at him.  Brown reports suffering Covid-19 symptoms nine days later, on July 29, 2020.

310.    Brown further reports that he was dragged 60-70 yards from his cell at the time, D126, to the dining hall.  In other words, Brown's journey with the infected guard transgressed almost the full length of the first floor of D-Wing and then the entire corridor from D-Wing to the CTF dining hall in the middle of Central CTF, past B-Wing and C-Wing.[19]

311.    Necessarily, that same infected guard must have walked through the full first floor of D-Wing on his way to extract Brown, exhaling respiratory droplets on to people and surfaces in D-Wing along the way, back and forth, for each targeted inmate.

312.    Through the end of July and August, at least five inmates caught Covid-19 in that same first floor row of D-Wing, per Diagram 1, below.

313.    On the second floor of D-Wing, Ronald Patterson reports his estimated contraction date of July 30, 2020.  His cellmate, Raemon Pardue, caught Covid on or about the same time.  Pardue died from Covid-19 just 20 days later, on August 20, 2020.

314.    CDCR claims that it identified three people who caught Covid-19 by July 31, 2020.  It locked down B, C and D-Wings on August 1, 2020.  It is not clear whether the three cases claimed by CDCR are Brown, Patterson and Pardue, nor did CDCR explain why it chose to lock down B and C-Wings, while excluding neighboring E-, F-, and G-Wings.

315.    Regardless, given Brown's experience, it can be inferred that unique teams of guards were assigned to extract the inmates out of a given wing.  These three inmates represent the three earliest reports of Covid-19 in Plaintiffs' possession reflecting contraction among CTF inmates.

---

[19]    *See* Diagram 1 *and* Figure 1.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

316.    They harmonize with the theory that, in all probability, a single contagious guard intentionally infected one or more inmates during the raid while conducting his extraction duties in D-Wing.

317.    However, D-Wing did not contain exclusively Black inmates. Consequently, rather than exclusively infecting the Black targets, Operation Akili ended up generally infecting D-Wing.  This started the viral fire that spread through all of Facility C and plausibly to the entire prison, blind to race.

### G.  CDCR's Pathologically False Explanations for the Raid.

318.    CDCR's explanation for the raid amounted to a pathological exercise in denial.  In the wake of protest after it, on July 21, 2020, the day after the raid, then-Warden Koenig described the raid in these terms:

> The event itself was a result of Security Threat Group (STG) behavior that has been on-going at the Correctional Training Facility (CTF).  CDCR does not identify the men racially and those under investigation are suspected of STG activity.  STG behavior jeopardizes everyone and especially, puts in harm's way, those who are trying to build better lives for themselves and their families.

> All the staff at CTF are fully committed to those efforts that help the men rehabilitate.  There is a great deal of evidence which shows our rehabilitative efforts are successful.  STG activity directly opposes the positive actions of the men applying themselves to being good citizens.

319.    In a later memorandum, on November 16, 2020, CDCR validated its actions in largely the same terms:

> We can confirm that an investigation was held as the result of STG behavior that has been ongoing at CTF. The incarcerated people in the investigation were not identified based on their race, and all safety protocols were followed through the investigation.  Warden

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

> Koenig personally toured during the investigation to
> ensure it was being conducted safely and
> appropriately. Nobody was harmed and the
> institution's normal operations resumed quickly.

320. Former Warden Koenig's argument that STG activity justified the raid is pathologically inaccurate. As reflected by the daily program reports, Black gang activity was totally non-existent at CTF. BGF activity was simply not a problem at CTF. Koenig clearly knew this: he personally signed off on the daily reports.

321. Warden Koenig's suggestion that no one was harmed during the raid is also preposterous, a blatant and obvious lie. Numerous inmates needed medical care, numerous were injured in various particulars, not to mention the deadly infectious consequences of the raid, which resulted in Raemon Pardue's death and 17 others.

322. By Koenig's public example, CTF guards and officials were effectively authorized by him to engage in similar outright prevarication about the raid, and as a result, CDCR guards and officials also consistently lied about these events in a brazen fashion.

323. As just one example, there was a mountain of racist vitriol hurled at inmates during the raid. But according to one of the more depraved guards (who in 2015 reportedly lit inmate Josh Soto on fire), Sergeant Josh Peffley (in a 602 administrative response given to Reginald Ware), "he [Peffley] never observed or heard derogatory or inappropriate statements being used by staff and no inmates reported anything to him."

324. Consequently, CDCR's version of these events is particularly unreliable, a typical installment of KKK-esque strategy to lie indiscriminately about relevant events.

325. The stated purpose of Operation Akili was to collect evidence to "validate" certain African American inmates as gang members (within the assumed meaning of 15 CCR 3378.1, *et seq.*), such that the few rights prisoners still possess could be further deteriorated, their release dates could be delayed, and CDCR could impose other indignities.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

326.    Among other punishments, being designated as a validated gang member effectively permits CDCR to segregate such inmates in the equivalent of solitary confinement.

327.    Gang validation, particularly at CTF, involves thorny constitutional issues, because the evidence of validation is not necessarily connected to any wrongdoing.  For example, a common item of evidence sought by guards are writings by one George Jackson, who is the founder of the "Black Guerrilla Family" or BGF, a reported prison gang.

328.    The problem is that Jackson was not some sort of mindless thug, but a wrongly-imprisoned philosopher and scholar who led the resistance to CDCR's murder spree against Black inmates from 1968-1970.  Reading his writing would not materially deviate from reading some of the Founding Fathers' literature.  Reviewing Jackson's actions reveals that they are not materially different than the positions of Nelson Mandela.

329.    Penalizing an inmate for possessing academic quality reading material violates basic and important American constitutional rights, can be regarded as some awful Fahrenheit-451 situation with a concluding splurge of reader defamation, and thus gang validation as to certain items as practiced by CDCR represents a legally controversial exercise.[20]

## H.  Individual Experiences by Representative Inmates

330.    In companion litigation, Plaintiffs provide over 50 accounts of the raid in question by inmates that were injured during the process.  For purposes here, Plaintiffs provide just three representative ones, along with a Covid narrative from each of the class representatives.

---

[20] *See* Zohrabi, Azadeh, "*Resistance and Repression: The Black Guerrilla Family in Context,*" 9 Hastings Race & Poverty L.J. 167 (2012); *McCabe v. Arave* 827 F.2d 634, 638 (9th Cir. 1987).

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## WITNESS/VICTIM: SHELTON ADAMS

### 1. Background and History

331.    Shelton Adams (J94864), currently an inmate at CTF, grew up in Modesto, California and was raised by his grandmother.

332.    Adams is African American.

333.    As an inmate, beginning in 2001, Adams embarked upon an impressive path of rehabilitation.  In the years since he has completed well over 60 programs, to the point that he is approaching consideration for release.  He was rejected for release in 2017.

334.    As a result of Adams' progress, CDCR guards are incentivized to provoke him into responsive action that would keep him incarcerated and a continuing source of profit and employment for them.  This includes labeling him a (dangerous) gang member and otherwise attempting to marginalize, debilitate, and reduce him to a criminal who can be subjugated, continuously incarcerated and financially exploited.

### 2. Attack on Adams During the Raid

335.    The official account of Shelton's function in the July 20, 2020 raid reads as the need to conduct an "enhanced institutional search" of housing units and an investigation of Security Threat Group (STG, aka, gang) persons potentially associated with BGF.

336.    Adams' account of the event (provided on July 26, 2020) is as follows, in relevant part:

> On 7-20-20, at approximately 0300 hrs, I was woken up by John Does yelling, "Get your black ass on the ground motherfucker!"  I immediately complied and posed no threat to anyone.  As I was on the floor, one John Doe stepped on my neck as the other John Doe twisted my arms upwards toward my head severely injuring my shoulders ([with one] arm was pulled out of its socket).  When I screamed in pain, one of the assailants mocked, "You niggers are soft."  I was lifted up off the floor by my hair and shoved face first into a wall.  The blow was so severe, I almost passed out.

I was then taken to the Central Dining Hall. As we were walking, I asked the assailant escorting me, "Sir, can I ask for your name?" The assailant suddenly grabbed me by my neck and slammed me up against the wall and stated, "Motherfucker, you're lucky to be able to walk!"

All of the assailants had their names concealed and were unmasked. I was forced to remain naked in front of everyone. We were forced to violate social distancing protocols. In fact, the assailants were telling us that we (Blacks) [would] have Covid-19 by the time this ordeal was over.

337.    Witnesses observed one of the CTF guards place Adams in a headlock as another one pulled his cuffed hands upwards, as if to dislocate his shoulders. Adams yelped in pain.

338.    They also observed Shelton being dragged down one or two flights of stairs in a headlock, in a pair of boxer shorts, arriving in front of cells 101-105. Using his arm as a noose, the officer started choking Adams when they were in front of cell 101, with the officer yelling [to the potential witnesses] "get on your fucking bunks!"

339.    The guard was observed with his back up against a wall and he lifted Adams to the point that he (Adams) was up on his toes and gagging for air.

340.    One witness states that the guards were not utilizing force to abate some threat; they utilized it for the purpose of "sadistic gratification," a well-known side effect of working as a prison guard pursuant to the literature of Philip Zimbardo and his famous Stanford study.

341.    Despite the Zimbardo effect, guards may not indulge these brutal appetites. They are well-paid – about $150K/year in salary – to resist them.

342.    Agents conducting the raid subsequently sought to ensure that witnesses to the attack would not attest to it by implying to the inmates – through conduct – that if they did, retaliation would result.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

343.     Adams subsequently underwent medical treatment for various of his injuries.  He suffered problems relating to his shoulders, lower back, and wrist.  He also strained his thoracic area and endured psychological trauma.

### 3.  Contraction of Covid-19

344.     Shelton Adams was housed in X-Wing during the raid and was forcefully extracted as detailed above.

345.     To the best of Plaintiffs' information, Adams did not contract Covid-19 on the day of the raid.

346.     Rather, several months later, while Covid-19 was still circulating around Facility C from the raid, and positive inmates were reportedly being held in G-Wing, on November 18, 2020 CTF guards declared that Adams had Covid-19 and moved him to G-Wing.  At the time, he had no symptoms.

347.     A few days later, on or about November 21, 2020, while in G-Wing, Adams experienced Covid-19 symptoms and thereafter tested positive.  From his perception, guards intentionally infected him by declaring a false positive.

348.     Defendants did deliberately attempt to infect the inmates on July 20, 2020.  Whether or not Shelton's later perception of a second attempt to infect him is true or not, it is fair for him to harbor this suspicion.

349.     Multiple inmates report that, beyond the raid, guards used their ability to infect inmates as a means of punishment, especially toward ones that filed 602's or took legal action.

350.     In Adams' particular case, Akili is a legal cause of his contraction by creation of an infectious environment that caused him to contract Covid-19, as are all other class members.  The guard that transported Shelton from X-Wing, without symptoms, possibly to be infected in G-Wing by Akili's lingering presence means that Adams possibly suffered two intentional acts that caused him the same injury.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## WITNESS/VICTIM: FREDERICK BRINKLEY

### 1. Background and History

351.    Frederick Brinkley (C79499) is an African-American inmate currently housed at CTF.

352.    Prior to his incarceration Brinkley worked as a ranch hand near Elk Grove, CA.

353.    Following his incarceration Brinkley earned his GED and has completed skills training (and earned certificates) in a wide range of vocations, including landscaping and building maintenance.  Employers have expressed an interest in hiring Frederick upon his release.

354.    Brinkley was not involved in gang activity at CTF.

### 2. Attack on Brinkley During the Raid

355.    On July 20, 2020, Brinkley was attacked in his sleep, yanked off his bunk, and slammed to ground.  He was restrained and marched in his underwear – and without shoes or a mask – to the dining hall, where he waited with approximately 100 other Black prisoners for a period of at least five hours until he was interrogated.

356.    No social distancing was practiced.  Prisoners were seated four to a table in several rows next to each other.

357.    Officers in the dining hall were not masked.  Brinkley was able to determine that they were Caucasian or Hispanic.  Every inmate brought to the dining hall, by contrast, was African-American.

358.    Throughout the event, officers repeatedly stated – with self-satisfaction – that "Black lives don't matter."  Others let prisoners know that they would almost certainly develop Covid-19 after the raid.

359.    When Brinkley asked Commanding Officer Martinez if he could put on some clothing, Martinez responded as follows: "I'm not getting shit for you niggers.  We don't care about you getting Covid-19."

PAVONE & FONNER, LLP
660 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

360.    Denigration of BLM, racial epithets, and a desire to see the prisoners develop the coronavirus dominated the conversation between officers, and between officers and inmates during the raid.

361.    Brinkley later developed pain in his back and arm as a result of the raid. He continues to take NSAIDs to help manage it.  He may have suffered permanent tendon damage.

### 3.  Contraction of Covid-19

362.    Brinkley also reports contracting Covid-19 in October 2020 and diagnosed in November, 2020, while in G-Wing.

363.    As a result, he lost his sense of taste and suffers from long Covid, mild dizziness, headaches, tiredness, joint and muscle pain, mild coughing and difficulty concentrating.

## WITNESS/VICTIM: LAWRENCE BROWN

### 1.  Background and History

364.    Lawrence Brown (BJ5119) is an African-American inmate who is currently housed at CTF.

365.    Brown was born in Santa Ana, CA and grew up in Orange County.  He was married at 25 and currently has seven children and 10 grandchildren.

366.    Brown enjoys helping others and notes that his religious faith now informs much of his life.

367.    He denies involvement in gang activity.

### 2.  Attack on Brown During the Raid

368.    The raid was putatively carried out to identify members of major Black gangs (*e.g.*, BGF members, Crips, Bloods, etc.).

369.    He awoke to a white man screaming profanities in my face ('Don't fucking move! Don't fucking move!')."  He asked the officers what was going on and was simply told to "shut [his] fucking mouth" and "shut the fuck up."

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

370.    He was also told repeatedly that if he "tried anything" the officers would not hesitate to "fuck [him] up."

371.    He was still trying to wake up and respond when the officer who had been screaming (and was still screaming) pulled him off the top bunk.  Brown crashed into the cement floor knees first, after which the agent pushed him into the cement floor.  His left shoulder and low back were injured as a result.

372.    Despite repeatedly telling the officers involved that he was in pain and that he was not resisting, he was pulled out of his cell on his belly – "like I was trash."

373.    Out of a combination of stress, fear, and physical injury, Brown ended up urinating on himself in his cell.

374.    During the raid officers shouted "Fuck Black Lives Matter!" and then high-fived one another.

375.    Like all the other victims of the raid, Brown was transported to the dining room – maskless, shirtless and shoeless – and left there for hours with approximately 100 other Black inmates, sitting shoulder-to-shoulder.  He waited 8-1/2 hours in urine-drenched boxers.

376.    Approximately nine days after the raid, Lawrence tested positive for Covid-19.

377.    Unsurprisingly, he suffered multiple injuries as a result of the treatment he received by the guards.  He developed pain and mobility issues in both of his knees and wrists as well as in his back, neck and left shoulder.

378.    Brown is traumatized by the de-humanizing elements of his treatment.  This aspect, he implies, was worse than the physical pain.  He suffered nightmares as a result and writes that he "doesn't trust anyone."

379.    Regarding the raid, "...never in my entire life has anyone [so] degraded me, de-humanized me, and violated me."

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

### 3. Contraction of Covid-19

380. Brown contracted Covid-19 on July 20, 2020 when guards spit on him in D-Wing while extracting him and was diagnosed with the disease on July 29, 2020.

## WITNESS: BERLAN DICEY

### 1. Background and History

381. Berlan Dicey, 42 and African American, is currently housed at CTF.

382. Dicey, born in Rancho Dominguez, CA, comes from a large family. He is the youngest of seven children. His father was a veteran of World War II and a former police officer. After his mother and father divorced, the family lived in many different towns and cities in California.

383. Dicey had hopes of a career in engineering or music, but with his ongoing incarceration, he now hopes to make a difference by speaking to and/or working with youth.

384. He denies any and all gang involvement.

### 2. Attack on Dicey During the Raid

385. The raid of July 20, 2020 was driven both by racial animus and fear of (and hostility toward) BLM. He says that when he was questioned on the morning of the raid, the questions revolved around BLM recruitment (if any) at CTF.

386. Dicey offers the following picture of the raid: he heard noises in the early morning hours of July 20, 2020, then looked out his window and saw a multitude of officers in "commando" type gear, and with lights on their helmets, running and preparing for activity.

387. Some of these officers entered Dicey's cell, grabbed him by the head, arms and shoulder, and "violently slammed [him] into a concrete wall" before zip-tying his hands extremely tightly. He was elbowed in the nose and mouth in the process.

388. The officers' name tags, and their faces, were covered.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

389.     He was escorted to "two or three Salinas Valley State Prison (SVSP) officials" and then, "out of nowhere," he says he was kicked, punched and thrown to the ground ("stomped on" as he puts it).

390.     He was picked up by the zip-ties, and, without his feet touching the ground, his penis and groin were touched as the officers carried him down the stairs.

391.     Dicey hurried along the hallway and into the dining hall, where "80 to 100 Black men, no mask, [were] crammed together."

392.     Dicey began to express his anger and rushed out of the dining hall but was immediately grabbed and beaten by two security officers who delivered multiple blows and had Dicey's genitals pressed up against a steel heater.

393.     Dicey was then placed in a holding cage for upwards of 3-1/2 hours.  The zip-ties cut off all circulation and caused intense shoulder pain.  They remained in the place for the duration of the raid.

394.     Dicey was then interrogated thoroughly and threatened throughout the process.

395.     He eventually sought medical attention on the orders of a nurse (who saw the condition of his right hand after the zip-ties were finally cut off); however, once he finally arrived, medical care was denied.

396.     Five days after the raid, Dicey finally received medical care; he was prescribed standard painkillers and topical creams for injuries to his stomach, groin and other areas.  He received physical therapy.  An ultrasound was performed.

## PLAINTIFF/CLASS REPRESENTATIVE 1: WILLIAM MILTON

### 1. Background and History

397.     William Milton, 55, is from Los Angeles, CA.

398.     William believes that prison officials attempted to deliberately infect inmates with Covid to block the release of non-violent offenders.  He raises this motivation within a larger framework of racism and greed.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

### 2. Perception of Events on July 20, 2020

399.    Milton reports as a witness:

On July 20, 2020, at approximately 0300 hours, I was awoken by loud rumbling, shouting, and keys jingling as prison staff ran into and through X-Wing (running up the stairs). My assigned cell in X-Wing during the time in question was 137 (lower bunk). Cell 137 is the very first cell to the right upon entering the building.

I stood at the cell door trying to determine what was going on. I heard the prison staff go in to a cell to the right of my position. I recognized Prisoner Brownlee's voice (Terrance Brownlee, COCRI C20389). He was screaming as though he was in a lot of pain.

Brownlee's screams got louder. I heard one of the prison staff shout "Shut the fuck up!" About a second or two later, I saw the prison staff drag Brownlee by his arm and hair between two tables that is directly in front of his cell (135) and hurried him out the building. One staff member had Brownlee by his arm (Brownlee was cuffed behind his back), and the other was pulling Brownlee by his hair.

Approximately ten seconds later, I heard loud bumping coming down the stairs as though someone was dragging something heavy. I saw a prison guard dragging Prisoner Adams (Shelton Adams, CDCR# J94864) by his head near cells 105 and 106, i.e., the prison guard had Adams in a headlock.

The prison guard attempted to drag Adams in said headlock position between the two rows of tables that are positioned directly in front of my cell, but decided to drag Adams toward the right side of the tables positioned directly in front of cells 101 to 105 (east side of the building). The two rows of tables consist of six tables - two rows of three tables positioned parallel directly in front of cells 137 to 134 (west side of building) and 101 to 105 (east side of the building). The space in between the two rows is very narrow.

The prison guard had Adams in a headlock using his (prison guard's) left arm and his (prison guard's) right hand to tighten his (Prison guard's) grip on Adams' head. As they made their way to

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

a position in between cells 101 and 102 - which is directly in front of me - the prison guard abruptly stopped and began choking Adams up against the chase door belonging to cell 101 using the headlock as a noose.

The prison guard had his back up against the wall (chase door) and pulling upward lifting Adams to the point he (Adams) was up on his toes and gagging for air.  My cell light was on and the prison guard looked in my direction.  Upon seeing me, the prison guard yelled at the top of his voice,  "Get on your fuckin' bunks!"  I immediately got on my bunk.

Seconds later, a separate prison guard shined a bright light in my face from outside my cell door window.  The prison guard· shined the light in my face and then shined the light on my cellie as he slept on the upper bunk.  The prison guard shined the light in my face again for approximately three to five seconds as I tried to shield my eyes from the laser powered beam of light.

I remained on my bunk and continued to listen to the goings on outside.  I heard other prisoners crying out in pain as they were being beaten and drug down the stairs.

All the prison guards and staff I observed had their faces covered.  I didn't recognize anyone other than the aforementioned prisoners nor was I able to see any name tags.

Neither Brownlee or Adams appeared to be resisting, fighting back, or was posing any kind of a threat to anyone.  Quite the opposite.  The only aggressors I observed were the prison guards.  They were not utilizing excessive force to abate some threat, they were utilizing excessive force for the very purpose of sadistic gratification and to cause those prisoners serious harm.

### 3.  Contraction of Covid-19

400.     Milton and his cellmate contracted Covid-19 in late November-early December 2020.  He is concerned that his positive test may have been an intentional false positive, designed to justify a decision to move him to quarantine and thus infect him with the virus.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

401. William and his cellmate tested negative in late November. Only a few days later, after almost no contact of any kind with the outside world, they then supposedly both tested positive. Milton spent two weeks in quarantine, surrounded by Covid-positive inmates, in one of CTF's chapels.

402. William remains beset by "long haul" Covid symptoms. These include (but are not limited to) mental fog, chest pain and difficulty breathing, rapid heart rate, leg weakness, breathlessness/dizziness/light-headedness, and a hacking cough.

## PLAINTIFF/CLASS REPRESENTATIVE 2: VICKTER ESTRADA

### 1. Background and History

403. Vickter Estrada, approximately 39 years of age, was born and raised in Los Angeles. His parents emigrated to the United States from Mexico. Vickter dropped out of school in the ninth grade; nevertheless, he has an extremely wide range of interests that include medicine, physiology and religion. He is keenly interested in the fight to eradicate global poverty.

### 2. Contraction of Covid-19

404. Estrada contracted Covid-19 on or about December 24, 2020. He believes he contracted it in Rainier B.

405. Estrada's infection lasted almost exactly three weeks. To quarantine him, CTF authorities transferred him from Whitney B to Rainier B and then, following his recovery, back to Whitney B.

406. Estrada describes a host of lingering symptoms, including loss of smell and taste, headaches, and fatigue.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## CLASS REPRESENTATIVE 3: WILLIAM PARDUE
## ON BEHALF OF THE ESTATE OF RAEMON PARDUE,
## AND INDIVIDUALLY, BRINGING A SURVIVOR ACTION

### 1. Background and History

407.    Raemon Pardue, who died at 50, was a CTF inmate from Los Angeles who contracted Covid-19 on approximately July 30, 2020 and succumbed to the disease on August 20, 2020.

408.    William Pardue is Raemon's father and currently resides in California City, CA, a community in Kern County roughly 100 miles north of Los Angeles.

409.    William is the Plaintiff representative for Raemon's estate.  There are no other known persons that would act as a superior or more appropriate representative for Raemon's estate, and as such, William asserts claims on his own behalf as Raemon's survivor and includes a claim on behalf of Raemon's estate.

### 2. Raemon's Contraction of Covid-19

410.    Raemon, an African-American, was one of the first inmates at CTF to contract Covid-19.

411.    Pardue, in D-Block cell 203, was housed with Plaintiff Ronald Patterson. Pardue contracted Covid-19 on or about the same time as Patterson, and it is probably the case that Pardue passed the virus to Patterson, or vice-versa, and they both passed it to others.

412.    Notably, it does not appear that Pardue was ever formally diagnosed with Covid-19, even as he was dying from it.  He may not have been removed from D-Wing for a considerable period of time, perhaps 10 days or longer after his actual contraction in late July, 2020.

413.    According to Diagram 1, some seven additional inmates contracted Covid on the second floor of D-Wing, on the same side of the wing as Pardue and Patterson, in August 2020 – the highest number of infections in D-Wing in any one month, with 25% data reporting.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

414.     Second prize for most D-Wing infections throughout the pandemic goes to the third floor on the same side as Pardue and Patterson, per Diagram 1, with 6 in August.

415.     According to Patterson, Pardue, knowing he had certain health conditions that rendered him vulnerable to Covid, was careful not to expose himself to the virus.  In the period before and immediately after the raid, Pardue rarely left his cell.  He had effectively isolated himself, though Patterson notes that Pardue did use the telephone on a semi-regular basis.

416.     Nevertheless, between Brown, Pardue and Patterson, D-Wing became engulfed in cases in August 2020.  Plaintiffs have chronicled 22 in D-Wing; CDCR reports 96 at CTF for that month.

417.     Pardue and Patterson's contraction of Covid-19, along with Brown, mark the beginning of the outbreak in D-Wing that eventually infected all of Central CTF and concurrently caused infections throughout the institution (*viz.*, North), as detailed herein.

418.     Plaintiff Pardue also brings an individual survivor action, as a person who has lost the affection, companionship, relationship, and benefit of his son.

## PLAINTIFF/CLASS REPRESENTATIVE 4: SAUL PELAYO

### 1.  Background

419.     Saul Pelayo, who identifies as Mexican, was born in 1973.  He counts San Diego as home.

### 2.  Contraction of Covid-19

420.     Pelayo was a resident of "Fox Wing," generally referred to as "F-Wing," in CTF's Central Facility.  He lived on the third tier of F-Wing in cell 348U, though at other times was living in 257L.

421.     Pelayo became infected with Covid-19 on or about November 7, 2020.  He tested positive for the virus on November 15, 2020.

422.     After testing positive, Pelayo was moved into quarantine, where his health declined rapidly.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

423.    Pelayo is still dealing with lingering Covid symptoms.  He now suffers from intellectual difficulty, headaches, chest pain and breathing difficulties, along with fatigue.

## PLAINTIFF/CLASS REPRESENTATIVE 5: ADAM SANFORD

### 1.  Background and History

424.    Adam Sanford arrived at CTF about two months prior to the July 20, 2020 raid and the subsequent outbreak of Covid-19 at the institution.  At the time of the raid he was housed in G-Wing, Cell 342.

425.    The raid was racially-motivated, by targeting African Americans, and was entirely unnecessary.

### 2.  Contraction of Covid-19

426.    A resident of G-Wing, Sanford tested positive for Covid-19 on November 5, 2020.  By November 11, 2020, G-Wing had become a quarantine location.  Covid-positive inmates were left where they were, while Covid-negative inmates were moved to different locations.

427.    Sanford's cellmate, who was still testing negative, was moved out for a time and then returned to Sanford's cell on November 21, 2021.  Sanford sees this as a microcosm of CTF's larger failures, in that his cellmate – Daitwon Futrell – was almost certainly positive at the time of his removal (having lived with a positive Adam Sanford for an extended period of time).  Futrell likely passed the virus on following his temporary transfer.  Sanford observes that these sorts of decisions were effective to spread Covid-19 to every part of CTF.

428.    In essence, according to Sanford, the very measures taken to putatively prevent the spread of Covid-19 through CTF, including a constant shuffling of inmates, worked to spread the virus and intensify the crisis.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## PLAINTIFF/CLASS REPRESENTATIVE 6: ROBERT CLARK

### 1. Background and History

429.    Robert Clark is a 58-year-old African-American former prisoner.  He was released and now lives in the Los Angeles area.

### 2. Administrative Exhaustion

430.    Clark completed his 602 administrative requirements by virtue of an appeal marked as Log Number 40562, and on information and belief, either timed out by CDCR constituting waiver on the agency's party or exhausted to the third level by Clark.

### 3. Contraction of Covid-19.

431.     At the time of the raid, Clark was housed in D-Wing, Cell 123.  As depicted in Diagram 1, he was just two cells across and over from Lawrence Brown.

432.    Clark was not removed out of D-Wing during the raid, but he did notice that the ones that were removed were removed without their masks on.

433.    He caught Covid-19 on or about August 7, 2020, about a week after Lawrence Brown was diagnosed, and has suffered health complications since that time.

### I. The Nighttime Attack Catalyzes a Covid-19 Epidemic Throughout the Prison, Killing 18 Inmates and Infecting 2,700 Others

434.    Prior to July 20, 2020, as confirmed by Warden Koenig himself, there were no cases of Covid-19 contraction at CTF.

435.    The first reported cases of contraction, "ground zero" of the outbreak (shown with green dots in Figure 1), occurred just days after the raid in late July in a specific wing of the prison, D-Wing, directly adjacent to where prisoners were interrogated during the raid.

436.    The shared timing and location of the interrogations and the first Covid cases creates an indisputable causal connection that identifies the raid as the source of the original infections, as shown below in **Figure 1**: *?

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**FIGURE 1**

**CTF Central July 2020 Dot Map**



437.    The interrogation rooms for the raid – sitting between D-Wing and E-Wing – were adjacent to the outbreak in D-Wing and the first cases of infection, as shown in **Figure 2**:

**FIGURE 2**

**CTF Central July 2020 Dot Map**



438.    Illuminating the strong raid-to-infection causality, one of the earliest victims, and probably "Patient Zero," Lawrence Brown (BJ5119) was housed in D-Wing and tested positive for Covid-19 approximately nine days after the raid on (or about) July 29, 2020.

439.    According to Brown, officers entered his cell in the dark without warning of any kind. He was thrown from his bed onto the cement floor and restrained violently. He protested that he was doing nothing to resist the officers, and yet he was dragged out of his cell by his feet, after which an officer knelt on his back, pressed his face into the cement, and warned him that he would be "...hurt worse if [he] didn't shut up."

440.    Brown was so traumatized in the moment that he urinated on himself. He was eventually dumped in the Chow Hall with all the other Black prisoners who had been rounded up that morning. He spent the next seven-to-eight hours tightly restrained and in significant pain.

441.    The treatment he received that morning closely parallels the treatment that most victims of the raid later described – a mixture of sadistic violence, threats and racial slurs – with officers, he says, "standing inches from my face, yelling at me to not fucking move, several times."

442.    Like so many other victims of the raid, Brown reports that members of the raiding party were wearing full riot gear. It is not clear, however, whether a riot mask offers good protection against Covid-19 transmission. The plastic is obviously impenetrable, but the mask is typically open at the bottom.

443.    Brown spent three weeks in quarantine. Yet for him, it was the raid itself, and not the Covid infection, that caused him the greatest suffering. The raid, he says, "really messed me up," and as a result of this trauma, he lost all faith in the personnel at CTF.

444.    For other inmates, however, and especially for those who were not specific targets of violence on July 20, Covid-19 did the most damage. As is shown in Figure 1, at least two other CTF inmates in D-Block, who happened to be cellmates,

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

contracted Covid-19 in the waning days of July 2020. One of this pair, Raemon Pardue, died from the disease on (or around) August 20, 2020.

445.    Neither Pardue nor his cellmate, Ronald Patterson, was a direct victim of the raid, but they witnessed it as occupants of D-Wing. Both began to experience symptoms of Covid-19 toward the end of July 2020, at roughly the same time as Lawrence Brown.

446.    As Diagram 1 indicates below, Covid-19 infections in D-Wing started in July, intensified in August, and then flattened out in subsequent months. But again, Plaintiffs only possess 25% of the infectious data at this point.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

# DIAGRAM 1

## D-WING CONTRACTIONS

July 2020   August 2020   September 2020   October 2020   November 2020

| 350 | 250 | 150 | 101 | 201 | 301 |
|---|---|---|---|---|---|
| Unknown / Unknown | Unknown / Unknown | Unknown / Unknown | Unknown / Unknown | Unknown / Unknown | Minch BH3418 / Unknown |
| **349** Unknown / Unknown | **249** Unknown / Unknown | **149** Unknown / Unknown | **102** Unknown / Unknown | **202** Valenzuela AW7455 / Unknown | **302** McClure F72185 / Jackson7 H67425 |
| **348** Unknown / Unknown | **248** Unknown / Unknown | **148** Unknown / Unknown | **103** Unknown / Unknown | **203** Pardini K97654 / Parkerson F24930 | **303** Alvarez I545093 / Unknown |
| **347** Unknown / Unknown | **247** Unknown / Unknown | **147** Unknown / Unknown | **104** Delvecung T10197 / Wilcox C00483 NIF | **204** Unknown / Unknown | **304** Unknown / Unknown |
| **346** Unknown / Unknown | **246** Unknown / Unknown | **146** Unknown / Unknown | **105** Unknown / Wilridge T43878 DEC | **205** Unknown / Unknown | **305** Unknown / Unknown |
| **345** Unknown / Unknown | **245** Unknown / Unknown | **145** Unknown / Unknown | **106** Unknown / Unknown | **206** Unknown / Unknown | **306** Unknown / Unknown |
| **344** Torres V74048 / Unknown | **244** Torres V74048 / Unknown | **144** Unknown / Unknown | **107** Unknown / Unknown | **207** DeLeon AJ6156 / Vasquez AB5466 | **307** Unknown / Unknown |
| **343** Unknown / Diaz B34449 | **243** Unknown / Unknown | **143** Unknown / Unknown | **108** Jenkins K88219 / Johnson V46926 | **208** Unknown / Unknown | **308** Unknown / Unknown |
| **342** Armenta V6789 / Romeroluna O6158 | **242** Unknown / Unknown | **142** Unknown / Unknown | **109** Unknown / Unknown | **209** King J42722 / Unknown | **309** Arrington K38723 / Cline H51406 |
| **341** Unknown / Unknown | **241** Amaya V66921 / Unknown | **141** Unknown / Unknown | **110** Unknown / Unknown | **210** Unknown / Unknown | **310** Unknown / Unknown |
| **340** Unknown / Unknown | **240** Unknown / Unknown | **140** Unknown / Unknown | **111** Unknown / Unknown | **211** Unknown / Unknown | **311** Unknown / Unknown |
| **339** Unknown / Unknown | **239** Unknown / Unknown | **139** Unknown / Unknown | **112** Unknown / Unknown | **212** Unknown / Unknown | **312** Unknown / Unknown |
| **338** Unknown / Unknown | **238** Unknown / Unknown | **138** Unknown / Unknown | **113** Dudley F7389 / Unknown | **213** Unknown / Unknown | **313** Unknown / Unknown |
| **337** Unknown / Unknown | **237** Unknown / Unknown | **137** Unknown / Unknown | **114** Unknown / Unknown | **214** Unknown / Unknown | **314** Unknown / Unknown |
| **336** Unknown / Unknown | **236** Unknown / Unknown | **136** West H63769 / Unknown | **115** Unknown / Unknown | **215** Kurby BF2935 NIF / Unknown | **315** Unknown / Unknown |
| **335** Unknown / Unknown | **235** Jackson7 H67425 NIF / Unknown | **135** Virgil B23478 / Unknown | **116** Jordan F99304 NIF / Unknown | **216** Jordan F99304 NIF / Olsen AN5454 | **316** Unknown / Unknown |
| **334** Unknown / Unknown | **234** Unknown / Unknown | **134** Unknown / Unknown | **117** Unknown / Unknown | **217** Jenkins K88219 / Rasmussen P67260 | **317** Unknown / Unknown |
| **333** Unknown / Unknown | **233** Unknown / Unknown | **133** Unknown / Unknown | **118** Unknown / Unknown | **218** McGee BL5802 NIF / Unknown | **318** Unknown / Unknown |
| **332** Gutierrez E49475 / Unknown | **232** Unknown / Unknown | **132** Unknown / Unknown | **119** Unknown / Unknown | **219** Unknown / Unknown | **319** Alvarez BJ7151 NIF / Unknown |
| **331** Unknown / Unknown | **231** Unknown / Unknown | **131** Unknown / Unknown | **120** Unknown / Unknown | **220** Unknown / Unknown | **320** Unknown / Unknown |
| **330** Unknown / Unknown | **230** Unknown / Unknown | **130** Unknown / Unknown | **121** Unknown / Unknown | **221** Unknown / Unknown | **321** Unknown / Unknown |
| **329** Unknown / Unknown | **229** Unknown / Unknown | **129** Unknown / Unknown | **122** Unknown / Unknown | **222** Peralta IX07234 / Unknown | **322** Lozova AN1797 / Unknown |
| **328** Unknown / Unknown | **228** Unknown / Unknown | **128** Unknown / Unknown | **123** Clark AP7204 / Unknown | **223** UNK / Unknown | **323** Unknown / Unknown |
| **327** Unknown / Unknown | **227** Unknown / Unknown | **127** Unknown / Unknown | **124** Unknown / Unknown | **224** Unknown / Unknown | **324** Moreno T93981 / Unknown |
| **326** Unknown / Unknown | **226** Unknown / Unknown | **126** Brown B25119 / Unknown | **125** Unknown / Unknown | **225** Unknown / Unknown | **325** Unknown / Unknown |

PAVONE & FONNER, LLP
600 WEST BROADWAY STE. 700
SAN DIEGO, CALIFORNIA 92101

447.    Regardless, shortly before the raid but more than six months into the pandemic, at a time when San Quentin already had hundreds of cases on its hands, CTF officials volitionally elected to engage in a violent, personal raid on Black prisoners, a decision that if it does not reflect a deliberate ambition to weaponize Covid-19 against the inmates, constitutes an absurdly dangerous penological decision that exceeds all boundaries of discretion, justification, and frankly, sanity.

448.    The safety considerations and protocols related to Covid that appear to have successfully guided decision-making prior to July 20, 2020 were abandoned in favor of the exact opposite approach to disease management, a sort of Rodney King meets Josef Mengele intersection of Schadenfreudian infectious malevolence.

449.    The group of commanding officers and investigators who carried out the attack on July 20, 2020 originated from different institutions and agencies. Some were members of CDCR's Office of Correctional Safety (OCS) in Sacramento, and specifically its Special Services Unit (SSU) and Gang Intelligence Operations (GIO). Others were Investigative Service Unit (ISU) members and/or Institutional Gang Investigators (IGI) based at both Soledad CTF and neighboring Salinas Valley State Prison (SVSP), as well as Pleasant Valley State Prison (PVSP).

450.    Accordingly, the correlation between the July 20, 2020 event and CTF's first cases of Covid-19 just days later is bolstered by the fact that those who carried out the raid were interlopers at a time when CTF was not receiving outside visitors.

451.    The facility was closed to regular visitors and family visitors from March 2020 onward, and although the closure order was followed by a 40-day grace period, this period expired months before the July 20, 2020 raid without a single Covid-19 case having appeared.

452.    CTF, in short, was entirely free of Covid-19 in the weeks and months leading up to the raid, and the prison's prohibition on most visitors had helped to preserve this state of affairs.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

453. Operation Akili, in effect, ended this prohibition, as it involved officers from different parts of the state who were not screened for Covid-19 prior to the event.

454. On August 1, 2020, following identification of the virus in D-Wing, that wing and two other wings, including C-Wing, went into immediate quarantine.

455. Throughout the remainder of August 2020 (represented with azure-blue dots below and again showing the cases of contraction according to Plaintiffs' best estimate of their chronological order) one can see the virus spread through D-Wing and also establish itself in E-Wing and F-Wing, as shown in **Figure 3**.

<u>**FIGURE 3**</u>
**CTF July-August 2020 Dot Map**[21]



---

[21] Plaintiffs' "dots" are not always strictly sequential because certain contraction reports did not (yet) meet our corroboration guidelines for inclusion.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

456.    A blow-up of the affected area (Figure 4, below) offers a clearer picture of just how quickly the virus made its way into E-Wing and F-Wing during the month of August.

## FIGURE 4
### CTF Central July-August 2020 Dot Map



457.    After the initial outbreak, officials embarked on a program of testing and quarantining inmates in a putative effort to contain the virus, and perhaps as a result, the spread receded in September 2020.

458.    During September 2020, Plaintiffs' current data run (currently at 25% reporting) shows six infections in D-Wing, in royal blue, as depicted in **Figure 5**.

## FIGURE 5
### CTF Central July-Sep 2020 Dot Map



PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

459.  In October 2020, the virus started to spread again, in the same south-east corner of CTF's Central Facility, by going from the D-E-F Wing area into B-Wing, C-Wing, and G-Wing, as shown with additional yellow dots in **Figure 6**, below.

### FIGURE 6
### CTF Central July-Oct 2020 Dot Map



460.  Notably, there are two October cases in Lassen Hall in CTF's North Facility; given the lack of proximity to D-Wing, these could possibly originate from a second source.

461.  While it is possible that a third case in Soledad North, in Whitney B, was from an independent source, its location fairly close to F-Wing suggests its appearance is more likely correlated with the continuing outbreak in Central, which by that time was radiating outward from D-Wing and E-Wing and causing large numbers of infections in other areas of CTF.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

462.    Through July, August, and September of 2020, it seemed as though CTF North might be spared the infectious misery afflicting Central.  There were no confirmed cases of Covid-19 in this half of the prison (based on the current data in Plaintiffs' possession) through September 2020.  In October 2020, according to Plaintiffs' current data, there were, again, only three cases in CTF North.

463.    Some prisoners in North have reported that as early as the spring of 2020 they were being moved and/or isolated, temporarily, as part of a Covid-oriented response by authorities.  Inmate William Lynn, for example, in the North Facility, claims that he was quarantined as early as May 7, 2020, close to three months before CTF identified its first case of Covid-19 in late July 2020.

464.    Despite such precautionary moves, however, the evidence at this point suggests that no one in North Facility actually tested positive for Covid-19 until October 2020.

465.    In October and November 2020 colder weather settled into the Bay Area, resulting in more sustained indoor contact between prisoners and creating conditions more amenable to the rapid transmission of a respiratory virus.  As a result, Covid-19 exploded throughout the prison (shown by red dots for November), generally radiating from the right, bottom corner section of the prison (south-east, geographically speaking) to the entire facility as shown below in **Figure 7**.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## **FIGURE 7**

### **CTF Central and North July-Nov 2020 Dot Map**



466.   Thus, in early November, CTF North's A-Yard, bounded in part by Lassen Hall (A and B) and Rainier Hall (A and B), began to see significant numbers of Covid cases.

467.   In B-Yard, which is bounded by Whitney Hall (A and B) and Shasta Hall (A and B) and thus effectively mirrors the layout of A-Yard, there were also many cases.

468.   In A-Yard, in terms of causation, it is most probable that the two October cases caused the November cases. It is plausible that these two October cases originated from the spread in D-Wing but it is also plausible that there was a second source in North.

469.   Similarly, in B-Yard, it is probable that the October case caused Whitney's spread in November and beyond, and it is plausible that the October case

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

1  originated from the spread in D-Wing, while it is equally plausible that the October case

2  originated from a second source.

3          470.    The explosion of cases in CTF North continued through December 2020,

4  shown below in **Figure 8**, with orange dots:

### **FIGURE 8**

### **CTF Central and North July-Dec 2020 Dot Map**



21

22          471.    Plaintiffs have documented approximately 700 cases, about 25% of CTF's

23  official Covid-19 statistics claiming over 2,700 cases.  Accordingly, there is

24  significantly more data to account for.

25          472.    Nevertheless, by January 2021 and in the months following, the pandemic

26  slowed significantly.  Plaintiffs have documented about 40 cases at CTF Soledad, while

27  CDCR reports 360.  There were clusters of Covid in Shasta Hall in January and

28

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

February 2021, additional cases in Rainier and a scattering of individual cases elsewhere.

473.    All told, from a single cluster of infections beginning just after the July 20, 2020 raid, Covid-19 spread throughout CTF Central, and plausibly spread to CTF North, ultimately claiming the lives of 18 inmates and infecting over 2,700 inmates.

474.    However, as detailed below, it is not unreasonable to calculate, based on statistics, that approximately 1,150 of these 2,700 cases would have occurred either way: (75 in Central and 1,067 in North = 1,142, non-Akili).

475.    In short, and by analogy, CTF prison officials intentionally started a forest fire.  They directly murdered between 1-18 inmates as a result and caused a lot of damage to others.  However, it is also true that a fire probably would have started at some point at CTF, either way, and injured a bit less than half of the total victims.

476.    In terms of liability for intentional torts, it matters not that other causes would have contributed.  Arsonists are liable for the entire fire they start, even ones with concurrent or multiple causes creating injuries suffered by victims during the process.

477.    That said, in terms of reasonable damage metrics, and reasonable litigation positions, Plaintiffs make room for the reality that legal responsibility should probably be proportionate to the direct harm caused.  Natural causes possibly account for a substantial portion of the fire damage, less than half (about 42%), given the total number of cases at CTF Soledad.

### J.  Causation Analysis

478.    For purposes of establishing causation, and assuming CDCR's Covid statistics are accurate, the spread of Covid-19 at CTF is best described as two related events: *(i)* an initial ignition with radiating spread that originated in D-Wing beginning on July 20, 2020 and continued through November 4, 2020, which caused about 250 cases in Central; and then *(ii)*, an explosion of 107 diagnosed cases beginning on November 5, 2020 that promoted spread throughout the prison until March 15, 2021 and

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

caused another 2,450 cases (250 more in Central and 2,200 in North), at which point the Covid-19 epidemic at CTF fizzled out.

479.    In the initial July 20-November 4, 2020 window, Operation Akili is almost certainly the exclusive cause of the 250 Covid-19 infections in Central, as established by the (H)(1) analysis below.

480.    In the November 5, 2020 – March 15, 2021 explosion window, Akili is most likely a concurrent (49%) – and therefore not exclusive – cause of the 2,200 infections in CTF North beginning November 5, 2020, per the (H)(2) observations.  For intentional tort purposes, a concurrent cause is a 100% legal cause.

> ### 1.    Operation Akili is the Sole Source of the 250 Covid-19 Infections at Central CTF through November 4, 2020.

481.    Using CDCR's own count, Table 5 (below), summarizes the number of diagnosed infections at CTF between March 2020 and March 2021 (by month):

| TABLE 5 | |
|---|---|
| **Month/yr** | **Cases** |
| March 2020 | 0 |
| April 2020 | 0 |
| May 2020 | 0 |
| June 2020 | 0 |
| July 2020 | 4 |
| August 2020 | 96 |
| September 2020 | 42 |
| October 2020 | 104 |
| November 2020 | 653 |
| December 2020 | 1452 |
| January 2021 | 360 |
| February 2021 | 13 |
| March 2021 | 3 |
| **Total** | **2,724** |

482.    From January 1, 2020 through July 19, 2020, there were no reported infections of Covid-19 at CTF.

483.   The total number of reported infections by CDCR from July 20, 2020 to November 4, 2020 is 261.  Plaintiffs identify 3 of those in CTF North but with only 1/4 of the data.  For estimation purposes, Plaintiffs assess that there were about 250 cases in Central and 11 in CTF North.

484.   The number of infections reported by CDCR from November 5, 2020 to March 31, 2021 is 2,463.

485.   As to the cause of the estimated 250 initial infections in Central, there are four dynamics/factors that lead one to conclude that Operation Akili is probably their exclusive source.

### a. The Timing of the First Infections Corresponds to the Raid.

486.   *First,* in March 2020 CTF effectively banned all regular and family visitors to the facility, though a 40-day grace period meant that CTF was still receiving some outside visitors until about April 8, 2020.

487.   After that, no visitors of any type were permitted.  This policy remained in place until the end of the year, and as of July 20, 2020, it had helped CTF to maintain its status as an institution entirely free of Covid-19.

488.   On July 29, 2020 – nine days after the raid – the first cases at CTF were diagnosed, one of which resulted from an inmate, Lawrence Brown, being spit on by a D-Wing extraction guard on July 20, 2020.

489.   By its nature, the raid introduced prison officials from across the state of California into an environment that had closed itself off to most outside visitors.  These individuals introduced a foreign element into CTF.

490.   There is no other viable alternative explanation for the first cases of Covid at CTF appearing in late July 2020, given the known lack of cases immediately before the raid, the timing of the initial infections, and the close contact between extraction officers and inmates during Operation Akili.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

### b.  No Credible Second/Independent Source Reporting.

491.    ***Second***, there is no reporting about a second source, independent of the raid, to account for the infections in Central through November 4, 2020.  There is no other "super-spreader" event, no specific infected guard or employee identified as a second source, and within CDCR's daily reports, there is no indication of a reportable event to compete with Operation Akili.

492.    Covid-19 radiated out from its origin point in D-Wing much like a rock dropped in a pond, rippling through Central and reaching the shores of North CTF in the manner one would have expected.

### c.  The Lack of Any Gap Between Infections.

493.    ***Third***, based on the data Plaintiffs have accumulated, there is no material gap between infections.  If Operation Akili started a Covid cluster from a single origin point and this cluster then fizzled out (for example, by August 31, 2020), there is a good chance there would be a gap between the last Operation Akili infection and the infections traceable to the new, second source.

494.    However, a pictorial review showing the number of days between infections in this window tells us that there is no significant gap, certainly none that is longer than the outside incubation period of about 10 days, as depicted in **Graph 1**.

495.    Moreover, this lack of a gap is based on only 25% of the data; with a complete picture of all the contraction dates, there would most likely be even shorter gaps.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## **GRAPH 1**

## **NUMBER OF DAYS OF GAP BETWEEN INFECTIONS**

### (JULY 20, 2020 - NOVEMBER 4, 2020) (with 20% of Data)



PAVONE & FONNER, LLP
600 WEST BROADWAY STE. 700
SAN DIEGO, CALIFORNIA 92101

### d. A Single Source Can Easily Account for All Central Infections.

496. **_Fourth_**, the World Health Organization (WHO) estimated Covid R-naught outside of custody to be between 1-4 and 2.4.

497. A 2020 study calculating the reproductive rate, or R-naught, of Covid-19 inside a custodial setting settled upon a figure of 8.44.[22]

498. The New York Times reported Covid data for California as of April 2021. That data included a report that 9/100 residents of California caught the disease within this state, while 42/100 caught Covid while in custody in California.

499. The above data indicates that conditions of confinement place prisoners at about 4.5 times greater risk of contracting Covid-19 than the regular population.

500. This high multiple also informs us, with an R-naught around 8, that the disease is extremely contagious to individuals who live in close quarters.

501. Given the uber-contagiousness of Covid-19 in custody, it is not surprising that a single infection on July 20, 2020 multiplied and spread to cause several hundred infections within three months.

502. In other words, a second, independent source of infection was certainly not necessary to produce an outbreak of this size.

503. Frankly, the number of Covid-19 infections from the single source of the raid would have been much higher given an estimated R-naught of 8.44, but on August 1, 2020, CTF officials placed B-Wing, C-Wing and D-Wing on quarantine, thereby suppressing the accelerated spread of Covid in a custodial setting.

504. Notably, officials did not put E-, F- and G-Wing on quarantine and this perhaps explains why the virus spread from D-Wing to these areas more aggressively, as shown in **Figure 6**.

505. Consequently, given:

---

[22] Puglisi, _et al_., "_Estimation of COVID-19 basic reproduction ratio in a large urban jail in the United States_," Annals of Epidemiology 53 (2021) 103-105.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

*(i)*    the zero-free Covid environment before the raid and the Covid ignition promptly after it;

*(ii)*    the lack of any alternate second source reporting event;

*(iii)*    the lack of any gap between infections; and

*(iv)*    the powerful ability of Covid-19 to spread quickly in a custodial setting,

Plaintiffs believe and thereon allege that Operation Akili exclusively caused all of the estimated 250 infections at CTF Central from July 20, 2020 to November 4, 2020.

### 2.    The Raid is Either the Exclusive or a Concurrent Cause as to the 2,500 Additional Covid-19 Cases as of November 5, 2020.

506.    **Figures 6-7** depict how cases in October 2020 started to appear in CTF North and then increased dramatically in November 2020.  The question for causation purposes is whether the spread into CTF North was a product of Akili, a product of other causes, or the confluence of both.

### a.    The Porous Barrier Between CTF Central and CTF North Suggests that the Virus Spread from D-Wing, Through Central, and then Moved from Central to North.

507.    Although CTF Central and CTF North are in many ways independent from each other – and house different classes of prisoners – witness testimony establishes that the barrier between the two was porous in terms of human traffic that might allow Covid-19 to jump from one facility to the other.

508.    Both staff and a smaller number of inmates moved regularly between Central and North for a variety of reasons, including their work detail.

509.    As related by an inmate witness, Derek Martinez:

> The only reason I believe we got any outbreak was because of the lack of mask wearing by staff that was shuffled between yards (from a day shift in C-yard to night shift here [in North] by same c/o's) to the lack of separation of medical staff to the separate yards.  The same medical staff that'd be exposed to corona in C-yard

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

would then be asked to work here in the same day.  That by itself would expose this population to covid.  The same happened for sure in the kitchen where I was working.  Staff that worked in central (C-yard) would come up and do a shift here.  Then they would take down their masks in the office for half their shift (way over the ~8 ~ 15 min. exposure limit) talk/eat in confined quarters.  They would talk to us with masks down, and way closer than the 6 foot distance requirement.

When kitchen staff did test positive a few times, they did not test the workers and kept it under wraps that anyone did test positive or later called it a false positive, even though they would quarantine that staff for the 2 week quarantine period. …

Or what happened to a few friends, they would get a false positive with no follow-up test to see if it was a false positive and that resulted in them getting moved to the dorm (which was a designated quarantine zone).  The dorm mind you was an open-aired no separation area where if you didn't have covid before going there you were sure to get infected once there as happened to those with false positives that were sent there.  Once the dorm was filled up the staff made a tent city on both c-yard and here at north yard.  Overflow of positives were then sent to those areas as well as parts of some of the buildings (Whitney b at B-yard and Ranier b on A-yard).  …

510.    Given this testimony, which incidentally Martinez signed under oath, it is reasonable to infer that Covid spread from CTF Central to North via prison officials' decision to actively move people back and forth between Central and North during the epidemic.

### b.    The Disproportionate Magnitude of CTF North's Covid Experience Relative to CDCR's Average Reporting Suggests that Operation Akili Is Equally Responsible for North's Cases.

511.    On November 5, 2020, CDCR reported 107 diagnosed infections in one day at CTF.  Given a reported 261 cases total from July 20, 2020 to November 4, 2020 –

PAVONE & FONNER, LLP
660 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

1  an average of just 2.4 new cases per day – the virus blasted off to 44 cases/day on

2  November 5, 2020, with lower multiples (but still many more cases than before) through

3  the winter of 2020.

4      512.   At the end of November 2020, CTF reported 653 cases for that month and

5  then 1,452 infections for December 2020.

6      513.   From January 1, 2020 to the end of the class window on March 15, 2021,

7  there were about 375 cases at CTF.

8      514.   From November 5, 2020 to the end of the epidemic in March 2021, CTF

9  reported a total of 2,463 cases, as reported in **Table 5**.

10     515.   In general, the colder weather in November significantly improved the

11  conditions for ignition of Covid, through a combination of a greater concentration of

12  inmates in confined spaces for longer periods of time (viz., more inmates being indoors),

13  and the fact that colder weather tends to exacerbate symptoms of respiratory illness,

14  coughing in particular.

15     516.   A study of CDCR's Covid-19 statistics for 32 other prisons (for which

16  Plaintiffs possess both 2020 population and Covid-19 data) indicates that there were

17  21,285 infections for a prison population of 83,686 (excluding CTF) during the period

18  November 5, 2020 – December 31, 2020, as shown below in **Table 6**.

| TABLE 6 CDCR COVID CASES - 2020 | | | | | |
|------|--------|------|--------|----------|-------|
| NO. | PRISON | POP. | 11/4/20 | 12/31/20 | DIFF. |
| 1. | ASP | 3286 | 2948 | 3110 | 162 |
| 2. | CAL | 2916 | 26 | 746 | 720 |
| 3. | CCC | 2099 | 667 | 1240 | 573 |
| 4. | CCI | 2929 | 857 | 1243 | 386 |
| 5. | CEN | 3080 | 75 | 512 | 437 |
| 6. | CHCF | 2379 | 10 | 441 | 431 |

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| | TABLE 6 CDCR COVID CASES - 2020 | | | | |
|---|---|---|---|---|---|
| NO. | PRISON | POP. | 11/4/20 | 12/31/20 | DIFF. |
| 7. | CIM | 1956 | 1435 | 1530 | 95 |
| 8. | CMC | 3023 | 302 | 1150 | 848 |
| 9. | CMF | 1963 | 8 | 448 | 440 |
| 10. | COR | 2917 | 363 | 715 | 352 |
| 11. | CRC | 1976 | 1665 | 1911 | 246 |
| 12. | CTF | 4200 | 261 | 2351 | 2090 |
| 13. | CVSP | 1855 | 1614 | 1798 | 184 |
| 14. | DVI | 1258 | 0 | 145 | 145 |
| 15. | FOL | 2011 | 1347 | 1360 | 13 |
| 16. | HDSP | 3295 | 5 | 1929 | 1924 |
| 17. | ISP | 2741 | 114 | 869 | 755 |
| 18. | KVSP | 3629 | 16 | 823 | 807 |
| 19. | LAC | 2680 | 198 | 1412 | 1214 |
| 20. | MCSP | 3850 | 45 | 1494 | 1449 |
| 21. | NKSP | 2306 | 86 | 656 | 570 |
| 22. | PBSP | 2191 | 3 | 194 | 191 |
| 23. | PVSP | 2743 | 30 | 1976 | 1946 |
| 24. | RJD | 3514 | 3 | 940 | 937 |
| 25. | SAC | 2233 | 12 | 234 | 222 |
| 26. | SATF | 4321 | 862 | 2992 | 2130 |
| 27. | SCC | 2865 | 18 | 1124 | 1106 |
| 28. | SOL | 3165 | 4 | 660 | 656 |
| 29. | SQ | 2614 | 2239 | 2245 | 6 |
| 30. | SVSP | 2885 | 129 | 414 | 285 |
| 31. | VSP | 2661 | 313 | 1481 | 1168 |
| 32. | WSP | 2345 | 295 | 1182 | 887 |
| 33. | Total | 87,886 | | | 23375 |
| 34. | Exc. CTF | 83,686 | | | 21,285 |

517.   Consequently, all other things being equal, the chances of a given inmate contracting Covid-19 while in prison at CDCR (not including CTF) during the period 11/5/20-12/31/20 was 25.4% (21,285/83,686).

518.   Applying that percentage to CTF, without the impact of Operation Akili, and again emphasizing the assumption of all other things being equal, the remaining

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

4,200 inmates at CTF (separating out the roughly 600 inmates in D-Wing and E-Wing who had already been ravaged by Covid-19 prior to November 4, 2020) would have experienced approximately 1,067 additional, naturally-occurring infections (based on the law of averages – 4,200 x 25.4%).

519.  CTF, however, reported 2,090 infections from November 5, 2020 to December 31, 2020 – roughly double (1.95x or 1,023 cases) the number that otherwise would have occurred without the raid (just 1,067 additional cases).

520.  Given this data, and again speaking as a matter of averages, it appears on a statistical basis that Operation Akili was responsible for at least 49% of the Covid-19 cases at CTF during this November-December 2020 window (1,023/2,090).  The other 51% (1,067/2,090) of infections might be attributable to the naturally higher risk of contracting Covid-19 from being in CDCR's custodial environment in November-December 2020.

521.  Like an arsonist who starts a forest fire and keeps it going until it finally explodes, Operation Akili effectively created a situation in which there were a dozen or so still-burning areas (active Covid cases) in Central as the incendiary conditions of early November approached.

522.  We know there was no firewall between Central and North in terms of restricted traffic between the two facilities; indeed, based on witness testimony, a case can be made that the opposite was true.

523.  For purposes of pleading a case of causation that plausibly suggests CDCR officials' responsibility for under *Iqbal/Twombly* standards for all 2,463 cases beginning on November 5, 2020, that testimony and the math show that Operation Akili was at least an equal (49%) cause of those cases, relative to other forces.

524.  As an intentional tort providing an equally potent causative mechanism as other forces, Akili is therefore clearly the legal cause of all 2,724 cases, encompassing both Central and North, from July 20, 2020 to March 15, 2021, in the same way that two

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

arsonists are both liable for all the damage of a forest fire, or, two persons that both stab an inmate to death are both liable for his murder.

## CLASS ACTION ALLEGATIONS

### A. Class Action Allegations

525.    This cause of action is brought as a class action and may properly be so maintained pursuant to the provisions of Federal Rule of Civil Procedure 23.  Class representatives William Milton, Vickter Estrada, William Pardue, Saul Pelayo, Adam Sanford, and Robert Clark bring this cause of action on behalf of themselves and all CTF inmates who ultimately contracted Covid-19 from July 20, 2020 through March 15, 2021.  This class is reported to consist of approximately 2,743 inmates.

### 1. Class Definition

526.    A class should be defined precisely and unambiguously, should be sufficiently definite so that it is administratively feasible to determine whether a particular individual is a member of the proposed class, and must not be defined so broadly as to include a great number of members who could not have been harmed by the defendant's allegedly unlawful conduct.

527.    The class is defined as all inmates housed at CTF Soledad that contracted Covid-19 from July 20, 2020 to March 15, 2021.

### 2. Ascertainable Class

528.    The class is ascertainable because CTF is required by state law to carefully track and report all instances of contraction of serious diseases to state health authorities.  Consequently, CDCR possesses exact information as to who caught Covid-19, and when, as to all persons in its custody.  Without any assistance from official channels, Plaintiffs have identified over 700 class members.

### 3. Numerosity

529.    Rule 23(a)(1) requires the plaintiff to show that "the class is so numerous that joinder of all members is impracticable."

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

530.   The class as identified, composed of approximately 2,700 inmates that caught Covid-19 in the designated window, is too numerous to make individual litigation practical or feasible.

### 4. Commonality

531.   Rule 23(a)(2) requires the plaintiff to show that there are questions of law or fact common to the class.

532.   Members of the class share numerous common questions of fact and law pertaining to the manner, method, and pathway of their contraction of Covid-19. Numerous issues relating to a true and accurate understanding of CTF's Covid-19 epidemic are common to the class.  These include:

(a)   Whether there were any documented Covid-19 infections before July 20, 2020 that could otherwise possibly interrupt causation between the raid and the epidemic;

(b)   the safety precautions in place to prevent the introduction of Covid-19 into the CTF prison population before July 20, 2020;

(d)   the impetus, details, plan, agreements, and coordinated action anticipated by Operation Akili;

(d)   pursuant to Operation Akili, whether CDCR rounded up approximately 100 Black inmates in Central Dining Hall #1 in close proximity during a global pandemic, required them to remove their clothes and packed them together without appropriate Covid-19 safety protocols, all of which would create the requisite viral conditions to trigger a super-spreader event.

(e)   the identity of the defendant actors involved in Operation Akili;

(f)   the chain of authority that permitted and/or encouraged the quantum of racial invective observed during the raid, in other words, did CTF guards announce that infecting the prisoners with Covid-19 was a purpose of Operation Akili and did they plan the operation to achieve that outcome?

(g)   the safety precautions, if any (or the opposite) contemplated, expected and executed during Operation Akili with respect to containing the spread of Covid-19;

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

(h)   the exact etiology of the CTF Covid-19 viral epidemic and any secondary causes;

(i)   the details surrounding the abandonment of the pre-raid safety precautions that permitted the July 20, 2020 raid to initiate a spread of the virus;

(j)   various policy decisions after the raid to contain, quarantine or minimize the spread of Covid-19 – or their abandonment;

(l)   whether the July 20, 2020 raid in fact a "super-spreader" event such that it actually and proximately caused all 2,743 reported Covid-19 infections (and 19 reported deaths) at CTF from July 20, 2020 to March 15, 2021 (or some more limited number if causation was interrupted), even if each individual case of contraction might have had its own specific viral journey among the inmate population;

(m)   the typical experience of a person that is infected and nevertheless survives Covid-19, which was the vast majority of the class;

(n)   the types, forms and extent of damages of surviving members of the class; and

(o)   whether Plaintiffs and class members are entitled to an award of reasonable attorneys' fees, prejudgment interest, and/or costs of suit.

### 5. Typicality

533.   Rule 23(a)(3) requires the plaintiff to show that the claims or defenses of the representative parties are typical of the claims or defenses of the class.

534.   The class plaintiffs are representative of the larger class. Each of them was housed at CTF and contracted Covid-19 in the designated window. There is no reason to think the class representatives' claims are markedly different from the remaining class members. Each plaintiff contracted Covid-19 in the designated window at CTF as a result of Defendants' original decision to introduce Covid-19 to CTF through Operation Akili, originating in D-Wing and spreading through Central CTF and then jumping from Central to North, as reflected in Figures 1-8.

535.   Each class representative alleges that he caught Covid-19 as the product of Defendants' original tort of conducting a conspiratorial super-spreader disease event

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

on July 20, 2020.  Figures 1-8 presented above indicate that the raid was indeed the source that spread the virus throughout the prison and thus is the presumptive causal mechanism for all members of the class.

536.    Each class representative alleges that Defendants originally targeted African-Americans in Operation Akili, that the raid was motivated by racial animus, and that Defendants maximized, rather than minimized, the chance of infecting such African-Americans, and did so successfully during the extraction and interrogation process in D-Wing, as depicted in Figures 1-8, and radiating out from there.  Plaintiffs have no reason to believe that members of the class would view the situation in any materially different way.

537.    Each class representative alleges that as a result of the July 20, 2020 raid, he ultimately contracted Covid-19, although the exact path of transmission of the virus necessarily varies between Plaintiffs, as it would for the spread of any disease.  Plaintiffs have no reason to believe that members of the class would view the situation any differently.

538.    Plaintiffs are unaware of any conflicting elements between the class representatives and the larger class: each has every incentive to establish that his contraction originated from the same original, assaultive, illegal and intentional raid on July 20, 2020, known as Operation Akili, while all make room for individual variation in the exact path that the virus took from the raid to reach him.

539.    Apart from the connection of the July 20, 2020 raid to the subsequent spike in infections, and apart from the racism expressed by guards deliberately intending that result, perceptions of the event specific to Covid-19 are similar and consistent, among both class representatives and class members.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## TABLE 7

| | TABLE 7 – COVID-19 ACCOUNTS | |
|---|---|---|
| **No.** | **WITNESS** | **EVIDENCE** |
| 1 | Shelton Adams | All of the assailants had their names concealed and they were unmasked.  I was forced to remain naked in front of everyone.  We were forced to violate social distancing protocols.  In fact, the assailants were telling us we (Blacks) will have Covid-19 by the time this order was over.<br><br>Adams contracted Covid-19 on or about November 18, 2020. |
| 2 | Fred Brinkley | While being escorted to the Dining Hall, I observed many other prison officials did not have any face masks on. … I asked C/O Y. Martinez, can I get some clothing and why were his colleagues not wearing masks and he responded by saying, 'I'm not get shit for you niggers, we don't care about COVID' … I was putting in plastic zip tie hand restraints, denied to be allowed to put my mask on.  The officers escorted me to the Facility Dinning [sic] Room area … The officers also denied prisoners to practice social distancing and deliberately mixed prisoners with prisoners in other housing units all of which violated COVID-19 health orders … In the Dining Room there were also approximately 150 prisoners in restraints and did not have masks on to cover our faces.  There were also officers who did not have name tags on their uniforms that were not wearing any face covering and their mask was around their neck … Officers were coughing … and not wearing a mask and the prisoners in the dining room area in an up roar begin yelling telling the officers to put on a mask.  The officers ignored us … the raid infected inmates with Covid-19, which is now rapidly spreading in Soledad … I and the others were detained in the dining hall for several hours while our cells were ransacked by staff.  Days later, some of the same inmates contracted Covid-19 … They dragged us all...to the dining hall in the dark with no shoes, clothes, mandated face mask (just the underwear we were sleep in), and placed at the dining hall tables four to a table in several rows next to each other.  Though [it was] dark, I could easily discern from reflecting lights that none of the staff had facial mask on their faces.<br><br>Brinkley was diagnosed with Covid-19 on or about November 5, |

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| No. | WITNESS | EVIDENCE |
|---|---|---|
| | **TABLE 7 – COVID-19 ACCOUNTS** | |

| No. | WITNESS | EVIDENCE |
|---|---|---|
| | | 2020. |
| 3 | Anthony Copeland | They continued to show me no concern, dragging me and pulling me out of my bed without allowing me to put on any clothes or my shoes or my mask to protect me from COVID-19.  I tried explaining to the officers that I have diabetes and have foot pain and I need my shoes.  Once again, the officer showed no concern about my medical condition, and continued to pull on me walking down the hallway towards the dining hall, putting me in the dining with about a hundred other inmates with no mask on. |
| 4 | Christopher Cox | I was stripped naked and crowded with other Black inmates without masks. |
| 5 | Dameon Oliver | On July 20, 2020, at 3:00 AM I was awakened by some CTF guard …pulling me out aggressively brutally from my ankles … without my Covid 19 face mask … the CTF guards violated my Covid 19 constitutional rights: They wore no mask.  all the blacks were crowded up in the dining hall bunched up 3 feet or less apart. |
| 6 | Berlan Dicey | I hurried up the corridor into the dining hall where I saw 80 to 100 black men, no mask, crammed at the tables. |
| 7 | Vickter Estrada (Representative) | Estrada caught Covid-19 on approximately December 24, 2020.  He was housed at Rainier B in Soledad North, Cell 218.  His infection lasted approximately three weeks, from December 24, 2020 to January 13, 2021, and he suffers from loss of smell, taste, from headaches and fatigue. |
| 8 | Rahsaan Fitzgerald | I was walked to the dining hall maskless and seated around other Blacks who also were maskless … there's a mandatory mask wearing policy here at Soledad.  I was not allowed to put my protective face mask on.  I was escorted to the dining hall & seated around 100 or more Black Inmates wearing no mask.  There were numerous officers coughing.  My well-being was compromised by these officers' negligence. |
| 9 | Daitwon Futrell | Since the raid of July 20, 2020, about a week later this prison had its first outbreak … I was transferred here CTF from LAC (Los Angeles County) state prison.  Now at LAC there was a very minimal amount of cases there.  The prisons know what other prisons have, a high or low [number] of cases.  There are also certain criterions that you must have to be transferred to this prison. |

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| No. | WITNESS | EVIDENCE |
|---|---|---|
| TABLE 7 – COVID-19 ACCOUNTS | | |

| No. | WITNESS | EVIDENCE |
|---|---|---|
| | | a few of which are EOP, ASU, SHU or a lifer. I have none of this and was still transferred to this prison.<br><br>This prison was still opened for transfers knowing of its outbreak. According to Sgt. Gonzalez this prison CTF (Central Training Facility) is not supposed to be accepting any inmates. I've been here since Oct 7, 2020 and have seen multiple wings get quarantined because of the virus.<br><br>On Nov 7, 2020, the wing I was in (G-wing) had 70+ cases. They tested us on Nov 5th and got the results Nov 8th. Now on Nov 9th the CO's in the wing that day told my cellie at the time that he was positive. Then they told me that I was going to move to a different wing. For whatever reason I did not move that night. So the next morning I packed up my property and pushed it outside the cell. They told me to go back inside the cell but I refused to go back in the cell. The cause of my refusal is because I was not going to stay in the cell with someone that tested positive for the Covid-19 virus.<br><br>Therefore I would be receiving an RVR (rule violation) for not going back in the cell with him. I don't believe I should be punished for being in charge of my life and health. This just shows their negligence for our health and safety. Also on Nov 10th this prison has exploded in cases of the corona virus. The last I heard this prison CTF has over 200 positive cases. Which proves that this prison since July does not have control of this deadly virus. |
| 10 | Bernard Harris | I was dragged out the cell … and escorted to the Dining Hall, without any shirt face mask or tennis shoe … while being escorted to the Dining Hall, I observed that the escorting officers and other agents did not have any face masks on. When I asked why were we not seated six feet apart, I was told by the escorting officer, "Black Lives Don't Matter to Them!" |
| 11 | Mark Harris | [O]n 7/20/20, in the morning me and about one hundred to two hundred African inmate here at Central facility, Soledad state prison were [extracted] and placed in handcuffs and marched to central facility dining hall in nothing but under-wear, no shoes, socks, and no face mask to protect me from getting sick from covd-19. This act was dangerous … |

| No. | WITNESS | EVIDENCE |
|-----|---------|----------|
| | **TABLE 7 – COVID-19 ACCOUNTS** | |
| 12 | Louis Johnson | [W]hat's funny is, two weeks prior to this raid, no inmates tested positive for the coronavirus, and two week after the raid, the prison became overwhelmed with corona virus. As of yesterday, the administration locked down the whole prison, claiming 161 inmates tested positive, but … it's much more than that here now, and they not giving us anything outside our cells, such as showers, canteen, packages, phone calls, or any other program. But yet, they allow inmates to cell feed us, and all the inmates that they say are positive, they are putting them in one big gym all together for 14 days, then allowing the inmates to go back to general population and continue to cell feed the whole population. So yes, CTF is intentionally spreading the Covid-19 virus throughout this prison, and they are still conducting transfers from one prison to another, and forcing inmates to accept cellmates from other prisons. If an inmate refuses a cellie, he's then written up a rule violation and punished, sometimes even placed in the hole. |
| 13 | Antoine Keil | When I was in the chow hall they told us we were going to get Covid-19. They had their names covered and was not wearing facemasks. They kept calling us niggers, motherfuckers, and assholes … the officers didn't have facemasks on and they had their name tags covered. They told us that us niggas were infected now. |
| 14 | Gary Lawless | They told us to shut the fuck up and we were not allowed to put our masks on. When we were in the kitchen after being kicked in the nuts and drug down the stairs, we have Covid now … I had no shoes or mask on as I was dragged down the stairs in my boxer briefs. I asked for my mask and was told I don't need it, everyone [is going to] catch coronavirus anyway. |
| 15 | Michael McCurty | While being escorted to the Dining Hall, I observed that none of the escorting officers and other agents [had] any face coverings or mask on (Going against COVID-19 directive orders) … I was pulled out of the cell … without any shirt, face mask or shoes. I was held in the Dining Hall for almost 5 hours with over 100 other black inmates. |
| 16 | Troy Mendenhall | I was singled out because of my race, assaulted and potentially exposed to Covid-19, precluded from wearing a mask among 100 |

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| No. | WITNESS | EVIDENCE |
|---|---|---|
| | | **TABLE 7 – COVID-19 ACCOUNTS** |
| | | other prisoners. |
| 17 | William Milton (Representative) | On July 20, 2020, at approximately 0300 hours, I was awoken by loud rumbling, shouting, and keys jingling as prison staff ran into and<br>through X-Wing (running up the stairs). My assigned cell in X-Wing during the time in question was 137 (lower bunk). Cell 137 is the very first cell to the right upon entering the building.<br><br>I stood at the cell door trying to determine what was going on. I heard the prison staff go in to a cell to the right of my position. I recognized Prisoner Brownlee's voice (Terrance Brownlee, COCRI C20389). He was screaming as though he was in a lot of pain.<br><br>Brownlee·s screams got louder. I heard one of the prison staff shout "Shut the fuck up!" About a second or two later, I saw the prison<br>staff drag Brownlee by his arm and hair between two tables that is directly in front of his cell (135) a..~d hurried him out the building. One staff member had Brownlee by his arm (Brownlee was cuffed behind his back), and the other was pulling Brownlee by his hair.<br><br>Approximately ten seconds later, I heard loud bumping coming down the stairs as though someone was dragging something heavy. I saw a prison guard dragging Prisoner Adams (Shelton Adams, CDCR# J94864) by his head near cells 105 and 106, i.e., the prison guard had Adams in a headlock.<br><br>The prison guard attempted to drag Adams in said headlock position between the two rows of tables that are positioned directly in front of my cell, but decided to drag Adams toward the right side of the tables positioned directly in front of cells 101 to 105 (east side of the building). The two rows of tables consist of six tables - two rows of<br>three tables positioned parallel directly in front of cells 137 to 134 (west side of building) and 101 to 105 (east side of the building).'Ihe<br>space in between the two rows is very narrow. |

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| No. | WITNESS | EVIDENCE |
|-----|---------|----------|
| \multicolumn — TABLE 7 – COVID-19 ACCOUNTS |||

| No. | WITNESS | EVIDENCE |
|-----|---------|----------|
|  |  | The prison guard had Adams in a headlock using his (prison guard's) left arm and his (prison guard's) right hand to tighten his (prison guard's) grip on Adams' head. |
|  |  | As they made their way to a position in between cells 101 and 102 – which is directly in front of me – the prison guard abruptly stopped and began choking Adams up against the chase door belonging to cell 101 using the headlock as a noose. |
|  |  | The prison guard had his back up against the wall (chase door) and pulling upward lifting Adams to the point he (Adams) was up on his toes and gagging for air. |
|  |  | My cell light was on and the prison guard looked in my direction. Upon seeing me, the prison guard yelled at the top of his voice, "Get on your fuckin' bunks!" I immediately got on my bunk. |
|  |  | Seconds later, a separate prison guard shined a bright light in my face from outside my cell door window. The prison guard shined the light in my face and then shined the light on my cellie as he slept on the upper bunk. The prison guard shined the light in my face again for approximately three to five seconds as I tried to shield my eyes from the laser powered beam of light. |
|  |  | I remained on my bunk and continued to listen to the goings on outside. I heard other prisoners crying out in pain as they were being beaten and drug down the stairs. |
|  |  | All the prison guards and staff I observed had their faces covered. I didn't recognize anyone other than than the aforementioned prisoners nor was I able to see any name tags. |
|  |  | Neither Brownlee or Adams appeared to be resisting, fighting back, or was posing any kind of a threat to anyone. Quite the opposite.<br>The only aggressors I observed were the prison guards. They were not utilizing excessive force to abate some threat, they were utilizing<br>excessive force for the very purpose of sadistic gratification and to |

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

| \multicolumn{3}{c}{**TABLE 7 – COVID-19 ACCOUNTS**} |
|------|---------|-------------------|
| **No.** | **WITNESS** | **EVIDENCE** |
| | | cause those prisoners serious harm. <br><br> William Milton subsequently contracted Covid-19 in November, 2020 as an occupant of X-wing in Central. He, and class member Corey Smith, were quarantined in the chapel (dorm setting). |
| 18 | Reginald Nettles | Prior to the 20, July 2020 raid, there wasn't a single case of covid-19; as of yesterday 11, November 2020 we now know from a local news report that the total number is 217 confirmed positive cases among inmates (active cases) and 20 confirmed active cases among staff here at CTF. |
| 19 | Anthony Oliver | All of a sudden, CTF during Aug.-Nov. 2020 have been having severe outbreaks of prisoners testing positive and there is no 'space' secured housing units to put them all in. So, prisoners' movement have been restricted only in our housing unit, 8 of 9 wings are on quarantine as I write, D-Wing was on quarantine Sept.-Oct. 2020, and G-Wing, X-Wing, Z-Wing was not. <br><br> However, as soon as D-Wing got cleared with having no more positive tests for COVID-19, outbreaks start in other wings, thereby placing us on quarantine and we never get a chance to see prisoners on quarantine. |
| 20 | Joseph O'Neal | The prisoners were not allowed to wear a mask and the peace officers disregarded...six feet away from people, denying us to practice social distancing … there were approximately 125 to 150 prisoners, all Black, none of us were allowed to retrieve our mask and we were mixing from all units. Several officers were not wearing a MASK, no covering and the Supervising Sergeant was coughing and everybody start[ed] yelling for the Sergeant to put on a mask and he refused! I believe this incident was also to infect us (race) with COVID-19." |
| 21 | Saul Pelayo (Representative) | Pelayo believes that he became infected with Covid-19 on November 7, 2020. He tested positive for the virus on November 15. After testing positive for Covid, Pelayo was moved into quarantine, where his health declined rapidly. He was a resident of F-Wing in CTF's Central Facility. He lived on the third tier of F-Wing in cell 348U. |

| No. | WITNESS | EVIDENCE |
|---|---|---|
|  **TABLE 7 – COVID-19 ACCOUNTS** | | |

| TABLE 7 – COVID-19 ACCOUNTS | | |
|---|---|---|
| **No.** | **WITNESS** | **EVIDENCE** |
| | | Pelayo attributes the rapid spread of Covid, following the precipitating raid on July 20, 2020, to CTF's practice of knowingly mixing Covid-positive and Covid-negative prisoners.<br><br>CTF officials, Saul stresses, displayed callous disregard for prisoners' health and safety and cross-contaminated prisoners by intentionally moving positive prisoners with Covid-negative prisoners.  He is confident that this practice caused his own infection.<br><br>He reports that he is still dealing with lingering Covid symptoms.  He describes "mental fog" and headaches, chest pain and breathing difficulties, along with general fatigue. |
| 22 | Adam Sanford (Representative) | A resident of G-Wing, Sanford tested positive for Covid-19 on November 5, 2020.  By November 11, 2020, G-Wing had become a quarantine location.  Covid-positive inmates were left where they were, while Covid-negative inmates were moved to different locations. |
| 23 | Jason Smith | I have been directly affected by the repercussion of the racial raid including but not limited to: (1) COVID-19 outbreak at CTF-C eleven (11) days later on 07/31/20 … as a result of the raid, dozens of prisoners contracted COVID-19 … [My complaint is that] conducting a racial raid targeting only black prisoners, in peak of the COVID-19 pandemic on 07/20/20, and failing to take proper safety protocols that subsequently led to an outbreak of the virus." |
| 25 | Clifford Williams | I was not provided adequate protection for COVID-19, when they placed me and two-hundred other black inmates in a confined area without a mask or our face, for over 5 hrs.  Unable to social distance. |
| 26 | Marcelle Williams | Officers flagrantly violated COVID-19 protocols … social distancing and other COVID-19 protocols were not followed during the 2020-07-20 raid. |
| 27 | Anonymous | The only business they like is lockdowns and gang war, because they get hazard pay (2x their regular pay), if there is a lockdown. |

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

### 6. Adequacy of Class Representatives

540.   As alleged above, the class representatives' claims are typical of the class members.  In addition, the class representatives have been apprised of their duties and have been selected because of their superior knowledge, interest and participation in these events.  As such, they will serve as adequate representatives of the class.

### 7. Adequacy of Class Counsel.

541.   Class counsel are experienced in civil rights litigation, have previously litigated a large mass tort/disease civil rights case action in California (relating to CDCR's 2005-2014 mass infliction of valley fever on prisoners), and possess no known conflicts of interest with the class representatives or the class members.

### 8. Risk of Inconsistent or Dispositive Adjudications

542.   Pursuant to Rule 23(b)(1)(A), a class action may also be maintained if prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

543.   Here, with as many as 2,700 individual actions theoretically possible, prosecuting separate actions would clearly create a risk of inconsistent or varying adjudications that would establish incompatible standards for CDCR.

544.   Pursuant to Rule 23(b)(1)(B), a class action may be maintained if adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

545.   Here, with as many as 2,700 individual actions theoretically possible, adjudications with respect to individual members would, as a practical matter, be dispositive of the interests of other members since Defendants may or will assert common defenses, some of which may dispositive as to others.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

546.    Alternatively, with as many as 2,700 individual actions theoretically possible, adjudications with respect to individual members would, as a practical matter, substantially impair or impede the ability of remaining class members to protect their interests.

### 9.  Common Questions of Fact and Law Predominate

547.    Pursuant to Rule 23(b)(1)(A), a class action may also be maintained if the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

548.    As reflected by the list above, the class representatives clearly share a large number of common issues with members of the class.  These same questions of fact and law are common to class members relative to plaintiffs proposing to litigate individual actions.

549.    The general tenor of the case also weighs in favor of permitting the matter to proceed on a class action basis, as the vast majority of plaintiffs do not have the technical or legal ability to prosecute a case of this complexity.

550.    To Plaintiffs' knowledge, there are no other known damage actions seeking relief for wrongful contraction of Covid-19; and there is no known competition for this kind of complex and difficult civil rights case.

551.    The Northern District is the most logical and appropriate forum for this case given that all cases of contraction occurred in this District, at a single prison located within its federal jurisdiction.

552.    The difficulty of managing this case as a class action is not exceedingly so.  Plaintiffs have already individually identified 25% of the class, with over 700 registered members.  Defendants are statutorily obligated to maintain records that would enable Plaintiffs to identify the remaining 2,000 class members.

553.    Proposed class members are unlikely to be able to file individual suits on their own in light of the complex coordination required to successfully exhaust both

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

prison administrative processes and DGS government claim processes, as all are incarcerated and the vast majority are indigent and unrepresented. Plaintiffs' counsel and the class representatives have made a concerted effort to protect the interests of the class on an administrative exhaustion basis.

554.  Class members have limited access to retained or court-appointed counsel. They have restricted access to research materials to protect their rights, including necessary forms and instructions to complete exhaustion processes fully and accurately. They face further obstacles relating to restrictions on their access to all of the above in light of the Covid-19 pandemic.

555.  In addition, they face the risk of retaliation for any legal (602) actions they take, as opposed to the class action vehicle where CDCR is not as easily able to retaliate against specific inmates who are prosecuting an action through class representatives.

556.  In summary, pursuant to Rule 23(b)(1), this case is appropriate as a class action suit because questions of fact and law common to the class predominate over the questions affecting only individual members of the classes. A class action is superior to other available means for the fair and efficient adjudication of this dispute.

557.  The damages suffered by the vast majority of individual class member is disproportionate to the burden and expense of individual prosecution of complex and extensive litigation to remedy Defendant's illegal conduct and actions.

## COMPENSATORY DAMAGE MODELS

558.  Plaintiffs seek compensatory damages, because the American legal system achieves justice through such damages.

559.  There are essentially three categories of compensatory damages associated with a wrongful case of Covid-19 contraction:

**Type 1**:  death, for which the usual tort rules apply;

**Type 2**:  temporal Covid, in which the ailment comes and goes sort of like the flu and damages are comparatively modest; and

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**Type 3**:    long-term Covid-19, which involves ongoing symptoms and disability from the ailment, which can only be assessed on a case-by-case basis.

560.    For estimation purposes in Schedule 1 below, Plaintiffs selected high and low estimates for each type of damage.

561.    **For Type 1 cases** (death): $1M was chosen as a low estimate and $5M for a high estimate.  According to CDCR data, 18 inmates died from Covid-19 in the class window.

562.    **For Type 2 cases**: Plaintiffs selected $10K for a low estimate for a temporal Covid case and $20K for a high estimate.  Average hospitalization costs for Covid-19 in 2020 are reported to be approximately $40,000.  CTF prisoners do not pay their own hospital bills, but this figure informs a prototypical type-2 case's non-economic value: such damages would probably be $10-20,000.

563.    **For Type 3 cases**: Plaintiffs chose a low estimate of $100,000 for a long Covid case and a high figure of $200,000.

564.    The Mayo Clinic reports that 11 months after having Covid-19, 20% of people ages 18 to 64 have at least one ongoing medical condition potentially attributable to it.  Among people age 65 and older, 25% have at least one such condition.  However, another study reported a figure of only 6%.[23]  For estimation purposes, Plaintiffs chose the lower figure.

565.    These long-term risks are thought to be a product of injury sustained during the active Covid infection, such as organ damage.  People who suffered severe illness during their Covid infection, or perhaps are more vulnerable to respiratory infections (such as William Milton who suffers from a pre-existing case of valley fever, which CDCR also gave to him) might have damaged their heart, kidneys, skin, or brain.  Inflammation and problems with the immune system can also occur.

[23]    Popescu, Saskia, "*Long-COVID: How Common Is It?*" Website: https://www.contagionlive.com (Oct. 26, 2022).

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

566. All of Plaintiffs' figures are, to be blunt, exceedingly conservative.[24]

567. The seriousness, severity and potential damages associated with conducting biological warfare no doubt explain why a person can be convicted of a federal crime for even *falsely claiming* (to a single private individual) that he mailed a package containing a deadly virus.[25]

568. Below is Schedule 1 setting forth high and low estimates for five different scenarios of the percentage of responsibility Operation Akili bears for the 2020-2021 epidemic at CTF:

(1) **Column B**: Operation Akili is responsible for 100% of the cases in Central through November 4, 2020 and 49% of Facility C's cases thereafter (397 cases of contraction, in total); 0% of North.

(2) **Column C**: Operation Akili is responsible for 100% of the cases in Central for the whole epidemic, but only Central (544 cases). It is not responsible for cases in CTF North.

(3) **Column D**: Operation Akili is responsible for 100% of the cases in Central through November 4, 2020, 49% of Facility C's cases thereafter and 49% of North's cases thereafter (1,477 cases). Plaintiffs believe this is the closest model to the epidemiological truth, setting aside legal rules about intentional torts.

(4) **Column E**: Operation Akili is responsible for all cases during the entire epidemic window (2,724 cases)

---

[24] *See* Exhibit 20 (Cutler, et al, "*The COVID-19 Pandemic and the $16 Trillion Virus,*" American Medical Association, JAMA Network (https://jamanetwork.com) (2020).

[25] *See United States v. Hale*, 762 F.3d 1214, 1225 (10th Cir. 2014) (affirming a biological warfare conviction in which Defendant Hale tried to minimize his *false* claim that he sent a package to a romantic rival containing Hanta virus, with sobering commentary on the seriousness of such misconduct; here, of course, Defendants delivered the virus and caused some portion of an epidemic and deaths).

PAVONE & FONNER, LLP
660 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
660 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## SCHEDULE 1

| HIGH/LOW DAMAGE ESTIMATES BASED ON VARYING IMPACT PROPORTIONS OF AKILI | | | | |
|---|---|---|---|---|
| **A** | **B** | **C** | **D** | **E** |
| **Damage Category** | **100% CTF Central to 11/4, 49% of Central After (0% North) (397 Cases)[26]** | **100% of CTF Central, 0% of North (544 Cases)[27]** | **Column B Plus 49% of North (1,487 Cases)** | **100% of Central and North (All) (2,724 Cases)** |
| **(Number of Cases) / Damages (Millions)** | | | | |
| **Low End (10K/case, 1M/death, 100K per long case)** | | | | |
| Type 1 ($1M)[28] | (2.5 Cases>3) 3 | (4) 4 | (9.8>10) 10 | (18) 18 |
| Type 2 (10K)[29] | (370) 3.70 | (507) 5.07 | (1388) 13.88 | (2,542) 25.42 |
| Type 3 (100K)[30] | (24) 2.4 | (33) 3.3 | (89) 8.9 | (163) 16.3 |
| **Total (Low)** | (397) 9.1 | (544) 12.37 | (1,487) 32.78 | (2724) 60.72 |
| **High End (20K/case, 5M/death, 200K per long case)** | | | | |
| Type 1 ($5M) | (3) 15 | (3.6>4) 20 | (10) 50 | (18) 90 |
| Type 2 (20K) | (370) 7.4 | (507) 10.14 | (1,388) 27.76 | (2,542) 50.84 |
| Type 3 (200K) | (24) 4.8 | (33) 6.6 | (89) 17.8 | (163) 32.6 |
| **Total (High)** | (397) 27.2 | (544) 36.74 | (1,487) 95.56 | (2724) 173.44 |

[26]  CDCR did not break down the number of cases between Central and North.  Based on Figure 8, Plaintiffs estimate that Central accounts for 25% of cases.  Based on this estimate, Central's total is 544 cases. 100% of Central's cases through 11/4 is estimated (100% attributable to Akili) to be 250 cases (CDCR reported 261 cases through 11/4, the vast majority of which must have been in Central, *see* Figures 1-8).  Forty-nine percent (49%) thereafter [(544-250)/2] adds another 147 cases after 11/4 for a total of 397 (250+147) Central cases for Column B.

[27]  For Column C, based on CDCR's report of 2,724 total cases, 25% of cases translates to 544 cases in Central total.  This makes the remainder in North 2,180.

[28]  CDCR reported 18 deaths in its 2020-2021 Covid-19 epidemic detail, in the applicable window.  (An early CDCR graph reports 17.)  Plaintiffs estimate the low end of a wrongful death case to be worth $1M; the high end $5M.

[29]  Plaintiffs provide two estimates for temporal Covid cases, $10K and $20K.

[30]  Plaintiffs estimate the percentage of Long Covid cases at 6%. Popescu, Saskia, "*Long-COVID: How Common Is It?*" Website: https://www.contagionlive.com (Oct. 26, 2022).  We use estimates of $100K for low and $200K for high.  This might be too low altogether.  Exhibit 20.

569.    As reflected by Schedule 1, depending on the assumptions one makes about the impact Akili had on CTF Covid cases and the figures assigned to each kind of Covid-related damage (death, modest, long), the range of damages for the class is between $9M and $173M.

570.    Notably, the originally targeted inmates – members of CTF's Black population – were peacefully engaged in CTF's rehabilitative programming only to be attacked, debilitated, and murdered by CTF officials, who decided to vent their anger about race issues – about murders from the 1970's, about Folsom's July 13, 2020 Harris stabbing, and about the rise of BLM – *none of which had anything to do with CTF Black inmates' own conduct*.

## PUNITIVE DAMAGES

571.    As detailed by the evidence and allegations set forth both above and below, Defendants initiated a violent, racist mass tort against Plaintiffs without cause, based on the pretextual claim of an urgency to gather gang evidence.

572.    However, acquisition of gang evidence, putatively in Plaintiffs' possession, by needlessly beating on inmates and assembling them in close proximity, was not a mission critical exercise, and could not in any realm of the imagination be justified during a global disease pandemic.

573.    Defendants' extraordinary racial animus expressed during the event was as gratuitous as it was telling about their intentions.  The real purpose of Operation Akili, as Defendants incredibly confessed to in real-time (effectively admitting the crime to the victim as they were carrying it out), was to deploy a weapon of biological mass destruction against the African American inmate population as retaliation for the uprising of African-American rights associated with the Black Lives Matter movement then in progress (catapulted to the national stage by the murder of George Floyd), along with other misguided racial reasons.

574.    Operation Akili went beyond the animus directed at the targeted population, spreading to all manner, ilk, and identity of prisoner at CTF, and exists as

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

one of the most openly deplorable acts of wanton malevolence that agents of the California Department of Corrections and Rehabilitation have ever committed.

575.    As such, these elements of the case as demonstrated by the presentation of the above facts, including a simply shocking amount of racial and Covid-related invective, individually and in their totality, also entitle Plaintiffs for relief in the form of punitive damages under the definitions set forth in federal law relating to evil motive,[31] in Civil Code section 3294(c)(1) pertaining to legal malice[32] and 3294(c)(2) relating to legal oppression,[33] up to ten times the compensatory figure as established by the U.S. Supreme Court.

576.    Indeed, Plaintiff counsel cannot imagine an evidentiary situation that would more merit punitive damages than this one, short of Defendants riding in on horses wearing white sheets and hoods, then burning 18 Black CTF inmates to death on a flaming cross, dousing them with racial invective in the process, and then watching or helping the fire spread to burn another 2,700 people.

577.    In addition, certain causes of action automatically entitle Plaintiffs to punitive damages if the elements of that claim are proven.

578.    Plaintiffs incorporate their damage discussion above: given the race-based overlay of Operation Akili on to its assaultive and infectious consequences, if this case were brought to a jury, it could result in a shockingly high quantum of damages – as shocking as Defendants' own misconduct.

---

[31]    This is phrased along the lines of 'evil motive or intent, or reckless or callous indifference to the federally protected rights of others.' *See Ngo v. Reno Hilton*, 140 F.3d 1299, 1302-1304 (9th Cir. 1998).

[32]    The term "malice" under California state law means "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." Civ. Code, § 3294, subd. (c)(1).

[33]    The term "oppression" means "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." Civ. Code, § 3294, subd. (c)(2).

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

579. Plaintiffs seek a figure that will be formally validated, paid, and is sufficient in its magnitude to send a conclusive deterrent message to California prison officials, especially at CTF, to stop their race war against Black inmates, which in this case included an impossible comfort with waging deadly biological warfare, or face profoundly expensive legal (and potentially criminal) consequences.

## CAUSES OF ACTION

### I.

### FIRST CAUSE OF ACTION

### VIOLATION OF BIOLOGICAL WEAPONS ANTI-TERRORISM ACT OF 1989

### (18 U.S.C. § 175)

**(By All Class Representatives on Behalf of All CTF Covid-19 Infected Inmates from July 20, 2020 to March 15, 2021 Against All Defendants Except Defendant 1, CDCR)**

580. Plaintiffs incorporate paragraphs 1-579, as if fully set forth into this cause of action.

### A. History of Use of Biological Weapons for Warfare

581. Throughout history, humans have devised innovative ways to kill other humans. When technology was primitive, warriors used whatever nature provided. Burning crops was the easiest and earliest form of warfare aimed at undermining an enemy, as was poisoning a community's drinking water with dead or rotting animals.

582. Slightly more advanced forms of biological warfare emerged when soldiers began dipping spears in feces and throwing poisonous snakes. During the Black Death epidemic of the mid-1300s, the Tartars catapulted plague-ridden corpses over the walls into cities held by their European enemies.

583. Modem biological warfare began during World War I, with all sides using various gas-based weapons.

**B. The Recoil from Use of Chemical and Biological Weapons in WWI**

584.    Even before hostilities started in World War I, the 1899 "Convention (II) with Respect to the Laws and Customs of War on Land," *etc*., prohibited the use of "poison or poisoned arms," in Article 23.

585.    However, the 1899 Convention was clearly not respected in this particular during WWI.

586.    The effect of chemical weapons was depicted in a famous 1919 painting by John Singer Sargent, showing British troops suffering the aftermath of a mustard gas attack:

:



587.    Consequently, after the war ended, the 1925 Geneva Protocols again prohibited chemical warfare, as well as use of "bacteriological methods" of warfare:

> Whereas the use in war of asphyxiating, poisonous or other gases, and of all analogous liquids, materials or devices, has been justly condemned by the general opinion of the civilized world ... To the end that this prohibition shall be universally accepted as a part of International Law ...

> That the High Contracting Parties, so far as they are not already Parties to Treaties prohibiting such use, accept this prohibition, agree to extend this prohibition to the use of bacteriological methods of warfare and agree to be bound as between themselves according to the terms of this declaration.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

## C.  Use of Chemical Weapons During World War II

588.    During World War II, the Nazis used chemical weapons in combat on several occasions along the Black Sea, notably in Sevastopol, where they used toxic smoke to force Russian resistance fighters out of caverns below the city.

589.    The Nazis also used asphyxiating gas in the catacombs of Odessa in November 1941, following their capture of the city, and in late May 1942 during the Battle of the Kerch Peninsula in eastern Crimea.

590.    However, the Nazi's most extensive use of poison gas is reflected by their use of carbon monoxide and hydrogen cyanide gas in its programs at Auschwitz and other detention camp facilities to genocidally murder millions of Jewish people, and other targeted victims.

591.    The World War II German program represents the deadliest use of poison gas in history.  It constituted a second flagrant violation of both the 1899 and 1925 Conventions.

592.    As to biological warfare during World War II, Japanese Unit 731 infected Chinese prisoners of war with horrifying diseases, such as cholera, epidemic hemorrhagic fever, and venereal disease.  It was also responsible for dropping plague-infected "flea bombs" on cities in China, although this likely had little effect.

593.    Both the Allies and the Axis countries prepared to wage further biological warfare during World War II, but they either hesitated or did not reach operational capacity to deploy these methods by the time victory was assured by the Allies.

594.    For example, during the final months of the war, Japan planned to use plague as a biological weapon against U.S. civilians in San Diego, California, during Operation Cherry Blossoms at Night.  The plan was set to launch on September 22, 1945, but it was not executed because of Japan's surrender (just) a month earlier, on August 15, 1945.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

### D.  Cold War

595.    The 1950s saw Great Britain's weaponization of plague, brucellosis, tularemia and later equine encephalomyelitis and vaccinia viruses, but the program was cancelled in 1956.

35.    The United States and Soviet Union had also developed sophisticated bio-weapons programs.  The U.S. worked on producing a single balloon of anthrax, with sufficient deadly material to kill every person on the planet.

36.    U.S. experimentation was at times directed at U.S. soldiers, at Fort Detrick, to prisoners in the Ohio State Penitentiary, and mild germs were secretly sprayed on to American cities to investigate the effects.  Scientists conducting the experiments made enough mistakes to become victims of their own pathogens 456 times, causing several deaths.

37.    Infectious diseases are the real-deal mass murderers on this planet.  They singlehandedly account for the fact that humans in earlier centuries often only lived to be 30 years old.  The reduction in disease in the modern era doubled the life expectancy of the human race.

38.    One need only compare the numbers to understand the magnitude of disproportion between two events that equally occupy the American mind in relation to death: the 9-11 terror attacks, which killed 3,000 people, and the Covid-19 pandemic, which caused 6.8M deaths.  Covid-19 was 2,266 times more deadly than 9-11.

39.    The leader of the U.S. offensive bio-weapons program, Bill Patrick, later observed that the Soviet's program was far more brutal.

40.    However, in 1969, then President Richard Nixon terminated the US's program, by allowing only scientific research for defensive purposes.

41.    Nixon's decision increased the momentum of the negotiations for a ban on biological warfare, which took place from 1969 to 1972 in the United Nation's Conference of the Committee on Disarmament in Geneva.

42.     These negotiations resulted in the 1972 Biological Weapons Convention (BWC), which was opened for signature on April 10 of that year and entered into force on March 26, 1975 after its ratification by 22 countries.

43.     Despite being a party and depositary to the 1972 BWC, the Soviet Union continued and expanded a massive offensive biological weapons program.  This attracted international suspicion after a 1979 Sverdlovsk anthrax leak killed approximately 85 people.

44.     In September 1984, a Buddhist group in Oregon, led by medical chief nicknamed "Nurse Mengele," biologically attacked the City of The Dalles with salmonella by introducing it to 35 restaurants in a commercial section near a highway. The attack infected approximately 1,000 people.[34]

596.     In 1988, Saddam Hussein used mustard gas as a chemical weapon against his own people, the Iraqi Kurds, in the Halabja massacre, later deemed a genocidal event.  He murdered between 3,200 and 5,000 Iraqi civilian, apparently to reverse the fact that Iranian forces had captured the city during Iraq's war with Iran.

597.     In 1989, the law being presently enforced, the "Biological Weapons Anti-Terrorism Act of 1989" was codified as 18 U.S.C. § 175.

598.     In 1993, in Paris, another convention resulted in another international agreement prohibiting chemical weapons, denominated the "Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction."

599.     On October 21, 1998 the United States implemented the 1993 Chemical Weapons Convention by passage of 22 U.S.C. § 6701.

600.     Since then, there have been significant questions why, in 2019, a biological laboratory in Wuhan was tampering with a virus, perhaps for the so-called purpose of "gain of function."  The Wuhan lab appears to have both evolved a SARS

---

[34]  Miller, Judith, *et al.*, Biological Weapons and America's Secret War, Simon & Schuster, pp. 15-33 (2001).

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

virus into Covid-19 and accidentally released it from its lab, thus starting the 2020 global pandemic.

601.    As recently as July 25, 2023, an employee of the Pfizer Corporation – the very manufacturer that is credited for creating the vaccine for Covid-19 – was caught on video by a media organization called "Project Veritas" admitting that Pfizer is itself considering or tampering with viruses on a gain-of-function basis, and thus apparently taking the same deadly risks with disease as the Wuhan lab did.[35]

602.    Meanwhile, criminal cases have been brought under the 1989 Act, mostly against disturbed or experimental individuals tampering with, stockpiling, or in some cases threatening to deploy deadly biological substances, usually against personal enemies.

603.    These individuals were prosecuted under this Act, are convicted, and have been sentenced to federal prison for significant terms, even when no one was actually injured.

604.    The only reason that biological weapons do not dominate modern military strategy is that they are difficult to control – not because wartime leaders, or other aggrieved persons, feel morally constrained to employ them.

605.    The point is this: despite treaties and international agreements going back over 100 years prohibiting biological and chemical weapons, as well as U.S. federal laws prohibiting such activities, humans cannot seem to resist the temptation to study, tamper with, and sometimes weaponize biological and chemical weapons, especially during wartime, or as in CTF guards' own unilateral race war with Black inmates, when they were sufficiently triggered to take such action.

606.    The 1989 Terrorism Act states two legislative purposes:

---

[35]    O'Keefe, James, "*Pfizer Director: Mutate Covid Via Directed Evolution to Continue Profiting from Vaccines,*" Website: https://www.projectveritas.com (January 25, 2023); *see also* Project Veritas, "*Pfizer Director Assaults James O'Keefe & Veritas Staff,*" Website: https://www.youtube.com/watch?v=u5n7RRKgDog&t=399s (January 25, 2023).

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

(1)    implement the Biological Weapons Convention, an international agreement unanimously ratified by the United States Senate in 1974 and signed by more than 100 other nations, including the Soviet Union; and

(2)    protect the United States against the threat of biological terrorism.

607.    As to the first reference, to the 1975 Convention, paragraphs 9 and 10 of that document state that the parties to the agreement are "Determined, for the sake of all mankind, *to exclude completely the possibility of bacteriological (biological) agents and toxins being used as weapons*, [and] [c]onvinced that such use would be repugnant to the conscience of mankind and that *no effort should be spared to minimise this risk*," take a series of steps to eliminate their production, stockpiling and usage.

608.    A fair reading of the underlying intent of the Act, which refers to the underlying intent of the 1975 BWS (which in turn refers to the 1925 Treaty, the latter of expressly stating a prohibition against the use of poisons or poisonous weapons), is to take every conceivable measure to prevent the usage of diseases as weapons.

609.    Similarly, the 1989 Act expressly states that its purpose is to prevent biological weapons being used against the United States.  This includes weaponization by its own citizens against its own citizens, since the Act is routinely enforced against US citizens (or anyone else) who takes aim at US citizens and especially government officials.

610.    For example, in *United States v. Baker*, Doug Baker was collecting various biological weapons on his property, including ricin, and had variously suggested that he might use some of his substances on certain personal enemies or government officials.[36]  He was convicted and sentenced to just under three years in a published opinion, later winning an appeal over a procedural issue.

611.    In *United States v. Hale*, a bitter homeowner sent a fax to a bankruptcy trustee stating simply, "Please check out the possible haz-mat problem sent in an orange

---

[36]    *United States v. Baker,* 98 F.3d 330, 333 (8th Cir. 1996).

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

envelope today."[37]  Even though the envelope contained no biological material, and no one, obviously, was injured, Hale was convicted of attempting to violate the 1989 Act.

612.   These cases demonstrate the low threshold for prosecution under this law. Despite the terror moniker, which invokes the larger idea of Middle Eastern suicide vest detonations, plane hijackers, or truck bombers parking pesticide-filled vans under NYC skyscrapers, biological terrorists do not have to be nation states, conduct military-caliber operations, or actually cause a mass casualty event.

613.   Consequently, the idea that CTF prison officials should somehow be exempt from the reach of this law on a criminal basis is implausible: deliberately weaponizing an agent of biological warfare, including and especially a deadly virus like Covid-19, and actually causing thousands of cases of infection and multiple deaths is clearly a serious violation of the 1989 Act.

614.   For civil litigation purposes, again, this law's dual purpose is to both (1) carry out international treaties that expressly state that no opportunity should be spared to relegate this type of warfare to the annals of history, and (2) was expressly passed to protect U.S. citizens from such warfare, even by individuals committing relatively minor biological warfare crimes.

615.   Application of these principles comfortably results in a policy conclusion that the need for civil enforcement – especially since the very biological weapon in question (Covid-19) caused a global pandemic through negligent misuse by China, is continuing to be tampered with by U.S. corporations, and was in fact weaponized by California prison officials causing a mass casualty event – "goes without saying."[38]

**E.  Application of 175's Elements including Conspiracy**

616.   As relevant here, section 175(a) states that:

> Whoever knowingly ... transfers ... any biological agent, toxin,
> or delivery system for use as a weapon ... or attempts,

---

[37]  *United States v. Hale,* 762 F.3d 1214, 1219 (10th Cir. 2014).
[38]  *United States v. Bond,* 572 U.S. 844, 857 (2014).

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

threatens, or conspires to do the same, shall be fined under
this title or imprisoned for life or any term of years, or both.

617.   As extensively detailed above, CTF officials deliberately transferred
Covid-19 to the CTF inmate population, starting with the intentional infection of
Lawrence Brown, threatened to do so to many other inmates (and possibly did),
obviously conspired to do so (Plaintiffs expressly include conspiracy as a legal theory
included herein), i openly announced their bio-terrorism intentions to the target
population while they were committing the crime,[39] and in fact did infect half of CTF's
inmate population.

618.   Accordingly, all CDCR defendants connected to Operation Akili are
subject to criminal prosecution and should be held civilly liable on either a direct
violation theory or on a conspiracy basis.

---

[39] In this regard, Defendants were decidedly less tactical in Operation Akili than the
Soviets in their consideration of such enterprises.  In a 1969 National Security
Report declassified from the Nixon Administration, US officials observed that
"[t]here are frequent Soviet references to BW weapons as a 'means of mass
destruction' that would be used in future conflicts ... [yet] [t]he Soviets probably
believe that biological warfare weapons ... are especially suitable *for clandestine
delivery*."  Exhibit 1 (1969 NSC Report excerpt).

PAVONE & FONNER, LLP
660 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

# II.

## SECOND CAUSE OF ACTION

## VIOLATION OF THE HERTZBERG-ALARCON CALIFORNIA PREVENTION OF TERRORISM ACT

### (Cal. Penal Code, § 11415, *et seq*.)

### (By All Class Representatives on Behalf of All CTF Covid-19 Infected Inmates from July 20, 2020 to March 15, 2021 Against All Defendants Except Defendant 1, CDCR)

619.   Plaintiffs incorporate paragraphs 1-618, as if fully set forth into this cause of action.

620.   Throughout the legislative history of Penal Code section 11415, *et seq.*, the same sentiment about its intent is expressed: "According to the author, 'All terrorism statutes are currently filed at the federal level.  This legislation seeks to bring similar counter terrorism statutes to the state level.'" (The author of the bill is retired California Senator Robert Myles Hertzberg.)

621.   Thus, the legislative intent analysis for the California law defaults to the legislative analysis of the federal statute, which is detailed above.

622.   For the same reasons, the overarching need to enforce the prohibitions that prevent people (and states) from employing weapons of mass destruction (including the biological warfare weapon Covid-19 that on a body count basis inflicted the same amount of human carnage as 68 nuclear bombs dropped on Hiroshima), is sufficiently important on a legislative intent basis to permit a civil action, as long as it is not expressly prohibited.

623.   Indeed, according to comments in the legislative history, "In America today there is a very real threat of terrorism involving chemical, biological, nuclear, radiological and large conventional weapons.  However, despite this emerging threat, California law is largely silent on the threat posed by weapons of mass destruction (WMD)."

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

624.   Penal Code section 11416 also sets forth an express statement of the legislation's intent:

> The Legislature hereby finds and declares that the threat of terrorism involving weapons of mass destruction, including, but not limited to, chemical, biological, nuclear, or radiological agents, is a significant public safety concern. The Legislature also recognizes that terrorism involving weapons of mass destruction could result in an intentional disaster placing residents of California in great peril. The Legislature also finds it necessary to sanction the possession, manufacture, use, or threatened use of chemical, biological, nuclear, or radiological weapons, as well as the intentional use or threatened use of industrial or commercial chemicals as weapons against persons or animals.

625.   It is clear that in a setting such as the prison environment after a biological weapons attack, where criminal authorities might be reluctant to enforce the law against fellow law enforcement officers, civil enforcement is particularly necessary to prevent bioterrorism by prison officials.

626.   Civil enforcement is also especially necessary since prison officials, holding complete custodial power of inmates, are easily able to employ weapons of mass destruction against inmates, as the latter cannot flee or seek shelter when guards trap them. This is what happened during Operation Akili.

627.   On the elements, Penal Code section 11417 defines biological weapons to include "weaponized pathogens, such as bacteria, viruses, rickettsia, yeasts, fungi, or genetically engineered pathogens, toxins, vectors, and endogenous biological regulators (EBRs)." Covid-19 falls within this definition.

628.   Penal Code section 11418(a)(1) states that, "[a]ny person, without lawful authority, who ... transfers ... any weapon of mass destruction, shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 for 4, 8, or 12 years."

629.   Penal Code section 11418(b)(1) states that, "[a]ny person who uses or directly employs against another person a weapon of mass destruction in a form that

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

may cause widespread, disabling illness or injury in human beings shall be punished by imprisonment in the state prison for life."

630.    Penal Code section 11418(b)(2) states that, "[a]ny person who uses or directly employs against another person a weapon of mass destruction in a form that may cause widespread great bodily injury or death and causes the death of any human being shall be punished by imprisonment in the state prison for life without the possibility of parole."

631.    Penal Code section 11418.5(a)(1) states that, "[a]ny person who knowingly threatens to use a weapon of mass destruction, with the specific intent that the statement ... is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety, or for his or her immediate family's safety shall be punished by imprisonment in a county jail."

632.    As extensively detailed above, Defendants openly, expressly and maliciously informed the inmates that they intended to infect them with Covid-19, while they were committing this crime.

633.    They used Covid-19 as a weapon of mass destruction.

634.    Therefore, they committed all of the above bioterrorism criminal offenses. It goes without saying that they are civilly liable.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

# III.

## CAUSE OF ACTION

### THIRD CLAIM - CIVIL RICO

### MASS INFLICTION OF COVID-19 BY CONDUCTING THE AFFAIRS OF CTF THROUGH A PATTERN OF BIOLOGICAL WARFARE

### (18 U.S.C. § 1961)

### (By All Class Representatives on Behalf of All CTF Covid-19 Infected Inmates from July 20, 2020 to March 15, 2021 Against All Defendants Except Defendant 1, CDCR)

635.    Plaintiffs incorporate paragraphs 1-634, as if fully set forth into this cause of action.

636.    The RICO laws have been used to combat the racist proclivities of White supremacist individuals acting in an associated or collective fashion.[40]

### A.  Factual Summary

637.    By July 19, 2020, and on information and belief, each Defendant was aware that inmates housed at CTF, and indeed all persons around the globe, faced an elevated risk of serious harm from potential infection with Covid-19.

638.    By July 19, 2020, each Defendant was aware that there was a global pandemic related to Covid-19 and that one pathway of transmission of disease resulted from close contact with other people, in that the effects of respiration served to transmit the virus from one person to another.

639.    By July 19, 2020, each Defendant was aware that incarceration poses extraordinary risk of disease transmission due to the close quarters of so many people, including inmates, prison staff and other personnel.

640.    As such, by July 19, 2020, each Defendant, through various orders, directives, policy initiatives, and other mandatory obligations, was aware that it was his legal duty to minimize the spread of Covid-19 by not exacerbating the conditions that risk an infectious event, by reference to respect for standard safety precautions: social

---

[40]    *United States v. Yarbrough*, 852 F.2d 1522 (9th Cir. 1988).

distancing; general minimization of needless movement and contact between people; utilization of masks and other protective gear; isolation of inmates from other people upon confirmation of infection; and exclusion of unnecessary visitors who might carry the infection into the prison from a remote location.

641.    Yet despite these standard precautions and well-publicized safety rules, each Defendant embarked on, participated in and executed Operation Akili, which was essentially an embrace-the-opposite philosophy.  It brought into the prison numerous correctional officers from other locations in order to increase the transmission vectors and maximized contact between inmates and guards and among inmates in an effort to intentionally to infect them with Covid-19, which they did.

642.    It weakened their natural immune defenses by assembling them in a common area without protective clothing or masks, at night and in the cold, with the intent to infect them with Covid-19.

643.    It exposed inmates to a large number of other inmates and CTF staff during the extraction, assembly and interrogation process, with the intent to infect them with Covid-19.

644.    Defendants' Operation Akili was designed as an exercise in forcibly removing approximately 100 inmates from their cells, in the middle of the night while they were sleeping, in order to herd them into CTF's central dining hall #1 and placing them in close proximity with each other.

645.    The guards did not respect social distancing rules, did not allow inmates to use their own masks, and did not provide them with masks.  Warm clothing was denied and many inmates were in a near-naked state.  They were forced to use a single dirty bathroom with no facilities for sanitation.  The guards yelled at the inmates at close quarters, expelling massive amounts of potentially infected aerosols and, in at least one instance, spit at them.  The guards did not observe standard safety precautions for minimization of disease spread; in fact, they maximized the risk that the inmates would get infected.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

646.    CDCR agents then individually interrogated the inmates about their gang affiliations while the larger group remained in this congested state of close physical proximity.

647.    Meanwhile, Defendants variously informed the inmates, employing an unusual amount of racial invective, that they were recklessly and/or deliberately exposing them to Covid-19, that the inmates were going to get infected, or that they would now be infected and that they would all catch Covid.  **Table 4** sets forth a representative sample of witness accounts.

648.    Before Operation Akili, as of July 20, 2020, CTF Soledad did not have any cases of Covid-19.  After it, infections appeared and eventually spiked in the November-December 2020 window:



649.    As can be seen by CDCR's graph of CTF Covid-19 detail, after July 20, 2020, well within the incubation window, CTF reported its first batch of cases and then steadily over the next few months it turned into a spiraling epidemic, peaking in mid-December at over 500 active cases at any one time.

650.    In California, there were about 3,090,000 cases between July 2020 and February 2021.[41]  With a population of about 40M people, the risk of infection was therefore about 0.07725, or 7,725 per 100,000 (7.7/100).

651.    As of July 2020, CTF had an inmate population of 4,800.  Approximately 2,743 inmates contracted Covid-19 from July 2020 to February 2021.  This is 57% percent of the CTF population.  Per 100,000 people, this translates to 57,000 people per 100K or 7.3 times as great a risk as the larger California population faced.

652.    In summary, the July 20, 2020 raid became a "super-spreader" event in that the mass aggregation of inmates in close proximity to one another (and to the guards), and especially their extraction from D-Wing, without safety precautions, such that the virus initially erupted and catalyzed the viral spread of the disease to the entire prison, to what ultimately became 2,743 infections and 19 deaths, by magnifying the risk of contraction to many times as great as the larger California population faced.

## B.  Factual Application of Civil RICO Elements

653.    Title 18 United States Code section 1962(c) states that "[i]t shall be unlawful for any person [1] employed by or associated with any enterprise engaged in, or the activities of which affect, [2] interstate or foreign commerce, [3] to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs [4] through a [5] pattern of racketeering activity … ."

654.    To bring a *Civil* RICO action, the plaintiff must also [6] be injured in his "business or property," pursuant to 18 U.S.C. § 1964.

---

[41]  Based on reporting from the New York Times, it appears that there was an average of 7,000 new cases each day in California from July 20, 2020 to November 20, 2020.  From November 20, 2020 through February 20, 2021, there were approximately 25,000 cases per day in California.  Thus, the total number of infections in California in the July 20, 2020 to February 20, 2021 window is about 3,090,000.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

1

### 1. Civil RICO "Enterprise"

655.    Title 18 U.S.C. § 1961(4) defines a RICO "enterprise" to include any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.  As set forth above in detail, Defendant CTF guards and prison officials assembled together to carry out Operation Akili in a coordinated fashion.  That unit of Operation Akili officials satisfies the enterprise element; otherwise, the enterprise can be regarded as CTF itself.

656.    Government agencies are recognized Civil RICO enterprises.

### 2. Interstate Nexus

657.    As Operation Akili was a coordinated, multi-agency raid, the preparation, planning and execution of it must have occurred days, weeks or months in advance of actual event.

658.    In this time period, and on information and belief, Defendants used interstate electronic means to communication with each other.

659.    The transmission or receipt of any email almost invariably requires the utilization of the interstate wire communication system.

660.    On information and belief, Defendants sent dozens or hundreds of emails that travelled through the interstate wires to coordinate the July 20, 2020 raid thereby satisfying the interstate commerce element.

661.    Defendants typically have and use an email address with the extension [name]@cdcr.ca.gov, but they also possess additional private email addresses, which Plaintiffs believe they periodically use even for work, and are affiliated with a number of out-of-state providers, such that their emails travel through interstate wires.

662.    In addition, Plaintiffs believe Defendants used their cell phones and sent and received text messages in planning and executing Operation Akili, which also, again on information and belief, involved out-of-state carriers for some of them, thereby causing texts and calls to utilize interstate wires.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

### 3.  Conduct Element

663.   By carrying out Operation Akili by using CTF as its organizational vehicle, each of Defendants participated in the raid and therefore each satisfies the conduct element.

### 4.  "Through" Element

664.   There must be a nexus between the predicate racketeering acts and the conduct of the enterprise.  A nexus exists when a defendant is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise and the predicate offenses are related to the activities of that enterprise.

665.   As detailed below, the predicate offenses are multiple acts of biological warfare, in weaponizing Covid-19 against CTF's inmate population.

666.   Defendants were only able to commit the predicate offenses because they exercised control over CTF prison, were employed there, had legal custody over the inmates, had them effectively trapped in a place where they could easily infect them with a disease through respiratory transmission – and they did so.

667.   As Operation Akili was a CDCR-sanctioned CTF raid, the referenced predicate acts were carried out by virtue of the direct operation of the Civil RICO enterprise.

### 5.  Pattern of Racketeering Activity

668.   Title 18 U.S.C. § 1961(1) defines racketeering to include the crime of committing biological warfare, in violation of 18 U.S.C. § 175.

669.   Section 175(a) makes it a federal crime to "knowingly … transfer[] any biological agent, toxin, or delivery system for use as a weapon… ."

670.   Section 175(c) defines the phrase "for use as a weapon" the transfer of a biological weapon for other than peaceful purposes.

671.   A biological agent includes an infectious disease capable of causing death, per 18 U.S.C. § 178(1).

672.   Covid-19 is a biological agent within the meaning of section 175, *et seq.*, and caused the "death, disease, or other biological malfunction in a human" in thousands of inmates by virtue of Operation Akili.

673.   Defendants used a system of having one or more infected CTF guards perform the cell extraction process, in a pretextual raid to address gang activity, in order to deliver Covid-19 to the targeted inmates, and eventually half of CTF's inmate population.

674.   Defendants therefore engaged in a pattern of racketeering activity by their cell extraction process during Operation Akili, in which, in close proximity, they yelled, shouted, and spit respiratory material at numerous Black inmates that were extracted from their cells, knowing or having reason to believe that one or more of the defendants was infected with Covid-19, which thereby ignited a viral fire that spread through D-Wing and the rest of the prison.  Accordingly, Defendants engaged in numerous acts of biological warfare as recognized predicate acts to operating a Civil RICO enterprise.

### 6.   "Business or Property" Injury

675.   Plaintiffs clearly suffered a personal injury by contracting Covid-19.  But Plaintiffs (and prisoners in general) are also in a working business (employment) relationship with CTF, CDCR, and effectively, the prison officials themselves.

676.   Prisoners are engaged in various programs to support their case for the earliest possible release; they work on a daily basis and earn a small hourly income; they also have a property interest in "business relations unhampered by schemes prohibited by the RICO predicate statutes."

677.   By waging biological warfare and then igniting a super-spreader disease event, CTF essentially shut down the normal business relations of the prison economy and thereby deprived Plaintiffs of a business or property interest in various particulars.

678.   Moreover, because of the relative ease of committing the predicate acts against inmates, who are confined and under prison officials' total control, Defendants are immediately capable of repeating such an exercise.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

# IV.

## FOURTH CAUSE OF ACTION

## CLASS ACTION

## CIVIL RICO CONSPIRACY

## CONSPIRACY TO MASS INFLICT COVID-19 BY CONDUCTING THE AFFAIRS OF CTF THROUGH A PATTERN OF BIOLOGICAL WARFARE

## (18 U.S.C. § 1961)

### (By All Class Representatives on Behalf of All CTF Covid-19 Infected Inmates from July 20, 2020 to March 15, 2021 Against All Defendants Except Defendant 1, CDCR)

679.    Plaintiffs incorporate paragraphs 1-672, as if fully set forth into this cause of action.

680.    Plaintiffs add an allegation, on information and belief, that Defendants also had a financial motive for such infectious activity, either because their compensation increased (*e.g.*, lockdown or "combat" pay), or that they received some sort of direct, indirect, or kickback-type of financial benefit from the spigot of taxpayer money that flows to the surrounding medical system during episodes of mass disease treatment.

681.    For all the reasons set forth above about Defendants' conspiracy in Operation Akili to mass infect the CTF prison population with Covid-19, including dozens of predicate crimes, Defendants were also engaged in a Civil RICO conspiracy.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

# V.

## FIFTH CAUSE OF ACTION

## VIOLATION OF FEDERAL CIVIL RIGHTS

## EIGHTH AMENDMENT VIOLATION

## DELIBERATE MASS INFLICTION OF COVID-19

### (42 U.S.C. § 1983)

### (By All Class Representatives on Behalf of All CTF Covid-19 Infected Inmates from July 20, 2020 to March 15, 2021, Against All Defendants Except Defendant 1, CDCR)

682.    Plaintiffs incorporate paragraphs 1-681, as if fully set forth into this cause of action.

683.    When the State takes a person into its custody and holds him against his will, the Constitution imposes upon it a corresponding duty to assume a responsibility for his safety and general well-being.

684.    When the State fails to provide for the needs of a confined individual, including appropriate medical attention and reasonable safety, it transgresses the substantive limits on state action set by the Eighth Amendment.

685.    An Eighth Amendment violation is stated when officials can be shown to have known of and disregarded a substantial risk of serious harm to prisoners.

686.    It is cruel and unusual punishment under the Eighth Amendment to expose inmates to adverse environmental toxins that cause serious harm including to conditions that cause, create and spread disease.

687.    In this case, as extensively set forth above, Defendants deliberately initiated a superspreader disease event against CTF Black inmates as a product of racial hatred, and in so doing, caused an epidemic of Covid-19 among the CTF population resulting in over 2,700 cases and 18 deaths.

# VI.

## SIXTH CAUSE OF ACTION

## VIOLATE OF FEDERAL CIVIL RIGHTS

## BIOLOGICAL TERRORISM – 18 U.S.C. § 175

### (42 U.S.C. § 1983)

### (By All Class Representatives on Behalf of All CTF Covid-19 Infected Inmates from July 20, 2020 to March 15, 2021 Against All Defendants Except Defendant 1, CDCR)

688.    Plaintiffs incorporate paragraphs 1-687, as if fully set forth into this cause of action.

689.    Each plaintiff had a federally-protected right to enforce violations of federal law by state officials pursuant to 42 U.S.C. 1983.

690.    Plaintiffs had a federal right to protection from biological terrorism pursuant to 18 U.S.C. § 175.

691.    Defendants violated that federal right when they engaged in such terrorism through Operation Akili, as extensively set forth above.

# VII.

## SEVENTH CAUSE OF ACTION

## VIOLATE OF FEDERAL CIVIL RIGHTS

## CONSPIRACY TO COMMIT BIOLOGICAL TERRORISM UNDER 18 U.S.C. § 175

### (42 U.S.C. § 1985)

692.    Plaintiffs incorporate paragraphs 1-691, as if fully set forth into this cause of action.

693.    Each plaintiff had a federally-protected right to enforce violations of the US Constitution and federal law committed by state officials, including conspiracies in violation of federal law by such officials pursuant to 42 U.S.C. 1985.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE 700
SAN DIEGO, CALIFORNIA 92101

694.  Plaintiffs had a federal right to protection from biological terrorism pursuant to 18 U.S.C. § 175 and a right to avoid cruel and usual punishment under the Eighth Amendment.

695.  Defendants violated that federal right when they engaged in a conspiracy, roughly encapsulated by CTF officials' name for it, Operation Akili, and committed such biological terrorism, as extensively set forth above.

## VIII.

## EIGHTH CAUSE OF ACTION

## RACIAL DISCRIMINATION IN THE COMMISSION OF FEDERALLY-SPONSORED STATE TERRORISM

## (42 U.S.C. § 2000d)

**(By All Class Representatives on Behalf of All CTF Covid-19 Infected Inmates from July 20, 2020 to March 15, 2021 Against Defendant 1, CDCR)**

696.  Plaintiffs incorporate paragraphs 1-695, as if fully set forth into this cause of action.

697.  Title VI of the Civil Rights Act of 1964 prohibits discrimination based on race, in programs or activities receiving federal financial assistance.

698.  Defendant CDCR receives federal financial assistance from the United States Department of Justice and related federal entities.  CDCR is thus bound to comply with Title VI and its implementing regulations, including 28 C.F.R. Sections 42.01 et seq.

699.  A litigant bringing a claim for racial discrimination must assert that the agency in question does receive federal assistance and that the entity involved has engaged in racial discrimination causing the injury in question.

700.  Notably, the elements of the claim do not appear to require the victim to be a member of the targeted racially discriminatory act.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

701.    As to the first element, CDCR's budget for 2018, 2019, and 2020 reflects contributions from the "federal trust fund" to CDCR's budget.[42]

702.    As to the second, CDCR officials conducted a raid denominated Operation Akili targeting approximately 100 CTF Black inmates, solely based on their race, by violently extracting them from their cells in the middle of the night, infecting them with Covid-19 in the process, and ultimately infecting half of the prison.

703.    Operation Akili was a race-motivated attack on CTF's Black inmates, in order to vent CTF prison officials' larger race grievances, such as the rise of BLM, murders of white guards in the 1970's, and a stabbing of white guards by a Black inmate at Folsom a week before the raid.  However, none of these race-based grievances were attributable to CTF's Black population.

704.    They liberally invoked racist vitriol against the Black inmates, including but not limited, to vulgar racist references in **Table 3**.

705.    Of particular importance is Defendants' promiscuous use of the word "nigger," which is widely regarded to be the most offensive and inflammatory racial slur in the English language.

706.    By going directly to the highest form of verbal abuse in American society, Defendants reveal that their actions possessed few if any moral or proportionate bounds.

707.    In word and deed, Defendants felt CTF Black inmates deserved to be treated with no moral limitations and they, Defendants, openly declared their intentions to unleash a weapon of mass destruction against their perceived enemy.

708.    Then they did so.

709.    Accordingly, for clarity's sake, this cause of action contains two types of claims: (1) a claim by the CTF Black infected inmates that they were subjected to (as detailed above, *entirely unwarranted*) racial discrimination concomitant to Operation Akili; and (2) a claim by CTF's 2,700 infected inmates, regardless of race, that

---

[42]    Exhibit 21 (excerpt of CDCR's state budget's federal contributions).

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

Operation Akili, proximately caused them damage because Akili acted as a superspreader disease event in violation of 18 U.S.C. 175 (and Cal. Pen. Code 11415, *et seq*.). In total, all 2,700 infected inmates assert this cause of action even though Defendants' racist invective was only directed to a relatively small proportion of the total pool of injured persons.

710.    Defendants satisfy the elements of the criminal statutes, by volitionally transferring a biological infectious disease agent to the Black inmate population, and half of CTF's entire inmate population, "for purposes of a weapon."

## IX.

## NINTH CAUSE OF ACTION

## STATE LAW CLAIM

## MASS VIOLATION OF CALIFORNIA RALPH ACT

### (By All Class Representatives on Behalf of All CTF Covid-19 Infected Inmates from July 20, 2020 to March 15, 2021 Against All Defendants Except Defendant 1, CDCR)

711.    Plaintiffs incorporate paragraphs 1-710, as if fully set forth into this cause of action.

712.    California Civil Code section 51.7(b)(1) contains the operative text of the Ralph Act. Its aim is to carry out the policy of the State of California to protect all persons from discrimination-based violence:

> All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation, or on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51[43] … or because another person perceives them to have one or more of those characteristics. The

---

[43] Section 51(b) states in turn: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, *race*, color, religion, [*etcetera*] are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

identification in this subdivision of particular bases of discrimination is illustrative rather than restrictive.

713.    As detailed above, because of their racial characteristics of being African-American, Plaintiffs were subjected to violence by CDCR guards on July 20, 2020 during Operation Akili.

714.    As detailed in a representative format in **Table 3** and **Table 4** and by virtue of the individual stories of the Plaintiffs themselves – at a time when African Americans as a whole at CTF were programming and were not engaged in gang violence – the guards carried out a violent operation exclusively against them.

715.    In doing so, the guards made overt, repeated, and vulgar references to racism.  The guards subjected the inmates to significant violence in pulling them out bed.

716.    The guards violently subdued, dragged, beat, punched, and choked inmates, in various degrees.

717.    The guards then rounded up by the inmates in one spot to catalyze a super-spreader Covid-19 disease epidemic event against the inmates, and they accomplished that purpose.

718.    Racial animus was a substantial motivating factor of Operation Akili.

719.    Plaintiffs, regardless of whether they were Black or nor, were injured by suffering a Covid-19 infection due to Defendants' violation of the California Ralph Act, as documented above.

720.    Defendants' conduct was the cause of certain inmates' physical injuries, and contraction of disease was a consequence for all Plaintiffs.  Operation Akili was at least an equal factor in causing all of the infectious harm.

721.    Pursuant to Civil Code section 52, Defendants' violation of the Ralph Act entitles Plaintiffs to actual damages, punitive damages, a civil penalty (of $25,000), attorney's fees and injunctive relief.

722.    Injunctive relief here is warranted to prevent agents of CTF, including Warden Koenig, of carrying out additional "Operation Akilis" directed against other minority groups or again directed at African Americans.

723.    Pursuant to Civil Code section 52(b), "[w]hoever denies the right provided by Section 51.7 or 51.9, or aids, incites, or conspires in that denial, is liable for each and every offense for the actual damages suffered by any person denied that right and, in addition, the following:

(1)    An amount to be determined by a jury, or a court sitting without a jury, for exemplary damages.

(2)    A civil penalty of twenty-five thousand dollars ($25,000) to be awarded to the person denied the right provided by Section 51.7 in any action brought by the person denied the right… .

(3)    Attorney's fees as may be determined by the court."

724.    Plaintiffs Class Representatives request these remedies on behalf of the entire class, as well as all other traditional legal remedies.

725.    Furthermore, pursuant to Civil Code section 52(b), all Defendants participating in Operation Akili are equally liable for the acts committed during it, as co-conspirators to a racist tort, bioterrorism-based mass Ralph Act violation.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

# X.

## TENTH CAUSE OF ACTION

## STATE LAW CLAIM

## MASS VIOLATION OF CALIFORNIA BANE ACT

**(By All Class Representatives on Behalf of All CTF Covid-19
Infected Inmates from July 20, 2020 to March 15, 2021
Against All Defendants Except Defendant 1, CDCR)**

726.   Plaintiffs incorporate paragraphs 1-725, as if fully set forth into this cause of action.

727.   For at least the prior two years before July 20, 2020, Black Class Representatives and the larger African-American population at CTF were peacefully engaged in rehabilitative programs (aka "programming") and were thereby exercising their civil rights to pursue liberty, safety and other civil rights (all thoroughly delineated in sections 1-7 of Article I of the California Constitution)[44], by slowly minimizing and

---

[44]   Article 1 contains a long series of personal rights under the California Constitution, including:

**Section 1:**   "All people are by nature free and independent and have inalienable rights.  Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

**Section 2(a):**   "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right.  A law may not restrain or abridge liberty of speech or press."

**Section 3(a):**   "The people have the right to … petition government for redress of grievances, and assemble freely to consult for the common good." [Which, parenthetically, would permit – and prohibits retaliation for – the invocation of the 602 grievance process].

**Section 4:**   "Free exercise and enjoyment of religion without discrimination or preference are guaranteed.  This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State.  The Legislature shall make no law respecting an establishment of religion.

removing the need for them to be punished or further incarcerated for their earlier criminal offenses.

728.    Defendant CDCR agents formulated Operation Akili, and pursuant to it, committed gratuitous violence, utilized provocative threats, and engaged in other acts of violent intimidation in order to force Plaintiffs to assemble without safety devices or precautions, in CTF central dining hall, which among other actions subjected them to a super-spreader disease event designed to mass infect them with Covid-19.

729.    Defendants carried out Operation Akili to interrupt the plaintiffs,' and the larger African Americans inmate population's, peaceful attempt to rehabilitate.  It did so to provoke violence or resistance in response that would give CDCR agents fresh cause to punish and continue incarcerating them.

730.    Defendants' operation was designed to promote further violence; to injure and provoke Plaintiffs; and to retaliate against them for peacefully exercising myriad rights designed to lift themselves out of their plight of long-term incarceration.

731.    By carrying out Operation Akili in its several elements, Defendants intended to disrupt and deprive all Black inmates (that were later infected with Covid-19) at CTF during the class window from pursuing their Article 1 state constitutional rights.

732.    In addition, during the operation, Defendants made it clear through conduct that witnesses were not to recount their percipient observations, by offering to take their statements in front of a group of hostile CDCR agents colloquially known as the "goon squad."  They thus committed a separate Bane Act violation in this particular.

**Section 6:**    "Slavery is prohibited.  Involuntary servitude is prohibited except to punish crime." [Notably, incarceration requires inmates to work for slave wages.]

**Section 7(a)**: "A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws…"

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

1 | 733.    Although the Bane Act may have been originally designed to protect the
2 | victim of a discriminatory threat, Plaintiffs believe, and thereon allege, that by
3 | committing racist threats against CTF Black inmates, which ultimately injured half of
4 | CTF's population with contraction of a disease, Defendants are liable for all injury.

734.    It is foreseeable that unintended targets of a bio-terrorism event, even ones premised on threats and attempted interruption of a specific smaller target group's civil rights (those of CTF's Black inmates), may become victims because engaging in bio-terrorism warfare is an ultra-hazardous activity.

## XI.

## ELEVENTH CAUSE OF ACTION

## CLASS ACTION

## STATE LAW MASS BATTERY

## TERRORIST WEAPONIZATION OF COVID-19

**(By All Class Representatives on Behalf of All CTF Covid-19 Infected Inmates from July 20, 2020 to March 15, 2021 who Contracted Covid-19, Against All Defendants Except Defendant 1, CDCR)**

735.    Plaintiffs incorporate paragraphs 1-734, as if fully set forth into this cause of action.

736.    Defendants' Operation Akili was designed as an exercise in forcibly extracting approximately 100 Black inmates from their cells, in the middle of the night while they were sleeping, in order to herd them into CTF's central dining hall #1 with approximately 100 other African Americans in close proximity.

737.    The guards forced them to strip naked, did not respect social distancing rules, did not allow inmates to use their own masks, and did not provide them with masks.  The guards did not observe standard safety precautions for minimization of disease spread; in fact, they maximized the risk that the inmates would get infected.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

738.   CDCR agents then individually interrogated the inmates individually about their gang affiliations while the larger group remained in this congested state of close physical proximity.

739.   Meanwhile, Defendants informed the inmates, using abjectly unacceptable racial epithets, that they were deliberately exposing them to Covid-19, that the inmates were going to get infected, and that they were now infected.

740.   As reflected by **Table3** and **Table 4**, Defendants showered Plaintiffs inmates with racist and Covid-related invective, announcing their infectious and malevolent intentions.

741.   Before Operation Akili, as of July 20, 2020, CTF Soledad did not have any cases of Covid-19.  As can be seen by CDCR's graph of CTF Covid-19 detail (above), after July 20, 2020, CTF reported its first batch of cases and then slowly but steadily over the next few months its rate increased and then it turned into a spiraling epidemic, peaking in mid-December at over 500 active cases at any one time.

742.   Accordingly, CDCR's own statistics illustrate that the July 20, 2020 raid was in fact a "super-spreader" event in that the mass aggregation of inmates in close proximity to one another (and to the guards) without safety precautions introduced and catalyzed the viral spread of the disease to the entire prison, to what ultimately became 2,719 infections and 18 deaths.

# XII.

## TWELFTH CAUSE OF ACTION

## STATE LAW CLAIM

## MASS TORT NEGLIGENCE ACTION

### (By All Class Representatives on Behalf of All CTF
### Covid-19 Infected Inmates from July 20, 2020 to March 15, 2021,
### Against All Defendants Except Defendant 1, CDCR)

743.     Plaintiffs incorporate paragraphs 1-742, as if fully set forth into this cause of action.

744.     As prison officials and agents, Defendants were obligated to numerous standards: a standard to only use as much force as necessary to accomplish any particular prison objective; standards to employ careful safety protection and social distancing protocols to avoid the spread of disease; standards to avoid unprofessional behavior; standards to minimize the spread of infectious diseases.

745.     Defendants shattered all of these standards, by resorting to excessive force to wake inmates up and move them to different places within the prison; by not only not following standard safety protocols but intentionally placing them in close quarters in order to proactively accomplish the spread of disease among the African-American population; and by authorizing, ventilating and openly expressing their most basic racial hatred toward Plaintiffs, in language that categorically defies all societal and professional norms.

746.     Plaintiffs were damaged by these actions, and inactions, by being physically brutalized, exposed to disease, and wrongfully vilified for the audacity of peacefully participating in the very programs designed to achieve their rehabilitation.

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

# XIII.

## THIRTEENTH CAUSE OF ACTION

### NEGLIGENT SUPERVISION

**(By All Class Representatives on Behalf of All CTF
Covid-19 Infected Inmates from July 20, 2020 to March 15, 2021,
Against Defendants 2, 6, 9, 10, 13-19, 21-22, 26, 28, 29, 30, 33, 37, and 40)**

747.    Plaintiffs incorporate paragraphs 1-746, as if fully set forth into this cause of action.

748.    Based on Plaintiffs' information, the following CDCR agents were present for Operation Akili in a supervisory capacity:

| DEF. NO. | NAME | POSITION |
|---|---|---|
| 2 | Craig Allen Koenig | Warden |
| 6 | Zachary Scott Brown | Commanding Officer |
| 9 | Jeffrey Dane DeAnzo | Correctional Sergeant |
| 10 | Enrique Galvan | Captain |
| 13 | J. Hunter | Correctional Lieutenant |
| 14 | Javiar G. Lopez | Correctional Lieutenant |
| 15 | Rodolpho S. Luna | Commanding Officer |
| 16 | Derrick Thomas Marion | OCS Chief |
| 17 | Yonatan U Cerna Martinez | Commanding Officer |
| 18 | Patrick A. McDonald | Correctional Sergeant |
| 19 | Nathan S. McDowell | Commanding Officer |
| 21 | Keith E. Mensing | Assistant Chief Deputy Warden |
| 22 | Donald G. Metcalfe | Captain |
| 26 | Joshua Kurt Peffley | Correctional Sergeant |
| 28 | Cory D. Perryman | Correctional Sergeant |
| 29 | Justin D. Pierce | Correctional Sergeant |
| 30 | Jeffrey John Reed | Correctional Lieutenant |
| 33 | Alex B. Serrato | Commanding Officer |
| 37 | Humberto Vera | Correctional Sergeant |
| 40 | Arturo Villalobos | Commanding Sergeant |

749.    As detailed above, Plaintiffs were subjected to CDCR supervisors who embraced their subordinates' racism, permitted their violent tendencies, and executed a plan with them to infect the inmates by proactively creating a super-spreader disease event.

750.    Defendant supervisors were unfit, incompetent, and violated the standard of care to supervise the tasks of agreeing to Operation Akili, of moving inmates safely in order to putatively carry out a search of cells and an interrogation session looking for gang affiliation paraphernalia, for all the reasons set forth above: the raid turned out to be a violent, racist, disease-spreading mass murder.

751.    Defendants' supervisory function was conducted below the standard of care for such a position because:

(1)    They agreed to perform a supervisory role in Operation Akili at all;

(2)    They selected, or permitted to be selected, subordinate officers that were incompetent, violent, racist, emotionally unstable (either generally or that day), and otherwise deliberately indifferent to the health and safety of the inmate population;

(3)    They agreed to supervise anyone for an operation that was fundamentally racist, violent and illegal;

(4)    When they observed subordinate officers behaving in a violent, inappropriate, or illegal manner, they did not step in (or they participated);

(5)    When they observed subordinate officers not conducting themselves in accordance with appropriate Covid-19 safety measures, they did not step in (or they participated);

(6)    When they observed subordinate officers not shielding their name tags, they did not step in (or they participated);

(7)    When they realized Operation Akili was fundamentally dangerous in terms of aggregating inmates in close proximity, they did not step in (or they participated);

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

(8)    They knew that Black CTF inmates were not engaged in gang behavior but decided to supervise their interrogation as if they were;

(9)    They supervised the punishment of Black inmates for actions not taken by them, such as murders from the 1970's, the rise of BLM, or the stabbing at Folsom prison by Harris;

(10)    such other acts and omissions below the standard of care for supervisory personnel as may be developed at trial.

752.    Because Defendant Supervisors violated the standard of care for professional corrections supervisors in the above particulars, they behaved in a negligent supervisory fashion.

753.    Plaintiffs were harmed in various particulars, as detailed in the individual accounts, as Defendants' acts and omissions caused Plaintiffs' injuries, infections and other damages.

## **PRAYER**

*Wherefore*, Plaintiffs pray for the following relief:

**On the First Cause of Action for Violation
of 18 U.S.C. § 157, the Class seeks:**

(1)    declaratory findings of co-conspirator, agency and entity liability as applicable to each defendant;

(2)    economic damages;

(3)    non-economic damages;

(4)    punitive damages;

(5)    Interest, as permissible;

(6)    costs, to be determined;

(7)    attorney's fees as available by law;

**On the Second Cause of Action for Violation
of Penal Code Section 11415, et seq., the Class seeks:**

(8)    declaratory findings of co-conspirator, agency and entity liability as applicable to each defendant;

(9)    economic damages;

(10)    non-economic damages;

(11)    punitive damages;

(12)    interest, as permissible;

(13)    costs, to be determined;

(14)    attorney's fees as available by law;

**On the Third Cause of Action**
**for Civil RICO, the Class seeks:**

(15)    declaratory findings of co-conspirator, agency and entity liability as applicable to each defendant;

(16)    economic damages, trebled;

(17)    non-economic damages;

(18)    punitive damages;

(19)    interest, as permissible;

(20)    costs, to be determined;

(21)    attorney's fees as available by law;

**On the Fourth Cause of Action for**
**Civil RICO Conspiracy, the Class Seeks:**

(22)    declaratory findings of co-conspirator, agency and entity liability as applicable to each defendant;

(23)    economic damages, trebled;

(24)    non-economic damages;

(25)    punitive damages;

(26)    interest, as permissible;

(27)    costs, to be determined;

(28)    attorney's fees as available by law;

**On the Fifth Cause of Action for Violation**
**of the Eighth Amendment, the Class Seeks:**

(29)    declaratory findings of co-conspirator, agency and entity liability as applicable to each defendant;

PAVONE & FONNER, LLP
600 WEST BROADWAY STE. 700
SAN DIEGO, CALIFORNIA 92101

(30)    economic damages;

(31)    non-economic damages;

(32)    civil penalties;

(33)    punitive damages;

(34)    statutory damages;

(35)    injunctive relief;

(36)    interest, as permissible;

(37)    costs, to be determined;

(38)    attorney's fees as available by law;

**On the Sixth Cause of Action for Racist**
**Biological Terrorism, the Class seeks:**

(39)    findings of co-conspirator, agency and entity liability as applicable to each Defendant;

(40)    economic damages;

(41)    non-economic damages;

(42)    injunctive relief;

(43)    interest, as permissible;

(44)    costs, to be determined;

(45)    attorney's fees.

**On the Seventh Cause of Action for Conspiracy**
**to Commit Racist Biological Terrorism, the Class seeks:**

(46)    declaratory findings of co-conspirator, agency and entity liability as applicable to each Defendant;

(47)    economic damages;

(48)    non-economic damages;

(49)    punitive damages;

(50)    interest, as permissible;

(51)    costs, to be determined;

(52)    attorney's fees as available by law;

PAVONE & FONNER, LLP
600 WEST BROADWAY, STE. 700
SAN DIEGO, CALIFORNIA 92101

**On the Eighth Cause of Action for Federally-Sponsored
Racist Terrorism, the Class seeks:**

(53)    declaratory findings of co-conspirator, agency and entity liability as
        applicable to each Defendant;

(54)    economic damages;

(55)    non-economic damages;

(56)    punitive damages;

(57)    interest, as permissible;

(58)    costs, to be determined;

(59)    attorney's fees as available by law;

**On the Ninth Cause of Action for Mass Violation
of the Ralph Act, the Class Seeks:**

(60)    declaratory findings of co-conspirator, agency and entity liability as
        applicable to each Defendant;

(61)    economic damages;

(62)    non-economic damages;

(63)    punitive damages;

(64)    statutory damages;

(65)    civil penalties;

(66)    interest, as permissible;

(67)    injunctive relief;

(68)    costs, to be determined;

(69)    attorney's fees as available by law;

**On the Tenth Cause of Action for Mass
Violation of the Bane Act, the Class Seeks:**

(70)    declaratory findings of co-conspirator, agency and entity liability as
        applicable to each Defendant;

(71)    economic damages;

(72)    non-economic damages;

(73)    punitive damages;

(74)    statutory damages;

(75)    civil penalties;

(76)    interest, as permissible;

(77)    costs, to be determined;

(78)    attorney's fees as available by law.

**On their Eleventh Cause of Action for**
**Mass Battery, the Class Seeks:**

(79)    declaratory findings of co-conspirator, agency and entity liability as applicable to each Defendant;

(80)    economic damages;

(81)    non-economic damages;

(82)    punitive damages, given a finding of gross negligence by Defendants;

(83)    interest, as permissible;

(84)    costs, to be determined;

**On their Twelfth Cause of Action for**
**Negligence, the Class Seeks:**

(81)    declaratory findings of co-conspirator, agency and entity liability as applicable to each Defendant;

(82)    economic damages;

(83)    non-economic damages;

(84)    punitive damages;

(85)    pre-judgment and post-judgment interest.

(86)    costs, to be determined.

**On their Thirteenth Cause of Action for**
**Negligent Supervision, the Class Seeks:**

(87)    declaratory findings of co-conspirator, agency and entity liability as applicable to each Defendant;

(88)    economic damages;

PAVONE & FONNER, LLP
600 WEST BROADWAY STE. 700
SAN DIEGO, CALIFORNIA 92101

(89)   non-economic damages;

(90)   punitive damages;

(91)   interest, as permissible;

(92)   costs, to be determined.

Date: February 8, 2023                      PAVONE & FONNER, LLP

                                            Benjamin Pavone, Esq.
                                            Attorneys for Plaintiffs

### **REQUEST FOR TRIAL BY JURY**

Plaintiffs respectfully request trial by jury.

Date: February 8, 2023                      PAVONE & FONNER, LLP

                                            Benjamin Pavone, Esq.
                                            Attorneys for Plaintiffs

# EXHIBIT 1

# EXHIBIT 1

UNCLASSIFIED

E145

~~SECRET~~, OADR  NSSM-5

17558

CIA —
DOD —
NSC —

REPORT
TO THE
NATIONAL SECURITY COUNCIL

EXC



US POLICY ON CHEMICAL AND BIOLOGICAL
WARFARE AND AGENTS

Submitted by the
Interdepartmental Political-Military Group
in response to NSSM 59

DEPARTMENT OF STATE      IM/IPS/CR/IR    Date: 8/15/97
( ) RELEASE    ( ) DECLASSIFY        IS/FPC/CDR
( ) EXCISE     ( ) DECLASSIFY ... EO Citations
( ) DENY          IN PART
                                          TS authority to
FOIA Exemptions   B1 B2  ( ) CLASSIFY as ( ) S or ( ) C Sec.
Exemptions                ( ) DOWNGRADE TS to ( ) S or ( ) C
                          (X) DOWNGRADE TS to (X) S or ( ) C OADR

GROUP 3
Downgraded at 12 year intervals,
not automatically declassifed.

UNCLASSIFIED

NOVEMBER 10, 19



## US POLICIES ON CHEMICAL AND BIOLOGICAL WARFARE AND AGENTS

### Introduction

In response to NSSM 59, this report by the Inter-departmental Political-Military Group (IPMG) examines US policies, programs, operational concepts and alternatives thereto with regard to both chemical and biological warfare* and agents. Part I contains background information on US policies and programs essential to an understanding of the policy issues. Part II addresses the important policy issues and options, and the relevant pros and cons.

While chemical and biological weapons are often referred to as a single group or category, there are important distinctions between them. For purposes of policy, international law, military application and public discussion, it is essential that these distinctions be kept clearly in mind. For the purposes of this report, CW and BW are considered separately. There are also significant differentiations within the broad chemical and biological categories that require separate consideration.

<u>Biological agents</u> require a period of incubation before they can take effect, and are generally not considered useful where rapid results may be required in tactical or battlefield situations. There are two other notable characteristics of biological weapons:

First, a small amount of an agent (in terms of weight and bulk) has the potential to infect a large target area measured in hundreds of square miles.

---

\* Department of Defense prefers the terms "biological agents" or "biological research agents."





- 8 -

## 2. Soviet Biological Warfare

Our intelligence on Soviet BW capabilities is much less firm than on CW activities. Soviet interest in various potential biological warfare agents has been documented and the intelligence community agrees that the Soviets have all the necessary means for developing an offensive capability in this field.

In Soviet writings, BW is linked with nuclear and chemical warfare in terms that indicate a high degree of political control and restraint. We believe that Soviet vulnerabilities would weigh heavily against Soviet initiation of BW.

There are frequent Soviet references to BW weapons as a "means of mass destruction" that would be used in future conflicts. We believe it unlikely that the Soviets would employ BW as a primary means of initial strategic attack, although it might subsequently be used in the course of a general war. Soviet and NSWP military forces, including naval units, are equipped with personnel and collective protective devices which could enable them to operate in a biological warfare environment. The Soviets probably believe that biological warfare weapons can be effective in some tactical situations, though ineffective in many, and are especially suitable for clandestine delivery.



# EXHIBIT 2

# EXHIBIT 2

# Guard Killed By Inmate At Soledad

*From Our Correspondent*

Soledad,
Monterey county

A Soledad Prison correctional officer died early yesterday after being stabbed in the neck late Wednesday by an inmate in the institution's "X" wing adjustment center.

Officer Robert J. McCarthy, 43, was the eighth man — including three officers to be killed at Soledad in the past 13 months.

Hugo Pinell, 26, an inmate convicted of rape in San Francisco in 1965, and currently serving a life sentence for attacking a San Quentin correctional officer in 1968, was being questioned yesterday by Monterey county district attorney investigators.

Pinell, a Nicaraguan, was also convicted of assaulting another inmate at Folsom Prison last year and is awaiting trial on charges of stabbing Correctional Officer William Monaghan at Soledad last December. Monaghan recovered from his wounds.

According to prison officials, Officer McCarthy was

See Back Page

# Soledad Guard

# Stabbed to Death

**From Page 1**

making a routine count of in-
mates in the harsh maxi-
mum-security wing about
11:10 p.m. Wednesday when
Pinell summoned him back,
saying he wanted to mail a
letter.

Officers who witnessed the
incident said McCarthy
stepped up to Pinell's cell
door to take the letter and
the inmate suddenly lashed
out through a small iron flap
in the door, stabbing the offi-
cer in the neck.

### PENS

Authorities declined to
identify the weapon or say
whether it was found, but in-
dicated that weapons in the
tight adjustment center are
sometimes fashioned from
such items as ballpoint pens
and toothbrushes.

The stabbing severed an
artery in McCarthy's neck,
according to officials, and he
was rushed to the prison hos-
pital with Sergeant Dwight
Phierolf, 46, holding his fin-
ger over the wound to halt
the bleeding.

Emergency surgery was
performed at the prison hos-
pital and McCarthy, a retired
Army veteran, was trans-
ferred to Fort Ord hospital
where he died at 6:37 a.m.
yesterday.

### WIFE

McCarthy, who had been
an officer at Soledad since
1966, leaves a wife and two
children at the family's home
in Marina. He had been
working full-time in "X"
wing since August, 1969.

Pinell was taken from his
cell to another maximum se-
curity section of the prison
and was undergoing ques-
tioning yesterday while other
inmates in "X" wing were
locked in their cells to permit
a complete search of the
area.

So far this year, five
correctional officers have
been stabbed in Soledad's



AP Wirephoto

## ROBERT McCARTHY
**Fatal neck wound**

"X" and "O" wing adjust-
ment centers — referred to
in the prison as "the hole."
At least one inmate has also
suffered stab wounds in an
attack by other inmates.

### BRAWL

Soledad's adjustment cen-
ter has been almost contin-
ually in the news since an
eruption of violence in Janu-
ary, 1970, when a white offi-
cer shot and killed three
black inmates to break up
what authorities said was a
racial "brawl" in the prison's
"O" wing exercise yard.

Three days later, a young
white officer was thrown to
his death over a railing in
one of the prison's wings.

The three black inmates
charged with that crime be-
came known as the "Soledad
Brothers," and are being
held in San Quentin awaiting
trial. Their case has become
a major subject of activist
protest throughout the coun-
try.

Another guard was killed
at Soledad in July of last
year, and a total of five in-
mates were killed in separ-
ate incidents before the year
was out.

# EXHIBIT 3

# EXHIBIT 3

# The Melancholy History of Soledad Prison *In Which*

## *a Utopian Scheme Turns Bedlam*

### Min S. Yee



COMMUNITY COLLEGE OF DENVER
RED ROCKS CAMPUS

HARPER'S MAGAZINE PRESS

Published in Association with Harper & Row, New York

entering yet another bad conduct report in his file to "further arouse the hostility" of the Adult Authority parole board. He reminded the court that the parole officials are "guided solely by the reports and recommendations of the prison officials."

The last allegation in Nolen's suit was even more damaging to the prison. He swore that Soledad officials were "willfully creating and maintaining situations that creates and poses dangers to plaintiff [Nolen himself] and other members of his race." Nolen said he "feared for his life." The case never came to trial; four months after he wrote the petition Nolen was shot to death by an O-wing guard. Two other black inmates, one of whom signed Nolen's petition, were also shot to death.

The killing of W. L. Nolen, on January 13, 1970, began an incredible chain of tragedies that led the California prison system to disaster. The initial consequence was the first killing of a guard in Soledad history, a revenge murder, and from there the poison spread. In the nineteen months following the January 13 incident, at least forty persons were killed as a result of events and circumstances in the California prison system. Of the forty, nineteen murders are directly linked to the series of tragedies which began with the shooting of W. L. Nolen. For the killing of seven guards, two CDC staff members and a Marin County judge, twenty-one blacks and two whites, all inmates, have been charged. No CDC guards or staff have been charged with the shooting deaths of seven black inmates.

These men died:

W. L. Nolen, black inmate, shot by white guard, O. G. Miller.
Cleveland Edwards, black inmate, shot by white guard, O. G. Miller.
Alvin Miller, black inmate, shot by white guard, O. G. Miller.
John V. Mills, white guard, beaten and shoved to his death; George Jackson, Fleeta Drumgo and John Clutchette, three black inmates, charged, acquitted.

36 ]   The Melancholy History of Soledad Prison

William Shull, white guard, stabbed to death; seven blacks charged, three went to trial, all acquitted.

Robert J. McCarthy, white guard, stabbed to death; Hugo Pinell, black inmate, charged.

Kenneth Conant, white prison administrator, stabbed to death; two whites charged.

William Christmas, black inmate, shot to death at the Marin Civic Center.

James McClain, black inmate, shot to death at Marin.

Jonathan Jackson, black youth, shot to death at Marin.

Harold J. Haley, white judge, shot to death at Marin; Ruchell Magee and Angela Davis charged; Davis acquitted, Magee on trial as this is written.

Richard L. McComas, guard lieutenant, gun suicide, after about a hundred Soledad inmates were transferred to Deuel; reportedly committed suicide because he feared for the lives of his men.

Leo Davis, white guard, stabbed to death while guarding a "snitch" who testified in the murder of guard Shull.

Paul Krasenes, white guard, stabbed and strangled to death.

Frank DeLeon, white guard, stabbed and shot to death.

Jere Graham, white guard, stabbed and shot to death; five blacks—Hugo Pinell, Fleeta Drumgo, John Larry Spain, David Johnson and Willie Tate—and two whites—an inmate named Luis Talamantes and an attorney named Stephen Bingham—charged with the three guards' deaths and the two stabbing deaths of:

John Lynn,

Ronald Kane.

George Jackson, shot to death by two white guards.

James Carr, considered George Jackson's closest friend on the outside, shot to death on lawn of his home; two whites charged.

Four other people were critically wounded in two of the above incidents but they survived:

Gary Thomas, assistant district attorney, Marin County, paralyzed from the waist down by gunshot wound to spinal column.

Kenneth McCray, white guard, throat slashed from ear to ear.

Charles Breckenridge, white guard, throat slashed badly.

Urbano Rubiaco, white guard, minor throat slashes, deep stab wounds to throat.

# EXHIBIT 4

# EXHIBIT 4

# Finister v. R.T.C. Grounds

United States District Court for the Central District of California

October 28, 2015, Decided; October 28, 2015, Filed

CASE NO. CV 12-3717-SVW (PJW)

**Reporter**
2015 U.S. Dist. LEXIS 178861 *

DASHAUN FINISTER, Petitioner, v. R.T.C. GROUNDS, Warden of SVSP, Respondent.

**Subsequent History:** Adopted by, Writ of habeas corpus denied, Dismissed by, Certificate of appealability denied Finister v. R.T.C. Grounds, 2016 U.S. Dist. LEXIS 82004 (C.D. Cal., June 22, 2016)

**Counsel:** [*1] Dashaun Finister, Petitioner, Pro se, Soledad, CA.

For R T C Grounds, warden of SVSP, Respondent: Dana M Ali, CAAG - Office of Attorney General, California Department of Justice, Los Angeles, CA.

**Judges:** PATRICK J. WALSH, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** PATRICK J. WALSH

## Opinion

REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This Report and Recommendation is submitted to the Hon. Stephen V. Wilson, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California. For the reasons discussed below, it is recommended that the Petition be denied and the action be dismissed with prejudice.

I.

SUMMARY OF PROCEEDINGS

A. State Court Proceedings

In July 2009, a jury in Los Angeles County Superior Court found Petitioner guilty of first degree murder during an attempted robbery and attempted murder. (Clerk's Transcript ("CT") 260-61.) The jury found that he committed the offenses for the benefit of a criminal street gang and that a principal used and discharged a firearm during the commission of the crime, causing great bodily injury. (CT 260-61.) He was sentenced to life in prison without parole plus 90 years to life.[1] (CT 274-76.) [*2]

---

[1] Petitioner was tried jointly with co-defendant Michael Gregory Harris, who was also convicted of first degree murder and attempted murder. (CT 262-63, 277-79.)

Petitioner appealed to the California Court of Appeal, which reduced his sentence but, in all other respects, affirmed the judgment in a written opinion.[2] (Lodged Document Nos. 4-8.) He then filed a petition for review in the California Supreme Court, which was summarily denied. (Lodged Document Nos. 9-11.)

B. Federal Court Proceedings

Thereafter, Petitioner, proceeding *pro se*, filed a Petition for Writ of Habeas Corpus and, ultimately, a Second Amended Petition (hereinafter "Petition") in this court, pursuant to 28 U.S.C. § 2254, claiming that the trial court violated his constitutional rights by failing to *sua sponte* instruct the jury with CALCRIM No. 703, governing accomplice liability in felony murder prosecutions.[3] (Petition at 8-9.)

II.

STATEMENT OF FACTS

The following statement of facts was taken verbatim from the California Court of Appeal's opinion affirming Petitioner's conviction:

**The burglary**

On January 31, 2008, Luz Gonzalez (Gonzalez) pulled into her driveway and noticed that the front door was ajar and the back door was wide open. When she called her husband on her cell phone he assured her that he had locked the doors before leaving the house that morning. Gonzalez walked into the house and saw that the house had been burglarized. Missing possessions included a large screen television, a camera, jewelry, an iPod, cash, a .45-caliber Para-Ordnance semi-automatic pistol, a .380-caliber Colt Mustang rifle, and a .38-caliber Colt gun. The guns were registered to Gonzalez's husband. Prior to the burglary, Gonzalez's husband had loaded Winchester .45-caliber bullets into the .45-caliber pistol. After the burglary, Gonzalez found the box of Winchester .45-caliber ammunition in a closet and turned it over to the police.

**The murder and attempted murder**

On February 1, 2008, [Steven] Harvey returned home to his duplex residence after taking his son to school. Harvey lived in the rear unit **[*4]** with his father, and his aunt lived in the front unit. Harvey closed the screen door, but not the wooden door leading to the outside. Harvey's cousin [Larry] Fulton was waiting for Harvey in the living room. The two sat down to play a video game. [Harris and Petitioner] then burst through the screen door, brandishing weapons and shouting "Give us all your money. It's a stick-up. It's not a game. Give us the money." Harvey initially stared at [Harris and Petitioner] in astonishment. Harvey got a good look at [Petitioner] and identified him from a photographic lineup and at trial. Harvey testified at trial that [Harris] looked like the second man, but he was not 100 percent sure.

---

[2] Petitioner's sentence was modified to life without the possibility of parole, plus 57 years to life. (Lodged Document No. 8 at 3, 23-24.)

[3] Although Petitioner has listed five separate claims for relief in his Petition, the claims are interrelated and each depends upon a finding that the court erred by failing to give **[*3]** CALCRIM No. 703 to the jury.

[Petitioner] was carrying either a nine-millimeter or .45-caliber handgun. Harvey told [Harris and Petitioner] that he had about $600 in the dresser in his bedroom and that he did not have any weapons. [Harris and Petitioner] took Harvey and Fulton to the bedroom with guns pointed at and touching their hands which were clasped behind their heads. [Harris and Petitioner] said that they needed at least $1,000. [Harris and Petitioner] threatened to blow Harvey and Fulton's heads off if they did not give [Petitioner [*5] and Harris] the rest of the money. [Harris and Petitioner] assured Harvey and Fulton that the threats were made "on the hood cuz," which is akin to a solemn oath made on the neighborhood. Fulton then gave the men $100 from his wallet. [Harris and Petitioner] herded Harvey and Fulton into the hallway, where they stood shoulder to shoulder. [Harris] was standing directly behind them and [Petitioner] was standing about six to ten feet away in the living room near the couch. Harvey began to fidget with anxiety, which seemed to upset [Harris and Petitioner]. Fulton assured them that Harvey was just jumpy and they intended to comply with [Harris and Petitioner's] demands. Harvey and Fulton never resisted or struggled with [Harris and Petitioner]. [Harris and Petitioner] ordered Harvey and Fulton to kneel with their hands behind their heads. Fulton immediately knelt, but Harvey continued to fidget. [Harris and Petitioner] argued between themselves about what to do with their captives. One of the assailants said that they should take Harvey and Fulton with them. The other shouted "No. Fuck that" and fired two shots as Harvey began to kneel next to Fulton. One shot hit Fulton in the back of [*6] the head and the other hit Harvey in the leg. [Harris and Petitioner] then fled. Harvey saw Fulton lying in a pool of blood and that his lips were moving.

Harvey's aunt saw [Harris and Petitioner] running out of the rear unit. She summoned emergency services when she saw that Harvey was wounded. Harvey and Fulton were taken to the hospital by ambulance. Fulton had suffered a fatal bullet wound to the head. The bullet entered the back of his head, perforated the right lung, and fractured the fourth cervical vertebrae. Harvey suffered a bullet wound to his thigh and was hospitalized overnight. He still had a scar at the time of trial.


**The investigation**

An expended .45-caliber bullet was recovered near the couch, a jacketed bullet fragment was found near a pile of clothing in the hallway, and an expended .45-caliber casing was also found in the hallway. Harvey's father found another .45-caliber casing in a pile of clothing in the hallway the day after the shooting. The casings were manufactured by Winchester. The casings and cartridges had been fired from the same .45-caliber firearm. The .45-caliber Para-Ordnance handgun is one of five weapons that could have fired these bullets.

Los Angeles [*7] County Sheriff's Department (LASD) Deputy Edmund Anderson testified that the casings and cartridges recovered from the Harvey house were consistent with the bullets found in Gonzalez's box of ammunition. The bullet removed from Fulton's body was the same grain size as the Gonzalez ammunition.

Deputies arrested [Petitioner] at an apartment in Long Beach where Harris's girlfriend Madalion Bradley (Bradley) lived with Domenique Lewis (Lewis). Items stolen from the Gonzalez residence were recovered from the same Long Beach apartment. Harris, who was not arrested at that time, was outside the apartment when [Petitioner] was detained.


**Harris's statements**

Three weeks after [Petitioner]'s arrest, Harris contacted authorities and arranged to meet LASD Deputy Todd Anderson in front of the Compton courthouse. Harris admitted his membership in the Acacia Block Crips gang and that his moniker was "Rocca." He eventually admitted his involvement in the Gonzalez burglary and that he had stolen a large screen television, some jewelry, an MP3 player, an iPod, a gold .38-caliber pistol, a .380-caliber pistol, and a black .45-caliber Para-Ordnance semi-automatic pistol. Harris said he put the items in a **[*8]** backpack and hid it near a canal, but thereafter could not find it. Later Harris admitted that he took the .45- and .380-caliber pistols to Lewis and Bradley's Long Beach apartment. He also claimed he gave the .45-caliber Para-Ordnance pistol to someone who sold it for $400 the day before the murder of Fulton. Harris said he had given the gold gun to a person named "Weezie." Harris knew that a .45-caliber gun had been used in the murder and the location of the wounds on each victim, even though the police had kept that information from the public. He also knew that one of the victims was named Steve. As he was being arrested, Harris stated: "I don't think that dude ever saw my face."

**Lewis's statements and testimony**

In February 2008, Lewis was interviewed by detectives while she was in custody. She told them that [Petitioner] and Harris were at her apartment with a group of other people. [Petitioner] and Harris claimed that they had shot someone and [Petitioner] admitted he was the shooter. At trial, Lewis testified that she had met [Petitioner] a few months before the murder. Harris and [Petitioner], also known as "Baby Tray," visited her apartment occasionally. On the day of the Gonzalez **[*9]** burglary, [Harris and Petitioner] brought a large screen television and jewelry to Lewis's apartment, claiming the items had been taken during a burglary they had just committed. Five days after the Fulton murder, Lewis heard [Harris and Petitioner] talking about shooting someone during a home invasion robbery. [Petitioner] said that when the victim tried to stop him, he shot the victim. When Lewis asked [Petitioner] why he did not just shoot the victim in the knee, [Harris and Petitioner] hung their heads. Lewis saw [Harris and Petitioner] with a black handgun before the day of the murder and noticed them spending more money than usual after the murder. She also testified that she told the truth to the detectives. She denied telling the police what they wanted to hear just so she could get out of jail.

**Gang expert and other witness testimony**

LASD Deputy Frederick Reynolds (Deputy Reynolds) testified as a gang expert that [Harris and Petitioner] were members of the Acacia Block Crips gang. The Acacia Block Crips gang makes its money by selling drugs and committing robberies and burglaries. Deputy Reynolds opined that [Harris and Petitioner] committed the murder and attempted murder in **[*10]** order to benefit the Acacia Block Crips because they swore "on the hood," and used a high level of violence during the crime. He testified that gang members maintain respect for the gang by committing murders.

Weezie was arrested after the Gonzalez burglary but before Gonzalez reported the crime to the police. One of Gonzalez's guns was recovered from Weezie when he was arrested. Weezie was incarcerated in juvenile hall on the day Fulton was murdered.

Robert Royce (Royce), a private investigator engaged by [Harris and Petitioner], testified that he interviewed Lewis while she was in custody and that she told him she did not tell the police the truth and that she would say anything they wanted to hear in order to get out of jail. Lewis said that she did

not tell the police that Harris was in possession of a handgun while in her apartment. Royce told her he would report her statements to defense attorneys.

(Lodged Document No. 8 at 4-8.)

III.

STANDARD OF REVIEW

The standard of review in this case is set forth in 28 U.S.C. § 2254:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated **[*11]** on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established federal law if it applies a rule that contradicts Supreme Court case law or if it reaches a conclusion different from the Supreme Court's in a case that involves facts that are materially indistinguishable. *Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002). To establish that the state court unreasonably applied federal law, a petitioner must show that the state court's application of Supreme Court precedent to the facts of his case was not only incorrect but objectively unreasonable. *Renico v. Lett*, 559 U.S. 766, 773, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010). Where no decision of the Supreme Court has squarely decided an issue, a state court's adjudication of that issue cannot result in a decision that is contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *See Harrington v. Richter*, 562 U.S. 86, 101, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

Petitioner raised his claim in his **[*12]** petition for review in the California Supreme Court, but that court did not explain its reasons for denying it. (Lodged Document No. 10.) The appellate court, however, did (Lodged Document No. 8), which this Court presumes is the basis for the state supreme court's subsequent decision denying the claim. In this situation, the Court looks to the appellate court's reasoning and will not disturb it unless it concludes that "fairminded jurists" would all agree that the state court's decision was wrong. *Richter*, 562 U.S. at 102; *Johnson v. Williams*, 133 S. Ct. 1088, 1094 n.1, 185 L. Ed. 2d 105 (2013) (approving reviewing court's "look through" of state supreme court's silent denial to last reasoned state-court decision).

IV.

DISCUSSION

Petitioner claims that the trial court should have *sua sponte* instructed the jury with CALCRIM No. 703 because it was not clear from the evidence whether Petitioner or Harris was the shooter.[4] (Petition at 8-9.)

---

[4] CALCRIM No. 703 defines the intent requirement for an accomplice charged with special **[*13]** circumstances felony-murder as follows:

2015 U.S. Dist. LEXIS 178861, *13

He argues that, without that instruction, the jury could have convicted him of murder without finding that he acted with the intent to kill or with reckless indifference to human life, as required under state law. (Petition at 9.) There is no merit to this claim.

A faulty jury instruction warrants federal habeas relief only if the instruction by itself so infected the entire trial that the resulting conviction violated due process. *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991). Where, as here, the alleged error is the failure to give an instruction--as opposed to giving the wrong instruction--the burden on a petitioner is "especially **[*15]** heavy" because any such omission is "less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977). To obtain habeas relief in this circumstance, a petitioner must also show that the error had a substantial and injurious effect or influence on the verdict. *Calderon v. Coleman*, 525 U.S. 141, 145, 119 S. Ct. 500, 142 L. Ed. 2d 521 (1998).

In denying this claim, the California Court of Appeal held that the trial court did not have a duty to *sua sponte* instruct the jury with CALCRIM No. 703 because there was evidence that Petitioner was the actual shooter:

At trial, Lewis confirmed that she told detectives that [Petitioner] shot Fulton. She testified that she confronted [Petitioner] and asked him why he had to shoot the victim. The passages that [Petitioner] cites to in support of his argument that Lewis suggested neither [Petitioner] nor Harris was the shooter or that both were the shooters do not support his interpretation. At one point, Lewis testified: "I said that as far as either one of them just coming out saying, 'Yeah, I killed them' ... I never heard that come out they mouth." Lewis's testimony that [Harris and Petitioner] hung their heads came immediately after she testified that she asked [Petitioner] "Why did you tell anybody?" He responded,

---

If you decide that (the/a) defendant is guilty of first degree murder but was not the actual killer, then, when you consider the special circumstance[s] of <insert felony murder special circumstance[s]>, you must also decide whether the defendant acted either with intent to kill or with reckless indifference to human life.

In order to prove (this/these) special circumstance[s] for a defendant who is not the actual killer but who is guilty of first degree murder as (an aider and abettor/ [or] a member of a conspiracy), the People must prove either that the defendant intended to kill, or the People must prove all of the following:

1. The defendant's participation in the crime began before or during the killing;

2. The defendant was a major participant in the crime; AND

3. When the defendant participated in the crime, (he/she) acted with reckless indifference to human life.

[A person acts with reckless indifference to human life when he or she knowingly engages in criminal activity that he or she knows involves a grave risk of death.]

[The People do not have to prove that the actual killer acted with intent to kill or with reckless indifference to human life in order for the special circumstance[s] of <insert felony-murder **[*14]** special circumstance[s]> to be true.]

[If you decide that the defendant is guilty of first degree murder, but you cannot agree whether the defendant was the actual killer, then, in order to find (this/these) special circumstance[s] true, you must find either that the defendant acted with intent to kill or you must find that the defendant acted with reckless indifference to human life and was a major participant in the crime.]

If the defendant was not the actual killer, then the People have the burden of proving beyond a reasonable doubt that (he/she) acted with either the intent to kill or with reckless indifference to human life and was a major participant in the crime for the special circumstance[s] of <insert felony murder special circumstance[s]> to be true. If the People have not met this burden, you must find (this/these) special circumstance[s] (has/have) not been proved true [for that defendant].

(Lodged Document No. 8 at 20-21 n.5.)

"Well, what **[*16]** am I going to do?" Moreover, in closing argument, the prosecutor argued that [Petitioner] shot Fulton in the head and Harvey in the leg.

(Lodged Document No. 8 at 21.)

The appellate court also found that any error in omitting the instruction was harmless because the jury necessarily found that Petitioner acted with the requisite intent to kill even if he only aided and abetted the murder:

> Assuming that the evidence did not establish that [Petitioner] was the shooter and that the jury could conclude from the evidence that [Petitioner] or Harris was the aider and abettor to the other, we find that the trial court's failure to instruct with CALCRIM No. 703 was harmless beyond a reasonable doubt.
>
> Here, the jury was instructed with CALCRIM No. 600 that "To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person. [¶] ... [¶] ... In order to convict the defendant of the attempted murder of Steve Harvey, the People must prove that the defendant not only *intended to kill Larry Fulton but also either intended to kill* **[*17]** *Steven Harvey, or intended to kill anyone within the kill zone.* If you have a reasonable doubt whether the defendant *intended to kill Larry Fulton by harming everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Steve Harvey.*" (Italics added.) Thus, given CALCRIM No. 600, if the jury found [Harris or Petitioner] was an aider and abettor, it necessarily found he intentionally aided and abetted the actual killer, who was himself motivated by the intent to kill. By finding [Harris and Petitioner] guilty of the attempted willful, deliberate, premeditated murder of Harvey, the jury found that [Harris and Petitioner] intended to kill Fulton. Therefore, a failure to give CALCRIM No. 703 was harmless because the jury had necessarily found intent to kill under another properly given instruction.

(Lodged Document No. 8 at 21-22 (internal citations omitted).)

The Court agrees. The trial court did not err and, even if it did, the error was harmless. To begin with, the evidence established that Petitioner admitted to Lewis that he was the shooter. (Reporter's Transcript ("RT") 1213-15; CT 133.) Thus, CALCRIM No. 703, the accomplice instruction, was irrelevant. **[*18]**

Petitioner challenges the veracity of Lewis's testimony. He points out that she was in custody at the time she initially spoke to police and, according to a defense investigator, later admitted to him that she would say anything that the police officers wanted to hear in order to get out of jail. This challenge is rejected. The jury listened to Lewis and the defense investigator and, obviously, rejected the investigator's claim that Lewis admitted that she was lying and accepted Lewis's testimony that Petitioner admitted that he shot the victims. This Court is not empowered or inclined to reassess that credibility determination. *See Bruce v. Terhune*, 376 F.3d 950, 957-58 (9th Cir. 2004) (per curiam) (holding district court's role in habeas does not include revisiting jury credibility determinations); *Roehler v. Borg*, 945 F.2d 303, 306 (9th Cir. 1991) (finding federal court on habeas review "do[es] not have the jurors' right to weigh the evidence" but may only determine "whether rational jurors could reach the conclusion that these jurors reached"); *United States v. Goode*, 814 F.2d 1353, 1356 (9th Cir. 1987) ("[I]t was the jury's job to decide whether to believe [the witness].").

Finally, even assuming that the trial court erred in failing to instruct the jury with CALCRIM No. 703, the error was harmless. The court charged the jury with CALCRIM No. 600, **[*19]** which required the jurors

to find that the defendants acted with the intent to kill in order to convict them of the attempted murder of Harvey--which the jurors did. As the state appellate court noted, in finding that the defendants intended to kill Harvey, the jury necessarily concluded that Petitioner and Harris also intended to kill Fulton. Thus, even if the jury did not find that Petitioner shot Fulton and Harvey, it did find that Petitioner acted with the requisite intent to kill to support his conviction for first degree murder as an accomplice. *See Stayer v. McDonald*, 2011 U.S. Dist. LEXIS 58360, 2011 WL 2149795, at *32 (E.D. Cal. June 1, 2011) ("Since other given instructions as cited by the state appellate court adequately described the findings the jury had to make with respect to the special circumstance alleged, it is of no moment if the trial court made an error of state law in failing to instruct with CALCRIM Nos. 700 and 703."). Finally, because the evidence was overwhelming that Petitioner was a major participant in an armed robbery in which the defendants held a loaded gun to the victims' heads, there was ample evidence to conclude that he acted with reckless indifference to human life and was, therefore, guilty under an accomplice theory even if he was not the **[*20]** shooter. *See Banister v. McComber*, 2015 U.S. Dist. LEXIS 106306, 2015 WL 4760683, at *9 (CD. Cal. July 21, 2015) (upholding conviction for special circumstances murder because failure to instruct with CALCRIM No. 703 was harmless error in light of "substantial evidence Petitioner was a major participant in the burglary, robbery and beating of [the victim]"); *see also California v. Roy*, 519 U.S. 2, 5, 117 S. Ct. 337, 136 L. Ed. 2d 266 (1996) (holding omission of "intent" element from aiding and abetting instruction subject to harmless error analysis where jury could have found intent based on evidence it considered). For these reasons, Petitioner's claim fails.

V.

RECOMMENDATION

For these reasons, IT IS RECOMMENDED that the Court issue an Order (1) accepting this Report and Recommendation and (2) directing that Judgment be entered denying the Petition and dismissing the case with prejudice.[5]

DATED: October 28, 2015.

/s/ Patrick J. Walsh

PATRICK J. WALSH

UNITED STATES MAGISTRATE JUDGE

---

End of Document

---

[5] The Court is not inclined to issue a certificate of appealability in this case. *See* Rule 11, Federal Rules Governing Section 2254 Cases ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.") If Petitioner believes a certificate should issue, he should explain why in his objections.

# EXHIBIT 5

# EXHIBIT 5



**WORKERS AND OPPRESSED PEOPLES OF THE WORLD UNITE**

HOME | NEWS | ESPAÑOL | SUBSCRIBE | JOIN US | CLASSES | BOOKS | PDF | VIDEO | DONATE

Home » Prisons: tear them down » Former Black Panther killed in California prison

# Former Black Panther killed in California prison

By **Abayomi Azikiwe** posted on August 19, 2015

Hugo Pinell, 71, a former comrade of George L. Jackson, was killed on Aug. 12 in California State Prison-Sacramento near Sacramento, Calif.

Pinell, known by many as "Yogi Bear," had recently been released from 46 years of solitary confinement and was the longest serving prisoner held in administrative detention in the state of California. He had written to one of his supporters that he feared for his life at the prison. (KPFA interview with Kiilu Nyasha, Aug. 13)

In 1965 Pinell was given a 3-years-to-life sentence for rape, a crime for which he said he was not guilty. He and his mother were told that if he did not confess, he could face the death penalty.



**Hugo Pinell in 1982**

Pinell was stabbed to death by another prisoner on the first day he was released into general population at CSP-Sacramento. The corporate media described the circumstances surrounding his killing as a "riot" when clashes erupted after Pinell was brutally stabbed in the prison yard.

His death has sent shockwaves through the ranks of veteran Black Panther Party members, supporters of political prisoners and anti-racist forces.

**San Quentin Six and George L. Jackson**

Pinell was a member of the San Quentin Six, who were involved in the attempted prison break to liberate George Jackson on Aug. 21, 1971, where Jackson was gunned down by guards. Three prison guards and two white

To search, type and hit enter

**Defend workers' rights, build Workers World!**

WORKERS AND OPPRESSED OF THE WORLD UNITE! ¡OPRIMID@S Y TRABAJADOR@S DEL MUNDO UNANSE! WORKERS WORLD PARTY PARTIDO MUNDO OBRERO

*Make a donation to support WW>>>*

**Get Workers World by Email**

EMAIL ADDRESS (REQUIRED)

FIRST NAME

LAST NAME

ZIP CODE

Subscribe

**Stay connected**

   

**This week's PDF**

Get the latest updates from Workers World

Email address

Subscribe

Long before that, George Jackson was already well known throughout the African-American revolutionary movement and the left as a whole. His prison letters were published in the 1970 book entitled "Soledad Brother: The Prison Letters of George Jackson."

The Soledad Brothers were three African-American prisoners, George Jackson, Fleeta Drumgo and John Clutchette, who were charged with killing a guard at San Quentin in January 1970. Several days earlier, three Black inmates had been killed by white prison guard snipers during a racial melee in the yard.

A national movement arose in defense of the Soledad Brothers, which drew the support of Angela Davis, a Communist Party member and lecturer who had been terminated by the University of California, Los Angeles in 1969 because of her political beliefs.

Jackson had originally been sentenced to a 1-year-to-life sentence in California in 1960 for being in the company of several others who stole $70 from a gas station. During his tenure in prison, Jackson began to read voraciously about history, military science, philosophy and Marxist-Leninist theory.

Prison authorities attempted to break Jackson's confidence and defiance for many years. He became a leader and mentor for other prisoners during a period when the Civil Rights, Black Power, anti-war and left movements were gaining tremendous ground in the U.S.

Pinell spent decades in solitary confinement for refusing to compromise with the system, and was the only one of the San Quentin Six remaining in prison. All the others had been released decades earlier.

**Black August started by political prisoners**

Pinell's killing occurred during Black August, an annual commemoration of the resistance of African Americans to oppression and exploitation. Created by political prisoners years ago, Black August continues to be commemorated across the U.S.

The month-long acknowledgement of resistance stems from the historical fact that many great efforts aimed at liberation took place during August. Such historical developments include the beginning of the Haitian Revolution (1791); Nat Turner's Rebellion in Virginia (1831); John Brown's raid on Harper's Ferry (1859); the Watts Rebellion (1965); the attempt by Jonathan Jackson, the younger brother of George, to free him from prison (1970); the San Quentin Rebellion (1971); and the 2014 police murder of Michael Brown in Ferguson, Mo.



Nov. 17, 2022 issue
Past issues

## Categories

Africa

Asia & the Pacific

Climate and Environmental Crisis

COVID-19 and Health Crisis

Disability rights

Editorials

Europe

Global

Human needs before profits

Im/migrants and Refugees

Latin America & the Caribbean

LGBTQ2+ liberation

Middle East

Mundo Obrero

Prisons: tear them down

Racism and Self-Determination

Reproductive Rights

Revolutionary Theory and Practice

Sports, Arts and Culture

Stop imperialist war and occupation ▼

Get the latest updates from Workers World

Email address

Subscribe

inside prison walls is continuing today through the rebellions and mass demonstrations in Ferguson, Baltimore and other cities.

African Americans are still jobless at rates at least twice as high as whites. Millions are confined to low-wage jobs with no economic security or social benefits.

Every week news stories report that African Americans are being gunned down by police and vigilantes.

The school-to-prison pipeline is still very much in evidence in urban areas. A disproportionate number of inmates and people under judicial supervision are African Americans and Latinos/as from poor and working-class backgrounds.

There are still many political prisoners inside the U.S. despite the "human rights" posture of successive administrations. Until the system of national oppression and capitalist exploitation is overthrown there is no hope for ending the prison-industrial complex.

African Americans     Black August     California     George Jackson

← Previous article                          Next article →

Workers unite!

Workers World Party

Youth and Students

## WW books



Tibet and the CIA's anti-China crusade

## Archives

Select Month ▾

## Workers World Party

 **PDF of November 17 issue**

 **PDF of November 10 issue**

 **PDF of October 27 issue**

 **PDF of October 20 issue**

 **Ukraine: Wage a class war against imperialist war**

 *Clarion call to the movement* **Prepare for the biggest global capitalist crisis in history**

## Print issue returns

Due to the COVID-19 pandemic, Workers World suspended printing and mailing of the newspaper in March 2020. We have continued publishing articles on workers.org, along with a weekly PDF of what would have been the printed version. We are pleased to announce that we have resumed printing and mailing on a monthly basis, for now. Subscribers should have received a printed paper since September 2021. Print subscriptions will still be extended in consideration of the temporary suspension of printing and the currently more limited print schedule. We recommend that subscribers with internet access get our free email subscription and share our articles with your contacts and on social media.
— *WW managing editors: John Catalinotto, Martha Grevatt, Deirdre Griswold, Monica Moorehead, Betsey Piette and Minnie Bruce Pratt.*

## Download this week's PDF



Nov. 17, 2022 issue
Past issues

## Contact Info

National Office
147 W. 24th St. 2nd Fl.
New York, NY 10011

Phone: 212-627-2994
E-mail: WWP@Workers.org

## Follow Workers World

   

Copyright © 2021 Workers World. Verbatim copying and distribution of articles is permitted in any medium without royalty provided this notice is preserved.

Copyright © 2021 Workers.org

▼   ─

Get the latest updates from Workers World

Email address

Subscribe

# EXHIBIT 6

# EXHIBIT 6

1  ASHLEY R. AMERIO, ESQ. (SBN 230469)
   JEFFREY FLETTERICK, ESQ. (SBN 270847)
2  **AMERIO LAW FIRM P.C.**
   1651 Response Road, First Floor
3  Sacramento, CA 95815
   Telephone: (916) 419.1111
4  Email: ashley@ameriolaw.com
          jeff@ameriolaw.com
5
   Attorneys for Plaintiff,
6  ALLEGRA CASIMIR-TAYLOR

7

8               **UNITED STATES DISTRICT COURT**

9               **EASTERN DISTRICT OF CALIFORNIA**

10

11  Estate of HUGO PINELL, deceased, by and       Case No.:
    through ALLEGRA CASIMIR-TAYLOR,
12  as Successor in Interest and ALLEGRA           **COMPLAINT FOR WRONGFUL
    CASIMIR-TAYLOR, Individually                   DEATH (CCP § 377.60, et. seq.)**
13
              Plaintiff,
14
       v.
15
    STATE OF CALIFORNIA, CALIFORNIA
16  DEPARTMENT OF CORRECTIONS AND
    REHABILITATION, SCOTT KERNAN,
17  RON RACKLEY, and DOES 1 through 100,
    inclusive,
18
              Defendants.
19

20

21         Plaintiffs ALLEGRA CASIMIR-TAYLOR and the Estate of HUGO PINELL, by and

22  through ALLEGRA CASIMIR-TAYLOR, as Successor in Interest, (herein, "Plaintiffs") for

23  causes of action against Defendants STATE OF CALIFORNIA, DEPARTMENT OF

24  CORRECTIONS AND REHABILITATION (herein after "CDCR"), SCOTT KERNAN, RON

25  RACKLEY and DOES 1 through 100, inclusive and each of them who allege as follows:

26                       **JURISDICTION AND VENUE**

27         1.      This complaint seeks damages and attorneys' fees pursuant to Title 42 U.S.C.

28  sections 1983 and 1988 for violations of decedent's and survivor's civil rights and violations of

AMERIO LAW FIRM, P.C.
1651 Response Road, Suite 111
Sacramento, CA 95815

California State law. Jurisdiction is founded upon Title 28 U.S.C. sections 1331 and 1343. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. section 1367.2.

2.    Plaintiffs' claims arose in the County of Sacramento, California. Venue lies in the Eastern District of California pursuant to 28 U.S.C. § 1291(b)(2).

**FACTUAL BACKGROUND**

3.    HUGO PINELL ("PINELL") had gained notoriety during his 43 years of incarceration in which he was isolated in the SHU unit for a majority of the time. He was known as one of the "San Quentin Six" for his alleged participation in a violent attack within the prison in 1971 under the leadership of black militant George Jackson that resulted in the death of correctional officers.

4.    Over the years, PINELL was attacked by other inmates. In 1981, he received lacerations when an inmate threw a homemade bomb at him. In 1984, he was stabbed twice in the back by another inmate.

5.    PINELL spent much of his time in prison in solitary confinement at his request. In 1987, he stated that he stayed in his cell in Folsom to avoid his enemies and was concerned that they're not going to give up now.

6.    CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION ('CDCR") employees referred to PINELL as the most dangerous man in the California prison system.

7.    ALLEGRA CASIMIR-TAYLOR reached out to her father, PINELL and started writing her father PINELL on a daily basis. His insight and caring despite his long incarceration was inspiring to her and renewed her vigor in pursuing her charitable work within under-served communities.

8.    PINELL was transferred to California State Prison, Sacramento in January 2014. Once PINELL was transferred, ALLEGRA CASIMIR-TAYLOR started visiting him every weekend and rearranged her schedule on a consistent basis so she would not miss the visitations.

9.    PINNEL was an important figure in ALLEGRA CASIMIR-TAYLOR's life.

AMERIO LAW FIRM, P.C.
1651 Response Road, Suite 111
Sacramento, CA  95815

**GENERAL ALLEGATIONS**

10.     This action arises out of the untimely and avoidable death of HUGO PINELL at New Folsom State Prison officially known as California State Prison, Sacramento ("CSPS") on August 12, 2015.

11.     PINELL was kept in a Security Housing Unit ("SHU") or solitary confinement for 43 years. Just 5 days before he was killed, he was released into general population despite the fact that CDCR knew that he was targeted by other inmates. They were aware of multiple credible death threats against PINELL including a threat issued by the Aryan Brotherhood.

12.     On August 12, 2015, PINELL was attacked by at least two white inmates in a general-population yard at CSPS. Jayson W. Weaver and Waylon D. Pitchford, who both had an extensive history of racially motivated attacks on other inmates, were criminally charged for their alleged role in the assassination.

13.     Defendants knew that Weaver was convicted in 2006 for an assault on another inmate, drawing a life-without-parole sentence and that he had already been serving a sentence of life in prison with the possibility of parole for a 1995 murder conviction.

14.     Defendants knew that Pitchford is facing charges in connection with another violent assault on an inmate at the Folsom prison and that he is accused of attacking another inmate and with possession of a shank in August 2013.

15.     The attack culminated in a prison riot that ended up injuring 29 other inmates. The riot began in a general-population yard at the prison, which houses 2,300 maximum-security inmates. The assassination of PINELL was that catalyst for the melee.

16.     CDCR staff knew that he was a target for assassination by multiple groups of prisoners and that there was substantial risk he would be killed if was taken out of the SHU unit and placed in General Population. Reportedly CDCR employees placed bets on how long PINELL would survive being in general population.

**PARTIES**

17.     The full extent of the facts linking the factiously designated Defendants within this cause of action and/or the true names or capacities, whether individual, corporate,

AMERIO LAW FIRM, P.C.
1651 Response Road, Suite 111
Sacramento, CA  95815

1    partnership, associate, or otherwise, of Defendants DOES 1 through 100 are unknown to

2    Plaintiffs. Plaintiffs are informed, believe, and alleged that each of Defendants designated as a

3    DOE is negligently, wantonly, wrongfully and unlawfully responsible in some manner for the

4    events and happenings herein referred to and proximately caused injured and damages to

5    Plaintiffs as herein alleged. Plaintiffs will hereinafter seek leave of Court to amend this

6    Complaint to show said Defendants' true names and capacities after the same have been

7    ascertained.

8        18.    At all times herein mentioned, each Defendant was the agent of each and all other

9    Defendants, and each of them, and said action was within the course and scope of said agency.

10        19.    At all times mentioned herein Plaintiff ALLEGRA CASIMIR-TAYLOR was the

11    daughter of decedent HUGO PINELL, and resided within the State of California.

12        20.    At all times mentioned herein Plaintiff's Decedent, HUGO PINELL, was an

13    inmate at CSPS within the State of California.

14        21.    Plaintiffs are informed and believe and thereon allege that, at all times mentioned

15    herein, Defendants, STATE OF CALIFORNIA and DOES 1 through 10 and STATE OF

16    CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION (CDCR) and

17    DOES 11-20 (hereinafter referred to as "STATE OF CALIFORNIA/CDCR"), was acting under

18    color of state law and were duly organized public entities within the State of California who

19    owned and/or controlled California State Prison, Sacramento (hereinafter referred to as "CSPS")

20    where the subject incident occurred, was acting under color of state law, and are subject to the

21    jurisdiction of this Court.

22        22.    At all times herein mentioned, Plaintiff is informed and believes that SCOTT

23    KERNAN and DOES 21-30 is the Chief of CDCR and was acting under color of state law.

24        23.    At all times herein mentioned, Plaintiff is informed and believes that RON

25    LACKEY and DOES 31-40 is the Warden at CSPS was acting under color of state law.

26    **COMPLIANCE WITH GOVERNMENT TORT CLAIM PROCEDURES**

27        24.    As a pre-requisite to the state law claims alleged herein against State of California

28    employees/agents, Plaintiffs timely filed governmental claims with the Victims Compensation

AMERIO LAW FIRM, P.C.
1651 Response Road, Suite 111
Sacramento, CA  95815

AMERIO LAW FIRM, P.C.
1651 Response Road, Suite 111
Sacramento, CA  95815

1    and Government Claims Board. A copy of the Claim is attached as Exhibit A.

2        25.    By correspondence from the California Victims Compensation and Government

3    Claims Board these claims were rejected. A copy of the rejection is attached as Exhibit B.

4        26.    This action has been filed within six months of the rejection by the California

5    Victims Compensation and Government Claims Board rejection, as required by law.

6                        **FIRST CAUSE OF ACTION**
                    Deliberate Indifference to Health and Safety
7          (Violation of the Eighth Amendment to the U.S. Constitution:
                    Survival Action- 42 U.S.C. §1983)
8

9        27.    On behalf of decedent PINELL, Plaintiffs re-allege and incorporate by reference

10   paragraphs 1 through 26, as though fully set forth herein.

11       28.    Defendants and Does 1 through 100, and each of them, knew that decedent was in

12   imminent danger of serious risk of harm to his health and safety, including being at obvious risk

13   of being targeted for assassination, if he was placed in general population due to (1) multiple

14   death threats (2) various documentation in his transfer paperwork and C-file, which specifically

15   noted that he had could not be placed in general population, and that he was in grave danger and

16   would be killed if he was let out of solitary confinement or SHU and placed in general

17   population.

18       29.    The imminent danger of death or grievous bodily harm to PINELL that

19   Defendants ignored and failed to take adequate safety precautions against were obvious and

20   immediate substantial threats to his health, safety, and to his very life.

21       30.    Defendants' acts and/or omissions as alleged herein, including but not limited to

22   the failure to take other measures to protect him from serious harm, constituted deliberate

23   indifference to a substantial risk PINELL's health, safety and well-being.

24       31.    As a direct and proximate result of Defendants' conduct, decedent PINELL

25   experienced the damages alleged herein, including but not limited to physical pain and suffering,

26   emotional distress, mental anguish, and loss of his life.

27       32.    The aforementioned acts and/or omissions of the individually named Defendants,

28   and each of them, were malicious, reckless and/or accomplished with a conscious disregard of

1    decedent's rights thereby entitling Plaintiffs to an award of exemplary and punitive damages

2    according to proof to punish the wrongful conduct alleged herein and to deter such conduct in the

3    future.

4                              **SECOND CAUSE OF ACTION**
                     Supervisory Liability based on Customs, Practices or Policies
5                              (Survival Action- 42 U.S.C. §1983)

6          33.     On behalf of decedent PINELL, Plaintiffs re-allege and incorporate by reference

7    the paragraphs 1 through 21, as though fully set forth herein.

8          34.     The aforementioned acts and/or omissions of Defendants, and each of the, in

9    being deliberately indifferent to PINELL's  health and safety and in violating decedent's civil

10   rights were the direct and proximate result of customs, practices or policies, or the lack thereof,

11   of SCOTT KERNAN, RON RACKLEY, and DOES 1 through 100, and each of them.

12         35.     Such customs, practices, polices and/or procedures include, but are not limited to,

13   an ongoing pattern of deliberate indifference to a credible and substantial threat to health and

14   safety of CSPS inmates, including the following: a failure to ensure implementation of

15   appropriate health and safety  plans; a failure to act upon death threats or threats of  grievous

16   bodily harm; a failure to provide appropriate staffing and training at CSPS for providing safety

17   and ensure inmates' civil rights are not violated; a failure to implement a policy to ensure that

18   staff would adequately respond to threats against inmate safety in a  timely manner; a failure to

19   create and/or implement guidelines that must be followed to remove inmates from places and

20   situations that present a serious and imminent risk of death; a failure to create and/or implement

21   protocols for monitoring at-risk inmates removed from protective custody and placed in general

22   custody, a failure to create, implement and/or ensure that staff follow policies, guidelines or steps

23   to be taken when staff observe that an inmate is in imminent danger of death; a failure to

24   adequately train and supervise employees and/or agents to prevent the occurrence of the

25   constitutional violations alleged herein; and a failure to promulgate appropriate policies or

26   procedures or take other measures to prevent the constitutional violations alleged herein.

27         36.     As a direct and proximate result of the aforementioned customs, practices,

28   policies and/or procedures of said Defendants, or as a result of Defendants' failure to promulgate

AMERIO LAW FIRM, P.C.
1651 Response Road, Suite 111
Sacramento, CA  95815

Complaint for Wrongful Death

1 | appropriate policies or procedures, decedent PINELL suffered the damages alleged herein,

2 | including but not limited to physical pain and suffering, emotional distress, mental anguish, and

3 | loss of his life.

4 | **THIRD CAUSE OF ACTION**
Failure to Supervise, Investigate and Discipline

5 | (Survival Action - 42 U.S.C. §1983)

6 | 37.    On behalf of decedent PINELL, Plaintiffs re-allege and incorporate by reference

7 | the paragraphs 1 through 36, as though fully set forth herein.

8 | 38.    The Constitutional violations by Defendants as alleged herein occurred as a result

9 | of the failure to adequately supervise, investigate, and discipline.

10 | 39.    Defendants SCOTT KERNAN, RON RACKLEY, and DOES 1 through 100, and

11 | each of them, failed to adequately supervise, investigate and discipline subordinate employees in

12 | regard to preventing deliberate indifference to the serious threats to the health and safety of

13 | inmates at CSPS. Said Defendants' failure to supervise, investigate and discipline employees

14 | amounted to deliberate indifference to inmates' right to be free of substantial risk of serious harm

15 | to their health and safety.

16 | 40.    As a direct and proximate result of the aforementioned failure to supervise,

17 | investigate and/or discipline, decedent PINELL suffered the damages alleged herein, including

18 | but not limited to physical pain and suffering, emotional distress, mental anguish, and loss of his

19 | life.

20 | **FOURTH CAUSE OF ACTION**
Substantive Due Process- Loss of Parent/Child Relationship

21 | (Violation of the Fourteenth Amendment to the U.S. Constitution: 42 U.S.C. §1983)

22 | 41.    Plaintiffs re-allege and incorporate by reference the paragraphs 1 through 40 as

23 | though fully set forth herein.

24 | 42.    The acts and/or omissions of Defendants as alleged herein, of being deliberately

25 | indifferent to the serious threat of imminent death of decedent PINELL by failing to take

26 | adequate preventative measures after they knew that there was a credible imminent deadly threat

27 | to decedent resulted in PINELL's death, which deprived Plaintiffs their liberty interest in the

28 | parent-child relationship in violation of their substantive due process rights as defined by the

AMERIO LAW FIRM, P.C.
1651 Response Road, Suite 111
Sacramento, CA  95815

1    First and Fourteenth Amendments to the United States Constitution.

2        43.    Such conduct by said Defendants "shocks the conscience."

3        44.    As a direct and proximate result of said Defendants' conduct, Plaintiffs suffered

4    injuries and damages as alleged herein including pain and suffering and emotional distress.

5        45.    The aforementioned acts and/or omissions of the individually named Defendants

6    were willful, wanton, malicious, reckless, and oppressive, thereby justifying an award of

7    exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such

8    conduct in the future.

9                    **FIFTH CAUSE OF ACTION**
                          Wrongful Death
10             (Cal. Code of Civil Procedure § 377.60 et seq.)

11       46.    On behalf of decedent PINELL, Plaintiffs re-allege and incorporate by reference

12    paragraphs 1 through 45, as though fully set forth herein.

13       47.    Plaintiff ALLEGRA CASIMIR-TAYLOR is the daughter of the decedent, who

14    has no surviving spouse or other surviving children. Filed concurrently with this complaint is

15    Declaration of ALLEGRA CASIMIR-TAYLOR complying with Cal. Code of Civil Procedure

16    section 377.32.

17       48.    The acts and/or omissions with deliberate indifference to a substantial risk of

18    serious harm by Defendants directly and proximately caused the wrongful death of PINELL and

19    were the direct and proximate cause of Plaintiffs' injuries entitling Plaintiffs to recover damages

20    pursuant to Code of Civil Procedure section 377.60 et seq.

21       49.    That on or about August 12, 2015, Defendants, and each of them expressed a

22    culpable state of mind showing deliberate indifference to a substantial risk to the safety of

23    decedent by recklessly placing him in the general population knowing of the known imminent

24    danger of serious harm to decedent's well-being without adequate means of protection which

25    resulted in his untimely death.

26    //

27    //

28    //

AMERIO LAW FIRM, P.C.
1651 Response Road, Suite 111
Sacramento, CA  95815

AMERIO LAW FIRM, P.C.
1651 Response Road, Suite 111
Sacramento, CA 95815

## SIXTH CAUSE OF ACTION
Wrongful Death
(Cruel and Unusual Punishment U.S.C. §1986)

50.    On behalf of decedent PINELL, Plaintiffs re-allege and incorporate by reference paragraphs 1 through 49, as though fully set forth herein.

51.    The acts and/or omissions of Defendants, and each of them, as alleged herein with deliberate indifference to a known substantial risk of serious harm by Defendants directly and proximately caused cruel and unusual punishment to be inflicted upon decedent which resulted in his death. Defendants expressed a willful disregard for decedent's well- being by recklessly placing him in the general population on August 12, 2015 without reasonable diligence in regards to his safety.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs prays for the following relief:

1. For compensatory, general and special damages against each Defendant, jointly and severally, in the amount proven at trial;

2. For punitive and exemplary damages against each individually named Defendant in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct;

3. For costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and as otherwise authorized by statute or law;

4. For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.

Dated: September 23, 2016                **AMERIO LAW FIRM, P.C.**


**By:** /s/ Ashley R. Amerio
ASHLEY R. AMERIO, ESQ.
JEFFREY FLETTERICK, ESQ.
Attorneys for Plaintiff

Complaint for Wrongful Death

# EXHIBIT 7

# EXHIBIT 7



# COURTHOUSE NEWS SERVICE

## State Sued Over Murder of 'San Quentin 6' Inmate

NICK CAHILL / September 27, 2016

SACRAMENTO, Calif. (CN) — Revered by civil rights activists for his role in California's 1960s prisoner-rights movement and one of the "San Quentin Six," Hugo Pinell was "assassinated" days after being released into general population in 2015 after 43 years in solitary confinement. Pinell's murder sparked a massive inmate riot at a California prison and left his family questioning why the 71-year-old inmate who was serving multiple life sentences was ever allowed on the prison yard.

Claiming a set-up by California prison officials, Pinell's daughter sued the California Department of Corrections and Rehabilitation in Federal Court on claims of wrongful death and negligent supervision on Friday.

Born in Nicaragua, Hugo "Yogi" Pinell was convicted of rape at the age of 19 and sentenced to life in 1965. He soon gained notoriety for his role in a botched 1971 San Quentin Prison escape that left six people dead, including three prison employees and Black Panther Party activist and inmate George Jackson.

In what was at the time the longest trial in California history with more than 23,000 pages of testimony, a Marin County jury convicted Pinell of two counts of felony assault by a prisoner serving a life sentence. The jury deliberated for 24 days and returned six of the 46 charges against the San Quentin Six. Pinell was given a third life sentence for slitting two officers' throats during the failed prison escape.

Pinell languished in solitary confinement for decades before he was released into the general population at California State Prison-Sacramento in August 2015. According to the complaint, the former Black Panther Party member

was killed by two white inmates in a supposedly racially motivated attack 50 years after first being incarcerated.

"Just five days before he was killed, he was released into general population despite the fact that [prison officials] knew that he was targeted by other inmates," Allegra Casimir-Taylor says in her complaint, filed on behalf of herself and Pinell's estate. "They were aware of multiple credible death threats against Pinell including a threat issued by the Aryan Brotherhood."

Pinell's fatal stabbing incited a prison riot at the 2,300-inmate maximum-security prison outside of Sacramento. About 70 inmates were involved with 29 sustaining injuries, according to prison officials.

Jayson Weaver and Waylon Pitchford are awaiting trial for Pinell's murder, with an Oct. 28 hearing scheduled at Sacramento County Superior Court. Weaver was previously convicted of assaulting another inmate, while Pitchford is facing charges for another inmate assault, according to the complaint.

Casimir-Taylor says the department of corrections knew Pinell was a target for assassination and risked his life by placing the elderly inmate into general population. She's suing the state for punitive and exemplary damages for failing to protect Pinell.

"Reportedly [prison officials] placed bets on how long Pinell would survive being in general population," the nine-page complaint states.

Casimir-Taylor's attorney Ashley Amerio did not return an interview request Tuesday. CDCR spokeswoman Terry Thornton declined to comment on the litigation, saying the department hasn't been served with the federal lawsuit.

After Pinell was transferred in 2014 to the maximum-security facility adjacent to the notorious Folsom prison that Johnny Cash famously played for inmates in 1968,Casimir-Taylor says she visited him every weekend. Pinell was an

important figure in his daughter's life and during the visits encouraged her to "renew her vigor" in performing charitable work.

In an article published in the San Francisco Bay View, an inmate claiming to be one of the last people to see Pinell alive says the murder was coordinated by the department of corrections.
"About the time I did reach Yogi, it was too late. Dragging him away from his killers, Yogi's eyes were wide open as he took his last breath. His eyes seem to say it all: 'I've done my part, young brotha. The rest is on you," Devon Bush wrote on January 30.

# EXHIBIT 8

# EXHIBIT 8

# Street signs honor fallen Correctional Training Facility staff

**JULY 5, 2019**



New street signs honor those who have fallen in service to the Correctional Training Facility.

**By Lieutenant Roland Ramon**

The Correctional Training Facility held a May 10 memorial to unveil newly renamed street signs in honor of the prison's officers who died in the line of duty. The ceremony was held at the facility's memorial garden and included the honor guard performing a flag salute.

The following officers were honored for giving the ultimate sacrifice for the citizens of the great State of California and their families



From left are Correctional Officers John "Jack" Mills, William Shull, Robert McCarthy and Program Administrator Kenneth Conant.

- On Jan. 16, 1970, at 6:35 p.m., while working in Y-Wing at Central Facility, Correctional Officer John V. Mills, at the age of 26, married and a father was murdered in the line of duty.
- On July 23, 1970, at approximately 9:50 a.m., while working in the recreation shack on the 1 Yard at North Facility, Correctional Officer William C. Shull, 40, married with four children, was murdered in the line of duty.
- On March 4, 1971, at 11:15 p.m., while working in X-Wing at Central Facility, Correctional Officer Robert J. McCarthy, 43, married with two children, was murdered in the line of duty.
- On May 19, 1971, at 9:20 a.m., while working in his office in Unit-I at Central Facility, Program Administrator Kenneth E. Conant, 49, married and a father was murdered in the line of duty.

Acting Warden C. Koenig addressed staff and guests and paid his respects to the fallen officers and their families. Their sacrifice impacts our staff today. The staff was challenged and encouraged to never forget these fallen officers.

The staff paid tribute through a moment of silence.

# EXHIBIT 9

# EXHIBIT 9

STATE OF CALIFORNIA
**GRIEVANCE**
CDCR 602-1 (03/20)

40562

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 1 of 2

| **STAFF USE ONLY** | Grievance #:_____ Date Received:_____ |
| --- | --- |
| | Date Due:_____ |
| | Categories:_____ |

_This is the process to ask for help with a complaint._

**Claimant Name:** Robert Clark    **CDCR #:** AP-7204 **Current Housing/Parole Unit:** D – 136

**Institution/Facility/Parole Region:** CTF Soledad

**In order for the Department to understand your complaint, make sure you have answered the following questions:**

- *What is the nature of your complaint?*
- *When and where did the complaint occur?*
- *Who was involved?*
- *Which specific people can support your complaint?*
- *Did you try to informally resolve the complaint?*
- *What rule or policy are you relying on to make your complaint?*
- *Are there documents that would be helpful to support your position? List the documents if you do not have them. Please note that documents submitted with this form will not be returned.*
- *What specific action would resolve your complaint?*

I am not satisfied to the response to 602 log # 00000040562 I specifically asked for the fire chiefs name and the Medical officer who authorized for inmates in CTF Soledad to be housed in the Gym and authorized inmates to sleep 36 inches apart from each other when the National distance is 6 feet. The answers or denial is a baseless cover up that Gym is not pratical for living please see the supporting document which is log # 00000040562. My health and safety was seriously compromised at CTF Facility I contracted Covid-19 and Im also High risk medical there is entirely to many people housed here, Im a ward of the state and its the states job to protect me. 3391 is the rule that been violated employee staff Conduct



CALIFORNIA DEPARTMENT of
**Corrections and Rehabilitation**

# CLAIMANT GRIEVANCE CLAIMS DECISION RESPONSE

**Re:** Grievance Claims Decision Response

| | |
|---|---|
| **Offender Name:** CLARK, ROBERT | **Date:** 10/21/2020 |
| **CDC#:** AP7204 | |
| **Current Location:** CTF-Facility C | **Current Area/Bed:** C DW 1 - 136001U |

**Log #:** 000000040562

**Claim #: 001**

**Institution/Parole Region of Origin:** Correctional Training Facility          **Facility/Parole District of Origin:** CTF-Facility C

**Housing Area/Parole Unit of Origin:**

**Category:** COVID-19                     **Sub-Category:** Social Distancing

### I. CLAIM

The grievant claims the he was moved from Y wing to Facility C Gym due to being positive for COVID 19. The Gym clusters everyone together and social distancing can not be maintained.

### II. RULES AND REFERENCES

#### A. CONTROLLING AUTHORITY

CCR Title 15, section 3383 State of Emergency.

#### B. DOCUMENTS CONSIDERED

CDCR Memorandum authored by Director Connie Gibson, dated March 18, 2020.CDCR Memorandum authored by Secretary Ralph M. Diaz and Receiver J. Clark Kelso, dated July 10, 2020.PSR-CTF-20-004

### III. REASONING AND DECISION

Your correspondence relates specifically to CDCR's efforts to address the COVID-19 pandemic.CDCR understands the risks that the COVID-19 pandemic presents to CDCR inmates, staff, and volunteers. In light of these risks, CDCR has taken the following steps in an effort to protect the inmate population: Mandatory health screening before entering CDCR facilities; additional deep cleaning efforts; increased supply of disinfectants, soap, hand sanitizer, and personal protective equipment; limitations and suspensions of inmate transfers and movements; quarantine protocols; cancelling visiting at CDCR facilities until further notice; and many other steps depending on your location.As for your specific concern that the Facility C Gym Dorm is unfit for human living, CTF Administration in conjunction with our Medical Department designated the Facility C Gym Dorm as the isolated living area for inmates who test positive for COVID-19. The State Fire Marshal approved the Facility C Gym Dorm to house a maximum capacity of 56 inmates. Additionally, CTF Maintenance Department as well as Healthcare Facilities Maintenance ensure the Gym Dorm maintains in a livable condition.The Department is doing its best to mitigate all those risks in close collaboration with the medical experts working for the Federal Receiver's Office. Furthermore, we will continue to work with all of our health care partners across the Department, throughout the State, and with the Federal Government to create a safe environment for all in our institutions.Presently, there is no evidence or facts to support the complainant's allegations that CTF is conducting an unlawful operation. Individuals who have contracted COVID-19 cannot simultaneously catch an additional bout while still active with an active case, therefore living in a dormitory setting with other positive patients does not impose an additional threat to ones health.

**Decision: Disapproved**

After a thorough review of all documents and evidence presented at the Office of Grievances Level, it is the order of the Office of Grievance to DISAPPROVE the claim.

| Staff Signature | Title | Date/Time |
|---|---|---|
| K. Mensing [MEKE003] | CDW (A) | 08/28/2020 |

**Claim #:  004**

**Institution/Parole Region of Origin:** Correctional Training Facility          **Facility/Parole District of Origin:** CTF-Facility C

**Housing Area/Parole Unit of Origin:**

**Category:**  COVID-19                          **Sub-Category:**   Social Distancing

### I. CLAIM

The claimant alleges he was not appropriately social distanced during the mass cell searches. States staff did not follow proper protocols for Covid-19.

### II. RULES AND REFERENCES

#### A. CONTROLLING AUTHORITY

CCR Title 15, section 3084.1 Right to AppealCCR Title 15, Section 3383 State of Emergency

#### B. DOCUMENTS CONSIDERED

CDCR Memorandum dated March 18, 2020, authored by Director Connie GibsonCDCR Memorandum dated June 11, 2020, authored by CDCR Secretary R. Diaz and CCHCS Receiver J. Clark Kelso602-1, Grievance, Log # 21429

### III. REASONING AND DECISION

The interview statements made by involved staff and inmate were considered. All documentation provided were researched and thoroughly reviewed. Based upon the information received for this claim, no facts, evidence or additional information were gathered which would substantiate your claim of improper protocols dealing with Covid-19. Staff followed policy by wearing their mask and properly separated the inmates within the guidelines directed.

**Decision: Disapproved**

After a thorough review of all documents and evidence presented at the Office of Grievances Level, it is the order of the Office of Grievance to DISAPPROVE the claim.

If you are dissatisfied with the decision of this claim, you may file a 602-2, appeal with the California Department of Corrections and Rehabilitation Office of Appeals.

| Staff Signature | Title | Date/Time |
|---|---|---|
| K. Mensing [MEKE003] | CDW (A) | 08/28/2020 |

P.E.A

CDCR No. AP-7204

Contraction Date: August 202

Other Comment: Please find
the letter I wrote you
~~December~~ Nov. or Dec 2020 with
the log# for this 602
They went way beyond
the dead line. The 602
was about how they
quarantined us in

Soledad Central Gym
in complete disregard
for the 6 feet National
Mandate and we
~~were~~ bunched together
step 4 to 8 inches
apart from each
other I enclosed
the 602 response
from Sacramento.

This is where I
Contracted Covid
D-wing August
2020

Please pay attention
to the way the attempted
to doctor up the Response.
TIM

INTEREGATION
ROOMS FOR 7-20.
RAED

**Diagram labels:**

EAST | RMPK

MTA

LAW LIBRARY | EDU

DENTAL

RR

MTA | VIS / DBARD

D-WING | X-WING

LAUNDRY | ION | Y-WING

HFM ROOM | OLD CANTEEN | Z-WING

THE CHOW HALL WE WAS ALL PUT IN.

CHOW HALL TWO

CENTRAL STATION

CHOW HALL ONE

LT OFFICE | NEW COMPUTER OFFICE
SGT OFFICE

CHAPEL 1 / CHAPEL 2

MTA | B-WING

GYM | C-WING

D-WING

OLD CONSEAL | INTEREGATION ROOMS
OFFICE

G-WING

F-WING | E-WING

MAIN GATE

CENTRAL YARD

FAMILY VISITING

YARD

# EXHIBIT 10

# EXHIBIT 10

# Two guards stabbed at high-security prison in Folsom

## LOCAL NEWS
**by: Associated Press**

**Posted: Jul 13, 2020 / 07:01 PM PDT / Updated: Jul 13, 2020 / 06:54 PM PDT**



FILE – In this Feb. 26, 2013, file photo, inmates walk through the exercise yard at California State Prison Sacramento, near Folsom, Calif. (AP Photo/Rich Pedroncelli, File)

*This is an archived article and the information in the article may be outdated.*

*Please look at the time stamp on the story to see when it was last updated.*

FOLSOM, Calif. (AP) — A convicted killer stabbed two guards at a high-security California prison Monday but both were expected to survive, officials said.

Correctional officers were releasing inmates into a yard Monday morning at California State Prison, Sacramento in Folsom when a prisoner who was being scanned with a metal detector pulled a 7-inch-long homemade weapon and stabbed a guard in the head and neck, according to a statement from the state Department of Corrections and Rehabilitation.

A second officer was stabbed in the right arm and a third officer received a hand injury before the inmate was subdued, authorities said.

One officer was treated at a hospital and released. There was no immediate word on the conditions of the other officers but their injuries weren't believed to be life-threatening, corrections officials said.

The attacker was identified as Michael Harris, who had minor injuries and was taken to a hospital, corrections officials said. He was to be kept in segregated housing while the attack is investigated.

Harris began serving a life sentence without possibility of parole in 2009 for a Los Angeles County shooting. He was convicted of first-degree murder, attempted murder and intentional discharge of a firearm causing great bodily injury or death, corrections officials said.

The prison east of Sacramento houses more than 2,300 inmates.

# EXHIBIT 11

# EXHIBIT 11

STATE OF CALIFORNIA
**GOVERNMENT CLAIM**
DGS ORIM 006 (Rev. 08/19)

DEPARTMENT OF GENERAL SERVICES
OFFICE OF RISK AND INSURANCE MANAGEMENT

## CLAIMANT INFORMATION

| LAST NAME **Milton** | FIRST NAME **William** | MIDDLE INITIAL |
|---|---|---|

| INMATE OR PATIENT IDENTIFICATION NUMBER (if applicable) **P38650** | BUSINESS NAME(if applicable) |
|---|---|

| TELEPHONE NUMBER | EMAIL ADDRESS |
|---|---|

| MAILING ADDRESS **Correctional Training Facility HWY 101 North/P.O. Box 689** | CITY **Soledad** | STATE **CA** | ZIP **93960-0689** |
|---|---|---|---|

| IS THE CLAIMANT UNDER 18 YEARS OF AGE?  ☐ Yes  ☒ No | INSURED NAME(Insurance Company Subrogation) |
|---|---|

| IS THIS AN AMENDMENT TO A PREVIOUSLY EXISTING CLAIM?  ☐ Yes  ☒ No | EXISTING CLAIM NUMBER (if applicable) | EXISTING CLAIMANT NAME(if applicable) |
|---|---|---|

### ATTORNEY OR REPRESENTATIVE INFORMATION

| LAST NAME ~~In Propria Persona~~ Pavone | FIRST NAME Benjamin | MIDDLE INITIAL |
|---|---|---|

| TELEPHONE NUMBER 619 224 8885 | EMAIL ADDRESS bpavone@cox.net |
|---|---|

| MAILING ADDRESS 600 W. Broadway | CITY San Diego | STATE CA | ZIP 92101 |
|---|---|---|---|

## CLAIM INFORMATION

STATE AGENCIES OR EMPLOYEES AGAINST WHOM THE CLAIM IS FILED **CTF Wrdn. C. Koenig; (AW) Mensing; (Cpt.) Metcalfe; and all other state employees acting in concert and under color of law (John Does 1 - 150, inclusive)**   DATE OF INCIDENT **11/27/20**

LATE CLAIM EXPLANATION (Required, if incident was more than six months ago)

| DOLLAR AMOUNT OF CLAIM **Non-Limited** | CIVIL CASE TYPE(Required, if amount is more than $10,000)  ☐ Limited ($25,000 or less)  ☒ Non-Limited (over $25,000) |
|---|---|

DOLLAR AMOUNT EXPLANATION
**Correctional Training Facility / HWY 101 North / P.O. Box 689 / Soledad, CA 93960-0689      (see below)**

INCIDENT LOCATION **Multiple Seizures; Fever; Chills; Migraines/Headaches; Dizziness/Lightheadedness; Severe Body Aches; Heightened Hypertension; Vomiting; Uncontrollable Hacking Cough; Emotional Distress; and other Hardships.**

SPECIFIC DAMAGE OR INJURY DESCRIPTION **State employees intentionally disregarded substantial risks to Claimant's health and safety, as well as recklessly and deliberately exposed and infected him with the deadly Covid-19 disease. (See copy of administrative grievances attached herewith.)**

CIRCUMSTANCES THAT LED TO DAMAGE OR INJURY **Inclusive with all the above, state officials: failed to release nonviolent second and third strikers who were eligible for release prior to the Covid-19 outbreak at CTF; failed to wear masks during 3am raids and assaults of CTF prisoners; deliberately housed Covid-positive prisoners with Covid-negative prisoners; housed Covid-negative prisoners with Covid-positive prisoners; failed to treat Claimant when he contracted Covid-19 and simply housed him other sick individuals; and failed to release Claimant (an eligible nonviolent prisoner) in effort to prevent reexposure or exposure to a variant form of the disease.**

EXPLAIN WHY YOU BELIEVE THE STATE IS RESPONSIBLE FOR THE DAMAGE OR INJURY **Inclusive with all the above, state employees acting in concert and under color of law recklessly and deliberately exposed and infected Claimant with Covid-19.**

**State employees also failed to take reasonable preventative measures to avoid a Covid-outbreak.**

STATE OF CALIFORNIA
**GOVERNMENT CLAIM**
DGS ORIM 006 (Rev. 08/19)

DEPARTMENT OF GENERAL SERVICES
OFFICE OF RISK AND INSURANCE MANAGEMENT

---

## AUTOMOBILE CLAIM INFORMATION    Not Applicable

| DOES THE CLAIM INVOLVE A STATE VEHICLE? | VEHICLE LICENSE NUMBER (if known) | STATE DRIVER NAME (if known) |
|---|---|---|
| ☐ Yes    ☐ No | | |

| HAS A CLAIM BEEN FILED WITH YOUR INSURANCE CARRIER? | INSURANCE CARRIER NAME | INSURANCE CLAIM NUMBER |
|---|---|---|
| ☐ Yes    ☐ No | | |

| HAVE YOU RECEIVED AN INSURANCE PAYMENT FOR THIS DAMAGE OR INJURY? | AMOUNT RECEIVED (if any) | AMOUNT OF DEDUCTIBLE (if any) |
|---|---|---|
| ☐ Yes    ☐ No | | |

## NOTICE AND SIGNATURE

I declare under penalty of perjury under the laws of the State of California that all the information I have provided is true and correct to the best of my information and belief. I further understand that if I have provided information that is false, intentionally incomplete, or misleading I may be charged with a felony punishable by up to four years in state prison and/or a fine of up to $10,000 (Penal Code section 72).

| SIGNATURE | PRINTED NAME | DATE |
|---|---|---|
| | William Milton | 2/18/21 |

## INSTRUCTIONS

- Include a check or money order for $25, payable to the State of California.
- $25 filing fee is not required for amendments to existing claims.
- Confirm all sections relating to this claim are complete and the form is signed.
- Attach copies of any documentation that supports your claim. Do not submit originals.

Mail the claim form and all attachments to:
   Office of Risk and Insurance Management
   Government Claims Program
   P.O.Box 989052, MS414
   West Sacramento, CA 95798-9052

Claim forms can also be delivered to:
   Office of Risk and Insurance Management
   Government Claims Program
   707 3rd Street, 1st Floor
   West Sacramento, CA 95605
   1-800-955-0045

---

**Department of General Services Privacy Notice on Information Collection**

This notice is provided pursuant to the Information Practices Act of 1977, California Civil Code Sections 1798.17 & 1798.24 and the Federal Privacy Act (Public Law 93-579).

The Department of General Services (DGS), Office of Risk and Insurance Management (ORIM), is requesting the information specified on this form pursuant to Government Code Section 905.2(c).

The principal purpose for requesting this data is to process claims against the state The information provided will/may be disclosed to a person, or to another agency where the transfer is necessary for the transferee-agency to perform its constitutional or statutory duties, and the use is compatible with a purpose for which the information was collected and the use or transfer is accounted for in accordance with California Civil Code Section 1798.25.

Individuals should not provide personal information that is not requested.

The submission of all information requested is mandatory unless otherwise noted. If you fail to provide the information requested to DGS, or if the information provided is deemed incomplete or unreadable, this may result in a delay in processing.

**Department Privacy Policy**
The information collected by DGS Is subject to the limitations in the Information Practices Act of 1977 and state policy (see State Administrative Manual 5310-5310.7). For more information on how we care for your personal information, please read the DGS Privacy Policy.

**Access to Your Information**
ORIM is responsible for maintaining collected records and retaining them for 5 years. You have a right to access records containing personal information maintained by the state entity. To request access, contact:

DGS ORIM
**Public Records Officer**
707 3rd St., West Sacramento, CA 95605
(916) 376-5300

 CALIFORNIA DEPARTMENT OF **GENERAL SERVICES**                    Governor Gavin Newsom

08/26/2021

Benjamin Pavone
Attorney at Law
600 W Broadway
San Diego, CA 92101-3311

RE:  Claim 21002734 for William  Milton P38650 against Department of Corrections
and Rehabilitation

Dear Benjamin Pavone,

Government Claims Program (GCP) staff completed its investigation of your claim
and rejected it for the following reasons.

The claim involves complex issues that are beyond the scope of analysis and legal
interpretation typically undertaken by the GCP.  Claims involving complex issues are
best determined by the courts.  Therefore, staff did not make a determination
regarding the merit of the claim, and it is being rejected so you can initiate court
action if you choose to pursue this matter further.

If you choose to pursue court action in this matter, it is not necessary or proper to
include the GCP in your lawsuit unless the GCP was identified as a defendant in your
original claim.  Please consult Government Code section 955.4 regarding proper
service of the summons.

If you have questions about this matter, please feel free to contact GCP by phone,
mail, or email using the contact information below.   Please remember to reference
the assigned claim number (21002734) in your communication.

Sincerely,

Eric Rivera, Program Analyst
Government Claims Program
gcinfo@dgs.ca.gov

**WARNING:**  Subject to certain exceptions, you have only six (6) months from the
date this notice was personally delivered or deposited in the mail to file a court action
on this claim.  See Government Code Section 945.6.  You may seek the advice of an
attorney of your choice in connection with this matter.  If you desire to consult an
attorney, you should do so immediately.

**DGS** CALIFORNIA DEPARTMENT OF
**GENERAL SERVICES**                              Governor Gavin Newsom

## DECLARATION OF SERVICE BY U.S. MAIL

Name of Claimant: William Milton
GCP File no.: 21002734

I am employed by the Government Claims Program. I am 18 years of age or older. I
am familiar with the business practice at the Government Claims Program for
collection and processing of correspondence for mailing with the United States Postal
Service. In accordance with that practice, correspondence placed in the internal mail
collection system at the Government Claims Program is deposited with the United
States Postal Service with postage thereon fully prepaid that same day in the
ordinary course of business. On 08/26/2021, I served the attached letter by placing a
true copy thereof enclosed in a sealed envelope in the internal mail collection system
at the Government Claims Program, located at 707 Third Street, West Sacramento,
CA 95605, addressed as follows:

Benjamin Pavone
Attorney at Law
600 W Broadway
San Diego, CA 92101-3311

I declare under penalty of perjury under the laws of the State of California that the
foregoing is true and correct and that this declaration was executed on 08/26/2021, at
West Sacramento, California.

Eric Rivera

# EXHIBIT 12

# EXHIBIT 12

  Governor Gavin Newsom

03/12/2021

Benjamin Pavone
Attorney at Law
600 W Broadway Suite 700
San Diego, CA 92101

RE: Claim 20010619 for Adam J Sanford AZ7450 against Department of Corrections and Rehabilitation

Dear Benjamin Pavone,

Government Claims Program (GCP) staff completed its investigation of your claim and rejected it for the following reasons.

The claim involves complex issues that are beyond the scope of analysis and legal interpretation typically undertaken by the GCP. Claims involving complex issues are best determined by the courts. Therefore, staff did not make a determination regarding the merit of the claim, and it is being rejected so you can initiate court action if you choose to pursue this matter further.

If you choose to pursue court action in this matter, it is not necessary or proper to include the GCP in your lawsuit unless the GCP was identified as a defendant in your original claim. Please consult Government Code section 955.4 regarding proper service of the summons.

If you have questions about this matter, please feel free to contact GCP by phone, mail, or email using the contact information below. Please remember to reference the assigned claim number (20010619) in your communication.

Sincerely,

Eric Rivera, Program Analyst
Government Claims Program
gcinfo@dgs.ca.gov

**WARNING:** Subject to certain exceptions, you have only six (6) months from the date this notice was personally delivered or deposited in the mail to file a court action on this claim. See Government Code Section 945.6. You may seek the advice of an attorney of your choice in connection with this matter. If you desire to consult an attorney, you should do so immediately.

 CALIFORNIA DEPARTMENT OF
GENERAL SERVICES                    Governor Gavin Newsom

## DECLARATION OF SERVICE BY U.S. MAIL

Name of Claimant: Adam Sanford
GCP File no.: 20010619

I am employed by the Government Claims Program. I am 18 years of age or older. I am familiar with the business practice at the Government Claims Program for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Government Claims Program is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business. On 03/12/2021, I served the attached letter by placing a true copy thereof enclosed in a sealed envelope in the internal mail collection system at the Government Claims Program, located at 707 Third Street, West Sacramento, CA 95605, addressed as follows:

Adam Sanford
PO Box 689
Soledad, CA 93960

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on 03/12/2021, at West Sacramento, California.

*Eric Rivera* (signature)

Eric Rivera

# EXHIBIT 13

# EXHIBIT 13

STATE OF CALIFORNIA

**GOVERNMENT CLAIM**

DGS ORIM 006 (Rev. 08/19)

DEPARTMENT OF GENERAL SERVICES
OFFICE OF RISK AND INSURANCE MANAGEMENT

## CLASS ACTION CLAIM

| **CLAIMANT INFORMATION** | | |
|---|---|---|
| LAST NAME<br>Pardue (on behalf of Estate of Raemon Pardue) | FIRST NAME<br>William | MIDDLE INITIAL<br>E. |
| INMATE OR PATIENT IDENTIFICATION NUMBER (if applicable)<br>K8765 (Raemon) | BUSINESS NAME(if applicable) | |
| TELEPHONE NUMBER<br>702 201 2787 | EMAIL ADDRESS<br>teamxliqhtskin@gmail.com | |
| MAILING ADDRESS<br>21413 Neuralia Rd. | CITY<br>California City | STATE<br>CA | ZIP<br>93505 |
| IS THE CLAIMANT UNDER 18 YEARS OF AGE?<br>☐ Yes  ☑ No | INSURED NAME(Insurance Company Subrogation)<br>n/a | |
| IS THIS AN AMENDMENT TO A PREVIOUSLY EXISTING CLAIM?<br>☐ Yes  ☑ No | EXISTING CLAIM NUMBER (if applicable)<br>n/a | EXISTING CLAIMANT NAME(if applicable)<br>n/a |

| **ATTORNEY OR REPRESENTATIVE INFORMATION** | | |
|---|---|---|
| LAST NAME<br>Pavone | FIRST NAME<br>Benjamin | MIDDLE INITIAL<br>L. |
| TELEPHONE NUMBER<br>619 224 8885 | EMAIL ADDRESS<br>bpavone@cox.net | |
| MAILING ADDRESS<br>600 W. Broadway, Ste. 700 | CITY<br>San Diego | STATE<br>CA | ZIP<br>92101 |

| **CLAIM INFORMATION** | |
|---|---|
| STATE AGENCIES OR EMPLOYEES AGAINST WHOM THE CLAIM IS FILED<br>State of California, Warden Craig Koenig (see Add'l Defendants) | DATE OF INCIDENT<br>07/20/2020 |

LATE CLAIM EXPLANATION (Required, if incident was more than six months ago)

| DOLLAR AMOUNT OF CLAIM<br>$100,000,000 | CIVIL CASE TYPE(Required, if amount is more than $10,000)<br>☐ Limited ($25,000 or less)  ☑ Non-Limited (over $25,000) |
|---|---|

DOLLAR AMOUNT EXPLANATION
Wrongful death of Raemon Pardue and a representatiive for mass infection of all CTF infected African-American inmates.

INCIDENT LOCATION
CTF Soledad

SPECIFIC DAMAGE OR INJURY DESCRIPTION

Please see attached Exhibits A and B.

CIRCUMSTANCES THAT LED TO DAMAGE OR INJURY

Please see attached Exhibits A and B.

EXPLAIN WHY YOU BELIEVE THE STATE IS RESPONSIBLE FOR THE DAMAGE OR INJURY

Please see attached Exhibits A and B.

STATE OF CALIFORNIA
**GOVERNMENT CLAIM**
DGS ORIM 006 (Rev. 08/19)

DEPARTMENT OF GENERAL SERVICES
OFFICE OF RISK AND INSURANCE MANAGEMENT

---

### AUTOMOBILE CLAIM INFORMATION

| | | |
|---|---|---|
| DOES THE CLAIM INVOLVE A STATE VEHICLE?<br>☐ Yes   ☑ No | VEHICLE LICENSE NUMBER (if known) | STATE DRIVER NAME (if known) |
| HAS A CLAIM BEEN FILED WITH YOUR INSURANCE CARRIER?<br>☐ Yes   ☑ No | INSURANCE CARRIER NAME | INSURANCE CLAIM NUMBER |
| HAVE YOU RECEIVED AN INSURANCE PAYMENT FOR THIS DAMAGE OR INJURY?<br>☐ Yes   ☑ No | AMOUNT RECEIVED (if any) | AMOUNT OF DEDUCTIBLE (if any) |

### NOTICE AND SIGNATURE

I declare under penalty of perjury under the laws of the State of California that all the information I have provided is true and correct to the best of my information and belief. I further understand that if I have provided information that is false, intentionally incomplete, or misleading I may be charged with a felony punishable by up to four years in state prison and/or a fine of up to $10,000 (Penal Code section 72). I have also relied on the investigation of my attorneys in developing this information.

| SIGNATURE *William Pardue* | PRINTED NAME<br>William Pardue, Estate and Class Representative | DATE<br>05/27/2021 |
|---|---|---|

### INSTRUCTIONS

- Include a check or money order for $25, payable to the State of California.
    - $25 filing fee is not required for amendments to existing claims.
- Confirm all sections relating to this claim are complete and the form is signed.
- Attach copies of any documentation that supports your claim. Do not submit originals.

Mail the claim form and all attachments to:
Office of Risk and Insurance Management
Government Claims Program
P.O. Box 989052, MS414
West Sacramento, CA 95798-9052

Claim forms can also be delivered to:
Office of Risk and Insurance Management
Government Claims Program
707 3rd Street, 1st Floor
West Sacramento, CA 95605
1-800-955-0045

---

### Department of General Services Privacy Notice on Information Collection

This notice is provided pursuant to the Information Practices Act of 1977, California Civil Code Sections 1798.17 & 1798.24 and the Federal Privacy Act (Public Law 93-579).

The Department of General Services (DGS), Office of Risk and Insurance Management (ORIM), is requesting the information specified on this form pursuant to Government Code Section 905.2(c).

The principal purpose for requesting this data is to process claims against the state. The information provided will/may be disclosed to a person, or to another agency where the transfer is necessary for the transferee-agency to perform its constitutional or statutory duties, and the use is compatible with a purpose for which the information was collected and the use or transfer is accounted for in accordance with California Civil Code Section 1798.25.

Individuals should not provide personal information that is not requested.

The submission of all information requested is mandatory unless otherwise noted. If you fail to provide the information requested to DGS, or if the information provided is deemed incomplete or unreadable, this may result in a delay in processing.

**Department Privacy Policy**
The information collected by DGS Is subject to the limitations in the Information Practices Act of 1977 and state policy (see State Administrative Manual 5310-5310.7). For more information on how we care for your personal information, please read the DGS Privacy Policy.

**Access to Your Information**
ORIM is responsible for maintaining collected records and retaining them for 5 years. You have a right to access records containing personal information maintained by the state entity. To request access, contact:

**DGS ORIM**
**Public Records Officer**
**707 3rd St., West Sacramento, CA 95605**

**(916) 376-5300**

# EXHIBIT A

# <u>EXHIBIT A</u>

### <u>STATEMENT OF INJURIES, ADDITIONAL FACTS,</u>
### <u>CIRCUMSTANCES, AND BASIS FOR GOVERNMENTAL RESPONSIBILITY</u>

1.  This is not a claim asserting the CDCR officials were merely negligent, reckless or careless in failing to manage the risks of Covid-19 transmission among African-American inmates – it is one in which officials diabolically weaponized the disease against them, all the while venomously referring to them as niggers, assholes and motherfuckers.

2.  In the early morning hours of July 20, 2020, CDCR's Correctional Training Facility, or CTF, in Soledad, California, was the location of a brutal, unwarranted, and senseless mass attack on the African-American population in its care.

3.  The 3 am raid, green-lighted by CTF warden Craig Koenig and carried out by a motley collection of CDCR security officers, was evidently intended to terrorize, injure, and humiliate a large number of sleeping inmates. Many were left with significant injuries.   Others suffered deep and profound humiliation and were left with fears, some of which materialized, about exposure to the Covid-19 virus.

4.  Prior the July 20 raid, there were no cases of Covid-19 at CTF. CTF was in lockdown during March 2020.   No regular or family visits were permitted.   This was followed by a 40-day period in which public visits to the facility were resumed and a risk of Covid-19 transmission (from outside the facility to the inmates) was created. Nevertheless, in April, 2020 and afterward, there were no cases of Covid-19 reported.

5.  Efforts to screen staff at the time were nevertheless lax.   Regular employees were asked only three questions, and none related to contact with friends, spouses, extended family and others.

6.  Mask-wearing policies for prisoners and staff were initially inconsistent.   It took an appeal on the part of a prisoner to push CTF to make masks mandatory for staff and inmates. On April 24, 2020, CTF imposed a mask policy for both guards and inmates, during any movement or interactions.   Masks were issued to prisoners regularly by CTF officials.   Prisoners signed for them.

7.  Between late April 2020 and July 20, 2020 (the date of the raid), rumors circulated among inmates that certain members of CTF staff had tested positive for Covid-19.   Some of these staff members may have participated in the raid itself, as detailed below.   Others suggest a nurse may have tested positive.   Regardless of the source, injuries produced by the raid brought large numbers of prisoners into direct contact with CTF's medical staff.

8.  Excessive force used against CTF's Black prisoners on July 20, 2020, combined with blatantly racist language by corrections officers explains the absence of effort to expose inmates to Covid-19 transmission, by holding a mass gathering of them. CDCR officials must have known that gathering so many people was an exceptionally dangerous enterprise on a disease transmission metric and they directly violated the policy that was in effect as of April 24, 2020.

9.    Consistent with the racist and offensive remarks being circulating by the guards during the raid (*see* **Exhibit B** complaint for detail), CTF officials took steps to maximize Covid-19 transmission between the inmates. They packed inmates into a single dining hall and left in close proximity to one another for hours on end.   None were permitted to take their mask with them when initially seized, none were given a mask while there, and none were permitted to retrieve their mask. (This dynamic sharply contrasts with the fact that guards wore their masks).   No attempt was made at social distancing.   The inmates were forced to sit face-to-face and shoulder-to-shoulder.   They were required to share a single, dirty bathroom.   None were permitted to retrieve their shoes or slippers before being forced to the dining hall.   Most inmates were half-clothed at best and some were naked.

10.    One week after the raid, CTF recorded its first official case of Covid-19. By the time CTF's outbreak finally subsided in February 2021, over 2,700 cases had been acknowledged.   At least 17 inmates died including Raemon Pardue.   In statements to the media during this period, CTF officials insisted that all proper safety protocols had been followed during the July 20, 2020 raid. This statement was 0% true.

11.    The pool of 2,700 cases, perhaps with exceptions, can be traced to the July 20, 2020 raid.   Not satisfied to merely brutalize prisoners both physically and psychologically, CDCR weaponized the Covid-19 virus.   They exploited its communicability to sow fear and confusion among the inmate population.

12.    In the weeks and months that followed, prisoners who were symptom-free were informed that they had tested positive for Covid-19 and were shunted into quarantined spaces that ensured that everyone within that space would contract the ailment.   Covid-free inmates were transferred into cells that had not been sanitized after housing Covid-19-positive inmates; inmates suspected of having Covid-19 found themselves hosting a number of different cellmates in rapid succession.   The reverse was also true: Covid-19-free inmates found themselves in the company of cellmates whose health status was uncertain. Inmates claim that fellow inmates infected with Covid-19, or who were suspected of having it, were tasked with distributing meals and washing clothes.

13.    At other points, prisoners were introduced into the facility from prisons in which Covid-19 was rampant.   Inmate Daniel Kim (BC7147), who has since been transferred to Salinas Valley State Prison (SVSP), is reportedly an example of this trend.

14.    Officials consistently downplayed the number of staff members who tested positive for Covid-19 and redirected blame toward prisoners for the growing severity of the epidemic.

15.    Inevitably, inmates who were especially vulnerable suffered most.   One of these was Raemon Pardue, CTF's first Covid-19 fatality, though not the facility's first post-raid Covid-19 case.   He died on August 20, 2020, almost exactly one month after the July 20 raid.

16.    Pardue suffered from type 2 diabetes and hypertension, both of which rendered him more vulnerable to Covid-19 infection.   Though he was not forced into close proximity with other prisoners and guards in the dining hall, Pardue's brief encounter with CTF agents (a significant percentage of whom, it should be noted, were

being "borrowed" from facilities where Covid-19 was raging at the time) may have had disastrous results. He fell ill shortly afterward, as did Ronald Patterson.

17.     Patterson tested positive for Covid-19 on August 15, only a few days before Pardue's death, suggests that Pardue contracted the virus first and passed it to Patterson.   Pardue, who had isolated himself from other prisoners, nevertheless caught the virus.

18.     Sixteen additional Covid-19 -related deaths followed that of Pardue, extending well into 2021. Covid-19 infections peaked in November and December 2020, leaving in their wake inmates with health issues ranging from memory loss and fatigue to physical pain and depression.

## William Milton

19.     Another inmate who suffered harm as a result of the Covid-19 weaponization effort described above was William Milton (P38650). Milton was not targeted during the raid on July 20, 2020 but was a witness to the verbal and physical abuse of fellow inmates by prison staff.

20.     Milton, 54, tested positive for Covid-19 on November 27, 2020, five months after the raid, but also near the peak of the Covid epidemic inside CTF.

21.     Milton avers that the raid introduced Covid into CTF. Thereafter staff regularly brought Covid-positive patients into his vicinity. This occurred with such regularity that he initiated 602 complaints.

22.     Like so many other Black inmates at CTF who contracted Covid-19, Milton tested positive in late November. This came despite the fact that his routine had not changed and that he had tested negative on multiple occasions shortly before.

23.     CTF's attitude toward Covid-19 was perplexing and counter-productive. Officials seemed to want inmates to become ill.   Milton points to the willingness of the Black prisoners in CTF's X-Wing to "602" corrections officers (that is, to complain about them via the 602 appeal process) as a potential explanation for officials' retaliation to spread Covid within CTF.   Staff members, according to Milton, had long expressed a desire to "take the Wing back."

24.     Milton also believes, like many of CTF's Black inmates, that prisoners from other institutions were brought into CTF for the purpose of infecting the prison population. The perception that prisoners were introduced from Covid-ravaged institutions, combined with the fact that they were neither isolated nor heavily-monitored following their arrival at CTF, supports this view.

25.     Daniel Young Kim (BC7147) is a possible example. Despite the fact that he was Covid-positive, and this fact was well-known among prisoners and staff, he was not quarantined prior to mixing with CTF prisoners.

26.     CTF's basic policy was to mix Covid-positive and Covid-negative prisoners whenever possible.   Like so many other Black prisoners at CTF, Milton was without symptoms when he tested positive on November 27, 2020.

27.     Milton was attuned to the dangers of the virus posed by CTF's policies and practices.   Before the raid (and before any Covid cases were identified at CTF), he filed a petition for a writ of habeas corpus, arguing that he was being subjected to cruel

and unusual punishment under the Eighth Amendment because of potential exposure in CTF's common areas.

28.     Even earlier, in March 2020, Milton filed a 602 in which he laid out his concerns:

> I'm a 54-year-old Black man. Borderline diabetic. [I] suffer from seizures, migraines, joint degeneration [and] hypertension...and currently take multiple medications. I ... contracted Coccidioidomycosis (Valley Fever) and pneumonia in 2011-2012. My immune system was severely compromised and I was compelled to take anti-fungal medications for approx. a year. It is more probable than not that I will suffer excruciating pain... [and] even death if I contract Covid-19 within the prison system in its current state.

29.     From late July 2020 onward, he complained about the risk Covid posed to his health and the dangers of mixing Covid-negative and Covid-positive prisoners together. He was cautious. And yet even he became a victim of the Covid-19 epidemic at CTF, largely because the larger goal was not to protect prisoners from exposure to Covid, but to expose them to it.

30.     The chain of Covid-19 transmission between July 2020 and November 2020 may be long, winding or circuitous, but it is also clear and undeniable. Absent the raid of July 20, there is every reason to believe that William Milton would never have tested positive, would never have been forced into quarantine, and would never have suffered a severe case of Covid-19.

31.     Milton's experience throws into sharp relief the policies and practices that CTF developed during and after the July 20 raid to facilitate the spread of Covid among CTF's Black population. Chief among these was the deliberate mixing of Covid-positive and Covid-negative prisoners for extended periods, often under the guise of "quarantining" already-infected inmates.

### Shelton Adams

32.     Inmate Shelton Adams (J94864), 42, was another victim of the Covid-19 weaponization program.   He tested positive on November 8, 2020.   He contracted Covid-19 just as he was recovering from injuries he suffered at the hands of CTF guards during the July 20, 2020 raid.

33.     Adams was in close and sustained physical contact with members of the group that carried out the raid.   Many inmates were briefly roughed up, subjected to racist vitriol, and then escorted to the dining hall and abandoned.   Adams was physically and psychologically abused, and it is plausible that he was first exposed to Covid-19 at this time.

34.     It is perhaps more likely that he contracted the virus in late October or early November from another inmate or member of staff.   But it also possible that Adams contracted the virus in late July, failed to develop detectable symptoms, and then passed Covid on to fellow inmates.   Research shows that it is not unusual for those who have had Covid to continue to test positive for weeks and even months afterward.   Adams' positive Covid test in early November could have been a remnant of the fact that he had had Covid, without realizing it, at some point after the July 20

raid. It is worth noting that, following his positive test in early November, Adams' symptoms were mild (see below).

35.    Adams confirms perceptions held by Milton regarding CTF's propensity to mix Covid-positive and Covid-negative patients, whether in (supposed) quarantine areas, in individual cells, or in common areas.

36.    He confirms that there was no opportunity for inmates taken to the dining hall to socially distance properly. The number of prisoners involved and the prevailing circumstances (no masks, inadequate clothing, a filthy communal bathroom, etc.) made it impossible for Adams and others to protect themselves adequately.

37.    Adams reported that his assailants told him that "All [Black prisoners at CTF] would have Covid-19 by the time the order [*i.e.*, the raid] was over..."

38.    Like other Black inmates at CTF, Adams was told that he had tested positive for Covid-19 during a period when he felt well. He exhibited no symptoms. Both his temperature and blood pressure were normal.

39.    Following his positive test, which followed a series of negative tests, Adams was moved into a "Covid-positive" wing. Several days later he began to feel unwell, and both his blood pressure and temperature shifted upward. As was the case with others at CTF, Adams did not experience symptoms of Covid-19 until he found himself, for an extended period, in close proximity to fellow inmates who were already sick.

40.    Adams believes that CTF staff saw the Covid crisis as an opportunity to impose payback against prisoners and as a means to achieve certain longstanding goals (e.g. to move certain prisoners, to get rid of others, and to re-establish authority over certain areas).

### Adam J. Sanford

41.    Adam Sanford (AZ7450), 37, was victimized by the Covid-19 outbreak in much the same way as Milton and Adams.

42.    Sanford, like Milton, Adams, and many other Black inmates at CTF, he believes that CTF's Covid crisis – which sickened thousands and ultimately cost 17 inmates their lives – began with the raid of July 20, 2020. "The racially-motivated raid they executed against us African-Americans," he writes, "[was] negligent and unnecessary and directly caused the coronavirus outbreak at this facility."

43.    The treatment inmates received after the raid – that is, *after* they had been beaten and subjected to race-based insults for hours on end – demonstrated fundamental indifference to the inmates' well-being.    In support of his claim, Sanford points to processes that Milton and Adams emphasize: the intentional transfer and mixing of Covid-positive and Covid-negative inmates.    While the ostensible purpose of this mixing was to isolate Covid-positive patients from Covid-negative patients, the real-world result of this practice was the opposite: Covid-positive patients were introduced into Covid-negative environments and the virus was allowed to further infect the inmate population.

44.    Officials Ignored the fact that an inmate with the coronavirus would take up to a week (or more) to exhibit symptoms and "test positive" following exposure. When inmates in an area of the prison tested negative for Covid, they were typically

removed from that area and housed with Covid-negative inmates in another part of the prison. The Covid-positive patients were left behind. The fundamental problem with the practice is that it simply "exported" as-yet-unrecognized cases of Covid-19 to other areas, which resulted in the virus spreading.   It would have been difficult to devise a more dangerous and efficient – but superficially reassuring – method of disseminating Covid-19 to the maximum number of inmates.

45.     Prison officials wasted no time in removing privileges from inmates to control the spread of Covid, even as their policy of transferring and mixing patients continued unabated.   Sanford, like many, lost phone access and his ability to communicate with worried family members. The right to access to the yard, the canteen, the law library and other areas was removed.    Without access to the canteen or delivered packages, it became impossible to maintain proper hygiene. Food was served improperly cooked and ice cold as a result of the canteen disruption.

46.     Sanford insists that while prisoners were denied privileges, officials continued to transfer between 20 and 30 prisoners per day, hastening the spread of the virus through CTF.

47.     Sanford tested positive on November 5, 2020.   His cellmate, who had been exposed to the virus but tested negative, was transferred at that point to another area of the prison, where he promptly fell ill and infected those around him. Sixteen days later, his cell-mate returned - still Covid-positive - and though the coronavirus had likely cleared Sanford's body by that point, he stresses that no official expressed the slightest concern about re-housing him with an inmate who was still contagious. Sanford knows that the risk of becoming re-infected was extremely low, but he marvels at the callousness and indifference of officials who seemed eager to endanger his health.

48.     After testing positive on November 5, 2020, Sanford was unable to access the showers for a full week.   He was never permitted to take a follow-up Covid test after his illness had passed.   He suggests that officials knew he would test negative for Covid at that point, and so to avoid having to answer uncomfortable questions about why they were housing a Covid-positive and Covid-negative inmate in the same cell, they simply avoided testing him and let his "Covid-positive" status stand, which nipped their problem in the bud. They did the same thing across the length and breadth of CTF, with officials ignoring or avoiding test results to achieve specific aims.

49.     An effort was made to downplay the number of Covid-related deaths inside the facility by suggesting that they were the result of other factors (e.g. heart disease, hypertension, etc.).

50.     On November 26, 2020, Sanford reported that he had not been able to access the yard – that is, he had not been able to go outside for upwards of 20 days.

51.     Sanford documented his Covid experience at CTF at the very height of the epidemic, in November 2020.   It took a physical an emotional toll on him, though in many respects it was the treatment he received from CTF officials, and not the pain wrought by the coronavirus, that caused the most suffering.

52.     As Milton, Adams, and other Black inmates at CTF came to recognize over time, CTF's policy of transferring prisoners, of blending groups, of labeling prisoners "Covid-positive" or "Covid-negative" on the spot, and of avoiding true containment was driven by a darker agenda. For officials at CTF, the Covid-19

epidemic - which began with the July 20 raid -- came to be seen not as a burden or an obstacle but an *opportunity*.

### <u>Quinn Wilridge</u>

53.     Like Shelton Adams, Quinn Wilridge was a victim of both the July 20, 2020 raid *and* the Covid-19 epidemic that the raid set in motion.

54.     At approximately 0300 hrs on July 20, 2020, masked officers entered Wilridge's cell, jumped on him, slammed him to the floor, punched him repeatedly and zip-tied his hands so tightly that his fingers turned black. He was slammed into lockers and steel tables and then escorted to the dining hall, where he was dumped with 100-200 other Black inmates of CTF and forced to wait interminably to be interrogated.

55.     As with Adams, who was in the dining hall at the same time, Wilridge had no access to a protective mask, was sitting "shoulder to shoulder" with other inmates, could use only one dirty communal bathroom, and was inadequately clothed.

56.     When Wilridge attempted to explain that he had certain pre-existing conditions that rendered him vulnerable to Covid-19 infection, he received insults and racial invective.

57.     Wilridge survived the ordeal, though his physical injuries took a significant amount of time to heal.   He was psychologically scarred by the incident, which he continued to replay in his head, especially at night, when trying to sleep.   He attended counseling to help him get over the experience.

58.     Wilridge tested positive for Covid-19 on December 11, 2020.   Prior to testing positive, he had implored staff at CTF to follow stricter Covid protocols, all of which to him seemed designed to accelerate the spread of the virus, not contain it

# EXHIBIT B

ELECTRONICALLY FILED BY
Superior Court of California,
County of Monterey
On 2/22/2021 10:15 AM
By: Rowena Esquerra, Deputy

OFFICES OF

**PAVONE &**  **FONNER, LLP**

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ.**
**STATE BAR NUMBER 181826**
600 WEST BROADWAY, SUITE 700
SAN DIEGO, CALIFORNIA 92101
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR PLAINTIFFS

# COUNTY OF MONTEREY, STATE OF CALIFORNIA,

## MONTEREY SUPERIOR COURT

| | |
|---|---|
| SHELTON ADAMS;<br>TERRENCE BROWNLEE;<br>ANTOINE KEIL; and<br>GARY LAWLESS,<br><br>          Plaintiffs,<br>v.<br><br>STATE OF CALIFORNIA, acting<br>through the California Department of<br>Corrections & Rehabilitation;<br>CRAIG KOENIG, warden of CTF;<br>COMMANDING OFFICER Y.<br>MARTINEZ, a CDCR agent;<br>J. LOPEZ, a CDCR agent;<br>and an unknown number of additional<br>state agents designated as Does 1-200,<br><br>          Defendants. | CASE NO.: 21CV000530<br><br>**COMPLAINT FOR:**<br><br>I.   **RACIST VIOLATION**<br>     **OF RALPH ACT**<br><br>II.  **RACIST VIOLATION**<br>     **OF BANE ACT**<br><br>III. **ASSAULT**<br><br>IV. **BATTERY**<br><br>V.  **WEAPONIZATION OF DISEASE**<br>     **(BATTERY CLASS ACTION)**<br><br>VI. **INTENTIONAL INFLICTION**<br>     **OF EMOTIONAL DISTRESS**<br><br>VII. **NEGLIGENCE**<br><br>VIII. **NEGLIGENT SUPERVISION** |

PAVONE & FONNER, LLP

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................4

    Table 1 .....................................................................................................................5

JURISDICTION ................................................................................................................6

PLAINTIFF PARTIES ......................................................................................................7

    Shelton Adams ........................................................................................................7

    Terrence Brownlee ..................................................................................................7

    Antoine Keil ...........................................................................................................7

    Gary Lawless ..........................................................................................................7

DEFENDANT PARTIES ...................................................................................................7

    State of California ...................................................................................................7

    CTF Warden Craig Koenig .....................................................................................8

    Y. Martinez ............................................................................................................8

    J. Lopez ..................................................................................................................8

    Defendant Does 1-200 ............................................................................................8

    Agency/Employment/Conspiracy Allegations .......................................................9

ADMINISTRATIVE EXHAUSTION ..............................................................................10

    Table 2 ..................................................................................................................10

STATEMENT OF FACTS................................................................................................10

    Shelton Adams ......................................................................................................12

        A.  Background and History ...........................................................................12

        B.  Attack on Adams During the Raid ...........................................................13

    Terrence Brownlee ................................................................................................14

        A.  Background and History ...........................................................................14

        B.  Attack on Brownlee During the Raid........................................................14

    Antoine Keil..........................................................................................................16

    Gary Lawless ........................................................................................................17

ENTITLEMENT TO PUNITIVE DAMAGES..................................................................18

CAUSES OF ACTION .....................................................................................................19

PAVONE & FONNER, LLP

I.   FIRST CAUSE OF ACTION - VIOLATION OF RALPH ACT .......................... 19

II.  SECOND CAUSE OF ACTION - VIOLATION OF BANE ACT .................... 21

III. THIRD CAUSE OF ACTION - ASSAULT ..................................................... 23

IV. FOURTH CAUSE OF ACTION - BATTERY .................................................. 23

V.  FIFTH CAUSE OF ACTION BATTERY CLASS ACTION FOR
     WEAPONIZATION OF COVID-19 VIRUS ..................................................... 24

     Table 3 ............................................................................................................ 25

     Class Action Allegations ................................................................................. 26

     Table 4 ............................................................................................................ 27

VI. SIXTH CAUSE OF ACTION - INTENTIONAL
     INFLICTION OF EMOTIONAL DISTRESS ................................................... 35

VII. NEGLIGENCE ................................................................................................ 35

VIII. NEGLIGENT SUPERVISION ........................................................................ 36

PRAYER ................................................................................................................... 37

SIGNATURE BLOCK ............................................................................................... 40

PAVONE & FONNER, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PAVONE & FONNER, LLP

## **INTRODUCTION**

1.      In what can only be described as one of the most eye-popping racist attacks in recent civil rights history, on July 20, 2020, the warden of the California Correctional Training Facility in Soledad, California executed a 3 am raid dubbed "Operation Akili" with the intent to injure, infect, terrorize, provoke and humiliate a large number of sleeping African American inmates.

2.      Not satisfied to merely engage in the KKK-style assault, CDCR agents at the same time elected to weaponize the Covid-19 virus by intentionally exposing a mass number of the inmate minorities to each other, and to the guards that had just assaulted them, without any protection or social distancing.

3.      This predictably and by design became a "superspreader" event and ultimately resulted in some 2,700 subsequent cases of Covid-19 infection traceable to it, including 17 deaths at this prison.

4.      This reality is illustrated by the following infection tracking graph put out by CDCR for each prison.  As to CTF, it shows how the mass interpersonal exposure on July 20, 2020 introduced and catalyzed a subsequent spike in infections.  Before this date, there were no Covid-19 infections in this prison.



5.      During the raid itself, CDCR agents additionally unleashed a torrent of openly racist vitriol at the inmates, which is singularly unprecedented for modern governmental action.

6.      Plaintiffs' inventory of this vitriol includes the following partial table of jarring racial slurs that both highlight the racial animus motivating the raid, and explains CDCR's infectious strategy with respect to the African-American population, as follows:

| | | |
|---|---|---|
| **TABLE 1** | | |
| **No.** | **WITNESS** | **EVIDENCE** |
| 1 | Shelton Adams | They told us (Black prisoners): "By the time this ordeal is over, you niggers will have Covid-19!" |
| 2 | Shelton Adams | One of the guards grabbed my hair and put me in a headlock while another guard grabbed my arms pushing them up and calling me a "bitch ass nigger." |
| 3 | Shelton Adams | When I screamed in pain, one of the assailants mocked, "You niggers are soft." |
| 4 | Fred Brinkley | I asked [a guard], can I get some clothing and why were his colleagues not wearing masks and he responded by saying, "I'm not getting shit for you niggers, we don't care about Covid." |
| 5 | Terrence Brownlee | The door swung open and the officers were calling me nigger. I'm six foot three so the officers had a hard time throwing me on the ground but I was not resisting. They were stepping on my neck and head. I was being punched, kicked and called a "nigger." |
| 6 | Chris Cox | They called me a nigger and said "fuck you, black gang bangers." |
| 7 | Santiago Grajeda | Brownlee was screaming in pain and one of the officers called Brownlee a "nigger" and told him to "shut the fuck up!" |
| 8 | Johnathan Hamilton | They just said, "Shut up nigger," and escorted me around with no mask, shoes.  I was in my boxers, and they beat me up. |
| 9 | Johnathan Hamilton | I asked them "what is this about?" And they said, "Shut up! You niggers want to play games." |
| 10 | Antoine Keil | They kept calling us niggers, motherfuckers, and assholes. |
| 11 | Gary Lawless | They just called me and my cellie niggers. We were singled out because we're Black. |
| 12 | Michael McCurty | While being escorted, I observed other inmates being told that "Black Lives Don't Matter Here at CTF" and "All you niggers will learn that sooner or later." |

| TABLE 1 | | |
|---|---|---|
| **No.** | **WITNESS** | **EVIDENCE** |
| 13 | Anthony Oliver | The officers came in his cell yelling and shouting "Don't move Nigger, Black Lives Don't Matter" while snatching Mr. O'Neal from his bed. |

7.    Most of the inmates, including Plaintiffs, were forcefully dragged out of bed, and in the process, pushed, shoved, choked, slammed, beaten or otherwise battered by guards, which resulted in various personal injuries and other damage.

8.    In a larger context, raid victim and author Marcelle "Talib" Williams wrote a poignant and comprehensive article documenting the events on July 20, 2020, included here as **Exhibit 1**, and concluded in part that Operation Akili was a form of frustration by the prison establishment, one that foresees its extinction as prison inventory gets continuously reduced, and uses a raid like this to drum up business in order to perpetuate its survival:

> [I]ncarcerated people know that it is counter-productive to commit acts that justify one's incarceration. Not only are incarcerated people politically aware of the effects of violence, but thanks to Black resistance authors such as Bell Hooks, we are aware of the effects of violence in a more holistic way to where non-violence becomes a lifestyle as well as a rock to be used against a system that bases its very existence on our dysfunction.  It is incarcerated people who promote non-violence that make prisons obsolete.

> CDCR officials are aware of this as well. Budgets are already being cut. Prisons are being scheduled to shut down, and employees of these institutions are going to have to find new jobs. However, a certain segment of CDCR have become so accustomed to this sadistic enterprise that they cannot imagine a world without it. They will go to imperceivable lengths to ensure its continued existence.

(*See* **Exhibit 1**.)

## JURISDICTION

9.    The Monterey County Superior Court has jurisdiction over this action because CTF Soledad Prison sits within its jurisdictional perimeter and Plaintiffs seek damages in excess of the $25,000 jurisdictional minimum.

PAVONE & FONNER, LLP

**PLAINTIFF PARTIES**

10.     The following four plaintiffs were among the inmates subjected to the raid and bring their individual cases jointly, pursuant to Code of Civil Procedure section 378, as they share common issues of law and fact with respect to the events encapsulated within Operation Akili.

### SHELTON ADAMS

11.     Shelton Adams is a 42-year-old African-American male, identified with CDCR Number J94864 and currently housed at CTF.

### TERRENCE BROWNLEE

12.     Terrence Brownlee is a 60-year-old African-American inmate, identified by CDCR Number C20389, currently housed at CTF.

### ANTOINE KEIL

13.     Antoine Keil is a 42-year-old African American man, identified by CDCR BG7305, released from custody.

### GARY LAWLESS

14.     Gary Lawless is a 54-year-old African-American inmate, identified by CDCR Number AR5184, currently housed at CTF.

**DEFENDANT PARTIES**

### STATE OF CALIFORNIA

15.     Defendant State of California is a state sovereign entity that in this case acted through its agency, the California Department of Corrections and Rehabilitation (CDCR), which in turn acts through its individual agents that carried out the raid.  CDCR had custody over the Plaintiffs at the time of these events and therefore had a series of protective obligations toward them that are imputed to the State of California.

16.     California is responsible on a vicarious basis for the actions of its individual agents, which to the best of Plaintiffs' knowledge, were CTF guards.  Few were wearing their

PAVONE & FONNER, LLP

identifying badges and those that were covered them up. Some may be members of CDCR's Office of Correctional Safety (OCS), which includes its Special Services Unit (SSU). Other agents may have been from CDCR's Institutional Gang Investigators (IGI, from both Soledad CTF and neighboring Salinas Valley State Prison), as well as CDCR Sacramento, and the CDCR Special Services Unit Gang Intel Ops (also known as SSU). However, to the best of Plaintiffs' knowledge, all individual agents were state employees.

17.     All individual agents are believed, and on that basis Plaintiffs allege, to have been acting within the scope of their employment with the State of California in carrying out the raid.

### CTF WARDEN CRAIG KOENIG

18.     Defendant Craig Koenig is the warden of CTF Soledad and acted as the singular leader, and top prison official, in terms of carrying out the July 20, 2020 raid on the inmates.

### Y. MARTINEZ

19.     Defendant Commanding Officer Y. Martinez is an agent of the California Department of Corrections, is an employee at CTF, and was involved in the raid function of the July 20, 2020 event.

### J. LOPEZ

20.     Defendant J. Lopez is an agent of the California Department of Corrections, is believed to be an affiliated employee at CTF, and was involved in the raid function of the July 20, 2020 event.

### DEFNDANT DOES 1-200

21.     Defendant Does 1-200 are an unknown number of additional presumed state guards or other state law enforcement agents. This complaint will be amended to name said defendants when their identity is ascertained. Defendant guards actively removed, covered or concealed their nametags so as to prevent their identification during the raid.

PAVONE & FONNER, LLP

## AGENCY/EMPLOYMENT/CONSPIRACY ALLEGATIONS

22.      Plaintiffs are informed and believe, and thereon allege, that each of the 200 fictitiously-named defendants is responsible in some manner for the claims, obligations, and damages sued upon herein.  Plaintiffs are unaware of any other law enforcement agencies that were involved in the raid, not mentioned herein.

23.      Plaintiffs are informed and believes, and thereon allege, that at all relevant times, unless specifically otherwise alleged, each of the defendants was the agent, servant and employee of each of the remaining defendants and was at all times relevant, acting within the course and scope of his authority as agent, servant, and/or employee and with the permission and consent of each of the remaining defendants.

24.      As detailed by the facts herein, Defendants were clearly in a conspiracy with each other and acted within the larger strategic plan denominated as "Operation Akili," and as such, each are liable for all of the misconduct of the whole operation, as co-conspirators.

25.      They shared a common plan and scheme to carry out a raid of exclusively of certain African-Americans, and no other groups alleged to have ties to gangs, in order to commit a series of racist torts upon them and to infect them with Covid-19 disease.  They acted in concert, per a plan.  Each individual was subjected to a similar experience of being dragged out of bed, out of his cell, violently attacked while being kidnapped to the central dining hall, required to strip, intentionally threatened and exposed to disease by the abandonment of safety precautions, and then interrogated while his cell was being tossed.

26.      This is what Operation Akili was – a violent KKK-style assault designed to inflict a mass human rights violation on the Plaintiffs – on the pretext of being a gang investigation seeking items of validation evidence, presumably pursuant to certain regulations adopted in 15 CFR 3378.2.

27.      Defendants each came to a mutual understanding pursuant to Operation Akili to accomplish their unlawful plan, and one or more of them committed an overt act, and in fact committed countless of them, to further that plan.

PAVONE & FONNER, LLP

# ADMINISTRATIVE EXHAUSTION

28.     Plaintiffs properly satisfied multiple administrative exhaustion requirements prior to filing suit, as reflected by the following table:

| TABLE 2 | | |
|---|---|---|
| **Plaintiff** | **602** | **DGS** |
| Shelton Adams | 3L Rejection 12/02/2020 (Log 000000022464) | Rejected 10/13/20 (Claim no. 20007795) |
| Terrence Brownlee | 3L Rejection 12/02/2020 (Log 000000021439) | Rejected 08/26/20 (Claim no. 20006938) |
| Antoine Keil | Released; no 602 admin exhaustion necessary | Rejected 10/27/20 (Claim no. 20007483) |
| Gary Lawless | 3L Rejection 02/13/2020 (Log # pending) | Rejected 09/11/20 (Claim no. 20007221) |

## STATEMENT OF FACTS

29.     Dubbed "Operation Akili," on July 20, 2020 at 3 am, CTF Soledad guards, dressed in black tactical gear led by Warden Koenig, and authorized by him, conducted a coordinated raid exclusively targeting African American inmates by waking them up in the middle of the night, forcefully removing them from their bed (by pulling or snatching them off of it), beating, choking, and attacking them, and then assembling them closely together naked in a dining hall, notably without any Covid-19 disease protection or social distancing safety protocols applied.

30.     CDCR was not particularly forthcoming about the indisputable problems with the raid.  The day after it, on July 21, 2020, in response to a public protest by affected family members, Warden Koenig described the raid in these terms:

> The event itself was a result of Security Threat Group (STG) behavior that has been on-going at the Correctional Training Facility (CTF). CDCR does not identify the men racially [!] and those under investigation are suspected of STG activity. STG behavior jeopardizes everyone and especially, puts in harm's way,

those who are trying to build better lives for themselves and their families.

All the staff at CTF are fully committed to those efforts that help the men rehabilitate. There is a great deal of evidence which shows our rehabilitative efforts are successful. STG activity directly opposes the positive actions of the men applying themselves to being good citizens.

31.     In a later memorandum, on November 16, 2020, CDCR validated its actions in largely the same terms:

We can confirm that an investigation was held as the result of STG behavior that has been ongoing at CTF. The incarcerated people in the investigation were not identified based on their race, and all safety protocols were followed through the investigation. Warden Koenig personally toured during the investigation to ensure it was being conducted safely and appropriately. Nobody was harmed and the institution's normal operations resumed quickly.

32.     The putative purpose of Operation Akili was to collect evidence to "validate" certain African American inmates as gang members (within the assumed meaning of 15 CCR 3378.1, *et seq.*), such that the few rights prisoners still possess could be further deteriorated, their release dates could be delayed, and CDCR could impose other indignities.

33.     Among other punishments, being designated as a validated gang member effectively permits CDCR to segregate such inmates in the equivalent of solitary confinement.

34.     Gang validation, particularly at CTF, involves thorny constitutional issues, because the evidence of validation is not necessarily connected to any wrongdoing.  For example, a common item of evidence sought by guards are writings by one George Jackson, who is the founder of the "Black Guerrilla Family" or BGF, a reported prison gang.

35.     Operation Akili sought to validate plaintiffs as BGF gang members.  The problem is that George Jackson was not some sort of mindless thug, but a wrongly-imprisoned philosopher and scholar.  Reading his writing would not materially deviate from reading some of the Founding Fathers' more revolutionary installments.

PAVONE & FONNER, LLP

36.    Penalizing an inmate for possessing academic quality reading material obviously violates some of the most basic and important American constitutional rights, can be regarded as some awful Fahrenheit-451 situation with a concluding splurge of reader defamation, and thus gang validation as to certain items as practiced by CDCR represents a legally controversial exercise.[1]

37.    Indeed, correctional officers affirmatively violate the First Amendment by seizing prisoner notes or literature "not advocating violence or illegal activity" and not "reasonably likely to cause violence at the prison."[2]

## SHELTON ADAMS

### A.  Background and History

38.    Shelton Adams grew up in Modesto, California, and was raised by his grandmother, because his mother had drug problems and his father was not actively involved in his upbringing.

39.    After being stabbed in the heart by rivals at age 15 (and no doubt a little concerned for his safety), he got caught with an unloaded BB gun and was treated to a conviction for attempted burglary and placed on probation.

40.    At age 16, according to prosecutors, he committed a double murder by shooting Francisco Vega and Enrique Cuevas during a botched robbery outside a south Modesto market, in May 1994.

41.    He accepted a plea deal that resulted in a sentence of 19 years to life.

42.    Beginning in 2001, Adams embarked on an impressive path of rehabilitation, completing over 60 programs, to the point where he is approaching consideration for release. He was rejected for release in 2017 but will be eligible again for consideration in 2022.

---

[1]    *See* Zohrabi, Azadeh (2012) "*Resistance and Repression: The Black Guerrilla Family in Context*," 9 Hastings Race & Poverty L.J. 167.
[2]    *McCabe v. Arave* (9th Cir. 1987) 827 F.2d 634, 638.

PAVONE & FONNER, LLP

43.     As a result, CDCR guards are incentivized to provoke him into responsive action that would result in his continuing to be incarcerated and a continuing source of profit and employment for them.  This includes labeling him a dangerous gang member and otherwise attempting to marginalize, debilitate and reduce him to a criminal that can be subjugated and exploited.

44.     On November 18, 2020, Adams was informed that he had contracted Covid-19.

**B.  Attack on Adams During the Raid**

45.     The official account of Shelton Adams' function in the July 20, 2020 raid reads as the need to conduct an "enhanced institutional search" of housing units and an investigation of Security Threat Group (STG) persons potentially associated with BGF.

46.     After the search, Adams was found not to be a member of BGF.  He does have a tattoo of a bleeding heart on his chest.  However, according to CDCR, this putatively means he is a "soldier" of the "Kumi African Nation Organization" (KANO).  CDCR expresses the dramatic concern that if other inmates take the time to fraudulently tattoo a bleeding heart on their person while not belonging to KANO, they may be targeted for assault.

47.     Whether this actually means anything in terms of presenting some obstacle to Adams' specific rehabilitation is unknown at present; affiliation as KANO could just as easily be undertaken with a group of other inmates for purposes of herd protection in a dangerous environment.  It is impossible to know and understand a prisoner's motivation without closer scrutiny.  In any event, the one item does not qualify Adams for formal validation.

48.     Adams' account of the event (given on July 26, 2020) is as follows, in relevant part:

> On 7-20-20, at approximately 0300 hrs, I was woken up by John
> Does yelling, "Get your black ass on the ground motherfucker!"  I
> immediately complied and posed no threat to anyone.  As I was
> on the floor, one John Doe stepped on my neck as the other John
> Doe twisted my arms upwards toward my head severely injuring
> my shoulders (arm was pulled out of its socket).  When I
> screamed in pain, one of the assailants mocked, "You niggers are

PAVONE & FONNER, LLP

soft." I was lifted up off the floor by my hair and shoved face first into a wall. The blow was so severe, I almost passed out.

I was then taken to the Central Dining Hall. As we were walking, I asked the assailant escorting me, "Sir, can I ask for your name?" The assailant suddenly grabbed me by my neck and slammed me up against the wall and stated, "Motherfucker, you're lucky to be able to walk!"

All of the assailants had their names concealed and they were unmasked. I was forced to remain naked in front of everyone. We were forced to violate social distancing protocols. In fact, the assailants were telling us that we (Blacks) will have Covid-19 by the time this ordeal was over.

49.    Witnesses corroborate this account. They observed one of the CTF guards place Adams in a headlock as the other one pulled his cuffed hands upwards, as if to dislocate his shoulders. Adams yelped in pain.

50.    They also observed Adams being dragged down one or two flights of stairs in a headlock, in a pair of boxer shorts, arriving in front of cells 101-105. Using his arm as a noose, the officer started choking Adams when they were in front of cell 101, with the officer yelling [to the potential witnesses] "get on your fucking bunks!"

51.    Still, the guard was observed with his back up against a wall and he lifted Adams to the point that he (Adams) was up on his toes and gagging for air.

52.    The only aggressors were the guards. In the view of one witness, guards were not utilizing force to abate some threat; they utilized it for the purpose of "sadistic gratification," a well-known side effect of working as a prison guard pursuant to the well-known literature of Philip Zimbardo.

53.    Agents conducting the raid subsequently sought to ensure that witnesses to the attack would not attest to it, by implying through conduct that if they did, retaliation would result.

54.    Adams subsequently underwent medical treatment for various of his injuries. He suffered problems relating to his shoulders, lower back and wrist, strained his thoracic and endured psychological trauma.

**TERRENCE BROWNLEE**

### A.  Background and History

55.    Terrence Brownlee is a 60-year-old African American man from Fresno, California.

56.    According to existing criminal records, in 1980, Brownlee was sentenced by plea to serve 17 years to life in state prison for second degree murder committed with a firearm. He was accused of shooting and killing a woman in 1980, Shirley Brown, when she refused a sexual advance in the course of a larger robbery of several motel occupants in Fresno.  He was 19 years old at the time.  He has since served 41 years in state prison.

57.    Brownlee, now 60, has made several overtures in the past few years to be released from prison, including two appeals in Fifth District Case Numbers, F077663 and F079638.

### B.  Attack on Brownlee During the Raid

58.    According to Brownlee's statement given on July 28, 2020:

> On July 20, 2020, at approximately 3:00 am, I was awoken by unknown assailants.  One of the assailants grabbed me by my legs and snatched me off the bunk.  I hit the floor very hard causing injury to my wrists and back.
>
> As I was lying in a prone position, one of the assailants knocked me from behind striking me in the testicles causing severe pain in my testicle and abdominal areas.  As I winced in pain, I was forced on to my feet barefoot in my underwear.  I overheard the assailants refer to me and others as "niggers."
>
> Once I arrived at the Central Dining Hall, I was forced to remove my boxers and remain naked in front of everyone. Only black prisoners were attacked and bounded up.  The

PAVONE & FONNER, LLP

> assailants used the derogatory term "nigger" as they spoke to us.  They did not have their masks on but I didn't recognize them as they are not regulars here at CTF Central.

59.    Witnesses also observed the attack on Brownlee.  According to one, "I recognized Prisoner Brownlee's voice.  He was screaming as though he was in a lot of pain.  Brownlee's screams got louder.  I heard one of the prison staff shout "shut the fuck up!" About a second or two later, I saw the prison staff drag Brownlee by his arm and hair between two tables that is directly in front of his cell (135) and hurried him out the building.  One staff member had Brownlee by his arm (Brownlee was cuffed behind his back), and the other was pulling Brownlee by his hair."

60.    Another witness heard the prison staff go into Brownlee's cell.  "The officers were beating Brownlee up.  There was loud bumping and screaming.  Brownlee was screaming in pain and one of the officers called Brownlee a 'nigger' and told Brownlee to 'shut the f--k up!'  The officers then [dragged] Brownlee out the cell by his hair.  Brownlee was on his stomach with his hands cuffed behind his back. The officers drug Brownlee in between some tables that's right in front of our cells and on out [of] the building."

61.    Brownlee reports injuries in his lower right ribs, shoulders and wrists.  He also began to have trouble swallowing and experienced painful consequences from being kicked and punched in the ribs.  He was still reporting pain as of September 6, 2020, a month and a half later.

## ANTOINE KEIL

62.    Plaintiff Antoine Keil is a 42-year-old African American man from the Bay Area.  He is a barber by trade and has four children.  He was released from custody in 2021, after a 2018 conviction for shooting a person that was mistakenly pursuing him as an informant.

63.    Keil related in his 602 on July 27, 2020:

> On July 20, 2020, at approximately 0300 hours, the door to my assigned cell abruptly swung open.  As I looked up (I was asleep), I was snatched from the bunk and slammed

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

> violently on to the floor and assaulted by wannabe
> commandos. I was not resisting and was given no cause for
> force to be used against me. One of the assailants had his
> knee on the back of my neck applying pressure. I said to
> the assailant, "I can't breathe."
>
> "That Black Lives bullshit don't mean anything here
> motherfucker!" the assailant snapped in response. I was
> lifted off the floor by my neck and violently slammed
> against the wall striking my forehead and mouth. I was then
> hurried down the stairs without shoes or socks. I injured my
> foot on the stairs' rough surface. Once I arrived at the
> Central Dining Hall, I was forced to remove my boxers and
> remain naked in front of everyone. …
>
> I was called "Nigger" multiple times by the unknown
> assailants. I even overheard one of the assailants tell
> another Black prisoners, "You niggas are now infected."

64.     Keil was injured in his fingers, shoulders and back.

### GARY LAWLESS

65.     Gary Lawless is a 54-year-old African-American inmate, identified by CDCR Number AR5184, currently housed at CTF.   He is a published author, having written a 2017 fiction novel called "The Body Count" about the struggles of inner-city life in Oakland, California.

66.     Lawless was convicted in 2013 of voluntary manslaughter, in a case of imperfect self-defense.

67.     He relates that on July 20, 2020, at around 3 am:

> My cell door swung open. I was woken up by someone in
> camouflage grabbing me around [my] legs and pulling me
> from the top bunk. I was in shock because I was asleep. I felt
> a hard kick between my legs so I tried to ball up. I was
> yanked from the floor & put into zipties with my hands
> behind my back, cutting off hand blood circulation. I had no
> shoes or mask on as I was dragged down the stairs in my
> boxer briefs. I asked for my mask and was told I don't need
> it, 'everyone gonna catch coronavirus anyway.'

68.     Lawless' thumbs and neck were injured.  He was treated for minor injuries, as well as referred for counseling for psychological trauma.

### ENTITLEMENT TO PUNITIVE DAMAGES

69.     As detailed by the evidence and allegations set forth both above and below, and especially in Tables 1, 2 and 4, Defendants initiated a violent mass tort against Plaintiffs, for the reported purpose of gathering gang evidence.  However, acquisition of gang evidence putatively in Plaintiffs' possession by searching their cells did not require any amount of force.

70.     Defendants' racial animus expressed during the event was as gratuitous as it was telling about their true intentions.  Furthermore, the "main event" of Operation Akili, to mass infect the African American population with Covid-19, which ultimately caused over 2,700 infections, is one of the most openly deplorable acts of wanton malevolence a government agency can undertake to commit.

71.     As such, these elements of the case, individually and in their totality, entitle Plaintiffs for relief under the definitions set forth in Civil Code section 3294(c)(1) pertaining to legal malice[3] and 3294(c)(2) relating to legal oppression.[4]  In addition, certain causes of action automatically entitle Plaintiffs to punitive damages if the elements of that claim are proven.

---

[3]   The term "malice" means "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1).)

[4]   The term "oppression" means "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (Civ. Code, § 3294, subd. (c)(2).)

PAVONE & FONNER, LLP

## CAUSES OF ACTION

## I.

## FIRST CAUSE OF ACTION

## VIOLATION OF RALPH ACT

## (By all Plaintiffs against All Defendants)

72.     Plaintiffs incorporate paragraphs 1-71, as if fully set forth into this cause of action.

73.     California Civil Code section 51.7(b)(1) contains the operative text of the Ralph Act.  Its aim is to carry out the policy of the State of California to protect all persons from unauthorized violence:

> All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation, or on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51[5] … or because another person perceives them to have one or more of those characteristics. The identification in this subdivision of particular bases of discrimination is illustrative rather than restrictive.

74.     As detailed above, because of their racial characteristics of being African-American, Plaintiffs were subjected to violence by CDCR guards on July 20, 2020 during Operation Akili.

75.     As detailed in a representative format in Table 1 and Table 3 and by virtue of the individual stories of the Plaintiffs themselves – at a time when African Americans as a whole at CTF were programming and were not engaged in gang violence – the guards carried out Operation Akili exclusively against African-Americans inmates.  The guards made overt,

---

[5]  Section 51(b) states in turn: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, *race*, color, religion, [*etcetera*] are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

repeated and vulgar references to racism.  The guards subjected the inmates to significant violence in pulling them out of bed.  The guards violently subdued, dragged, beat, punched and choked the inmates.  The guards then rounded up by the inmates in one spot to catalyze a superspreader Covid-19 disease epidemic event against the inmates, and they accomplished that purpose successfully.

76.     Given the detail documented above, racial animus was a substantial motivating factor of Operation Akili.

77.     Plaintiffs were injured in various particulars, as documented above.

78.     Defendants' conduct was the direct cause of the inmates' injuries, and to the extent that contraction of disease was a consequence for some, Operation Akili was at least a substantial factor in causing the resulting harm.

79.     Pursuant to Civil Code section 52, Defendants' violation of the Ralph Act entitles Plaintiffs to actual damages, punitive damages, a civil penalty (of $25,000), attorney's fees and injunctive relief.

80.     Injunctive relief here is warranted to prevent agents of CTF, including Warden Koenig, of carrying out additional "Operation Akilis" directed against other minority groups or again directed at African Americans.

81.     Pursuant to Civil Code section 52(b), "[w]hoever denies the right provided by Section 51.7 or 51.9, or aids, incites, or conspires in that denial, is liable for each and every offense for the actual damages suffered by any person denied that right and, in addition, the following:

(1)     An amount to be determined by a jury, or a court sitting without a jury, for exemplary damages.

(2)     A civil penalty of twenty-five thousand dollars ($25,000) to be awarded to the person denied the right provided by Section 51.7 in any action brought by the person denied the right… .

(3)     Attorney's fees as may be determined by the court."

82.     Plaintiffs request these remedies, as well as all other traditional legal remedies.

83.     Furthermore, pursuant to Civil Code section 52(b), all Defendants participating in Operation Akili are equally liable for the acts committed during it, as co-conspirators to a mass tort Ralph Act violation.

## II.

## SECOND CAUSE OF ACTION

## VIOLATION OF BANE ACT

## (By all Plaintiffs against All Defendants)

84.     Plaintiffs incorporate paragraphs 1-83, as if fully set forth into this cause of action.

85.     For at least the prior two years before July 20, 2020, Plaintiffs and the larger African-American population at CTF were peacefully engaged in rehabilitative programs (aka "programming") and were thereby exercising their civil rights to pursue liberty, safety and other civil rights (all thoroughly delineated in sections 1-7 of Article I of the California Constitution)[6], by slowly minimizing and removing the need for them to be punished or further incarcerated for their earlier criminal offenses.

---

[6]    Article 1 contains a long series of personal rights under the California Constitution, including:

**Section 1:** "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."
**Section 2(a):** "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."
**Section 3(a):** "The people have the right to … petition government for redress of grievances, and assemble freely to consult for the common good." [Which, parenthetically, would permit – and prohibits retaliation for – the invocation of the 602 grievance process].
**Section 4:** "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State. The Legislature shall

PAVONE & FONNER, LLP

86.     Defendant CDCR agents formulated Operation Akili, and pursuant to it, committed gratuitous violence, utilized provocative threats, and engaged in other acts of violent intimidation in order to force Plaintiffs to assemble without safety devices or precautions, in CTF central dining hall, at which time they were subjected to a superspreader disease event designed to mass infect them with Covid-19.

87.     Defendants carried out Operation Akili to interrupt the plaintiffs', and the larger African Americans inmate population's, peaceful attempt to rehabilitate.  It did so to provoke violence or resistance in response that would give CDCR agents fresh cause to punish and continue incarcerating them.

88.     Defendants' operation was designed to promote further violence; to injure and provoke Plaintffs; and to retaliate against them for peacefully exercising myriad rights designed to lift themselves out of their plight of long-term incarceration.

89.     By carrying out Operation Akili in its several elements, Defendants intended to disrupt and deprive Plaintiffs from pursuing their Article 1 state constitutional rights.

90.     In addition, during the operation, Defendants made it clear through conduct that witnesses were not to recount their percipient observations, by offering to take their statements in front of a group of hostile CDCR agents known as the "goon squad."  They thus committed a separate Bane Act violation.

---

make no law respecting an establishment of religion.
**Section 6:** "Slavery is prohibited. Involuntary servitude is prohibited except to punish crime." [Notably, incarceration requires inmates to work for slave wages.]
**Section 7(a)**: "A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws…"

PAVONE & FONNER, LLP

# III.

## THIRD CAUSE OF ACTION

## ASSAULT

### (By all Plaintiffs against All Defendants)

91.    Plaintiffs incorporate paragraphs 1-90, as if fully set forth into this cause of action.

92.    On July 20, 2020 Defendants acted, intending to cause physical harm to Plaintiffs, by, among other things, violently removing them out of bed, shoving them, kicking them, dragging them, beating them, using excessively tight restraints, and ordering them to stand in close proximity to one another without protection or social distance and threatening them with exposure to Covid-19 in the process, so as to maximize the chance of contraction of this disease.

93.    After being awoken while sleeping, Plaintiffs reasonably believed that they would be, and they were, continuously contacted in a harmful manner.

94.    Defendants were in a position to carry out such harmful contact, and they did so, by inflicting injuries on Plaintiffs as well as subjecting them to the risk of contraction of Covid-19 and ultimately infecting some of them by virtue of intentionally creating a "superspreader event."

95.    At no time did Plaintiffs consent to such conduct, provoke it, or act in any way that would make them responsible for it.

# IV.

## FOURTH CAUSE OF ACTION

## BATTERY

### (By all Plaintiffs against All Defendants)

96.    Plaintiffs incorporate paragraphs 1-95, as if fully set forth into this cause of action.

PAVONE & FONNER, LLP

97.     On July 20, 2020 Defendants acted, intending to cause physical harm to Plaintiffs, by, among other things, violently removing them out of bed, shoving them, kicking them, dragging them, choking them, beating them, and ordering them to stand in close proximity to one another without protection or social distance and threatening them with exposure to Covid-19 in the process, so as to maximize the chance of contraction of this disease.

98.     At no time did Plaintiffs consent to these acts.

99.     A reasonable person in Plaintiffs' situation would have been offended by the unprovoked attack by Defendants.

# V.

## FIFTH CAUSE OF ACTION

## BATTERY CLASS ACTION FOR

## WEAPONIZATION OF COVID-19 VIRUS

### (By Plaintiffs Adams as Class Representative against All Defendants)

100.     Plaintiffs incorporate paragraphs 1-99, as if fully set forth into this cause of action.

101.     Defendants' Operation Akili was designed as an exercise in forcibly removing a large number of inmates from their cells, in the middle of the night while they were sleeping, in order to herd them into CTF's central dining hall #1 with approximately 100 other African Americans in close proximity.

102.     The guards forced them to strip naked, did not respect social distancing rules, did not allow inmates to use their own masks, and did not provide them with masks.  The guards did not observe safety precautions.

103.     CDCR agents then interrogated the inmates individually about their gang affiliations while the larger group remained in this congested state of close physical proximity.

104.     Meanwhile, Defendants informed the inmates, using abjectly unacceptable racial epithets, that they were deliberately exposing them to Covid-19, that the inmates were

PAVONE & FONNER, LLP

going to get infected, and that they were now infected.  Table 3 sets forth representative sample of witness accounts:

<table>
<tr><td colspan="3" align="center"><strong>TABLE 3</strong></td></tr>
<tr><td><strong>No.</strong></td><td align="center"><strong>WITNESS</strong></td><td align="center"><strong>EVIDENCE</strong></td></tr>
<tr><td>1</td><td>Shelton Adams</td><td>They told us (Black prisoners): "By the time this ordeal is over, you niggers will have Covid-19!"</td></tr>
<tr><td>2</td><td>Fred Brinkley</td><td>I asked [a guard], can I get some clothing and why were his colleagues not wearing masks and he responded by saying, "I'm not getting shit for you niggers, we don't care about Covid."</td></tr>
<tr><td>3</td><td>Terrence Brownlee</td><td>The officers ... didn't have any masks on. They told us we were going to get Coronavirus.</td></tr>
<tr><td>4</td><td>Marvin Foster</td><td>Guard: "'I hope you get COVID.'"</td></tr>
<tr><td>5</td><td>Antoine Keil</td><td>When I was in the chow hall they told us we were going to get Covid-19.</td></tr>
<tr><td>6</td><td>Gary Lawless</td><td>They told us to shut the fuck up and we were not allowed to put our masks on. When we were in the kitchen after being kicked in the nuts and dragged down the stairs, we have Covid now.</td></tr>
<tr><td>7</td><td>Gary Lawless</td><td>I had no shoes or mask on as I was dragged down the stairs in my boxer briefs. I asked for my mask and was told I don't need it, "everyone gonna catch coronavirus anyway."</td></tr>
<tr><td>8</td><td>Antwyone Lynch</td><td>I asked if I could wear a face mask or covering and they responded to me by saying, "no, we don't care if you catch COVID, you're a tuff crip!'"</td></tr>
<tr><td>9</td><td>Joseph O'Neal</td><td>The Supervising Sergeant was coughing and everybody started yelling for the Sergeant to put on a mask and he refused!  I believe this incident was also to infect us (race) with COVID-19.</td></tr>
<tr><td>10</td><td>Clifford Williams</td><td>I was not provided adequate protection for COVID-19, when they placed me and two hundred other black inmates in a confined area without a mask or our face, for over 5 hrs.  Unable to social distance."</td></tr>
</table>

PAVONE & FONNER, LLP

1    105.    Before Operation Akili, as of July 20, 2020, CTF Soledad did not have any

2   cases of Covid-19.  After it, this happened:



PAVONE & FONNER, LLP

15    106.    As can be seen by CDCR's graph of CTF Covid-19 detail, after July 20, 2020,

16   CTF reported its first batch of cases and then slowly but steadily over the next few months its

17   rate increased and then it turned into a spiraling epidemic, peaking in mid-December at over

18   500 active cases at any one time.

19    107.    Accordingly, CDCR's own statistics illustrate that the July 20, 2020 raid was in

20   fact a "superspreader" event in that the mass aggregation of inmates in close proximity to one

21   another (and to the guards) without safety precautions introduced and catalyzed the viral spread

22   of the disease to the entire prison, to what ultimately became 2,719 infections and 17 deaths.

23                            **CLASS ACTION ALLEGATIONS**

24    108.    Plaintiff Shelton Adams brings this cause of action on behalf of himself and the

25   2,719 CTF inmates who ultimately contracted Covid-19 from July 20, 2020 to February 15,

26   2021, pursuant to Code of Civil Procedure section 382.

27

28

109.    Apart from the connection of the July 20, 2020 raid to the subsequent spike in infections, and apart from the racism expressed by guards deliberately intending that result, perceptions of the event specific to Covid-19 are remarkably similar and consistent:

<table>
<tr><td colspan="3" align="center"><strong>TABLE 4</strong></td></tr>
<tr><td><strong>No.</strong></td><td><strong>WITNESS</strong></td><td align="center"><strong>EVIDENCE</strong></td></tr>
<tr><td>1</td><td>Shelton Adams</td><td>All of the assailants had their names concealed and they were unmasked.  I was forced to remain naked in front of everyone.  We were forced to violate social distancing protocols.  In fact, the assailants were telling us we (Blacks) will have Covid-19 by the time this order was over.</td></tr>
<tr><td>2</td><td>Fred Brinkley</td><td>While being escorted to the Dining Hall, I observed many other prison officials did not have any face masks on. … I asked C/O Y. Martinez, can I get some clothing and why were his colleagues not wearing masks and he responded by saying, 'I'm not get shit for you niggers, we don't care about COVID' … I was putting in plastic zip tie hand restraints, denied to be allowed to put my mask on. The officers escorted me to the Facility Dinning [sic] Room area … The officers also denied prisoners to practice social distancing and deliberately mixed prisoners with prisoners in other housing units all of which violated COVID-19 health orders … In the Dining Room there were also approximately 150 prisoners in restraints and did not have masks on to cover our faces. There were also officers who did not have name tags on their uniforms that were not wearing any face covering and their mask was around their neck … Officers were coughing … and not wearing a mask and the prisoners in the dining room area in an up roar begin yelling telling the officers to put on a mask. The officers ignored us … the raid infected inmates with Covid-19, which is now rapidly spreading in Soledad … I and the others were detained in the dining hall for several hours while our cells were ransacked by staff. Days later, some of the same inmates contracted Covid-19 … They dragged us all...to the dining hall in the dark with no shoes, clothes, mandated face mask (just the underwear we were sleep in), and placed at the dining hall tables four to a table in several rows next to each other. Though [it was] dark, I could easily discern from reflecting lights that none of the staff had facial mask on their faces.</td></tr>
</table>

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

| TABLE 4 | | |
|---|---|---|
| **No.** | **WITNESS** | **EVIDENCE** |
| 3 | Anthony Copeland | They continued to show me no concern, dragging me and pulling me out of my bed without allowing me to put on any clothes or my shoes or my mask to protect me from COVID-19.  I tried explaining to the officers that I have diabetes and have foot pain and I need my shoes. Once again, the officer showed no concern about my medical condition, and continued to pull on me walking down the hallway towards the dining hall, putting me in the dining with about a hundred other inmates with no mask on. |
| 4 | Christopher Cox | I was stripped naked and crowded with other Black inmates without masks. |
| 5 | Dameon Oliver | On July 20, 2020, at 3:00 AM I was awakened by some CTF guard …pulling me out aggressively brutally from my ankles … without my Covid 19 face mask … the CTF guards violated my Covid 19 constitutional rights: They wore no mask. All the blacks were crowded up in the dining hall bunched up 3 feet or less apart. |
| 6 | Berlan Dicey | I hurried up the corridor into the dining hall where I saw 80 to 100 black men, no mask, crammed at the tables. |
| 7 | Rahsaan Fitzgerald | I was walked to the dining hall maskless and seated around other Blacks who also were maskless … there's a mandatory mask wearing policy here at Soledad. I was not allowed to put my protective face mask on. I was escorted to the dining hall & seated around 100 or more Black Inmates wearing no mask. There were numerous officers coughing. My well-being was compromised by these officers' negligence. |
| 8 | Daitwon Futrell | Since the raid of July 20, 2020, about a week later this prison had its first outbreak … I was transferred here CTF from LAC (Los Angeles County) state prison. Now at LAC there was a very minimal amount of cases there. The prisons know what other prisons have, a high or low [number] of cases. There are also certain criterions that you must have to be transferred to this prison. A few of which are EOP, ASU, SHU or a lifer.  I have none of this and was still transferred to this prison.

This prison was still opened for transfers knowing of its outbreak. According to Sgt. Gonzalez this prison CTF (Central Training Facility) is not supposed to be accepting any inmates. I've been here |

| | TABLE 4 | |
|---|---|---|
| **No.** | **WITNESS** | **EVIDENCE** |
| | | since Oct 7, 2020 and have seen multiple wings get quarantined because of the virus.<br><br>On Nov 7, 2020, the wing I was in (G-wing) had 70+ cases. They tested us on Nov 5th and got the results Nov 8th. Now on Nov 9th the CO's in the wing that day told my cellie at the time that he was positive. Then they told me that I was going to move to a different wing. For whatever reason I did not move that night. So the next morning I packed up my property and pushed it outside the cell. They told me to go back inside the cell but I refused to go back in the cell. The cause of my refusal is because I was not going to stay in the cell with someone that tested positive for the Covid-19 virus.<br><br>Therefore I would be receiving an RVR (rule violation) for not going back in the cell with him. I don't believe I should be punished for being in charge of my life and health. This just shows their negligence for our health and safety. Also on Nov 10th this prison has exploded in cases of the corona virus. The last I heard this prison CTF has over 200 positive cases. Which proves that this prison since July does not have control of this deadly virus. |
| 9 | Bernard Harris | I was dragged out the cell … and escorted to the Dining Hall, without any shirt face mask or tennis shoe … while being escorted to the Dining Hall, I observed that the escorting officers and other agents did not have any face masks on. When I asked why were we not seated six feet apart, I was told by the escorting officer, "Black Lives Don't Matter to Them!" |
| 10 | Mark Harris | [O]n 7/20/20, in the morning me and about one hundred to two hundred African inmate here at Central facility, Soledad state prison were [extracted] and placed in handcuffs and marched to central facility dining hall in nothing but under-wear, no shoes, socks, and no face mask to protect me from getting sick from covd-19. This act was dangerous … |
| 11 | Louis Johnson | [W]hat's funny is, two weeks prior to this raid, no inmates tested positive for the coronavirus, and two week after the raid, the prison became overwhelmed with corona virus.  As of yesterday, the administration locked down the whole prison, claiming 161 inmates |

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

| No. | WITNESS | EVIDENCE |
|---|---|---|
| | | **TABLE 4** |
| | | tested positive, but … it's much more than that here now, and they not giving us anything outside our cells, such as showers, canteen, packages, phone calls, or any other program. |
| | | But yet, they allow inmates to cell feed us, and all the inmates that they say are positive, they are putting them in one big gym all together for 14 days, then allowing the inmates to go back to general population and continue to cell feed the whole population.  So yes, CTF is intentionally spreading the Covid-19 virus throughout this prison, and they are still conducting transfers from one prison to another, and forcing inmates to accept cellmates from other prisons. If an inmate refuses a cellie, he's then written up a rule violation and punished, sometimes even placed in the hole. |
| 12 | Antoine Keil | When I was in the chow hall they told us we were going to get Covid-19. They had their names covered and was not wearing facemasks. They kept calling us niggers, motherfuckers, and assholes … the officers didn't have facemasks on and they had their name tags covered. They told us that us niggas were infected now. |
| 13 | Gary Lawless | They told us to shut the fuck up and we were not allowed to put our masks on. When we were in the kitchen after being kicked in the nuts and drug down the stairs, we have Covid now … I had no shoes or mask on as I was dragged down the stairs in my boxer briefs. I asked for my mask and was told I don't need it, everyone [is going to] catch coronavirus anyway. |
| 14 | Michael McCurty | While being escorted to the Dining Hall, I observed that none of the escorting officers and other agents [had] any face coverings or mask on (Going against COVID-19 directive orders) … I was pulled out of the cell … without any shirt, face mask or shoes. I was held in the Dining Hall for almost 5 hours with over 100 other black inmates. |
| 15 | Troy Mendenhall | I was singled out because of my race, assaulted and potentially exposed to Covid-19, precluded from wearing a mask among 100 other prisoners. |
| 16 | Reginald Nettles | Prior to the 20, July 2020 raid, there wasn't a single case of covid-19; as of yesterday 11, November 2020 we now know from a local news report that the total number is 217 confirmed positive cases among |

| TABLE 4 | | |
|---------|---|---|
| **No.** | **WITNESS** | **EVIDENCE** |
| | | inmates (active cases) and 20 confirmed active cases among staff here at CTF. |
| 17 | Anthony Oliver | All of a sudden, CTF during Aug.-Nov. 2020 have been having severe outbreaks of prisoners testing positive and there is no 'space' secured housing units to put them all in. So, prisoners' movement have been restricted only in our housing unit, 8 of 9 wings are on quarantine as I write, D-Wing was on quarantine Sept.-Oct. 2020, and G-Wing, X-Wing, Z-Wing was not.<br><br>However, as soon as D-Wing got cleared with having no more positive tests for COVID-19, outbreaks start in other wings, thereby placing us on quarantine and we never get a chance to see prisoners on quarantine. |
| 18 | Joseph O'Neal | The prisoners were not allowed to wear a mask and the peace officers disregarded...six feet away from people, denying us to practice social distancing … there were approximately 125 to 150 prisoners, all Black, none of us were allowed to retrieve our mask and we were mixing from all units. Several officers were not wearing a MASK, no covering and the Supervising Sergeant was coughing and everybody start[ed] yelling for the Sergeant to put on a mask and he refused! I believe this incident was also to infect us (race) with COVID-19." |
| 19 | Jason Smith | I have been directly affected by the repercussion of the racial raid including but not limited to: (1) COVID-19 outbreak at CTF-C eleven (11) days later on 07/31/20 … as a result of the raid, dozens of prisoners contracted COVID-19 … [My complaint is that] conducting a racial raid targeting only black prisoners, in peak of the COVID-19 pandemic on 07/20/20, and failing to take proper safety protocols that subsequently led to an outbreak of the virus." |
| 20 | Clifford Williams | I was not provided adequate protection for COVID-19, when they placed me and two-hundred other black inmates in a confined area without a mask or our face, for over 5 hrs. Unable to social distance. |
| 21 | Marcelle Williams | Officers flagrantly violated COVID-19 protocols … social distancing and other COVID-19 protocols were not followed during the 2020-07-20 raid. |
| 22 | Warden Koenig | **<u>July 22, 2020</u>** |

PAVONE & FONNER, LLP

| TABLE 4 | | |
|---|---|---|
| **No.** | **WITNESS** | **EVIDENCE** |
| | | "My record as far as the treatment of the men here illustrates my caring. *The fact that no inmates have tested positive for COVID at CTF is proof of our efforts.* Monday [July 20, 2020] all staff were masked and the men were socially distanced beyond the required mandates." [Emphasis added.]<br><br>[Acknowledging that *before the raid*, there were no Covid cases at CTF.] |
| 23 | Anonymous | The only business they like is lockdowns and gang war, because they get hazard pay (2x their regular pay), if there is a lockdown. |

110.    Given the evidence in Table 4, Adams sues on a class action basis because the class of 2,719 persons who contracted Covid-19 from July, 2020 to February 15, 2021 is too numerous for joinder to be practical.

111.    Proposed class members are unlikely to be able to file individual suits on their own in light of the complex coordination required to successfully exhaust both prison administrative processes and DGS government claim processes, as all are incarcerated and the vast majority are indigent.

112.    Plaintiffs have limited access to retained or court-appointed counsel.  They have restricted access to research materials to protect their rights, including necessary forms and instructions to complete exhaustion processes fully and accurately.  They have further obstacles relating to restrictions on their access to all of the above in light of the Covid-19 pandemic.  In addition, they face the risk of retaliation for any legal (602) actions they take, as opposed to the class action vehicle where CDCR is not as easily able to retaliate against a large number of inmates prosecuting an action as only the class representative(s) are required to navigate the administrative exhaustion system.

113.    Pursuant to Civil Code section 382, questions of fact and law are common to the class, including but not limited to:

PAVONE & FONNER, LLP

    (a)  Did CTF have any documented Covid-19 infections before July 20, 2020 that could otherwise interrupt causation between the raid and the epidemic?

    (b)  Did CDCR in fact round up approximately 100 Black inmates in Central Dining Hall #1, require them to strip naked and pack them together without appropriate Covid-19 safety protocols, which would create the requisite viral conditions to trigger a superspreader event?

    (c)  Did CTF guards announce that infecting the prisoners with Covid-19 was a purpose of Operation Akili and did they plan the operation to achieve that outcome?

    (d)  Was the July 20, 2020 raid a "superspreader event" such that it actually and proximately caused all 2,719 Covid-19 infections (and 17 deaths) at CTF as of February 15, 2021, even if each individual case of contraction might have had its own specific viral journey among the inmate population?

114.     Shelton Adams' contraction of Covid-19 represents a typical claim in that he was a direct victim of the July 20, 2020 raid, was not afforded Covid-19 safety precautions during the round-up, and was exposed to and subsequently contracted Covid-19 as a result of the July 20, 2020 event as the catalyst. He also personally heard statements announcing CDCR's intent to infect the African-American population. Covid-19 infections are a distinct kind of injury and generally result in a similar set of consequences.

115.     Defenses to the claim would be common to all members of the class, including but not limited to, the defense's attempt to prove that the July 20, 2020 event was not a superspreader event, that other paths caused the subsequent spike of Covid-19 infections, that guards were following requisite safety protocols on July 20, 2020 and that they adhered to regulatory procedure in adopting and carrying out Operation Akili.

116.     Plaintiff and his counsel will adequately protect the interests of the class. They have no known conflicts of interest. Plaintiff's counsel does not represent guards, police or other state agents. Plaintiff counsel is a 25th-year civil, civil rights and appellate litigator, is experienced in prison mass tort litigation, and previously represented (and still represents) hundreds of disease victims in a comparable action spanning eight years.

PAVONE & FONNER, LLP

117.    The questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members.  Like any disease event, individual contraction stories will of course have a level of uniqueness to them, in much the same random walk that ten dollars' worth of quarters (later learned to be toxic) might get distributed and passed around in a prison.

118.    But if a single superspreader event is considered the original legal cause of the resulting infections – in other words, if that $10 worth of toxic quarters should never have been in the prison in the first place (even if the exact timing or exact method of transmission and distribution of the virus varies between individuals in the same way the journey of a given toxic quarter ends up in a particular prisoner's hands) – then the common legal issue of whether that original introduction caused all infections predominates over the particular contraction story of any given individual.

119.    For the victims of the CTF Covid-19 epidemic, a class action is equivalent or superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all individual victims that contracted Covid-19 would be impracticable.

120.    The class is readily definable as all persons who suffered contraction of Covid-19 from July 20, 2020 to February 15, 2021.  Prosecution as a class action will eliminate the possibility of duplicative litigation, while also providing redress for individual claims that would otherwise be too small, too difficult, and too burdensome to support the expense of individual litigation.

121.    The class of victims was damaged by the trauma and debilitation of being exposed to, and contraction of, the Covid-19 virus.  Most recovered, such that tort damages are modest but certainly not negligible.  However, some suffered more serious consequences, up to and including death, such that damages are higher.

PAVONE & FONNER, LLP

## VI.

## SIXTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

122.    Plaintiffs incorporate paragraphs 1-107, as if fully set forth into this cause of action.

123.    Defendants' Operation Akili was outrageous: the idea of committing systematic gratuitous violence against inmates merely to accomplish the logistic goal of moving them all to a dining hall, the decision to douse them with racial epithets during the process, and the larger plan to infect them with Covid-19 by creating a superspreader disease event exceeds all bounds of conduct tolerated by a civilized society.

124.    Defendants intended to cause Plaintiffs emotional distress during the process, by committing aforesaid gratuitous violence, humiliating and stripping their dignity with racial epithets, and telegraphing to them that they would be the subject of Covid-19 contraction.

125.    Plaintiffs suffered severe emotional distress by being subjected to gratuitous violence, racial epithets, and the potential contraction of disease.

126.    Defendants' conduct above was a substantial cause of this distress.

## VII.

## NEGLIGENCE

127.    Plaintiffs incorporate paragraphs 1-107, as if fully set forth into this cause of action.

128.    As prison officials and agents, Defendants were obligated to numerous standards: a standard to only use as much force as necessary to accomplish any particular prison objective; standards to employ careful safety protection and social distancing protocols to avoid the spread of disease; and standards to avoid unprofessional behavior.

129.    Defendants shattered all of these standards, by resorting to excessive force to wake inmates up and move them to different places within the prison; by not only not

PAVONE & FONNER, LLP

following standard safety protocols but intentionally abandoning them in order to proactively accomplish the spread of disease among the African-American population; and by authorizing, ventilating and openly expressing their most base racial hatred toward Plaintiffs, in language that categorically defies all societal and professional norms.

130.     Plaintiffs were damaged by these actions, and inactions, by being physically brutalized, exposed to disease, and wrongfully vilified for the audacity of peacefully participating in the very programs designed to achieve their rehabilitation.

## VIII.

## NEGLIGENT SUPERVISION

131.     Plaintiffs incorporate paragraphs 1-107 and 128-130, as if fully set forth into this cause of action.

132.     As mentioned above, Plaintiffs were subjected to CDCR agents who embraced their racism, engaged their violent tendencies, and planned to infect the inmates by proactively creating the conditions for a superspreader disease event.

133.     CDCR, the employer of the individual agent defendants, hired these agents.

134.     These agents were unfit and incompetent to perform the tasks of moving inmates safely in order to putatively carry out a search of cells and an interrogation session looking for gang affiliation paraphernalia.

135.     That CDCR knew or should have known that these agents were not up to the task of carrying out the search according to established legal rules and safeguards – pretty much the opposite – which created a massive amount of risk and materialized damage to the plaintiffs.

136.     Plaintiffs were indeed harmed in various particulars, as detailed above, and that the entity's failure to have properly supervised, trained and obedient agents caused the injuries, infections and other damages plaintiffs suffered.

PAVONE & FONNER, LLP

PAVONE & FONNER, LLP

## **PRAYER**

*Wherefore:*

### **On their first cause of action for violation of the Ralph Act, each Plaintiff seeks:**

(1)     findings of co-conspirator, agency and entity liability as applicable to each defendant;

(2)     economic damages;

(3)     non-economic damages;

(4)     civil penalties;

(5)     punitive damages;

(6)     statutory damages;

(7)     injunctive relief;

(8)     pre-judgment and post-judgment interest;

(9)     costs, to be determined;

(10)    attorney's fees;

### **On their second cause of action for violation of the Bane Act, each Plaintiff seeks:**

(11)    findings of co-conspirator, agency and entity liability as applicable to each Defendant;

(12)    economic damages;

(13)    non-economic damages;

(14)    civil penalties;

(15)    punitive damages;

(16)    statutory damages;

(17)    injunctive relief;

(18)    pre-judgment and post-judgment interest;

(19)    costs, to be determined;

(20)    attorney's fees.

21CV000530

**On their third cause of action for assault:**

(21)    findings of co-conspirator, agency and entity liability as applicable to each Defendant;

(22)    economic damages;

(23)    non-economic damages;

(24)    punitive damages;

(25)    pre-judgment and post-judgment interest;

(26)    costs, to be determined;

**On their fourth cause of action for battery:**

(27)    findings of co-conspirator, agency and entity liability as applicable to each Defendant;

(28)    economic damages;

(29)    non-economic damages;

(30)    punitive damages;

(31)    pre-judgment and post-judgment interest;

(32)    costs, to be determined;

**On their fifth cause of action for class action battery (disease weaponization):**

(33)    findings of co-conspirator, agency and entity liability as applicable to each Defendant;

(34)    certification as a class of the 2,719 Covid-19 victims, with Plaintiff Adams as their class action representative and with P&F counsel as Adams' and the class legal representative;

(35)    economic damages;

(36)    non-economic damages;

(37)    punitive damages;

(38)    pre-judgment and post-judgment interest;

(39)    injunctive relief;

(40)    costs, to be determined;

**<u>On their sixth cause of action for intentional infliction of emotional distress</u>:**

(41)    findings of co-conspirator, agency and entity liability as applicable to each
          Defendant;

(42)    economic damages;

(43)    non-economic damages;

(44)    punitive damages;

(45)    pre-judgment and post-judgment interest;

(46)    costs, to be determined;

(47)    attorney's fees.

**<u>On their seventh cause of action for negligence</u>:**

(48)    findings of co-conspirator, agency and entity liability as applicable to each
          Defendant;

(49)    economic damages;

(50)    non-economic damages;

(51)    punitive damages, given a finding of gross negligence by Defendants;

(52)    pre-judgment and post-judgment interest;

(53)    costs, to be determined;

**<u>On their eighth cause of action for negligent supervision</u>:**

(54)    findings of co-conspirator, agency and entity liability as applicable to each
          Defendant;

(55)    economic damages;

(56)    non-economic damages;

(57)    punitive damages;

(58)    pre-judgment and post-judgment interest;

1

(59)    costs, to be determined;

2

Dated: February 21, 2021                    PAVONE & FONNER, LLP

3

4

5

Benjamin Pavone, Esq.

6

Attorneys for Plaintiffs

7

8

9

10

11

PAVONE & FONNER, LLP

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1



# They came for us in the morning: What prison officials don't want you to know about the raid on 200+ incarcerated Black people at Soledad

September 2, 2020



In prison, Talib Williams is known as "the student" — always studying, learning and teaching.

*by Talib Williams*

Emmett Till, the Scottsboro Boys, the Central Park 5, and the list goes on. The ramifications of being falsely accused of a crime in America can be, and often have been, deadly for Black people.

Since the horrors of the European capitalist-economic enterprise known as the Atlantic Slave Trade, Black people – primarily Black men – have been lynched, burned alive, castrated and subjected to every other form of torture imaginable, as a result of being falsely accused of a crime. On the surface, these accusations seem to be rooted in fear and ignorance, but when investigated, are proven to be rooted in nothing other than a device on behalf of the dominant capitalist, white supremacist or patriarchal culture to maintain a position of power.

Not too long ago, we witnessed an attempt at jeopardizing the life of a Black man in Central Park. Just hours before George Floyd was murdered by four Minneapolis police officers, this man, who was birdwatching, politely asked a white woman to leash her dog. Her hostile call to police came not out of fear or ignorance, but was due to a boldness provided by her knowledge of how Black men in particular are viewed now and historically in this country.

Her attempt on the life of this Black man reveals the ever-present reality of what it means to be Black in America: to live in fear of being hunted. Media outlets immediately noted that things could and likely would have been drastically different had the incident not been caught on camera. Protesters and activists throughout the world held up and continue to hold up signs asking this very question about the latest string of televised crimes against Black people, "How many weren't caught on camera?" But what about places where there are no cameras?

As an incarcerated person, I immediately began to reflect on my present reality and what those who are incarcerated know all too well: namely that what occurs in public throughout America has been taking place in the darkness of America's prison system since its inception. "The prison is the place where state power is perhaps more forcefully experienced and publicly legitimized without being seen," writes Dan Berger in "Captive Nation."

"In other words, the prison is an example of state power at its most violent extreme, as well as an example of the way that power cloaks itself in invisibility," he writes.

The lens through which we have been allowed to look into California's prison system is the darkest opaque. Oftentimes, it takes a major incident for light to be shone on prisons: a riot, stabbing, major contraband bust, anything to slant public opinion against the incarcerated.

But when something takes place that puts the integrity of correctional officers, and ultimately the entire system itself into question, silence abounds.



Soledad CTF prison

In the aftermath of the violent 3 a.m. raid on approximately 200 incarcerated Black people at Soledad State Prison on July 20 – if it wasn't for the tireless effort of my wife, Tasha Williams, whose article in the San Francisco Bay View first alerted the world to what happened here at Soledad, as well as the tireless effort of countless wives, family members and loved ones sharing her article and the stories of their incarcerated friends and family who were brutalized, the world would, without doubt, still be in the dark about what happened to us.

Prison officials, on the other hand, waited an entire week before releasing a statement, and still it was only after and in response to receiving thousands of phone calls and emails from across the country culminating in protests in front of the prison that the spokesperson for Soledad State Prison released a statement to the public.

The statement denied the injuries, denied we were targeted because of our race, and most telling of all, that statement would not have been released had it not been for the continuous pressure from both inside and, more importantly, outside organizers against a system that thrives in silence. The prison's silence was an attempt to "cloak itself in invisibility," and yet their public statement was an attempt to do the same.

The following is a detailed first-hand account and contextualizing of what really happened in the early morning hours of July 20, 2020, at Soledad CTF (Correctional Training Facility), as well as the events that followed.

When I was violently snatched out of my sleep and slammed into the wall head first off the top bunk, I thought I was dreaming. I didn't know what was going on; all I heard was yelling and felt hands grabbing my arms and legs. With a knee in my back, my hands were zip-tied and I was forcefully snatched up by my throat and dragged out of the cell.

As soon as my eyes were able to adjust enough to glance to the right, I heard my cell mate, a 55-year-old man with degenerative disc disease in his spine, a chronic shoulder injury, and who is a diabetic, crying out that they were hurting his arm. I could see what I believe were two men wearing helmets, equipped with night vision, wearing fatigues, with black marks covering their faces entirely, doing to him what had been done to me.



A group of faculty and staff from a local high school visit Soledad Prison. – Photo: Chelcey Adami

I was carried out of the housing unit barefoot, wearing nothing but boxer briefs, forced to walk on a filthy floor down the central corridor, towards the dining hall. Along the way I could see and hear the same thing happening in every unit we passed, officers yelling "drag him" referring to people who had already been ripped violently from their sleep.

The atmosphere was filled with fear and uncertainty. To my surprise, when we turned into the dining hall, I saw close to 200 incarcerated people looking as shocked as I was. Shocked that it was so early in the morning, and at the fact that we were raided in a way never before seen at Soledad.

Never has a group of people who haven't been involved in any disruptive activity – and who haven't even been arrested for committing a crime – been raided the way we were. Even when someone commits a crime, they are not raided the way we were raided.

I have been in prison going on 19 years and I have never seen or heard of a group of people having been raided the way we were. But walking out of the dark housing unit, into the brightly lit corridor, I noticed patches across officers' chests that told me this wasn't a normal raid.

This was an inter-agency operation, a joint team or special ops, security squad officers – SSU (Special Services Unit) and IGI (Institutional Gang Investigators) – from both Soledad CTF and neighboring Salinas Valley State Prison, as well as CDCR Sacramento, Office of Correctional Safety (OCS), and Special Services Unit Gang Intel Ops (SSU).

But even more than that, we were shocked at the fact that every single person sitting there in the dining hall was Black. Every age group from early 20s to late 70s. Nobody knew anything. Everyone was complaining about their injuries and the way we were raided.

Zip-tied, sitting on stainless steel stools, practically naked in a freezing kitchen during the worst pandemic to hit the world in over a hundred years, we soon realized something that was clearly not the concern of whoever was in charge of this operation: We were sitting next to each other without our masks. We immediately began to demand that we be provided face masks, but just like our demands for medical attention, we were ignored.

We sat there in anger, frustration, fear and, possibly more than anything else, confusion. No one could make sense of "why." Why, after the prison's Black population was congratulated and praised by the warden on institutional television for helping maintain a peaceful and positive program, were we being treated so inhumanely?

But the longer we sat there, a troubling picture began to emerge; people spoke to being told by masked officers, "Black lives don't matter." Listening to everyone's experiences, I thought to myself, "This can't be happening!" at which point I heard an officer tell one person who was complaining about the fact that we were crammed next to each other without masks: "I hope you motherfuckers get COVID!"

The environment was hostile; an officer was in the guntower pointing his rifle at us, which led to an uproar and chant of "Black Lives Matter," which resulted in Black buddies being carried away. It was around this time that one brother from my building, Bernard Harris, told me my hands were purple – I was so cold that I couldn't feel that my hands had lost circulation due to the tightness of the zip-ties.

I immediately walked over to an officer named Brown and showed him my hands and he helped another officer, who looked horrified, cut off the zip-ties and replaced them with a looser pair. This was the only relief I experienced while sitting in that dining hall and I don't believe this could be separated from the fact that Brown was the only Black correctional officer present during our entire ordeal in that dining hall.

Brown is a regular correctional officer, not part of the Security Squad – Investigations Services Unit (ISU) and IGI – or the extraction team, which also included members of the Security Squad, as well as Sacramento's Special Services Unit Gang Intel Ops (SSU), all of whom were either white or of an ethnicity that possesses an inroad to whiteness.

While there are cries throughout the world of "defund police" and diversify the ranks of police forces, making them more "racially inclusive," what happened in the early morning hours of July 20, 2020, here at Soledad begs the question: How much more humanely would our Black bodies have been treated had there been more Black officers present?

When I returned to where I was seated, almost every other individual in that dining hall had to have their zip-ties cut off due to loss of circulation. We sat in that cold dining hall shivering for six hours, some of us zip-tied the entire time.

When we raised hell to use the bathroom, we were walked to the back of the kitchen to a secluded part of the prison one at a time, forced to walk barefoot in the officers spit on an already urine-covered bathroom floor. I was forced to strip naked and when I complained, I was told, "You shouldn't have been Black."

Every time I tried to get a glimpse of an officer's name tag, there was none, only patches that read "CTR/SVSP" and "police." One officer, who came over to where we were waiting to go to the bathroom, however, was recognizable as Third Watch Building

Officer Martinez, a known racist with multiple complaints against him for making racist comments and attempting to incite hostilities between the Black and Latinx populations.

It still remains unclear as to why he, a regular correctional officer, was there dressed as a member of the extraction team. Had he been one of the officers who violently extracted incarcerated people (while sleeping) from their beds in the very building he's responsible for managing five days a week? Is this why they covered their faces and wore no name tags?

But Martinez wanted to be seen. Like a sadistic predator circling back to see its victim, he couldn't help but show his face. However, his presence raises another question: During a pandemic that has forced CDCR officers and officials to take a 10 percent pay cut due to the governor's budget and be prohibited from working overtime, per their agreement, how is it that he was able to work overtime coming to work during non-work hours to play "Army"?

This wasn't just my experience alone. Every other Black person in that dining hall early that morning had a similar, and some an even worse experience. One person who was victimized – Erwin Harris, T25610 – was pulled violently off his top bunk, dragged out of his cell, zip-tied and pushed down a flight of stairs. He had to be taken to medical in a wheelchair.

Another person victimized, Eric Frazier, C62189, also had to be taken to medical in a wheelchair, having been dragged violently out of his cell despite telling his captors he had a pre-existing back and hip injury. He was met with racial slurs while his seemingly lifeless body – according to one eye-witness who wishes to remain anonymous – was dragged to the corridor, when finally a wheelchair was requested.

Another person victimized, Ronald J. Smallwood, C15171, wrote, "At approximately 3:39 a.m., I was awakened by several individuals which I later found out were IGI, ISU and OCS. I was snatched out of my cell in my underwear and NOTHING else. I was then handcuffed with zip-ties and escorted to the chow hall. I sat there for five hours in zip-ties."

Another person victimized, Derrick Porter, A88849, wrote: "On 7-20-20 at 3:30 am my cell door was pulled open while me and my cellie were asleep. We were attacked and assaulted by ISU Squad members. I was violently snatched off the top bunk by masked CDCR employees. I injured my arm, head, neck, and hip.

"Several officers jumped on my back and legs, while one put his knee on the side of my head. I was cuffed in, zip-tied and dragged out the cell. Not one ISU/OCS Task Unit

officer had an identification name tag. I was put in dining hall #1 with no socks, no shoes, no shirt, and no mask.

"It was over 100 Black inmates, all zip-tied and in almost no clothes without masks. We were placed side-by-side and the wall was lined with CDCR employees who wore ISU black patches with CTF/SVSP logos and no name tags. These un-named officers were coughing and sneezing in the dining hall with us in it. SVSP staff came from a prison that has a COVID outbreak amongst staff and inmates. I was scared."

Another person victimized, Marcelle Franklin, J65015, wrote: "At 3:30 am on 7-20-20, I was awakened by unknown individuals wearing helmets and face masks, later identified as CTF/SVSP ISU IGI and OCS. I was forcefully slammed to the ground, zip-tied, and dragged out of my cell by multiple ISU officers, then placed in dining hall #1 without a mask, in nothing but my underwear for over five hours."

*CDCR officials can't wrap their heads around the fact that incarcerated Black people throughout the entire state of California aren't involved in any STG gang activity.*

And lastly, in direct contradiction to what the warden said in an email the following day, attempting to distance himself from having knowledge of our condition, Marcus Harris, O09716, wrote: "On 7-20-20 at about 3:00 am, I was awakened by my cell door being slammed open and being physically snatched out of bed by some unknown persons. I was taken down to the Central Facility dining hall, handcuffed, with nothing on except underwear, and was made to sit on metal stools with no jacket, shoes, t-shirt, or mask for about five and a half hours.

"When I asked to see a doctor, I was told 'No.' After about five hours, the warden came in and started to give officers 'high fives,' telling them 'Good job!' I stood up and said, 'How are you going to give them high fives and tell them good job for messing over a bunch of innocent Black people?'"

But it wasn't over. We were then escorted out of the dining hall, still virtually naked, once again down the central corridor, still zip-tied, officers and free staff now clocking in to work looking at us as if we were animals. We were led one by one into what used to be the counselor's office at the end of the west corridor, where we were interrogated by plain clothed OCS officers.

When we get near the entrance, an OCS officer asked my name and CDCR number before handing the officer escorting me a packet that had my picture. In red letters was the word "Target," below which was a paragraph of which I was only able to read the

first line, which said, "His father is Milton Hayes, a validated associate of the Black Guerilla Family."

If you know me or have read my most recent blog post, "Crying Out From Soledad: An Open Letter to a Lawyer," then you know that this is an issue about which I already have two pending lawsuits for retaliation, racial and religious discrimination against CDCR officers and officials for harassing me since 2011 for being in contact with my father.

They also single me out for my writing and journalism against this racist system, particularly my article in the San Francisco Bay View entitled, "Soledad prison guards refuse to wear safety masks amidst COVID-19 pandemic" for which I was raided less than a week after it was published, and more specifically my last book, "Soledad Uncensored," the forward of which is being published as a series of articles, also in the San Francisco Bay View, entitled, "Soledad uncensored: Racism and the hyper-policing of Black bodies," the entirety of which speaks directly against what was happening to us these early morning hours of July 20, 2020. Had my writings contributed to my being included in this roundup?

I was led to a room where two OCS officers, one white, one Black, were waiting. They told me to face the wall while they cut off my zip-ties and honestly I thought they were going to beat me, or worse. I was so nervous my mouth instantly became dry.



Soledad Correctional Training Facility – Photo: The Salinas Californian

But, frustrated that I was once again – based on what I was able to read from the description below my picture – being harassed because of my father's past, I asked, "What the hell is going on? This is how you guys are getting down now?! Snatching people out of bed at 3:00 in the morning?! You have been harassing me since 2011 because of my father!"

That is when the white officer asked, "Why would you say we were harassing you because of your father?". "Because that's what is says on the paper you just set aside," I responded, noticing the look on his face change when the Black officer chimed in saying, "We're not harassing you. We just want to ask you some questions about Black Lives Matter.

"How do you feel about what happened to George Floyd? I know what the one cop did was wrong and he deserves to go to jail, but all cops aren't bad," he said. That's ironic, considering the fact that here we were, having this conversation about police brutality rooted in racial biases, after approximately 200 Black men were violently snatched from their beds while sleeping – by police.

The premise upon which they sought to base the conversation was disrespectful. We had the whole "a few bad apples" conversation before I got tired and asked them, "So you mean to tell me y'all did all this to ask us about George Floyd and Black Lives Matter?!" when again the Black officer said, "Honestly, you have some tattoos on you that indicate you're BGF!"

I shot back: "I'm not BGF, like I said when I first came in. Y'all have been harassing me since 2011 for being in contact with my father who, according to you, is a validated associate of the Black Guerilla Family. To me he's simply my father who went to prison in '89 and had been out of my life until my sister found him still incarcerated in 2005.

"I have every letter he's ever written me and not one of them is criminal in nature. They are letters from a father trying to mend a broken bond with his son. And about the tattoo you guys have been harassing me about since 2011, everything about it is Islamic." I turned around to show them my back tattoo, which is a dragon with a huge crescent moon and star in the center of it flanked by the sword and staff of the prophet Muhammed, with a verse from the Qur'an over it in Arabic script.

"What about the dragon is Islamic?" they ask. At which point I give them a detailed explanation of a hadith mentioned in S.V. Mr. Ahmed Ali's commentary to chapter 96, verse 6-7, of the Holy Qur'an about an enemy of the prophet Muhammed attempting to harm him while he (Muhammed) was praying, but turning back in fear because he saw that the prophet Muhammed was being protected by a dragon.

After explaining my tattoos for the 20th time, as well as explaining to them how racist it is to assume that a Black person in prison with a tattoo of a dragon – or a gorilla or snake, for that matter – is a member of a prison gang that has used such symbols – I further explained my point by saying that "if I was Asian and had a dragon tattoo it wouldn't be an issue!"

They replied, "But you're not!" and when I asked affirmatively, "So it's because I'm Black?" they, to my surprise said, "Yes." After they "apologized" regarding the misunderstanding of my tattoo, saying, "We hope you can get that cleared up about your tattoo," they told me I could go.

When I returned to my cell, still confused as to why we were kidnapped in the middle of the night just to be questioned about Black Lives Matter, George Floyd, and a prison "gang" from the '70s, I was shocked even further by the way they trashed the cell. Everything was thrown all over the place.

My cellmate, who had returned to the cell before me, was busy separating his remaining property from mine when I noticed that every single piece of paperwork, writing paper, envelopes, every letter, picture, photo album, phone book and book was gone. In the midst of my remaining property was a "Security Squad Receipt" that said the only thing taken was "paperwork."



Soledad CTF prison yard

Later that morning, when everyone was let out of their cells to set up like we do every morning for "cell reading," everyone was shocked that we weren't on "scheduled program," which is the normal protocol when there is a threat, especially one that necessitates a raid. The first step of a "modified program" due to a threat is for the officers to conduct a "threat assessment" by interviewing everyone in the prison one by one, voluntarily.

The fact that they weren't conducting a threat assessment didn't make sense. Obviously, something wasn't right. In the process of cleaning up and preparing for breakfast, someone found paper tags presumed to be place markers used during the raid. One had the words "property team," "tag 1, receipts" and "Charlie" printed over a watermark on the SSU seal. The other has the words, "Charlie wing" which is the unit where the tags were found, as well as the unit I'm housed in.

At the top of this particular tag, however, were words that would explain everything: "Operation Akili." The name of this operation was a Swahili word that means "intelligence," which comes from the Arabic word "Agli," having the same meaning. They were on a fishing expedition, a dragnet – intelligence gathering – which explains why the only thing they took was paperwork, letters, books, pictures and phone books.

There was no threat. Not only did the name of their operation indicate that there was no threat, but the raid itself turned up no weapons, no notes referring to any type of threat or STG (Security Threat Group, the new term for "gang") activity. The reality is, there has been no Black STG activity here at Soledad whatsoever. In fact, ask CDCR and Soledad CTF officials to release a report stating how many weapons Black incarcerated people have been found in possession of and how many STG related incidents in the last 10 years have Black incarcerated people been involved in, and I guarantee the answer will shock you.

I was able to obtain every single Program Status Report (PSR) from 2017 to 2020 and not one single report refers to a single STG activity involving the population of incarcerated Black people, not even in the days surrounding the raid. But herein lies the reason why: CDCR officials can't wrap their heads around the fact that incarcerated Black people throughout the entire state of California aren't involved in any STG gang activity.

As I've been highlighting in my writing these past couple of years, the criminal mentality of old that most people have been conditioned to associate with prison does not exist. Incarcerated people throughout California realize that the days of languishing in prison until one is useless and unable to contribute to society are over.

*It is incarcerated people who promote non-violence that make prisons obsolete.*

Even people who entered the prison system as gang members no longer glorify gang culture or the culture of violence. Not only are "self-help" groups being created by incarcerated people themselves to challenge ideas of toxic masculinity and the culture of violence, such as "success stories," which was recognized by the California Legislature, but laws are being passed that have taken into consideration the work that we are in here doing, which gives incarcerated people hope like we've never had before.

And with the passing of Assembly Concurrent Resolution No. 186, introduced by Assemblymember Kamlager, that "the Legislature recognizes the need for statutory changes to end extreme sentencing," which disproportionately subjects Black people.

It says, "The Black community is disproportionately subjected to extreme sentences, representing less than 15 percent of the national population, but comprising 48.3 percent of people serving life sentences, 55 percent of people serving virtual life sentences, and 56.4 percent of people serving life sentences without the possibility of parole" and that "research has shown that long sentences do not deter future crimes and that there is no reliable evidence showing that any deterrent effect is "sufficiently large to justify the cost of long prison sentences …

"In 2018, only 2.9 percent of people serving life sentences were released and only 0.3 percent of people serving third-strike were released, and … out of 988 people convicted of murder who were released from California prisons over a 20-year period, only 1 percent were arrested for new crimes. None of the 988 people were rearrested for murder and none of them went back to prison over the 20-year period examined."

Understanding this, incarcerated people know that it is counter-productive to commit acts that justify one's incarceration. Not only are incarcerated people politically aware of the effects of violence, but thanks to Black resistance authors such as Bell Hooks, we are aware of the effects of violence in a more holistic way to where non-violence becomes a lifestyle as well as a rock to be used against a system that bases its very existence on our disfunction. It is incarcerated people who promote non-violence that make prisons obsolete.

CDCR officials are aware of this as well. Budgets are already being cut. Prisons are being scheduled to shut down, and employees of these institutions are going to have to find new jobs. However, a certain segment of CDCR have become so accustomed to this sadistic enterprise that they cannot imagine a world without it. They will go to imperceivable lengths to ensure its continued existence.

Since they can no longer use the "violent criminal" as a justification, they have resorted to criminalizing the very existence of incarcerated people. This becomes even more troubling when racism enters into the equation. We know the effects of systemic racism in the police departments and judicial systems, but what many people aren't aware of, by design, are the effects of systemic racism inside the prison system. Guns don't exist in prison (except in strategically placed guntowers) so you aren't going to have "officer involved shootings" of unarmed Black and Latinx people.

Prison is a different kind of monster; the weapon of choice in prison is and always has been "documentation." Michael Foucault wrote in his famous "Discipline and Punish: The Birth of the Prisons," "It must be possible to hold the prisoner under permanent observation; every report that can be made about him must be recorded and compared."

He continues, "No detail is unimportant, but not so much for the meaning that it conceals within it as for the hold it provides for the power that wishes to seize it." Departments of "Corrections" aren't concerned with the accuracy of the information about you so much as they are concerned with how they can use that information to control every aspect of your existence in order to maintain their position of dominance. Their sole concern is to create, on paper, a perpetual criminal, thereby justifying the perpetual existence of prison.

Just two days after the raid, we received our property back. Well, almost all of it. Almost everyone who was raided got a receipt notifying them of certain items not returned "pending investigation." Guess what these items were? Books, newspapers, pictures and quotes from Black historical figures. DOCUMENTATION.

They kept my book "Soledad Uncensored," quotes from George Jackson used for research on my book, a picture of Dr. Angela Davis and Jonathon Jackson protesting in front of Soledad in the '70s – also used for my book – and a letter to a journalist about COVID-19 and anti-Black racism in prison.



Angela Davis and Jonathan Jackson march to free George Jackson and the rest of the Soledad

Their reason for keeping these items, written on the receipt, was: "The aforementioned items will be retained for further investigation into your suspected involvement with the Black Guerilla Family (BGF) Security Threat Group-1 (STG-1)." Everyone else who received a receipt had had the same exact words written on it. Items taken from them include newspaper articles about George Jackson, pictures of the San Quentin 6, and even sheets of paper with book titles written on them: "Blood in My Eye," "The Spook Who Sat By the Door."

This is what we're dealing with, and it can't be described as anything other than racist. Every facet of existence of incarcerated people is criminalized, especially if you're Black. Everything from the books we read to our hairstyles are criminalized.

Hairstyles aren't seen as an attempt to express our individuality in an environment whose intent is to strip us of anything unique, or that points to our being individuals in any way. Instead, our hairstyles are seen by certain elements within CDCR as expressions of "gang culture," despite the fact that in the history of American street gangs, there has never been a single hairstyle associated with an expression as one's affiliation. Even still, young Black men are harassed and even chased down to be given "verbal warnings" for having designs shaved into their heads.

Don't get "caught" with a book by Angela Davis, Marcus Garvey or Malcom X, and you damn sure better not get "caught" with a book by George Jackson – all of which aren't on any official list of prohibited books and are all allowed into the prison through order from Amazon Prime, or any other bookseller. But once an officer sees you with one, you will – if you're Black – immediately be under investigation as a member of the Black Guerilla Family, an organization formed in the '70s in prison that today, in 2020, is virtually nonexistent, except in the minds of correctional officers intent on living in the past.

So what you end up with is young Black men who are afraid to study their history for fear of being labeled, while those who muster up the courage – being dedicated and committed to non-violence – seeking to understand the pitfalls of the past in order to contribute to a society they once took part in destroying, by preventing others from treading the course of violence, through knowledge, they are criminalized.

Before recent events, I thought this targeting was simply because correctional officers didn't understand Black culture, but like the white lady in Central Park, correctional officers aren't acting out of ignorance, but in fact are tapping into the very anti-Black racist ideas that underpin American society.

They know we are not members of the Black Guerilla Family, but they also know that, in a society so deeply connected to racist ideas concerning prison, that incarcerated Black men are seen as perpetually criminal, and thus labeling us as BGF places a stigma on us that will last throughout the duration of our incarceration, and becomes a barrier in the way of our release. These are the lengths they will go to.

Two days after we received our property, people began to receive "validation packets," a process to becoming validated by CDCR as a member or associate of a Security Threat Group. It was only after this point that the spokesperson for Soledad CTR released his

statement to the public that the people who were raided were members of a Security Threat Group. They were trying to cover their asses.

People were being labeled everything from "chief financial officer for BGF" to "BGF foot soldier." I told a friend of mine, "Watch these fools say I have something to do with education," when lo and behold! That same day I received my validation packet saying that I was "the Minister of Education for BGF," but that was only the beginning.

They said the pictures of George Jackson on my Instagram page managed by my family to advertise my writings, was "BGF propaganda." They even went so far as saying about my crescent moon and star tattoo: "It (the star) contains five outer-pointed and five inner-pointed, with each point representing one point of the 10-point party platform of the Black Panther Party (BPP), which is part of the BGF constitution."

But if you thought it couldn't get worse, they had the nerve to say that the Arabic verse from the Qur'an (79.14) on my back "translated into English as 'Assaulter, attacker with alertness.'" I couldn't believe what I was reading. The officer who wrote it was B. Barron.

He wrote: "While conducting photographs of his tattoos (on 4-27-20) specifically on Williams upper back above and below the black dragon, I discovered Arabic writing. I was unable to translate the Arabic writing, therefore, I questioned Williams on the meaning of the tattoos. Williams became defensive and stated, 'You can figure that out. Do your job."

Based on my training and experience, I know Williams becoming defensive about his tattoos means they are indicative of gang membership. Upon discovering the Arabic writing, I contacted the OCS, Correctional Intelligence Task Force (CITF) and Federal Bureau of Investigation's (FBI) Terrorism Task Forces (CT2) to translate the Arabic writing discovered on Williams' tattoos.

"Upon receiving the translation from OCS, the Arabic writing translated to English as 'Assaulter, attacker with alertness' and 'Tajdeed.' This Arabic writing is significant to the BGF also meaning he will conduct assaults on behalf of the BGF. The Arabic writing is also indicative to the membership of the Radical Islamic Group "Tajdeed UL-Islam (TUI).""

I couldn't believe what I was reading. "Tajdid," which is on my lower back, is a concept in Islam that refers to returning back to the original humanistic teachings of Islam, popularly known as Surism. To associate such a term with "radicalism" is disrespectful.

They gave me 72 hours to respond to the allegations in writing, and since they were trying to validate me as a member of BGF, that's what I focused on, saving everything else for the lawsuit. What I wrote in response to the allegations mentioned above (in part) was: "I find it strange that B. Barron only pointed out the star, attempting to link it with BGF via the Black Panther Party. When pictures were taken of my back tattoo between 2015-2019, First Lt. Officer Pearson (?) immediately recognized the crescent moon and star.



Beautiful Big Sur is only 66 road miles from Soledad, much closer as the crow flies, but there are no field trips for prisoners.

"B. Barron's failure to recognize the crescent moon shows that he had his mind set on associating me with BGF. When I said to B. Barron, concerning the Arabic writing on my back, 'You can figure it out. Do your job." I said that out of frustration, having already explained my tattoos at least five times before, and not because B. Barron said, "They are indicative of gang membership."

The Arabic writing across my back is Verse 14 of chapter 79 of the Holy Qur'an that translates into English as, "Then behold they will be upon a wide expanse." Which is a reference to a scene on the Day of Judgment when humanity will be standing "upon a wide expanse" of earth, awaiting God's judgment.

Whoever was responsible for the OCS Correctional Intelligence's Task Force (CITF) needs to be re-trained. B. Barron stated that he "contacted the Federal Bureau of Investigations (FBI) Terrorism Task Force (CT-2) to translate the Arabic writing" but only used "the translation from OCS," which according to them "translated to English as 'Assaulter, attacker with alertness." According to B. Barron, "This Arabic writing is significant to the BGF also meaning he will conduct assaults on behalf of BGF."

The reason B. Barron omitted the translation from the FBI is because they told him it was a verse from the Qur'an, and therefore didn't fit his narrative, just like the huge crescent moon and star didn't fit his narrative, so he omitted mentioning the moon. This is giving him the benefit of doubt.

What I believe is that B. Barron never sent a picture of my tattoo to the OCS or the FBI, but that he himself "translated" the Arabic, and therefore must be investigated for falsifying documents, because there is no way that an expert would have come up with that translation.

This is what racism looks like inside Soledad State Prison. You will be raided in the middle of the night and assaulted by officers, and when media attention is placed on the officers' actions, those same officers will falsify documents in order to cover their asses.

And because we live in a society where incarcerated people are viewed as perpetually criminal, who knows how far into the future, and to what lengths, officers will carry these allegations. Will our families be targeted next?

#BLACKINCARCERATEDLIVESMATTER

#FREETHEMALL

#FREETALIB

*Send our brother some love and light: Talib Williams, V69247, CTF CW-121, P.O. Box 689, Soledad CA 93960. And visit his website, www.talibthestudent.com.*



Gov... .. ... in News...

02/16/2022

Benjamin L. Pavone
Attorney at Law
600 West Broadway Suite 700
San Diego, CA 92101

RE:  Claim 21004971 for Estate of Raemon Pardue, William E. Pardue

Dear Benjamin L. Pavone,

The Government Claims Program (GCP) received the claim you presented on 05/27/2021.

GCP staff reviewed your claim and determined that the cause of action accrued 07/20/2020.

The GCP has no jurisdiction to consider the claim for the following reason(s).

Your application for leave to present a late claim was filed more than one year from the date of the incident that is the basis of the claim.  Please see Government Code section 911.2.

The GCP will take no further action on your claim.

If you have questions about this matter, please feel free to contact GCP by phone, mail, or email using the contact information below.   Please remember to reference the assigned claim number (21004971) in your communication.

Sincerely,

Government Claims Program
gcinfo@dgs.ca.gov

# EXHIBIT 14

# EXHIBIT 14

**INMATE/PAROLEE APPEAL**
CDCR 602 (REV. 03/12)                                                                                                    Side 1

| IAB USE ONLY | Institution/Parole Region: | Log #: | Category: |
|---|---|---|---|
| | | | |
| | *FOR STAFF USE ONLY* | | |

You may appeal any California Department of Corrections and Rehabilitation (CDCR) decision, action, condition, policy or regulation that has a material adverse effect upon your welfare and for which there is no other prescribed method of departmental review/remedy available. See California Code of Regulations (CCR), Title 15, Section 3084.1. You must send this appeal and any supporting documents to the Appeals Coordinator (AC) within 30 calendar days of the event that led to the filing of this appeal. If additional space is needed, only one CDCR Form 602-A will be accepted. Refer to CCR 3084 for further guidance with the appeal process. No reprisals will be taken for using the appeal process.

Appeal is subject to rejection if one row of text per line is exceeded.             WRITE, PRINT, or TYPE CLEARLY in black or blue ink.

| Name (Last, First): | CDC Number: | Unit/Cell Number: | Assignment: |
|---|---|---|---|
| Estrada Nicktor | G·67609 | B·WH·B·141·UP | ISUDT outpatient |

State briefly the subject of your appeal (Example: damaged TV, job removal, etc.):

Exposure to and contraction of COVID-19 while incarcerated at CTF-Soledad

A. Explain your issue (If you need more space, use Section A of the CDCR 602-A):

On Thu. Mar. 11, 2021 I was diagnosed to had caught COVID with the result of having false negative tests and not one positive confirmed for unknown reasons. CTF-Soledad was well known by state leaders and prison officials (CDCR) to be

B. Action requested (If you need more space, use Section B of the CDCR 602-A):

I request monetary compensation above $100k for the risk of severe consequences to my lungs, body, pain, suffering and punitive damages. To be granted an Accelerated Release due to COVID-19 pandemic in

**Supporting Documents: Refer to CCR 3084.3.**
☐ Yes, I have attached supporting documents.
List supporting documents attached (e.g., CDC 1083, Inmate Property Inventory; CDC 128-G, Classification Chrono):

_____     _____

☑ No, I have not attached any supporting documents. Reason: Because all COVID-19 test and Medical Progress Note can be found in my Medical file.

_____     _____

Inmate/Parolee Signature: *Victor R. Estrada*          Date Submitted: Fri. Apr. 9, 21

☐ By placing my initials in this box, I waive my right to receive an interview.

| **C. First Level - Staff Use Only** | Staff – Check One: Is CDCR 602-A Attached?  ☐ Yes   ☐ No |
|---|---|

This appeal has been:
☐ Bypassed at the First Level of Review. Go to Section E.
☐ Rejected (See attached letter for instruction) Date: _____ Date: _____ Date: _____ Date: _____
☐ Cancelled (See attached letter) Date: _____
☐ Accepted at the First Level of Review.

Assigned to: _____ Title: _____ Date Assigned: _____ Date Due: _____

First Level Responder: Complete a First Level response. Include Interviewer's name, title, interview date, location, and complete the section below.

Date of Interview: _____ Interview Location: _____

Your appeal issue is:  ☐ Granted   ☐ Granted in Part   ☐ Denied   ☐ Other: _____

See attached letter. If dissatisfied with First Level response, complete Section D.

Interviewer: _____ (Print Name) Title: _____ Signature: _____ Date completed: _____

Reviewer: _____ (Print Name) Title: _____ Signature: _____

Date received by AC: _____

| | AC Use Only<br>Date mailed/delivered to appellant ____ / ____ / ____ |
|---|---|

*STAFF USE ONLY* (vertical text, right margin)

STATE OF CALIFORNIA                                                                          DEPARTMENT OF CORRECTIONS AND REHABILITATION
**INMATE/PAROLEE APPEAL**
CDCR 602 (REV. 03/12)                                                                                                                       Side 2

**D. If you are dissatisfied with the First Level response**, explain the reason below, attach supporting documents and submit to the Appeals Coordinator for processing within 30 calendar days of receipt of response.   If you need more space, use Section D of the CDCR 602-A.

_____
_____
_____
_____
_____
_____

Inmate/Parolee Signature: _____   Date Submitted : _____

| **E. Second Level - Staff Use Only** | Staff – Check One: Is CDCR 602-A Attached?   ☐ Yes    ☐ No |
|---|---|

This appeal has been:

☐ By-passed at Second Level of Review.  Go to Section G.
☐ Rejected (See attached letter for instruction) Date: _____   Date: _____   Date: _____   Date: _____
☐ Cancelled (See attached letter)
☐ Accepted at the Second Level of Review

Assigned to: _____   Title: _____   Date Assigned: _____   Date Due: _____

Second Level Responder:  Complete a Second Level response.  If an interview at the Second Level is necessary, include interviewer's name and title, interview date and location, and complete the section below.

Date of Interview: _____   Interview Location: _____

Your appeal issue is:  ☐ Granted   ☐ Granted in Part   ☐ Denied   ☐ Other: _____

See attached letter.  If dissatisfied with Second Level response, complete Section F below.

Interviewer: _____   Title: _____   Signature: _____   Date completed : _____
                    (Print Name)

Reviewer: _____   Title: _____   Signature: _____
                 (Print Name)

Date received by AC: _____

| | **AC Use Only**<br>Date mailed/delivered to appellant ____ /____ /____ |
|---|---|

**F.  If you are dissatisfied with the Second Level response**, explain reason below; attach supporting documents and submit by mail for Third Level Review.  It must be received within 30 calendar days of receipt of prior response.  Mail to: Chief, Inmate Appeals Branch, Department of Corrections and Rehabilitation,  P.O. Box 942883, Sacramento, CA 94283-0001.  If you need more space, use Section F of the CDCR 602-A.

_____
_____
_____
_____
_____

Inmate/Parolee Signature: _____   Date Submitted: _____

| **G.  Third Level - Staff Use Only** |
|---|

This appeal has been:
☐ Rejected (See attached letter for instruction) Date: _____   Date: _____   Date: _____   Date: _____   Date: _____
☐ Cancelled (See attached letter)    Date: _____
☐ Accepted at the Third Level of Review.  Your appeal issue is ☐ Granted   ☐ Granted in Part   ☐ Denied   ☐ Other: _____
      See attached Third Level response.

| | **Third Level Use Only**<br>Date mailed/delivered to appellant ____ /____ /____ |
|---|---|

**H. Request to Withdraw Appeal:**  I request that this appeal be withdrawn from further review because; State reason. (If withdrawal is conditional, list conditions.)

_____
_____
_____
_____

_____   Inmate/Parolee Signature: _____   Date: _____
Print Staff Name: _____   Title: _____   Signature: _____   Date: _____

STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL FORM ATTACHMENT**
CDCR 602-A (REV. 03/12)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Side 1

| IAB USE ONLY | Institution/Parole Region: | Log #: | Category: |
|---|---|---|---|
| | | | |

FOR STAFF USE ONLY

Attach this form to the CDCR 602, only if more space is needed. Only one CDCR 602-A may be used.

**Appeal is subject to rejection if one row of text per line is exceeded.    WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First): | CDC Number: | Unit/Cell Number: | Assignment: |
|---|---|---|---|
| Estrada Nickter | G 67609 | B·WH·B·141·UP | ISUDT outpatient |

**A. Continuation of CDCR 602, Section A only (Explain your issue):** a high risk prison for contracting COVID from Sep.2020 - Feb. 2021. In spite of this (CDCR) with knowledge of the serious risk of substantial harm posed by COVID exposed me to a risk of contraction by not enforcing the safety guidelines on all personnel to prevent exposure and contraction of COVID while quarantined in Rainier B side Quarantine Hall from Nov. 2020 - Feb. 2021. I was exposed to COVID through the bread racks that are being used to carry the food trays for breakfast and dinner. Most of the time if not all of the time the inmates that were quarantined there due to being exposed to COVID because their celly tested positive were feed first and in doing so contaminating the bread racks with COVID. Then I and the rest of the inmates that were quarantined due to pending transfer would get food off the same contaminated bread racks. I became ill on Dec. 24, 2020 and that same morning got tested for COVID that ended up being a false negative result and also all of the rest of these tests after that one. Since then I continue to suffer lost of smell, lost of taste, fatigue, mental fatigue, lung pain, pain in my eyes and head aches, and who knows how long this will continue on for.

Inmate/Parolee Signature: _Victor R. Estrada_    Date Submitted: Fri. Apr 9, 21

**B. Continuation of CDCR 602, Section B only (Action requested):** efforts to address the existing emergency COVID-19 pandemic. To have all state leaders, prison officials (CDCR) and all staff responsible to my exposure and contraction of COVID-19 be held responsible for their negligence and to be disciplined accordingly.

Inmate/Parolee Signature: _Victor R. Estrada_    Date Submitted: Fri. Apr. 9, 2021

STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL FORM ATTACHMENT**
CDCR 602-A (REV. 03/12)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

**Side 2**

**D. Continuation of CDCR 602, Section D only (Dissatisfied with First Level response):** _____

Inmate/Parolee Signature: _____    Date Submitted: _____

**F. Continuation of CDCR 602, Section F only (Dissatisfied with Second Level response):** _____

Inmate/Parolee Signature: _____    Date Submitted: _____

STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL**
CDCR 602 (REV. 03/12)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Side 1

| IAB USE ONLY | Institution/Parole Region: | Log #: |
|---|---|---|
| | | |

You may appeal any California Department of Corrections and Rehabilitation (CDCR) decision, action, condition, policy or regulation that has a material adverse effect upon your welfare and for which there is no other prescribed method of departmental review/remedy available.  See California Code of Regulations (CCR), Title 15, Section 3084.1.  You must send this appeal and any supporting documents to the Appeals Coordinator (AC) within 30 calendar days of the event that led to the filing of this appeal.  If additional space is needed, only one CDCR Form 602-A will be accepted. Refer to CCR 3084 for further guidance with the appeal process.  No reprisals will be taken for using the appeal process.

**Appeal is subject to rejection if one row of text per line is exceeded.**          **WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First): | CDC Number: | Unit/Cell Number: | Assignment: |
|---|---|---|---|
| Estrada Vickter | G·67609 | B·WH·B·141·UP | ISUDT Outpatient |

State briefly the subject of your appeal (Example: damaged TV, job removal, etc.):

Exposure to and contraction of COVID-19 while incarcerated at CTF-Soledad.

A.  Explain your issue (If you need more space, use Section A of the CDCR 602-A):

On Thu. Mar. 11, 2021 I was diagnosed to had caught COVID-19 with the result of having false negative tests and not one positive confirmed for unknown reasons. CTF-Soledad was well known by state

B.  Action requested (If you need more space, use Section B of the CDCR 602-A):

I request monetary compensation above $100K for the risk of severe consequences to my lungs, body pain, suffering and punitive damages. To be granted an Accelerated Release due to COVID

**Supporting Documents: Refer to CCR 3084.3.**

☐ Yes, I have attached supporting documents.

List supporting documents attached (e.g., CDC 1083, Inmate Property Inventory; CDC 128-G, Classification Chrono):

_____    _____

_____    _____

☑ No, I have not attached any supporting documents. Reason: because all the supporting documents can be found in my Medical Records. the outpatient Progress Note for Thu. Mar. 11, 2021 and the COVID-19 test from Dec. 24, 2020 – Mar. 2021.

Inmate/Parolee Signature: _Victor L. Estrada_          Date Submitted: 4·9·2021

| ☐ By placing my initials in this box, I waive my right to receive an Interview. |
|---|

**RECEIVED**

**APR 09 2021**

**CTF Appeals**

STAFF USE ONLY (vertical text in right margin)

---

**C.  First Level - Staff Use Only**          Staff – Check One: Is CDCR 602-A Attached?   ☐ Yes   ☐ No

This appeal has been:

☐ Bypassed at the First Level of Review. Go to Section E.

☐ Rejected (See attached letter for instruction)  Date: _____ Date: _____ Date: _____ Date: _____

☐ Cancelled (See attached letter)  Date: _____

☐ Accepted at the First Level of Review.

Assigned to: _____ Title: _____ Date Assigned: _____ Date Due: _____

First Level Responder:  Complete a First Level response. Include Interviewer's name, title, interview date, location, and complete the section below.

Date of Interview: _____ Interview Location: _____

Your appeal issue is: ☐ Granted   ☐ Granted in Part   ☐ Denied   ☐ Other: _____

See attached letter. If dissatisfied with First Level response, complete Section D.

Interviewer: _____ (Print Name)   Title: _____ Signature: _____ Date completed: _____

Reviewer: _____ (Print Name)   Title: _____ Signature: _____

Date received by AC: _____

| | AC Use Only |
|---|---|
| | Date mailed/delivered to appellant ___/___ |

STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL FORM ATTACHMENT**
CDCR 602-A (REV. 03/12)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Side 1

IAB USE ONLY

Attach this form to the CDCR 602, only if more space is needed.  Only one CDCR 602-A may be used.
Appeal is subject to rejection if one row of text per line is exceeded.   WRITE, PRINT, or TYPE CLEARLY in black or blue ink.

| Name (Last, First): | CDC Number: | Unit/Cell Number: | Assignment: |
|---|---|---|---|
| Estrada, Vickter | G-67609 | B.WH.B.141.UP | IGUDT Outpatient |

**A. Continuation of CDCR 602, Section A only (Explain your issue):** leaders and prison officials (CDCR) to be a high risk prison for contracting COVID-19 from September 2020 — February 2021. In spite of this (CDCR) with knowledge of the serious risk of substantial harm posed by COVID-19 exposed me to a risk of contraction by not enforcing the safety guidelines on all personnel to prevent exposure and contraction of COVID-19. While quarantined in Rainier B-Side from November 2020 - February 2021 I was exposed to COVID-19 through the bread racks that are being used to carry the food trays for breakfast and dinner. Most of the time if not all the time the inmates that were quarantined there due to being exposed to COVID-19 because their celly tested positive were feed first and in doing so contaminating the bread racks with COVID-19. Then I and the rest of the inmates that were quarantined due to pending transfer would get feed off the same contaminated bread racks. I became ill on Dec. 24, 2020 and that same morning got tested for COVID that ended up being a false negative result and also all the rest of the test after that one. Since then, I continue to suffer lost of smell, lost of taste, fatigue, mental fatigue, lung pain, pain in my eyes and head aches, and who knows how long this will continue on for.

Inmate/Parolee Signature: *Victor R. Estrada*      Date Submitted: 4.9.2021

**B. Continuation of CDCR 602, Section B only (Action requested):** -19 pandemic in efforts to address the existing emergency COVID-19 pandemic. To have all state leaders, prison officials (CDCR) and all staff responsible to my exposure and contraction of COVID-19 be held responsible for their negligence and to be disciplined accordingly.

Inmate/Parolee Signature: *Victor R. Estrada*      Date Submitted: 4.9.2021

STAFF USE ONLY



CALIFORNIA DEPARTMENT *of*
**Corrections and Rehabilitation**

# CLAIMANT GRIEVANCE CLAIMS DECISION RESPONSE

**Re:** Grievance Claims Decision Response

**Offender Name:** ESTRADA, VICKTER                          **Date:** 05/18/2021
**CDC#:** G67609

**Current Location:** CTF-Facility B                         **Current Area/Bed:** B WH B1 - 141141U

**Log #:** 000000106665

**Claim #: 001**
**Institution/Parole Region of Origin:** Correctional Training Facility        **Facility/Parole District of Origin:** CTF-Facility B
**Housing Area/Parole Unit of Origin:**
**Category:** COVID-19                    **Sub-Category:** Other Issues – NOS

### I. CLAIM

Grievant claims he was exposed to COVID-19 through the bread racks that were used for cell feeding.

### II. RULES AND REFERENCES

#### A. CONTROLLING AUTHORITY

California Code of Regulations (CCR), Title 15, Section 3084 Inmate Appeals
CCR, Title 15, Section 3084.1 Right to Appeal
CCR, Title 15, Section 3383 State of Emergency

#### B. DOCUMENTS CONSIDERED

Program Status Report (PSR) CTF-20-OPS-007
CDCR Memorandum authored by Director Connie Gibson, dated March 18, 2020
CDCR Memorandum authored by Secretary Ralph M. Diaz and Receiver J. Clark Kelso, dated April 1, 2020
COVID-19 Interim Guidance for Health Care and Public Health Providers (August 19, 2020)

### III. REASONING AND DECISION

Grievant alleges the California Department of Corrections and Rehabilitation (CDCR) exposed him to COVID-19 due to the improper handling of the bread racks used to carry food trays during cell feeding.

The CDCR's priority is to protect the health and well-being of our staff and the inmate population, as well as providing a safe environment. In relation to the roles and responsibilities of inmates and staff during COVID-19, CDCR memorandum dated April 8, 2020, herein states staff are to ensure that assigned porters are thoroughly cleaning communal areas (dayrooms, showers, restrooms, offices, etc.) a minimum of twice per shift during second and third watch. The housing porters perform their duties as directed by the cleaning schedule and when necessary, staff will increase the frequency in which they disinfect touchpoints (telephones, tables, door knobs, desk areas, etc.).

PSR CTF-20-OPS-007, which is issued to the housing units every morning, allows porters to be utilized within the housing unit only. All CDCR institutions have been instructed to conduct additional deep-cleaning efforts in high-traffic, high-volume areas, including visiting and health care facilities. Staff and inmates are practicing social distancing strategies where possible, including limiting groups, rearranging scheduled movements to minimize mixing of people from different housing areas, requiring social distancing during yard time, and adjusting dining schedules to facilitate cell feeding processes where possible

to allow for social distancing and additional cleaning and disinfecting. At the time, face barriers, N95 masks, were issued weekly to the inmate population and daily to inmate workers and were required to be donned anytime they are outside their cell or living area.

The CDCR and CTF are committed to the safety of the community, staff, and those in its care. Executives and staff at CDCR and California Correctional Health Care Services (CCHCS) are working closely with infectious disease control experts to minimize the impact of COVID-19 on our operations. CDCR and CCHCS are dedicated to the safety of everyone who lives in, works in, and visits our state prisons. The Department has a longstanding outbreak management plan in place to address communicable disease outbreaks such as influenza, measles, mumps, norovirus, and varicella, as well as preparedness procedures to address a variety of medical emergencies and natural disasters.

Per PSR CTF-20-OPS-007, Facility-A, Fremont Dorm and Lassen Hall A side, were designated as isolation housing for positive COVID-19 inmates. Rainier Hall was designated as quarantine housing. Additionally, according to COVID-19: Interim Guidance for Health Care and Public Health Providers (August 19, 2020): To reduce the likelihood of COVID-19 spreading from one location to another, movement shall be limited to that which is necessary for clinical care, medical isolation or quarantine, reduction of overcrowding, and serious custody concerns. Inmates who were previously infected with COVID-19 and have been moved to the resolved status are considered to be immune from re-infection for at least twelve weeks, and shall not be required to re-test for movement purposes during that time frame.

As to your specific concern regarding the spread of COVID-19 due to the use of bread racks. Inmates on quarantine were fed after the non-quarantine inmates. All staff and inmates directly dealing with quarantine inmates donned Personal Protective Equipment to include; latex gloves, plastic gown, face shield, and N95 mask. At the completion of the cell feeding, the bread racks were taken to Facility A Culinary where they were cleaned via the tray machine.

Inmates are only moved on medical's direction to an isolation unit or quarantine unit based on a positive test for COVID-19 or as a result of contact tracing. Additionally, all employees and visitors are required to be screened for COVID-19 by having temperature checks and answering the COVID-19 questionnaire. All employees and visitors are mandated to wear surgical face masks at all times while on institutional grounds. Custody supervisors and managers conduct COVID-19 audits on a daily and weekly basis. All staff employed at CTF are mandated to test for COVID-19 on a weekly basis. Housing units have handwashing (sinks) and hand sanitizer.

If you believe you are sick, you should request to see a medical provider. If you are in need of more cleaning supplies, please talk with the Correctional Officer on duty or your Correctional Counselor. The incarcerated population is being provided extra soap when requested and hospital-grade disinfectant that meets Centers for Disease Control and Prevention (CDC) guidance for COVID-19. CTF, CDCR, and CCHCS, will continue to work diligently with the CDC on how we can best keep our workforce protected and provide for the safety and security of our institutions.

**Decision: Disapproved**

After a thorough review of all documents and evidence presented at the Office of Grievances Level, it is the order of the Office of Grievance to DISAPPROVE the claim.

If you are dissatisfied with the decision of this claim, you may file a 602-2, appeal with the California Department of Corrections and Rehabilitation Office of Appeals.

| Staff Signature | Title | Date/Time |
|---|---|---|
| L. Martinez [MALU004] | CDW | 05/17/2021 |

STATE OF CALIFORNIA
**APPEAL OF GRIEVANCE**
CDCR 602-2 (03/20)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 1 of 2

| STAFF USE ONLY | Appeal #:_____ | Date Received:_____ |
|---|---|---|
| | Date Due:_____ | |
| | Categories:_____ | |
| | Grievance #: OODOOOD 45582 | |

Claimant Name: Estrada, Vicker          CDCR #: G67609

Current Housing/Parole Unit: NB. 141. UP          Institution/Facility/Parole Region: CTF. Soledad

☐ There are no claims that can be appealed.

☐ The following claims cannot be appealed:

Claim #s:

_____
_____
_____

*This is the process to appeal the decision made regarding a claim that is not listed above.*

Claim #: 000000 114033

Explain the reason for your appeal of any claims not listed above. Be as specific as you can.

*I am dissatisfied with the response I was given because* I did turn in my Grievance on time. I turned it in on Fri. Apr 9, 2021 as you'll see on the Claimant Grievance Receipt Acknowledgment dated 4.9.2021 Re# Log#0000000 106665. Somewhere down the line a misunderstanding was made. Therefore, I would like for my Grievance Log #0000000106665 to be processed accordingly and given it's appropriate response and remedy. Thank you very much for your time and assistance.

_____
_____
_____
_____

Are there documents that would be helpful to support your position? Attach copies of those documents. If you don't have the documents, identify them as best you can below: Yes. Claimant Grievance Receipt Acknowledgment dated 4.9.2021 re: Log#0000000106665. 006 Acknowledgment Of Receipt And Closure Of Grievance, dated 5.3.2021 and Multi-Purpose Form dated Mon. May 3, 2021. Hand copy of 602 Grievance dated Friday Apr 9, 2021.

DISTRIBUTION     **Original:** Claimant's File     **Copies:** DAI, DAPO, and Claimant

STATE OF CALIFORNIA
**APPEAL OF GRIEVANCE**
CDCR 602-2 (03/20)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 2 of 2

Claim #:_____

Explain the reason for your appeal. Be as specific as you can.

*I am dissatisfied with the response I was given because*_____

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Are there documents that would be helpful to support your position? Attach copies of those documents. If you don't have the documents, identify them as best you can below:

_____
_____
_____
_____
_____
_____

Reminder: Please attach all documents in your possession that support your claim(s).

Please note that this form and supporting documents will not be returned to you.

Claimant Signature:_____     Date Signed: Wed. May 12/21

MAIL TO:
Office of Appeals
Department of Corrections and Rehabilitation
P.O. Box 942883
Sacramento, CA 95811

STATE OF CALIFORNIA
**APPEAL OF GRIEVANCE**
CDCR 602-2 (03/20)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 1 of 2

106665

| **STAFF USE ONLY** | Appeal #:_____ Date Received:_____ |
| | Date Due:_____ |
| | Categories:_____ |
| | Grievance #:_____ |

Claimant Name:_____ CDCR #:_____

Current Housing/Parole Unit:_____ Institution/Facility/Parole Region:_____

☐ **There are no claims that can be appealed.**

☐ **The following claims cannot be appealed:**

**Claim #s:**
_____
_____

*This is the process to appeal the decision made regarding a claim that is not listed above.*

**Claim #:** 106665

Explain the reason for your appeal of any claims not listed above. Be as specific as you can.

*I am dissatisfied with the response I was given because* the 2nd watch and 3rd watch regular officers where verbaly made aware of the cross contamination that keeped ocurring through the bread racks because they keeped feeding first the inmates that were quaranfined due to being exposed to COVID because their telly tested positive and then I and the rest of the inmates that were quaranfined due to pending transfer wald get feed off the same contaminated bread racks. One Officer in particular had recomended me to griebance the matter and that Officer is K. Kuramura 3rd watch regular, and also had said that it didn't matter who got feed first because everyone was going to catch COVID no matter how the feeding was done.

Are there documents that would be helpful to support your position? Attach copies of those documents, if you don't have the documents, identify them as best you can below:

Claimant Grievance Claims Decision Response dated 5·18·2021 and copy of Grievance dated 4·9·2021 and all the rest of the supporting documents like my endorsement per Auditor Action and cell change from Whitney Hall to Rainner Hall B-side that occur on or

STATE OF CALIFORNIA
**APPEAL OF GRIEVANCE**
CDCR 602-2 (03/20)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 2 of 2

**Claim #:** 106065

Explain the reason for your appeal. Be as specific as you can.

*I am dissatisfied with the response I was given because_____*

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Are there documents that would be helpful to support your position? Attach copies of those documents, if you don't have the documents, identify them as best you can below:

Oct. 2020 can be found in my Central File in S.O.M.S.

_____

_____

_____

_____

**Reminder:** Please attach all documents in your possession that support your claim(s).

Please note that this form and supporting documents will not be returned to you.

**Claimant Signature:** *Victor R. Estrada*    **Date Signed:** 10.1.2021

MAIL TO:

Office of Appeals
Department of Corrections and Rehabilitation
P.O. Box 942883
Sacramento, CA 95811



CALIFORNIA DEPARTMENT *of*
Corrections and Rehabilitation

## CLAIMANT APPEAL CLAIMS DECISION RESPONSE

**Re:** Appeal Claims Decision Response

**Offender Name:** ESTRADA, VICKTER
**CDC#:** G67609
**Current Location:** CTF-Facility B

**Date:** 09/08/2021

**Current Area/Bed:** B WH B1 - 141141U

**Log #:** 000000106665

**Claim # 001**
**Institution/Parole Region of Origin:** Correctional Training Facility          **Facility/Parole District of Origin:** CTF-Facility B
**Housing Area/Parole Unit of Origin:**
**Category:** COVID-19          **Sub-Category:** Other Issues - NOS

The California Department of Corrections and Rehabilitation (CDCR) Office of Appeals received this claim on 06/04/2021.

California Code of Regulations, title 15, provides the Office of Appeals 60 calendar days to complete a response. Due to the expiration of time, this response by the Office of Appeals will be the only response.

You do not need to resubmit this claim to the Office of Grievances or to the CDCR Office of Appeals.

**Decision: Time Expired**

State of California

Department of Corrections and Rehabilitation
Office of Appeals

# Memorandum



To:       Claimant

Subject:   **TIME-EXPIRED RESPONSE FROM THE OFFICE OF APPEALS**

Thank you for submitting your appeal for review by the California Department of Corrections, Office of Appeals. Pursuant to Title 15, section 3486(i)(10), if the Office of Appeals is not able to respond to a claim in 60 calendar days, as in this case, then the claim must be answered "time-expired." As a result, the answer provided by the Office of Grievances remains unchanged and this appeal is now closed. No further action will be taken by the Department and no appeal of this action is permitted under the regulations.

Also, pursuant to Title 15, section 3485(e), "The appeal package submitted by the claimant shall be stored electronically by the Department. The CDCR Form 602-2 shall contain a notification to the claimant that the documents submitted will not be returned to the claimant." Therefore, your Form 602-2 and any supporting documents are not included with this response.

However, a copy of your entire appeal package is maintained in your Central File. The process for requesting copies of documents contained in Central Files, often referred to as an *Olsen* review, can be found in the Department Operations Manual, sections 13030.16 and 13030.17.

Thank you,

HOWARD E. MOSELEY
Associate Director

# EXHIBIT 15

# EXHIBIT 15

**INMATE/PAROLEE APPEAL**
CDCR 602 (REV. 03/12)                                                                                          Side 1

| IAB USE ONLY | Institution/Parole Region: | Log #: | Category: |
|---|---|---|---|
| | | | |

*FOR STAFF USE ONLY*

You may appeal any California Department of Corrections and Rehabilitation (CDCR) decision, action, condition, policy or regulation that has a material adverse effect upon your welfare and for which there is no other prescribed method of departmental review/remedy available.  See California Code of Regulations (CCR), Title 15, Section 3084.1.  You must send this appeal and any supporting documents to the Appeals Coordinator (AC) within 30 calendar days of the event that led to the filing of this appeal.  If additional space is needed, only one CDCR Form 602-A will be accepted.  Refer to CCR 3084 for further guidance with the appeal process.  No reprisals will be taken for using the appeal process.

Appeal is subject to rejection if one row of text per line is exceeded.                    WRITE, PRINT, or TYPE CLEARLY in black or blue ink.

| Name (Last, First): | CDC Number: | Unit/Cell Number: | Assignment: |
|---|---|---|---|
| Milton, William | P38650 | Covid Quarantine | Crapper Cleaner |

State briefly the subject of your appeal (Example: damaged TV, job removal, etc.): Deliberate Indifference, Gross Negligence, and Reckless Disregard to Health & Safety Causing Exposure/Infection of Covid-19 In Violation of Farmer v. Brennan; see also In re Van Staich (A160122) WL 6144780

A. Explain your issue (If you need more space, use Section A of the CDCR 602-A): I am compelled to submit this grievance against the responsible prison employees (i.e., CTF Warden C. Koenig; Acting Warden Mensing; Captain E. Galvan; Captain Metcalfe; and all other state employees acting in concert and under color of law incorporated here as John Does 1-150,

B. Action requested (If you need more space, use Section B of the CDCR 602-A): I request monetary compensation for all injuries directly or indirectly caused by the events set forth herein including, but not limited to: (1) Covid-19 infection; (2) long-term injuries caused by Covid-19; and, (3) exacerbation and worsening of preexisting injuries.

Supporting Documents: Refer to CCR 3084.3.
[X] Yes, I have attached supporting documents.
List supporting documents attached (e.g., CDC 1083, Inmate Property Inventory; CDC 128-G, Classification Chrono):

CDCR 602-A; Covid-19 Negative Test Results; Covid-19 Positive Test Results; Electronic Unit Health Record (eUHR).
[ ] No, I have not attached any supporting documents. Reason :

Inmate/Parolee Signature: _____ Date Submitted: 12/20/20

[ ] **By placing my initials in this box, I waive my right to receive an interview.**

C. First Level - Staff Use Only                              Staff – Check One: Is CDCR 602-A Attached?   [ ] Yes   [ ] No
This appeal has been:
[ ] Bypassed at the First Level of Review.  Go to Section E.
[ ] Rejected (See attached letter for instruction)  Date: _____ Date: _____ Date: _____ Date: _____
[ ] Cancelled (See attached letter)  Date: _____
[ ] Accepted at the First Level of Review.
   Assigned to: _____ Title: _____ Date Assigned: _____ Date Due: _____

First Level Responder:  Complete a First Level response.  Include Interviewer's name, title, interview date, location, and complete the section below.
   Date of Interview: _____ Interview Location: _____
Your appeal issue is:  [ ] Granted   [ ] Granted in Part   [ ] Denied   [ ] Other: _____
   See attached letter.  If dissatisfied with First Level response, complete Section D.
Interviewer: _____ Title: _____ Signature: _____ Date completed: _____
           (Print Name)
Reviewer: _____ Title: _____ Signature: _____
         (Print Name)
Date received by AC: _____

| | AC Use Only |
|---|---|
| | Date mailed/delivered to appellant ___ / ___ / ___ |

STAFF USE ONLY

STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL**
CDCR 602 (REV. 03/12)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

**Side 2**

**D. If you are dissatisfied with the First Level response,** explain the reason below, attach supporting documents and submit to the Appeals Coordinator for processing within 30 calendar days of receipt of response.   If you need more space, use Section D of the CDCR 602-A.

_____

_____

_____

_____

_____

_____

Inmate/Parolee Signature: _____     Date Submitted : _____

---

**E.  Second Level - Staff Use Only**                                      Staff – Check One: Is CDCR 602-A Attached?   ☐ Yes    ☐ No

This appeal has been:

☐ By-passed at Second Level of Review.  Go to Section G.
☐ Rejected (See attached letter for instruction) Date: _____     Date: _____     Date: _____     Date: _____
☐ Cancelled (See attached letter)
☐ Accepted at the Second Level of Review

Assigned to: _____     Title: _____     Date Assigned: _____     Date Due: _____

Second Level Responder:  Complete a Second Level response.  If an interview at the Second Level is necessary, include interviewer's name and title, interview date and location, and complete the section below.

Date of Interview: _____     Interview Location: _____

Your appeal issue is:  ☐ Granted     ☐ Granted in Part     ☐ Denied     ☐ Other: _____

See attached letter.  If dissatisfied with Second Level response, complete Section F below.

Interviewer: _____ (Print Name)     Title: _____     Signature: _____     Date completed : _____

Reviewer: _____ (Print Name)     Title: _____     Signature: _____

Date received by AC: _____

| AC Use Only |
| Date mailed/delivered to appellant ____ / ____ / ____ |

**F.  If you are dissatisfied with the Second Level response,** explain reason below; attach supporting documents and submit by mail for Third Level Review.  It must be received within 30 calendar days of receipt of prior response.  Mail to: Chief, Inmate Appeals Branch, Department of Corrections and Rehabilitation,  P.O. Box 942883, Sacramento, CA 94283-0001.  If you need more space, use Section F of the CDCR 602-A.

_____

_____

_____

_____

_____

Inmate/Parolee Signature: _____     Date Submitted: _____

---

**G.  Third Level - Staff Use Only**

This appeal has been:
☐ Rejected (See attached letter for instruction) Date: _____   Date: _____   Date: _____   Date: _____   Date: _____
☐ Cancelled (See attached letter)    Date: _____
☐ Accepted at the Third Level of Review.  Your appeal issue is ☐ Granted   ☐ Granted in Part   ☐ Denied   ☐ Other: _____
   See attached Third Level response.

| Third Level Use Only |
| Date mailed/delivered to appellant ____ / ____ / ____ |

**H. Request to Withdraw Appeal:**  I request that this appeal be withdrawn from further review because; State reason. (If withdrawal is conditional, list conditions.)

_____

_____

_____

_____

_____ Inmate/Parolee Signature: _____     Date: _____

Print Staff Name: _____     Title: _____     Signature: _____     Date: _____

STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL FORM ATTACHMENT**
CDCR 602-A (REV. 03/12)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Side 1

| IAB USE ONLY | Institution/Parole Region: | Log #: | Category: |
|---|---|---|---|
| | | | |
| | | FOR STAFF USE ONLY | |

Attach this form to the CDCR 602, only if more space is needed. Only one CDCR 602-A may be used.

**Appeal is subject to rejection if one row of text per line is exceeded.    WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First): | CDC Number: | Unit/Cell Number: | Assignment: |
|---|---|---|---|
| Hilton, William | P33650 | Covid-19 Quar. | Crapper Cleaner |

A. Continuation of CDCR 602, Section A only (Explain your issue) inclusive),    for    deliberately, maliciously, recklessly, and negligently committing acts consisting of, but not limited to: (Claim #1) Placing me (Covid -) in the vicinity with Covid + prisoners who have tested positive for Covid-19; (Claim #2) Placing Covid + prisoners with Covid - prisoners in an attempt to develop herd immunity; and, (Claim #3) committing these acts as reprisals for taking part in protected conduct. FACTUAL ALLEGATIONS: There were absolutely no cases of Covid-19 in X-Wing. The Named-Defendants decided to do a number of things to the prison population to increase the susceptibility of Covid-19 exposure, infection, and death (e.g., the 7-20-20 raid in which black prisoners were targeted for assault and infection; and the constant placing of Covid + prisoners in the vicinity with Covid - prisoners; etc.). As a direct result of these and other negligent actions, an outbreak of 100's of Covid-19 positive cases occurred. I tested negative on two occasions. I tried to convince the Named-defendants to stop bringing Covid + prisoners in my vicinity. We were informed by the Named-Defendants that too many grievances and lawsuits are being filed by guys in X-Wing so they "wanted the wing." They also ADMITTED that they were "negligent," "reckless," and "made mistakes." I tested positive on 11-27-20. I wasn't placed in isolation and instead placed in the chapel with 10 other Covid + prisoners. I suffered: (1) multiple seizures; (2) skyrocketing blood pressure; (3) migraines; (4) dizziness and confusion; (5) hacking dry cough; and (6) excruciating pain. I was provided no Covid-19 meds then moved to another Covid+ wing.

Inmate/Parolee Signature: _____    Date Submitted: 12|20|20

B. Continuation of CDCR 602, Section B only (Action requested): _____

_____

Inmate/Parolee Signature: _____    Date Submitted: _____

STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL FORM ATTACHMENT**
CDCR 602-A (REV. 03/12)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Side 2

D. Continuation of CDCR 602, Section D only (Dissatisfied with First Level response): _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Inmate/Parolee Signature: _____ Date Submitted: _____

F. Continuation of CDCR 602, Section F only (Dissatisfied with Second Level response): _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Inmate/Parolee Signature: _____ Date Submitted: _____



CALIFORNIA DEPARTMENT *of*
**Corrections and Rehabilitation**

# CLAIMANT GRIEVANCE CLAIMS DECISION RESPONSE

**Re:** Grievance Claims Decision Response

**Offender Name:** MILTON, WILLIAM                    **Date:** 01/20/2021
**CDC#:** P38650

**Current Location:** CTF-Facility C                    **Current Area/Bed:** C  XW  1 - 133001L

**Log #:** 000000070852

**Claim #: 001**

**Institution/Parole Region of Origin:** Correctional Training Facility        **Facility/Parole District of Origin:** CTF–Facility C
**Housing Area/Parole Unit of Origin:**
**Category:** COVID-19                    **Sub-Category:** Other Issues - NOS

### I. CLAIM

The claimant is alleging prison staff deliberately, maliciously, recklessly, and negligently committed acts against COVID-19 protocols.

### II. RULES AND REFERENCES

#### A. CONTROLLING AUTHORITY

Title 15 Section 3084.1- Right to appealTitle 15 Section 3383- State of Emergency

#### B. DOCUMENTS CONSIDERED

State of Emergency CDCR Memorandum authored by Director Connie Gibson dated March 8, 2020 CDCR Memorandum authored by Secretary Ralph M. Diaz and Receiver J. Clark Kelso dated July 10, 2020

### III. REASONING AND DECISION

The health and safety of our population is of critical importance to the California Department of Corrections and Rehabilitation and California Correctional Health Care Services. The Department took action, including transitioning a number of inmates to parole, to protect staff and inmates at the State's institutions. These additional measures were meant to help mitigate the spread of the novel coronavirus, also known as COVID-19. These measures will increase both capacity and physical space at the State's prisons, which will allow the Department to increase physical distancing and assist with isolation quarantine efforts for suspected or positive COVID-19 cases. CDCR understands the risks that the COVID-19 pandemic presents to CDCR inmates, staff, volunteers. In light of these risks, CDCR has taken the following steps, in an effort to protect the inmate population: mandatory health screening before entering CDCR facilities; additional deep cleaning efforts; increased supply of disinfectants, soap, hand sanitizer, and personal protective equipment; limitations and suspensions of inmate transfers and movements; quarantine protocols; cancelling visiting at CDCR facilities until further notice; and many other steps depending on your location.In accordance with the COVID-19 SCREENING AND TESTING MATRIX FOR PATIENT MOVEMENT CTF and CDCR adhere to the follow:To reduce the likelihood of COVID-19 spreading from one location to another, movement shall be limited to that which is necessary clinical care, medical isolation or quarantine, reduction of overcrowding, and serious custody concerns. COVID-19 screening consists of a verbal symptom questionnaire and temperature screening. All COVID-19 testing shall be by Polymerase Chain Reaction (PCR) unless specifically stated otherwise. Symptomatic inmates shall be isolated alone in celled housing with a solid door and tested for COVID-19. Inmates with a PCR-confirmed diagnosis of CC -19 may be housed together as a cohort on isolation status. Inmates who were previously infected with COVID and were subsequently moved to the resolved status are considered by the CDC to be immune from re-infection for 90 days from the date of first symptoms or first positive test, whichever ca first. These patients shall not be required to re-test or be quarantined for movement purposes during that time frame. The claimant was placed in G-Win (isolation wing) to be monitored for a positive COVID-19 test.

**Decision: Disapproved**

After a thorough review of all documents and evidence presented at the Office of Grievances Level, it is the order of the Office of Grievance to DISAPPROVE the claim.

If you are dissatisfied with the decision of this claim, you may file a 602-2, appeal with the California Department of Corrections and Rehabilitation Office Appeals.

| Staff Signature | Title | Date/Time |
|---|---|---|
| L. Martinez [MALU004] | CDW | 01/19/2021 |

STATE OF CALIFORNIA
**APPEAL OF GRIEVANCE**
CDCR 602-2 (03/20)
      X

70852

DEPARTMENT OF CORRECTIONS AND REHABILITATION
**Page 1 of 4**
XXXXXXXXX

**STAFF USE ONLY**

| | |
|---|---|
| Appeal #:_____ | Date Received:_____ |
| Date Due:_____ |
| Categories:_____ |
| Grievance #:_____ |

Claimant Name:___Milton, William_____  CDCR #:_____P38650_____

Current Housing/Parole Unit:___XW-133 Low_____  Institution/Facility/Parole Region:_CTF - Central_____

☐ There are no claims that can be appealed.

☐ The following claims cannot be appealed:

Claim #s:

*AFTER CONTRACTING COVID - AT FINAL LEVEL*

_____

_____

_____

_This is the process to appeal the decision made regarding a claim that is not listed above._

Claim #:_____XXXXX  001 as to CGCDR Log #70852_____

Explain the reason for your appeal of any claims not listed above. Be as specific as you can.

_I am dissatisfied with the response I was given because_ I incorporate all allegations, statements, claims, and requests made in Grievance No. 70852 (CDCR 602-1), as though they were stated fully in this section. I am not satisfied with the CGCDR because, but not limited to: (1) it ignores Claim #1, #2, and #3 raised in Grievance No. 70852 (CDCR 602/602-A); (2) it is nothing more than a cookie-cutter or boilerplate response imbued with misrepresentations to give it a false sense of reliability; (3) it omits the fact that prison officials admitted they were grossly negligent, reckless and deliberately indifferent and disregarded a substantial risk to my health and safety; (4) it omits the serious physical injuries I sustained; and, (5) I have not been monetarily compensated.

_____

_____

Are there documents that would be helpful to support your position? Attach copies of those documents, if you don't have the documents, identify them as best you can below:

Copy: Grievance #70852 (CDCR 602/602-A); CGCDR dated 1/20/21; see also eUHR (Covid Test Results)

_____

_____

_____

_____

STRIBUTION    Original: Claimant's File    Copies: DAI, DAPO, and Claimant

STATE OF CALIFORNIA
**APPEAL OF GRIEVANCE**
CDCR 602-2 (03/20)

Page 2 of 4

Claim #: 002 as to CGCDR Log #70852

Explain the reason for your appeal. Be as specific as you can.

*I am dissatisfied with the response I was given because* I incorporate all allegations, statements, claims, and requests made in Grievance No. 70852 (CDCR 602-1), including Claim #1 above, as though they were stated fully in this section. I am not satisfied with the CGCDR because, but not limited to: (1) it ignores Claim #1, #2, and #3 raised in Grievance No. 70852 (CDCR 602/602-A); (2) it is nothing more than a cookie-cutter or boilerplate response imbued with misrepresentations to give it a false sense of reliability; (3) it omits the fact that prison officials admitted they were grossly negligent, reckless and deliberately indifferent and disregarded a substantial risk to my health and safety; (4) it omits the serious physical injuries I sustained; and, (5) I have not been monetarily compensated. As such, Claim #2 had been waived at the first level.

Are there documents that would be helpful to support your position? Attach copies of those documents, If you don't have the documents, identify them as best you can below:

Same As Claim #1 Above

**Reminder:** Please attach all documents in your possession that support your claim(s).

Please note that this form and supporting documents will not be returned to you.

Claimant Signature: _____     Date Signed: 2/12/21

MAIL TO:
Office of Appeals
Department of Corrections and Rehabilitation
P.O. Box 942883
Sacramento, CA 95811

STATE OF CALIFORNIA
**APPEAL OF GRIEVANCE**
CDCR 602-2 (03/20)

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Page 3 of 4

RXGXXXKX

| **STAFF USE ONLY** | Appeal #: ___70852_____ Date Received:_____ |
| | Date Due:_____ |
| | Categories:_____ |
| | Grievance #:_____ |

Claimant Name: _Milton, William_____  CDCR #: P38650  (CTF - Central)

Current Housing/Parole Unit: XW-133 Low_____  Institution/Facility/Parole Region: CTF - Central_____

☐ There are no claims that can be appealed.

☐ The following claims cannot be appealed:

Claim #s:
_____
_____
_____

_This is the process to appeal the decision made regarding a claim that is not listed above._

Claim #: _____003 as to CGCDR Log #70852

Explain the reason for your appeal of any claims not listed above. Be as specific as you can.
_I am dissatisfied with the response I was given because_ I incorporate all allegations, statements, claims, and requests made in Grievance No. 70852 (CDCR 602-1), including Claim #1 and #2 above, as though they were stated fully in this section. I am not satisfied with the CGCDR because, but not limited to: (1) it ignores Claim #1, #2, and #3 raised in Grievance No. 70852 (CDCR 602/602-A); (2) it is nothing more than a cookie-cutter or boilerplate response imbued with misrepresentations to give it a false sense of reliability; (3) it omits the fact that prison officials admitted they were grossly negligent, reckless and deliberately indifferent and disregarded a substantial risk to my health and safety; (4) it omits the serious physical injuries I sustained; and, (5) I have not been monetarily compensated. As such, Claim #3 had been waived at the first level._

Are there documents that would be helpful to support your position? Attach copies of those documents, if you don't have the documents, identify them as best you can below:
Same As Claim #1 and #2 Above
_____
_____
_____
_____
_____

DISTRIBUTION      Original: Claimant's File      Copies: DAI, DAPO, and Claimant

STATE OF CALIFORNIA
**APPEAL OF GRIEVANCE**
CDCR 602-2 (03/20)

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Page 4 of 4

Claim #:_____

Explain the reason for your appeal. Be as specific as you can.

*I am dissatisfied with the response I was given because*_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Are there documents that would be helpful to support your position? Attach copies of those documents, if you don't have the documents, identify them as best you can below:

_____

_____

_____

_____

_____

_____

**Reminder:** Please attach all documents in your possession that support your claim(s).

Please note that this form and supporting documents will not be returned to you.

Claimant Signature:_____    Date Signed: 2 | 12 | 21

MAIL TO:                    Office of Appeals
                   Department of Corrections and Rehabilitation
                            P.O. Box 942883
                          Sacramento, CA 95811

# EXHIBIT 16

# EXHIBIT 16

**INMATE/PAROLEE APPEAL**
CDCR 602 (REV. 03/12)

Side 1

| IAB USE ONLY | Institution/Parole Region: | Log #: 27588 | Category: |
|---|---|---|---|

*FOR STAFF USE ONLY*

You may appeal any California Department of Corrections and Rehabilitation (CDCR) decision, action, condition, policy or regulation that has a material adverse effect upon your welfare and for which there is no other prescribed method of departmental review/remedy available. See California Code of Regulations (CCR), Title 15, Section 3084.1. You must send this appeal and any supporting documents to the Appeals Coordinator (AC) within 30 calendar days of the event that led to the filing of this appeal. If additional space is needed, only one CDCR Form 602-A will be accepted. Refer to CCR 3084 for further guidance with the appeal process. No reprisals will be taken for using the appeal process.

**Appeal is subject to rejection if one row of text per line is exceeded.**          **WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First): Pelayo, S. | CDC Number: P-61090 | Unit/Cell Number: CTF-FW-348L | Assignment: |
|---|---|---|---|

State briefly the subject of your appeal (Example: damaged TV, job removal, etc.): SINGLE CELL APPEAL TO MINIMIZE CONTRACTING COVID-19 INFECTION AND/OR DEATH FROM RELATED ILLNESSES; NOTICE OF LIABILITY

**A.** Explain your issue (If you need more space, use Section A of the CDCR 602-A): I am forced to submit this formal grievance for acts consisting of but not limited to: (Claim #1) jeopardizing my health & safety; (Claim #2) deliberate indifference; (Claim #3 Discrimination. FACTUAL ALLEGATIONS: Under the U.S. Constitution 8th Amendment, I am to be protected

**B.** Action requested (If you need more space, use Section B of the CDCR 602-A): Per COVID-19 prevention, I request: 1) Single Cell Status. If my request is denied, monetary compensation for any and all injuries directly or indirectly caused by the events set forth herein including, but not limited to: (a) 8th Amendment violation for deliberately

**Supporting Documents: Refer to CCR 3084.3.**
☐ Yes, I have attached supporting documents.
List supporting documents attached (e.g., CDC 1083, Inmate Property Inventory; CDC 128-G, Classification Chrono):

_____

_____

☐ No, I have not attached any supporting documents. Reason :_____

_____

Inmate/Parolee Signature: By Saul Pelayo          Date Submitted: 09/08/2020

☐ By placing my initials in this box, I waive my right to receive an interview.

**C. First Level - Staff Use Only**          Staff – Check One: Is CDCR 602-A Attached?  ☐ Yes  ☐ No
This appeal has been:
☐ Bypassed at the First Level of Review. Go to Section E.
☐ Rejected (See attached letter for instruction) Date: _____ Date: _____ Date: _____ Date: _____
☐ Cancelled (See attached letter) Date: _____
☐ Accepted at the First Level of Review.

Assigned to: _____ Title: _____ Date Assigned: _____ Date Due: _____

First Level Responder: Complete a First Level response. Include Interviewer's name, title, interview date, location, and complete the section below.

Date of Interview: _____ Interview Location: _____

Your appeal issue is:  ☐ Granted  ☐ Granted in Part  ☐ Denied  ☐ Other: _____

See attached letter. If dissatisfied with First Level response, complete Section D.

Interviewer: _____ Title: _____ Signature: _____ Date completed:_____
                (Print Name)

Reviewer: _____ Title: _____ Signature: _____
              (Print Name)

Date received by AC:_____

| AC Use Only |
| Date mailed/delivered to appellant ____ / ____ / ____ |

STAFF USE ONLY

STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL FORM ATTACHMENT**
CDCR 602-A (REV. 03/12)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Side 1

| IAB USE ONLY | Institution/Parole Region: | Log #: 37588 | Category: |
|---|---|---|---|
| | | | |
| | *FOR STAFF USE ONLY* | | |

Attach this form to the CDCR 602, only if more space is needed. Only one CDCR 602-A may be used.

**Appeal is subject to rejection if one row of text per line is exceeded.    WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First): | CDC Number: | Unit/Cell Number: | Assignment: |
|---|---|---|---|
| Pelayo, S. | P-61090 | CTF-FW-348L | |

A.  Continuation of CDCR 602, Section A only (Explain your issue) : from harm, cruel & unusual punishment. The Center for Disease Control and Prevention ("CDCP") mandates social distancing as a COVID-19 preventive measure. I am a 47 yr. old Mexican who takes medications that debilitate my immune system. My TB Code is 32. I have chronic Kidney disease stage two. I'm obese; suffer hypertension; gastroesophageal reflux disease; acute pharyngitis; and, microscopic hematuria. Not being single-cell it's impossible to practice the CDCP mandated social distancing requirement. Living in a 5'x10' cell with less than 3'x5' walking space, one toilet shared by both & lacking the minimal cleaning supplies, greatly increases the propensity of sickness and COVID-19 related illnesses. CTF is now an infected COVID-19 zone. There is no legitimate penological interest in disregarding the substantial risk to my health by failing to single-cell-me. If I were not Mexican, the odds of being single cell are obviously greater. THEREFORE, I am placing "every" agent and agency on NOTICE that "IF" and "WHEN" I am exposed to COVID-19, I reserve the right of claim without controversy from defendants. Upon my death, I give my family the right of claim in all forms to hold all agents and agencies liable for placing me in jeopardy, as there is no way for CDR and CTF to guarantee my protection from contracting COVID-19 under its watch, by keeping me housed together with another prisoner in a 5'x10' cell that was initially designed for one person. One cannot keep the CDCP mandates while not being single cell.

Inmate/Parolee Signature: By: Saul Pelayo w/out recourse    Date Submitted: 09/08/2020

B.  Continuation of CDCR 602, Section B only (Action requested): subjecting me to conditions society is not willing to tolerate; (b) 14th Amendment violation for not housing me as single-cell, during this pandemic, before being exposed to COVID-19 and related illnesses as permitted of other races; (3) deliberate indifference for keeping me in a congested, overcrowded environment. (Award will not be limited to, but will include: Compensatory damages; Exemplary damages; Mental Anguish damages; Nominal damages; Punitive damages; Economic and non-economic damages; Medical and related expenses; Lost earning, past and future; And, Costs of suits incurred herein.

Inmate/Parolee Signature: By: Saul Pelayo w/out recourse    Date Submitted: 09/08/2020

Rec'd on 2-12-21 by
CTF, 3rd/w, X w, C/o
mendoza @ 1531 hrs @ cell

 CALIFORNIA DEPARTMENT of
Corrections and Rehabilitation

# CLAIMANT APPEAL CLAIMS DECISION RESPONSE

**Re:** Appeal Claims Decision Response

**Offender Name:** PELAYO, SAUL                                    **Date:** 01/22/2021
**CDC#:** P61090
**Current Location:** CTF-Facility C                              **Current Area/Bed:** C XW 2 - 223001U

**Log #:** 000000037588

---

**Claim # 001**
**Institution/Parole Region of Origin:** Correctional Training Facility       **Facility/Parole District of Origin:** CTF-Facility C
**Housing Area/Parole Unit of Origin:**
**Category:** COVID-19                          **Sub-Category:** Social Distancing

The California Department of Corrections and Rehabilitation (CDCR) Office of Appeals received this claim on 11/02/2020.

California Code of Regulations, title 15, provides the Office of Appeals 60 calendar days to complete a response. Due to the expiration of time, this response by the Office of Appeals will be the only response.

You do not need to resubmit this claim to the Office of Grievances or to the CDCR Office of Appeals.

**Decision: Time Expired**

STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL**
CDCR 602 (REV. 03/12)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

**Side 1**

| | IAB USE ONLY | Institution/Parole Region: | Log #: 60938 | Category: |
|---|---|---|---|---|
| | | | FOR STAFF USE ONLY | |

You may appeal any California Department of Corrections and Rehabilitation (CDCR) decision, action, condition, policy or regulation that has a material adverse effect upon your welfare and for which there is no other prescribed method of departmental review/remedy available. See California Code of Regulations (CCR), Title 15, Section 3084.1. You must send this appeal and any supporting documents to the Appeals Coordinator (AC) within 30 calendar days of the event that led to the filing of this appeal. If additional space is needed, only one CDCR Form 602-A will be accepted. Refer to CCR 3084 for further guidance with the appeal process. No reprisals will be taken for using the appeal process.

**Appeal is subject to rejection if one row of text per line is exceeded.**          **WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First): | CDC Number: | Unit/Cell Number: | Assignment: |
|---|---|---|---|
| Palayo, S. | P-61090 | CTF-GW-333U | |

State briefly the subject of your appeal (Example: damaged TV, job removal, etc.): DELIBERATE EXPOSURE TO & INFECTED WITH COVID-19 in contravention of In re Staitch, 2020 WL6144782; Farmer v Brennan, 511 U.S. 825 RE: M. Daguio & Stg. D. Sandoval

A. Explain your issue (If you need more space, use Section A of the CDCR 602-A): This formal grievance accuses prison guard M. Daguio & Sgt. D. Sandoval of acts consisting of but not limited to (Claim #1) Deliberate Exposure to COVID-19. FACTUAL ALLEGATIONS: I was formally without a cell-mate & had tested negative, until Daguio & Stg. D. Sandoval forced me

B. Action requested (If you need more space, use Section B of the CDCR 602-A): 1) Punitive damages; Compensatory damages; Exemplary damages; 2) costs of suits incurred herein, for any & all injuries directly or indirectly caused by the events set forth herein from each party involved, including but not limited to: 3) failing to adhere to the holding in

**Supporting Documents: Refer to CCR 3084.3.**
☐ Yes, I have attached supporting documents.
List supporting documents attached (e.g., CDC 1083, Inmate Property Inventory; CDC 128-G, Classification Chrono):

_____          _____

_____          _____

☐ No, I have not attached any supporting documents. Reason :_____

_____

_____

Inmate/Parolee Signature: By S. Pelayo          Date Submitted: November 20, 2020

☐ **By placing my initials in this box, I waive my right to receive an interview.**

**C. First Level - Staff Use Only**          Staff – Check One: Is CDCR 602-A Attached?  ☐ Yes  ☐ No

This appeal has been:
☐ Bypassed at the First Level of Review.  Go to Section E.
☐ Rejected (See attached letter for instruction)  Date: _____  Date: _____  Date: _____  Date: _____
☐ Cancelled (See attached letter) Date: _____
☐ Accepted at the First Level of Review.

Assigned to: _____  Title: _____  Date Assigned: _____  Date Due:_____

First Level Responder: Complete a First Level response. Include Interviewer's name, title, interview date, location, and complete the section below.

Date of Interview: _____  Interview Location: _____

Your appeal issue is:  ☐ Granted  ☐ Granted in Part  ☐ Denied  ☐ Other: _____

See attached letter. If dissatisfied with First Level response, complete Section D.

Interviewer: _____  Title: _____  Signature: _____  Date completed:_____
(Print Name)

Reviewer: _____  Title: _____  Signature: _____
(Print Name)

Date received by AC:_____

| AC Use Only |
| Date mailed/delivered to appellant ____ / ____ / ____ |

STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL FORM ATTACHMENT**
CDCR 602-A (REV. 03/12)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Side 1

| IAB USE ONLY | Institution/Parole Region: | Log #: 60938 | Category: |
|---|---|---|---|
| | | FOR STAFF USE ONLY | |

Attach this form to the CDCR 602, only if more space is needed. Only one CDCR 602-A may be used.

Appeal is subject to rejection if one row of text per line is exceeded.    WRITE, PRINT, or TYPE CLEARLY in black or blue ink.

| Name (Last, First): | CDC Number: | Unit/Cell Number: | Assignment: |
|---|---|---|---|
| Pelayo, S. | P-61090 | CTF-GW-333U | |

**A. Continuation of CDCR 602, Section A only (Explain your issue) :** to take a call mate; that had
formally been on quarantine in Y-Wing (See Appeal No. 49089). After the bed moves done
at the direction of Daguio & Sandoval, did F-Wing surged with COVID19. Daguio had
personally informed me that it was his decision to give me a call mate because I like
to file 602's (See Appeals No. 23212, 37588, 38562 & 39544). On November 15, 2020,
my call mate was moved out as he tested positive for COVID-19. (Claim #2) Deliberate
Reprisals. Three days later, Daguio told me he was moving me to G-Wing, despite that
I was already single cell & received a negative result the previous day. I was moved
to G-Wing, then given a call mate from F-Wing that was sick with COVID. In spite that
I was single cell in F-Wing, Daguio moved me out to G-Wing, then sent me a COVID-19
sick prisoner as a call mate. I had no COVID-19 symptoms before those bed moves. Sgt.
D. Sandoval had told me she didn't care what happens to be because I like to file 602
(id. at 49089).

Inmate/Parolee Signature: By Saul Pelayo    Date Submitted: November 20, 2020

**B. Continuation of CDCR 602, Section B only (Action requested):** In re Staich, that increased the susceptibility of me
contracting COVID-19; 4) increasing the susceptibility of infection for purposes of retaliation for taking
part in protected conduct; and, 5) knowingly failing to adhere to safety protocols specifically quarantine
those inmates who have been in direct contact with any person who has tested positive.

Inmate/Parolee Signature: By Saul Pelayo    Date Submitted: November 20, 2020

*[handwritten: Issued on 6-1-21 F.Riley]*

*[handwritten: Rec'd on 6-1-21 by CTF, 3rd/w, YW, c/o DeMayo @ 1:505 hrs @ cell YW 244L]*

CALIFORNIA DEPARTMENT *of*
**Corrections and Rehabilitation**

## CLAIMANT APPEAL CLAIMS DECISION RESPONSE

**Re:** Appeal Claims Decision Response

**Offender Name:** PELAYO, SAUL                    **Date:** 04/10/2021
**CDC#:** P61090
**Current Location:** CTF-Facility C                **Current Area/Bed:** C XW 2 - 223001U

**Log #:** 000000060938

**Claim #  002**

**Institution/Parole Region of Origin:** Correctional Training Facility        **Facility/Parole District of Origin:** CTF-Facility C
**Housing Area/Parole Unit of Origin:**
**Category:** General Employee
Performance                    **Sub-Category:**    Substandard Performance

### I. ISSUE ON APPEAL

It is appellant's position that appellant was without a cellmate and had tested negative for COVID-19. Appellant contends Correctional Officer M. Daguio and Correctional Sergeant D. Sandoval forced appellant to take a cellmate that had been formally quarantined. Appellant asserts after "F-Wing" surged with positive COVID-19, Correctional Officer Daguio informed appellant the decision to give appellant a cellmate was due to appellant liking to file CDCR Form 602s.

### II. RULES AND REFERENCES

#### A. CONTROLLING AUTHORITY

Title 15, section 3000, 3001, 3004, 3270, 3380, 3391 and 3480

#### B. DOCUMENTS CONSIDERED

CDCR Form 602, Log #60938; Interviews located in the Strategic Offender Management System

### III. REASONING AND DECISION

The Office of Appeals reviewed the claim and the above information. While the Office of Grievances inaccurately noted there was no facts or evidence to substantiate the claim, the Office of Appeals found sufficient information to support that staff did not act outside of policy as indicated by appellant regarding a retaliatory bed move. As such, claim #2 is denied.

### IV. REMEDY

Your claim has been denied. Therefore, there is no applicable remedy.

**Decision: Denied**

After a thorough review of all documents and evidence available at the time of this written decision, it is the order of the Office of Appeals that this claim is denied. This decision exhausts the administrative remedies available to the claimant within CDCR.

| Staff Signature | Title | Date/Time |
|---|---|---|
| H. Moseley [MOHO002] | Chief | 04/09/2021 |

STATE OF CALIFORNIA
**APPEAL OF GRIEVANCE**
CDCR 602-2 (03/20)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

20808

Page 1 of 2

| STAFF USE ONLY | Appeal #: _____ Date Received: _____ |
| | Date Due: _____ |
| | Categories: _____ |
| | Grievance #: _____ |

Claimant Name: Pelayo, S.                    CDCR #: P-61090

Current Housing/Parole Unit CTF-C-FW-345L          Institution/Facility/Parole Region: Correctional Training Fac.

☐ There are no claims that can be appealed.

☐ The following claims cannot be appealed:

Claim #s:

_This is the process to appeal the decision made regarding a claim that is not listed above._

Claim #: 001

Explain the reason for your appeal of any claims not listed above. Be as specific as you can.

_I am dissatisfied with the response I was given because_ the decision response doesn't establish CTF has the means to protect me from contracting COVID-19 and/or related illnesses, possibly resulting in death; it's a asinine response. I incorporate all claims & requests of Appeal No. 20808 as though they were fully written herein. The responder acquiescence my claim, (by their silent response), that I'm not a risk to public safety, were I to be released on parole. Proof thereof is shown that being Mexican, I didn't engage in any of the CTF staged riots of 2018-2019, (i.e., 8/5/18, 10/16/18, 2/7,14,15/2019 & 8/14/2019), all which involved Mexicans. I must exhaust administrative remedies. THEREFORE, NOTICE is hereby given that "IF" & "WHEN" I'm exposed to COVID-19 or related illnesses, I reserve the right of claim without controversy from defendants. Upon my death, I give my family the right of claim in all forms to hold all agents & agencies liable for placing my Health & Safety in jeopardy, as there is no way for CDCR or CTF to guarantee my protection from contacting COVID-19 under its watch; namely by keeping me in a congested, overcrowded environment. RAND notice is hereby served.

Are there documents that would be helpful to support your position? Attach copies of those documents, if you don't have the documents, identify them as best you can below: See attached copies of: (1) Decision Response; (2) 602 & 602-A Submitted; (3) Patient Discharge Instructions; (4) Lifting Restrictions Chrono; (5) Threat Assessment Chrono; (6) CSRA Assessment; (7) Core Men's v.4 Needs Assessment; (8) Personal Relapse Prevention Plan; (9) PCG's Support Letters; (10) Support Network; and, (11) Personal Parole Plans.

STATE OF CALIFORNIA
**APPEAL OF GRIEVANCE**
CDCR 602-2 (03/20)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 2 of 2

**Claim #:**_____

Explain the reason for your appeal. Be as specific as you can.

*I am dissatisfied with the response I was given because*_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Are there documents that would be helpful to support your position? Attach copies of those documents, if you don't have the documents, identify them as best you can below:

_____

_____

_____

_____

_____

_____

**Reminder:** Please attach all documents in your possession that support your claim(s).

Please note that this form and supporting documents will not be returned to you.

**Claimant Signature:** S. Pelayo, P-61090    By J. Pelayo    **Date Signed:** 09/16/2020

MAIL TO:                          Office of Appeals
                    Department of Corrections and Rehabilitation
                              P.O. Box 942883
                             Sacramento, CA 95811

# EXHIBIT 17

# EXHIBIT 17

**INMATE/PAROLEE APPEAL**
CDCR 602 (REV. 03/12)

Side 1

IAB USE ONLY

You may appeal any California Department of Corrections and Rehabilitation (CDCR) decision, action, condition, policy or regulation that has a material adverse effect upon your welfare and for which there is no other prescribed method of departmental review/remedy available. See California Code of Regulations (CCR), Title 15, Section 3084.1. You must send this appeal and any supporting documents to the Appeals Coordinator (AC) within 30 calendar days of the event that led to the filing of this appeal. If additional space is needed, only one CDCR Form 602-A will be accepted. Refer to CCR 3084 for further guidance with the appeal process. No reprisals will be taken for using the appeal process.

Appeal is subject to rejection if one row of text per line is exceeded.    WRITE, PRINT, or TYPE CLEARLY in black or blue ink.

| Name (Last, First): Sanford, Adam | CDC Number: AZ-7450 | Unit/Cell Number: FW-259L | Assignment: Kitchen |
|---|---|---|---|

State briefly the subject of your appeal (Example: damaged TV, job removal, etc.):

Denial of emergency medical care and threats of reprisal for seeking medical care

A. Explain your issue (If you need more space, use Section A of the CDCR 602-A): On Tuesday 12/29/2020
I was denied medical care and threatend by the Sergeant as well as the officers at TTA medical.
I went to TTA at 1310 hrs to inform medical staff that I am having corona virus symptoms and
wanted to be tested for corona virus. However the female Sergeant asked when my last test was

B. Action requested (If you need more space, use Section B of the CDCR 602-A): I want this appeal to be
processed as an emergency appeal as stipulated in CCR Title 15 3084.9 (1)(B) as it
involves my life being in jeopardy and threats being made against me for attempting to
seek emergency medical care. I want to be retested for corona virus before

Supporting Documents: Refer to CCR 3084.3.
☐ Yes, I have attached supporting documents.
List supporting documents attached (e.g., CDC 1083, Inmate Property Inventory; CDC 128-G, Classification Chrono):

_____    _____

_____    _____

☒ No, I have not attached any supporting documents. Reason: I only have one copy of the
Center For Disease Control printout that should have allowed me to speak
with medical staff. However I will produce this document if interview
is given to discuss staff threats

Inmate/Parolee Signature: _____    Date Submitted: 12/29/2020

☐ By placing my initials in this box, I waive my right to receive an interview.

RECEIVED
DEC 30 2020
CTF Appeals

STAFF USE ONLY

C. First Level - Staff Use Only    Staff – Check One: Is CDCR 602-A Attached?  ☐ Yes  ☐ No
This appeal has been:
☐ Bypassed at the First Level of Review. Go to Section E.
☐ Rejected (See attached letter for instruction)  Date: _____    Date: _____    Date: _____
☐ Cancelled (See attached letter)  Date: _____
☐ Accepted at the First Level of Review.
    Assigned to: _____    Title: _____    Date Assigned: _____    Date Due: _____

First Level Responder: Complete a First Level response. Include Interviewer's name, title, interview date, location, and complete the section below.
    Date of Interview: _____    Interview Location: _____
Your appeal issue is:  ☐ Granted   ☐ Granted in Part   ☐ Denied   ☐ Other: _____
    See attached letter. If dissatisfied with First Level response, complete Section D.
Interviewer: _____ (Print Name)   Title: _____   Signature: _____   Date completed: _____
Reviewer: _____ (Print Name)   Title: _____   Signature: _____
Date received by AC: _____

AC Use Only
Date mailed/delivered to appellant ___ / ___ / ___

230

STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL FORM ATTACHMENT**
CDCR 602-A (REV. 03/12)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Side 1

IAB USE ONLY

Attach this form to the CDCR 602, only if more space is needed. Only one CDCR 602-A may be used.
Appeal is subject to rejection if one row of text per line is exceeded.    WRITE, PRINT, or TYPE CLEARLY in black or blue ink.

| Name (Last, First) | CDC Number: | Unit/Cell Number: | Assignment: |
|---|---|---|---|
| Sanford, Adam | AZ7450 | FW-259L | Kitchen |

A.  Continuation of CDCR 602, Section A only (Explain your issue): to which I informed her it was 11/9/2020.
She then told me I would not be allowed to retest for 90 days. I informed the sergeant as
well as the other officers that I had in my possession a printout from Center For Disease Control
That indicated that people who have tested positive for COVID-19 do not need to quarantine or
get tested again for up to 3 months as long as they do not develop symptoms again. It goes
on to say people who develop symptoms again within 3 months of their first bout of COVID-19
may need to be tested again. Yet when I tried to produce the printout none of the officers
or the sergeant would look at it. I informed the sergeant that I wanted to speak with
medical staff as this was an emergency as my life is in jeopardy as well as all who come
into contact with me especially my cell mate however I was denied this and rather the
sergeant as well as present officers began to give me medical advice which by no means
are they qualified to give. I then asked the sergeant if I needed to go man down in order
to speak with medical staff and her reply was "you would go mandown for a COVID test,
what do you want to go SNY?" After that the officer in the cage stood up and said
"you better just fucking leave." This was a complete violation of my right to receive the
necessary medical care during a pandemic and outbreak within this facility. I was
denied medical care by officers who are not qualified to make any medical decisions
by not allowing me to speak with any medical professionals whatsoever during myself having
a medical emergency. Instead I was disrespected and met with threats of reprisal.

Inmate/Parolee Signature: _____    Date Submitted: 12/29/2020

B.  Continuation of CDCR 602, Section B only (Action requested): It has been 90 days since my last test on 11/9/2020.
I want all officers at TTA medical on 12/29/2020 at 1310 hrs. to be identified so when I pursue court
litigation I may know the names of each officer and the female sergeant involved. I also want
these officers and sergeant to be held accountable for denying me the right to receive emergency
medical care and giving out false medical information. I want to leave this facility for fear of
reprisal from this sergeant and officers involved.

Inmate/Parolee Signature: _____    Date Submitted: 12/29/2020

231



CALIFORNIA DEPARTMENT *of*
Corrections and Rehabilitation

## CLAIMANT GRIEVANCE CLAIMS DECISION RESPONSE

**Re:** Grievance Claims Decision Response

**Offender Name:** SANFORD, ADAM JAMES          **Date:** 02/22/2021
**CDC#:** AZ7450

**Current Location:** CTF-Facility D          **Current Area/Bed:** D 005 1 - 000038L

**Log #:** 000000072535

**Claim #: 001**

**Institution/Parole Region of Origin:** Correctional Training Facility          **Facility/Parole District of Origin:** CTF-Facility C
**Housing Area/Parole Unit of Origin:**
**Category:** General Employee Performance          **Sub-Category:** Substandard Performance

### I. CLAIM

Alleges he was denied medical as he requested to be tested for Covid. Alleges an unknown C/O working in medical made an unprofessional comment, "You better just fucking leave" violating policy.

### II. RULES AND REFERENCES

#### A. CONTROLLING AUTHORITY

I. CCR Title 15 Section 3004 Rights and Respect of OthersII. CCR Title 15, Section 3391 Employee Conduct

#### B. DOCUMENTS CONSIDERED

I. OOG Log# 72535 Claim# 001II. Staff Interviews

### III. REASONING AND DECISION

Your allegations of staff misconduct were reviewed by the Hiring Authority or his designee (Chief Deputy Warden) on January 4, 2021, and deemed to be processed as Supervisorial Review.The claimant requested to be COVID-19 tested at East Medical without any medical staff being informed and custody staff saying unprofessional comments. Staff informed the claimant on how to request Treatment Triage Area (TTA) for an emergency or filled out Heath Care Request Form CDCR 7362 for a COVID-19 test. Staff did not deny medical attention nor did staff use profanity toward the claimant at any time. Staff were within policy conducting themselves in a professional manner.The interview statements made by involved staff and inmate were considered. All documentation provided were researched and thoroughly reviewed. Based upon the information received for this claim, no facts, no new evidence, or additional information were gathered which would substantiate your claim.

**Decision: Disapproved**

After a thorough review of all documents and evidence presented at the Office of Grievances Level, it is the order of the Office of Grievance to DISAPPROVE the claim.

If you are dissatisfied with the decision of this claim, you may file a 602-2, appeal with the California Department of Corrections and Rehabilitation Office of Appeals.

| Staff Signature | Title | Date/Time |
|---|---|---|
| L. Martinez [MALU004] | CDW | 02/21/2021 |

229

STATE OF CALIFORNIA
**APPEAL OF GRIEVANCE**
CDCR 602-2 (03/20)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

72535

Page 1 of 2

| **STAFF USE ONLY** | Appeal #:_____ Date Received:_____ |
| | Date Due:_____ |
| | Categories:_____ |
| | Grievance #:_____ |

Claimant Name: _Sanford, Adam_  CDCR #: _AZ7450_

Current Housing/Parole Unit: _Dorm 5 - 38 L_  Institution/Facility/Parole Region: _CTF / Facility D_

☐ There are no claims that can be appealed.

☐ The following claims cannot be appealed:

Claim #s:
_____
_____

_This is the process to appeal the decision made regarding a claim that is not listed above._

Claim #: _001_

Explain the reason for your appeal of any claims not listed above. Be as specific as you can.

_I am dissatisfied with the response I was given because_ it is clear to see that staff were in violation of my rights to receive emergency medical care. If I was informing officers at TTA that I was symptomatic for COVID-19 and requesting to be tested for COVID-19 why for any reason would I not be given any medical care. Staff most certainly used profane language towards me and did indeed deny me medical care which is clear as day to see as I was asking for emergency medical care at the TTA yet was sent away without any care whatsoever. It is not hard for anyone to see that if staff did not deny medical care then I would have received medical care. Therefore my allegations of staff misconduct should have been looked at more seriously for why would an inmate requesting medical care in an emergency be sent away without any unless threatened.

Are there documents that would be helpful to support your position? Attach copies of those documents, if you don't have the documents, identify them as best you can below:

_____
_____
_____
_____
_____

**DISTRIBUTION**    Original: Claimant's File    Copies: DAI, DAPO, and Claimant

232

# EXHIBIT 18

# EXHIBIT 18

| | | | MURDER TIT-FOR-TAT CHRONOLOGY | | |
|---|---|---|---|---|---|

| NO. | DATE | MURDER VICTIM | VICTIM PHOTO | KILLER |
|---|---|---|---|---|
| 1. | 1970-01-13 | W.L. Nolen Cleveland Edwards Alvin Miller |  | CDCR Guards |
| 2. | 1970-01-16 | John V. Mills |  | Blacks/BGF (George Jackson, et al.) |
| 3. | 1970-07-23 | William Shull |  | Blacks/BGF (George Jackson, et al.) |
| 4. | 1971-03-04 | Robert McCarthy |  | Blacks/BGF (Hugo Pinell)  |
| | | | 45 YEARS GO BY | |
| 5. | 2015-08-07 | Hugo Pinell |  | CDCR Guards (still holding a grudge) |
| 6. | 2019-05-00 | CTF Warden Koenig holds Ceremony for 2-4 | "Never forget" | Photo Below |
| 7. | 2020-07-13 | Guard stabbed at | | Black |

| | | | | |
|---|---|---|---|---|
| **MURDER TIT-FOR-TAT CHRONOLOGY** | | | | |
| **NO.** | **DATE** | **MURDER VICTIM** | **VICTIM PHOTO** | **KILLER** |
| | | Folsom | | |
| 8. | 2020-07-20 | Koenig: Operation Akili | Reason: "BGF Gang Activity" | |



"Acting Warden C. Koenig addressed staff and guests and paid his respects to the fallen officers and their families. Their sacrifice impacts our staff today. The staff was challenged and encouraged to never forget these fallen officers."

# EXHIBIT 19

# EXHIBIT 19

STATE OF CALIFORNIA
# GOVERNMENT CLAIM
DGS ORIM 006 (Rev. 08/19)

DEPARTMENT OF GENERAL SERVICES
OFFICE OF RISK AND INSURANCE MANAGEMENT

Government Claim Number: 20010657

## CLAIMANT INFORMATION

| LAST NAME | FIRST NAME | MIDDLE INITIAL |
|---|---|---|
| Pelayo | Saul | |

| INMATE OR PATIENT IDENTIFICATION NUMBER (if applicable) | BUSINESS NAME (if applicable) | |
|---|---|---|
| CDCR# P-61090 | | |

| TELEPHONE NUMBER | EMAIL ADDRESS | | |
|---|---|---|---|

| MAILING ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| Correctional Training Facility/ HWY 101 N./ P.O. Box 689 | Soledad | CA | 93960 |

| IS THE CLAIMANT UNDER 18 YEARS OF AGE? | INSURED NAME (Insurance Company Subrogation) | |
|---|---|---|
| ☐ Yes  ☒ No | | |

| IS THIS AN AMENDMENT TO A PREVIOUSLY EXISTING CLAIM? | EXISTING CLAIM NUMBER (if applicable) | EXISTING CLAIMANT NAME (if applicable) |
|---|---|---|
| ☐ Yes  ☒ No | | |

## ATTORNEY OR REPRESENTATIVE INFORMATION

| LAST NAME | FIRST NAME | MIDDLE INITIAL |
|---|---|---|
| pro per | | |

| TELEPHONE NUMBER | EMAIL ADDRESS | | |
|---|---|---|---|
| N/A | | | |

| MAILING ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| N/A | | | |

## CLAIM INFORMATION

| STATE AGENCIES OR EMPLOYEES AGAINST WHOM THE CLAIM IS FILED CTF's Prison Personnel, to wit: PDP, CMO, CME; prison Lieutenants J. Raed; C. Whitman; L. Kuster; prison guards H. Romero; J. Nunez; M. Dapulio; L. Lopez; Garcia; M.G.Zavala; Sgt. D. Sandoval; DOES 1-6 | DATE OF INCIDENT June 6, 2020 |
|---|---|

LATE CLAIM EXPLANATION (Required, if incident was more than six months ago)

| DOLLAR AMOUNT OF CLAIM Non-Limited | CIVIL CASE TYPE (Required, if amount is more than $10,000) ☐ Limited ($25,000 or less) ☒ Non-Limited (over $25,000) |
|---|---|

DOLLAR AMOUNT EXPLANATION
To be determined by a jury or court sitting without a jury

INCIDENT LOCATION
Correctional Training Facility / HWY 101 N. / P.O. Box 689 / Soledad, CA 93960

SPECIFIC DAMAGE OR INJURY DESCRIPTION
Chronic Kidney Disease Stage II; State & Federal Constitutional Violations; COVID-19 and related illnesses; Emotional Distress; Hardship;

CIRCUMSTANCES THAT LED TO DAMAGE OR INJURY
CTF prison staff's deliberate indifference to my Health & Safety; displaying a callous disregard to my Health & Safety despite obvious needed care.

EXPLAIN WHY YOU BELIEVE THE STATE IS RESPONSIBLE FOR THE DAMAGE OR INJURY
While acting under the color of law, they failed to timely respond to the medical needed care and accommodation; they were deliberate indifferent waiting for it to reach an irreparable stage before intervening, thereafter retaliated for grieving the issues.

Ex. 90:1

STATE OF CALIFORNIA
**GOVERNMENT CLAIM**
DGS ORIM 006 (Rev. 08/19)

DEPARTMENT OF GENERAL SERVICES
OFFICE OF RISK AND INSURANCE MANAGEMENT

| AUTOMOBILE CLAIM INFORMATION | N/A | | |
|---|---|---|---|
| DOES THE CLAIM INVOLVE A STATE VEHICLE? <br> ☐ Yes ☐ No | | VEHICLE LICENSE NUMBER (if known) | STATE DRIVER NAME (if known) |
| HAS A CLAIM BEEN FILED WITH YOUR INSURANCE CARRIER? <br> ☐ Yes ☐ No | | INSURANCE CARRIER NAME | INSURANCE CLAIM NUMBER |
| HAVE YOU RECEIVED AN INSURANCE PAYMENT FOR THIS DAMAGE OR INJURY? <br> ☐ Yes ☐ No | | AMOUNT RECEIVED (if any) | AMOUNT OF DEDUCTIBLE (if any) |

**NOTICE AND SIGNATURE**

I declare under penalty of perjury under the laws of the State of California that all the information I have provided is true and correct to the best of my information and belief. I further understand that if I have provided information that is false, intentionally incomplete, or misleading I may be charged with a felony punishable by up to four years in state prison and/or a fine of up to $10,000 (Penal Code section 72).

| SIGNATURE <br> *By Saul Pelayo* | PRINTED NAME <br> Saul Pelayo | DATE <br> 11/22/2020 |
|---|---|---|

**INSTRUCTIONS**

- Include a check or money order for $25, payable to the State of California.
  - $25 filing fee is not required for amendments to existing claims.
- Confirm all sections relating to this claim are complete and the form is signed.
- Attach copies of any documentation that supports your claim. Do not submit originals.

Mail the claim form and all attachments to:
Office of Risk and Insurance Management
Government Claims Program
P.O. Box 989052, MS414
West Sacramento, CA 95798-9052

Claim forms can also be delivered to:
Office of Risk and Insurance Management
Government Claims Program
707 3rd Street, 1st Floor
West Sacramento, CA 95605
1-800-955-0045

---

**Department of General Services Privacy Notice on Information Collection**

This notice is provided pursuant to the Information Practices Act of 1977, California Civil Code Sections 1798.17 & 1798.24 and the Federal Privacy Act (Public Law 93-579).

The Department of General Services (DGS), Office of Risk and Insurance Management (ORIM), is requesting the information specified on this form pursuant to Government Code Section 905.2(c).

The principal purpose for requesting this data is to process claims against the state The information provided will/may be disclosed to a person, or to another agency where the transfer is necessary for the transferee-agency to perform its constitutional or statutory duties, and the use is compatible with a purpose for which the information was collected and the use or transfer is accounted for in accordance with California Civil Code Section 1798.25.

Individuals should not provide personal information that is not requested.

The submission of all information requested is mandatory unless otherwise noted. If you fail to provide the information requested to DGS, or if the information provided is deemed incomplete or unreadable, this may result in a delay in processing.

**Department Privacy Policy**
The information collected by DGS is subject to the limitations in the Information Practices Act of 1977 and state policy (see State Administrative Manual 5310-5310.7). For more information on how we care for your personal information, please read the DGS Privacy Policy.

**Access to Your Information**
ORIM is responsible for maintaining collected records and retaining them for 5 years. You have a right to access records containing personal information maintained by the state entity. To request access, contact:

DGS ORIM
Public Records Officer
707 3rd St., West Sacramento, CA 95605
(916) 376-5300

Rec'd on 3-16-2021
@ cell @ 2028 hrs , c/o R. Saenz

**DGS** GENERAL SERVICES

Governor Gavin Newsom

03/12/2021

Saul Pelayo P61090
P.O. Box 689
Soledad, CA 93960

RE: Claim 20010657 for Saul Pelayo P61090 against Department of Corrections
and Rehabilitation

Dear Saul Pelayo,

Government Claims Program (GCP) staff completed its investigation of your claim
and rejected it for the following reasons.

The claim involves complex issues that are beyond the scope of analysis and legal
interpretation typically undertaken by the GCP. Claims involving complex issues are
best determined by the courts. Therefore, staff did not make a determination
regarding the merit of the claim, and it is being rejected so you can initiate court
action if you choose to pursue this matter further.

If you choose to pursue court action in this matter, it is not necessary or proper to
include the GCP in your lawsuit unless the GCP was identified as a defendant in your
original claim. Please consult Government Code section 955.4 regarding proper
service of the summons.

If you have questions about this matter, please feel free to contact GCP by phone,
mail, or email using the contact information below. Please remember to reference
the assigned claim number (20010657) in your communication.

Sincerely,

Eric Rivera, Program Analyst
Government Claims Program
gcinfo@dgs.ca.gov

**WARNING:** Subject to certain exceptions, you have only six (6) months from the
date this notice was personally delivered or deposited in the mail to file a court action
on this claim. See Government Code Section 945.6. You may seek the advice of an
attorney of your choice in connection with this matter. If you desire to consult an
attorney, you should do so immediately.

**DGS** CALIFORNIA DEPARTMENT OF
GENERAL SERVICES

Governor Gavin Newsom

## DECLARATION OF SERVICE BY U.S. MAIL

Name of Claimant: Saul Pelayo
GCP File no.: 20010657

I am employed by the Government Claims Program. I am 18 years of age or older. I am familiar with the business practice at the Government Claims Program for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Government Claims Program is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business. On 03/12/2021, I served the attached letter by placing a true copy thereof enclosed in a sealed envelope in the internal mail collection system at the Government Claims Program, located at 707 Third Street, West Sacramento, CA 95605, addressed as follows:

Saul Pelayo
P.O. Box 689
Soledad, CA 93960

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on 03/12/2021, at West Sacramento, California.

_Eric Rivera_ (signature)

Eric Rivera

Office of Risk and Insurance Management | *State of California* | *Government Operations Agency*
*707 3rd Street, 1st Floor | West Sacramento, CA 95605 | t 800-955-0045 f 916-376-6387*
Ex. 90:4

# EXHIBIT 20

# EXHIBIT 20

Opinion

# The COVID-19 Pandemic and the \$16 Trillion Virus

**VIEWPOINT**

**David M. Cutler, PhD**
Department of Economics, Harvard University, Cambridge, Massachusetts.

**Lawrence H. Summers, PhD**
Harvard Kennedy School, Cambridge, Massachusetts.


Viewpoint pages 1491 and 1493 and Editorial pages 1502 and 1504


Related article page 1562

**The SARS-CoV-2** (severe acute respiratory syndrome coronavirus 2) pandemic is the greatest threat to prosperity and well-being the US has encountered since the Great Depression. This Viewpoint aggregates mortality, morbidity, mental health conditions, and direct economic losses to estimate the total cost of the pandemic in the US on the optimistic assumption that it will be substantially contained by the fall of 2021. These costs far exceed those associated with conventional recessions and the Iraq War, and are similar to those associated with global climate change. However, increased investment in testing and contact tracing could have economic benefits that are at least 30 times greater than the estimated costs of the investment in these approaches.

Since the onset of coronavirus disease 2019 (COVID-19) in March, 60 million claims have been filed for unemployment insurance. Before COVID-19, the greatest number of weekly new unemployment insurance claims (based on data from 1967 on) was 695 000 in the week of October 2, 1982. For 20 weeks beginning in late March 2020, new unemployment claims exceeded 1 million per week; as of September 20, new claims have been just below that amount.

---

## The total cost [of the pandemic] is estimated at more than \$16 trillion, or approximately 90% of the annual gross domestic product of the US.

Recessions feed on themselves. Workers not at work have less to spend, and thus subsequent business revenue declines. The federal government offset much of the initial loss owing to the shutdown, which has averted what would likely have been a new Great Depression. But the virus is ongoing, and thus full recovery is not expected until well into the future. The Congressional Budget Office projects a total of \$7.6 trillion in lost output during the next decade.[1]

Lower output is not the only economic cost of COVID-19; death and reduced quality of life also can be measured in economic terms. To date, approximately 200 000 deaths have been directly attributable to COVID-19; many more will doubtless occur. In the US, approximately 5000 COVID-19 deaths are occurring per week and the estimated effective reproduction number ($R_t$ [ie, the average number of people who become infected by a person with SARS-CoV-2 infection]) is approximately 1. If these rates continue, another 250 000 deaths can be expected in the next year. Seasonal factors could increase mortality, although whether COVID-19 will display a regular seasonal pattern is unknown. In addition to COVID-19 deaths, studies suggest increased deaths from other causes, amounting to almost 40% of COVID-19–related deaths. Thus, if the current trajectories continue, an estimated 625 000 cumulative deaths associated with the pandemic will occur through next year in the US.

Although putting a value on a given human life is impossible, economists have developed the technique of valuing "statistical lives"; that is, measuring how much it is worth to people to reduce their risk of mortality or morbidity. This approach has been used as a standard in US regulatory policy and in discussions of global health policy.[2]

There is a lengthy economic literature assessing the value of a statistical life; for example, in environmental and health regulation. Although no single number is universally accepted, ranges are often used. In environmental and health policy,[3] for example, a statistical life is assumed to be worth \$10 million. With a more conservative value of \$7 million per life, the economic cost of premature deaths expected through the next year is estimated at \$4.4 trillion.

Some individuals who survive COVID-19 are likely to have significant long-term complications, including respiratory, cardiac, and mental health disorders, and may have an increased risk of premature death. Data from survivors of COVID-19 suggest that long-term impairment occurs for approximately one-third of survivors with severe or critical disease.[4] Because there are approximately 7 times as many survivors from severe or critical COVID-19 disease as there are COVID-19 deaths, long-term impairment might affect more than twice as many people as the number of people who die.

Given the predominance of respiratory complications among COVID-19 survivors, affected individuals may be like those with moderate chronic obstructive pulmonary disease, which has been estimated to have a quality-of-life disutility of approximately −0.25 to −0.35. Assuming a total reduction in quality-adjusted life expectancy, including length as well as quality of life, of 35% and taking into consideration the assumed value of a year of life yields an estimated loss from long-term complications of \$2.6 trillion for cases forecast through the next year.

Even individuals who do not develop COVID-19 are affected by the virus. Loss of life among friends and loved ones, fear of contracting the virus, concern about economic security, and the effects of isolation and loneliness have all taken a toll on the mental health of the population. The proportion of US adults who report symptoms of depression or anxiety has averaged approximately 40% since April 2020; the comparable figure in early 2019 was 11.0%.[5] These data translate to an estimated 80 million additional individuals with these mental health conditions related to COVID-19. If, in line with prevailing estimates, the cost of these conditions is valued at about \$20 000 per person per year and the mental health symptoms

**Corresponding Author:** David M. Cutler, PhD, Department of Economics, Harvard University, 1805 Cambridge St, Cambridge, MA 02138 (dcutler@fas.harvard.edu).

© 2020 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ on 01/22/2023

Opinion    Viewpoint

| Category | Cost (billions), US$ |
|---|---|
| Lost GDP | 7592 |
| Health loss | |
|    Premature death | 4375 |
|    Long-term health impairment | 2572 |
|    Mental health impairment | 1581 |
| Total | 16 121 |
| Total for a family of 4 | 196 475 |
| % of annual GDP | 90 |

Table. Estimated Economic Cost of the COVID-19 Crisis

Abbreviation: GDP, gross domestic product.

last for only 1 year, the valuation of these losses could reach approximately $1.6 trillion.

The estimated cumulative financial costs of the COVID-19 pandemic related to the lost output and health reduction are shown in the **Table**. The total cost is estimated at more than $16 trillion, or approximately 90% of the annual gross domestic product of the US. For a family of 4, the estimated loss would be nearly $200 000. Approximately half of this amount is the lost income from the COVID-19–induced recession; the remainder is the economic effects of shorter and less healthy life.

Output losses of this magnitude are immense. The lost output in the Great Recession was only one-quarter as large. The economic loss is more than twice the total monetary outlay for all the wars the US has fought since September 11, 2001, including those in Afghanistan, Iraq, and Syria.[6] By another metric, this cost is approximately the estimate of damages (such as from decreased agricultural productivity and more frequent severe weather events) from 50 years of climate change.[7]

For this reason, policies that can materially reduce the spread of SARS-CoV-2 have enormous social value. Consider a policy of widescale population testing, contact tracing, and isolation. For example, assuming 100 000 individuals are tested, the cost of testing would be approximately $6 million. According to current values for SARS-CoV-2 prevalence in some areas, approximately 5000 people will test positive.

Many infections could be prevented by this approach. Not every person who tests positive for SARS-CoV-2 is infectious; perhaps 20% of people who test positive are sufficiently late in the course of infection that transmission probabilities are low.[8] In addition, approximately 25% of people who test positive would likely not quarantine.[9] However, given an $R_t$ of about 1, reducing transmission by 45% could lead to approximately 2750 fewer positive cases. This could prevent about 14 deaths (estimated value ≈ $96 million) and about 33 critical and severe cases (estimated value ≈ $80 million). These subsequent cases not occurring could ultimately lead to even fewer cases, but even ignoring that, the projected economic return from the test and trace strategy is approximately 30 times the cost (ie, investment of approximately $6 million leads to averted costs of an estimated $176 million).

The Rockefeller Foundation estimates that a policy of 30 million tests weekly would require an additional $75 billion in spending during the next year[10]; adding the cost of contact tracing might bring the total to approximately $100 billion.

Congress is currently discussing whether to provide economic support to mitigate the economic damage caused by COVID with legislation following up on the Coronavirus Aid, Relief, and Economic Security (CARES) Act. The highest-return investments that should be included in such legislation are increased testing and contact tracing. A minimum of 5% of any COVID economic relief intervention should be devoted to such health measures.

More generally, the immense financial loss from COVID-19 suggests a fundamental rethinking of government's role in pandemic preparation. Currently, the US prioritizes spending on acute treatment, with far less spending on public health services and infrastructure. As the nation struggles to recover from COVID-19, investments that are made in testing, contact tracing, and isolation should be established permanently and not dismantled when the concerns about COVID-19 begin to recede.

**ARTICLE INFORMATION**

**Published Online:** October 12, 2020.
doi:10.1001/jama.2020.19759

**Conflict of Interest Disclosures:** Dr Cutler reports receiving fees from serving as an expert witness for opioid and vaping litigation, personal fees for article preparation from the Brookings Institution, and research support from the Pharmaceutical Research and Manufacturers of America outside the submitted work. He is also a commissioner of the Health Policy Commission in Massachusetts. Dr Summers reports receiving personal fees from various financial institutions outside the submitted work and personal fees for article preparation from the Brookings Institution.

**Funding/Support:** This work was funded by the National Institute on Aging under award P01AG005842.

**Role of the Funder/Sponsor:** The National Institute on Aging had no role in the preparation, review, or approval of the manuscript; and decision to submit the manuscript for publication.

**Additional Information:** More information on the calculations is available at http://scholar.harvard.edu/cutler.

**REFERENCES**

1. Congressional Budget Office. *An Update to the Economic Outlook: 2020 to 2030*. Congressional Budget Office; 2020.

2. Jameson D, Summers L, Alleyne G, et al Global health 2035: a world converging in a generation. *Lancet*. 2013;382:1898-1955.

3. Robinson L. COVID-19 and uncertainties in the value per statistical life. *Regulatory Review*. August 5, 2020.

4. Ahmed H, Patel K, Greenwood D, et al Long-term clinical outcomes in survivors of coronavirus outbreaks after hospitalization or ICU admission: a systematic review and meta-analysis of follow-up studies. *medRxiv*. Preprint posted April 22, 2020. doi:10.1101/2020.04.16.20067975

5. Centers for Disease Control and Prevention. Mental health: Household Pulse Survey. Accessed September 5, 2020. https://www.cdc.gov/nchs/covid19/pulse/mental-health.htm

6. Crawford NC. United States budgetary costs and obligations of post-9/11 wars through FY2020: $6.4 trillion. November 13, 2019. https://watson.brown.edu/costsofwar/files/cow/imce/papers/2019/US%20Budgetary%20Costs%20of%20Wars%20November%202019.pdf

7. Nordhaus W. Projections and uncertainties about climate change in an era of minimal climate policies. *Am Economic J*. 2018;10(3):333-360. doi:10.1257/pol.20170046

8. World Health Organization. Criteria for releasing COVID-19 patients from isolation. Scientific Brief. June 17, 2020. https://www.who.int/publications/i/item/criteria-for-releasing-covid-19-patients-from-isolation

9. Bilinski A, Mostashari F, Salomon JA. Modeling contact tracing strategies for COVID-19 in the context of relaxed physical distancing measures. *JAMA Netw Open*. 2020;3(8):e2019217. doi:10.1001/jamanetworkopen.2020.19217

10. Rockefeller Foundation. National Covid-19 testing and tracing action plan. July 16, 2020. Accessed September 5, 2020. https://www.rockefellerfoundation.org/wp-content/uploads/2020/07/TheRockefellerFoundation_ExecutiveSummary_7_20.pdf

© 2020 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ on 01/22/2023

# EXHIBIT 21

# EXHIBIT 21

*Welcome to California's*

# 2020-21

# Governor's Budget

RELEASED ON JANUARY 10, 2020

# Proposed Budget Detail

The following table presents budget year positions and expenditures for each agency area. These totals are comprised of State funds which include General Fund, special funds, and selected bond funds. These totals do not include federal funds, other non-governmental cost funds, or reimbursements.

| State Agencies | Positions | General Fund* | Special Funds* | Bond Funds* | Total State Funds* |
|---|---|---|---|---|---|
| Business, Consumer Services, and Housing | 6,029.5 | $349,906 | $1,024,591 | $1,082,912 | $2,457,409 |
| **TOTALS** | **384,792.9** | **$153,083,298** | **$63,757,896** | **$5,351,539** | **$222,192,733** |

| State Agencies | Positions | General Fund* | Special Funds* | Bond Funds* | Total State Funds* |
|---|---|---|---|---|---|
| Corrections and Rehabilitation | 57,087.1 | $13,387,521 | $3,129,605 | $- | $16,517,126 |
| Environmental Protection | 5,965.7 | $142,873 | $3,782,578 | $18,066 | $3,943,517 |
| General Government | 12,553.0 | $4,461,466 | $6,692,362 | $8,998 | $11,162,826 |
| Government Operations | 19,436.5 | $1,425,113 | $351,081 | $7,916 | $1,784,110 |
| Health and Human Services | 32,442.5 | $47,476,340 | $23,780,688 | $- | $71,257,028 |
| Higher Education | 163,567.1 | $17,508,587 | $194,848 | $418,503 | $18,121,938 |
| K thru 12 Education | 2,524.7 | $59,638,902 | $427,588 | $1,541,387 | $61,607,877 |
| Labor and Workforce Development | 11,025.1 | $163,643 | $887,133 | $- | $1,050,776 |
| Legislative, Judicial, and Executive | 13,153.5 | $4,382,782 | $3,586,111 | $539,749 | $8,508,642 |
| Natural Resources | 20,541.8 | $3,905,704 | $1,791,831 | $1,106,457 | $6,803,992 |
| Transportation | 40,466.4 | $240,461 | $18,109,480 | $627,551 | $18,977,492 |
| **TOTALS** | **384,792.9** | **$153,083,298** | **$63,757,896** | **$5,351,539** | **$222,192,733** |

\* Dollars in thousands

Download CSV    Printable Table

## 5225   Department of Corrections and Rehabilitation - Continued

| | | Positions | | | Expenditures | | |
|---|---|---|---|---|---|---|---|
| | | 2018-19 | 2019-20 | 2020-21 | 2018-19* | 2019-20* | 2020-21* |
| | Administration | | | | | | |
| 4585 | Rehabilitative Programs-Adult Education | 1,357.4 | 1,356.8 | 1,359.1 | 227,143 | 240,985 | 244,089 |
| 4590 | Rehabilitative Programs-Cognitive Behavioral Therapy and Reentry Services | 166.6 | 159.3 | 166.2 | 117,715 | 129,484 | 190,025 |
| 4595 | Rehabilitative Programs-Adult Inmate Activities | 244.6 | 274.8 | 274.8 | 73,961 | 85,418 | 91,073 |
| 4600 | Rehabilitative Programs-Adult Administration | 167.5 | 201.6 | 200.9 | 22,194 | 25,031 | 25,053 |
| 4650 | Medical Services-Adult | 9,554.4 | 9,825.6 | 9,959.4 | 2,085,624 | 2,193,446 | 2,217,380 |
| 4655 | Dental Services-Adult | 964.6 | 1,037.0 | 1,035.3 | 173,176 | 178,336 | 178,935 |
| 4660 | Mental Health Services-Adult | 2,324.8 | 2,757.3 | 2,804.0 | 458,309 | 476,396 | 462,382 |
| 4661 | Psychiatric Program-Adult | 1,489.9 | 2,015.8 | 2,008.8 | 283,104 | 296,605 | 296,552 |
| 4665 | Ancillary Health Care Services-Adult | - | - | - | 393,487 | 413,080 | 435,010 |
| 4670 | Dental and Mental Health Services Administration-Adult | 245.3 | 251.7 | 252.8 | 49,724 | 51,022 | 51,641 |
| **TOTALS, POSITIONS AND EXPENDITURES (All Programs)** | | 57,589.8 | 57,726.6 | 56,998.9 | $12,597,346 | $13,320,052 | $13,394,852 |

| FUNDING | | 2018-19* | 2019-20* | 2020-21* |
|---|---|---|---|---|
| 0001 | General Fund | $12,260,035 | $12,991,819 | $13,088,380 |
| 0001 | General Fund, Proposition 98 | 18,306 | 21,893 | - |
| 0831 | California State Lottery Education Fund California Youth Authority | 63 | 104 | - |
| 0890 | Federal Trust Fund | 1,110 | 1,999 | 1,647 |
| 0917 | Inmate Welfare Fund | 73,961 | 86,418 | 92,073 |
| 0942 | Special Deposit Fund | 2,322 | 1,825 | 1,956 |
| 0995 | Reimbursements | 241,912 | 215,378 | 210,594 |
| 3085 | Mental Health Services Fund | 637 | 1,616 | 1,202 |
| 8059 | State Community Corrections Performance Incentive Fund | -1,000 | -1,000 | -1,000 |
| **TOTALS, EXPENDITURES, ALL FUNDS** | | $12,597,346 | $13,320,052 | $13,394,852 |

## LEGAL CITATIONS AND AUTHORITY

DEPARTMENT AUTHORITY

Government Code Title 2, Division 3, Part 2.5, Chapter 1, Article 14

PROGRAM AUTHORITY

4515-Juvenile Operations and Juvenile Offender Programs:
Government Code section 12838.1. Welfare and Institutions Code sections 1000-1000.7, 1700, 1701, and 1710. Penal Code section 6001.

4520-Juvenile Academic and Vocational Education:
Welfare and Institutions Code sections 1120.1 and 1120.2. Penal Code section 6001.

4525-Juvenile Health Care Services:
Welfare and Institutions Code section 1700. Penal Code section 6001.

4530-4550-Adult Corrections and Rehabilitation Operations - General Security; Inmate Support; Contracted Facilities; Institution Administration: Government Code section 12838.1(c). Penal Code sections 1168, 1170, 1203.03, 2910, 2910.5, 2910.6, 4750-4754, 4758, 5068, 5080, and 6250-6258. Welfare and Institutions Code, Division 3.

4555-4565-Parole Operations - Adult Supervision; Adult Community Based Programs; Adult Administration:
Government Code section 12838.1(c). California Code of Regulations, Title 15, Division 3. Penal Code sections 3000-3073, and 5058.

* Dollars in thousands, except in Salary Range. Numbers may not add or match to other statements due to rounding of budget details.

# EXHIBIT 22

# EXHIBIT 22



# They came for us in the morning: What prison officials don't want you to know about the raid on 200+ incarcerated Black people at Soledad

September 2, 2020



In prison, Talib Williams is known as "the student" — always studying, learning and teaching.

*by Talib Williams*

Emmett Till, the Scottsboro Boys, the Central Park 5, and the list goes on. The ramifications of being falsely accused of a crime in America can be, and often have been, deadly for Black people.

Since the horrors of the European capitalist-economic enterprise known as the Atlantic Slave Trade, Black people – primarily Black men – have been lynched, burned alive, castrated and subjected to every other form of torture imaginable, as a result of being falsely accused of a crime. On the surface, these accusations seem to be rooted in fear and ignorance, but when investigated, are proven to be rooted in nothing other than a device on behalf of the dominant capitalist, white supremacist or patriarchal culture to maintain a position of power.

Not too long ago, we witnessed an attempt at jeopardizing the life of a Black man in Central Park. Just hours before George Floyd was murdered by four Minneapolis police officers, this man, who was birdwatching, politely asked a white woman to leash her dog. Her hostile call to police came not out of fear or ignorance, but was due to a boldness provided by her knowledge of how Black men in particular are viewed now and historically in this country.

Her attempt on the life of this Black man reveals the ever-present reality of what it means to be Black in America: to live in fear of being hunted. Media outlets immediately noted that things could and likely would have been drastically different had the incident not been caught on camera. Protesters and activists throughout the world held up and continue to hold up signs asking this very question about the latest string of televised crimes against Black people, "How many weren't caught on camera?" But what about places where there are no cameras?

As an incarcerated person, I immediately began to reflect on my present reality and what those who are incarcerated know all too well: namely that what occurs in public throughout America has been taking place in the darkness of America's prison system since its inception. "The prison is the place where state power is perhaps more forcefully experienced and publicly legitimized without being seen," writes Dan Berger in "Captive Nation."

"In other words, the prison is an example of state power at its most violent extreme, as well as an example of the way that power cloaks itself in invisibility," he writes.

The lens through which we have been allowed to look into California's prison system is the darkest opaque. Oftentimes, it takes a major incident for light to be shone on prisons: a riot, stabbing, major contraband bust, anything to slant public opinion against the incarcerated.

But when something takes place that puts the integrity of correctional officers, and ultimately the entire system itself into question, silence abounds.



Soledad CTF prison

In the aftermath of the violent 3 a.m. raid on approximately 200 incarcerated Black people at Soledad State Prison on July 20 – if it wasn't for the tireless effort of my wife, Tasha Williams, whose article in the San Francisco Bay View first alerted the world to what happened here at Soledad, as well as the tireless effort of countless wives, family members and loved ones sharing her article and the stories of their incarcerated friends and family who were brutalized, the world would, without doubt, still be in the dark about what happened to us.

Prison officials, on the other hand, waited an entire week before releasing a statement, and still it was only after and in response to receiving thousands of phone calls and emails from across the country culminating in protests in front of the prison that the spokesperson for Soledad State Prison released a statement to the public.

The statement denied the injuries, denied we were targeted because of our race, and most telling of all, that statement would not have been released had it not been for the continuous pressure from both inside and, more importantly, outside organizers against a system that thrives in silence. The prison's silence was an attempt to "cloak itself in invisibility," and yet their public statement was an attempt to do the same.

The following is a detailed first-hand account and contextualizing of what really happened in the early morning hours of July 20, 2020, at Soledad CTF (Correctional Training Facility), as well as the events that followed.

When I was violently snatched out of my sleep and slammed into the wall head first off the top bunk, I thought I was dreaming. I didn't know what was going on; all I heard was yelling and felt hands grabbing my arms and legs. With a knee in my back, my hands were zip-tied and I was forcefully snatched up by my throat and dragged out of the cell.

As soon as my eyes were able to adjust enough to glance to the right, I heard my cell mate, a 55-year-old man with degenerative disc disease in his spine, a chronic shoulder injury, and who is a diabetic, crying out that they were hurting his arm. I could see what I believe were two men wearing helmets, equipped with night vision, wearing fatigues, with black marks covering their faces entirely, doing to him what had been done to me.



A group of faculty and staff from a local high school visit Soledad Prison. – Photo: Chelcey Adami

I was carried out of the housing unit barefoot, wearing nothing but boxer briefs, forced to walk on a filthy floor down the central corridor, towards the dining hall. Along the way I could see and hear the same thing happening in every unit we passed, officers yelling "drag him" referring to people who had already been ripped violently from their sleep.

The atmosphere was filled with fear and uncertainty. To my surprise, when we turned into the dining hall, I saw close to 200 incarcerated people looking as shocked as I was. Shocked that it was so early in the morning, and at the fact that we were raided in a way never before seen at Soledad.

Never has a group of people who haven't been involved in any disruptive activity – and who haven't even been arrested for committing a crime – been raided the way we were. Even when someone commits a crime, they are not raided the way we were raided.

I have been in prison going on 19 years and I have never seen or heard of a group of people having been raided the way we were. But walking out of the dark housing unit, into the brightly lit corridor, I noticed patches across officers' chests that told me this wasn't a normal raid.

This was an inter-agency operation, a joint team or special ops, security squad officers – SSU (Special Services Unit) and IGI (Institutional Gang Investigators) – from both Soledad CTF and neighboring Salinas Valley State Prison, as well as CDCR Sacramento, Office of Correctional Safety (OCS), and Special Services Unit Gang Intel Ops (SSU).

But even more than that, we were shocked at the fact that every single person sitting there in the dining hall was Black. Every age group from early 20s to late 70s. Nobody knew anything. Everyone was complaining about their injuries and the way we were raided.

Zip-tied, sitting on stainless steel stools, practically naked in a freezing kitchen during the worst pandemic to hit the world in over a hundred years, we soon realized something that was clearly not the concern of whoever was in charge of this operation: We were sitting next to each other without our masks. We immediately began to demand that we be provided face masks, but just like our demands for medical attention, we were ignored.

We sat there in anger, frustration, fear and, possibly more than anything else, confusion. No one could make sense of "why." Why, after the prison's Black population was congratulated and praised by the warden on institutional television for helping maintain a peaceful and positive program, were we being treated so inhumanely?

But the longer we sat there, a troubling picture began to emerge; people spoke to being told by masked officers, "Black lives don't matter." Listening to everyone's experiences, I thought to myself, "This can't be happening!" at which point I heard an officer tell one person who was complaining about the fact that we were crammed next to each other without masks: "I hope you motherfuckers get COVID!"

The environment was hostile; an officer was in the guntower pointing his rifle at us, which led to an uproar and chant of "Black Lives Matter," which resulted in Black buddies being carried away. It was around this time that one brother from my building, Bernard Harris, told me my hands were purple – I was so cold that I couldn't feel that my hands had lost circulation due to the tightness of the zip-ties.

I immediately walked over to an officer named Brown and showed him my hands and he helped another officer, who looked horrified, cut off the zip-ties and replaced them with a looser pair. This was the only relief I experienced while sitting in that dining hall and I don't believe this could be separated from the fact that Brown was the only Black correctional officer present during our entire ordeal in that dining hall.

Brown is a regular correctional officer, not part of the Security Squad – Investigations Services Unit (ISU) and IGI – or the extraction team, which also included members of the Security Squad, as well as Sacramento's Special Services Unit Gang Intel Ops (SSU), all of whom were either white or of an ethnicity that possesses an inroad to whiteness.

While there are cries throughout the world of "defund police" and diversify the ranks of police forces, making them more "racially inclusive," what happened in the early morning hours of July 20, 2020, here at Soledad begs the question: How much more humanely would our Black bodies have been treated had there been more Black officers present?

When I returned to where I was seated, almost every other individual in that dining hall had to have their zip-ties cut off due to loss of circulation. We sat in that cold dining hall shivering for six hours, some of us zip-tied the entire time.

When we raised hell to use the bathroom, we were walked to the back of the kitchen to a secluded part of the prison one at a time, forced to walk barefoot in the officers spit on an already urine-covered bathroom floor. I was forced to strip naked and when I complained, I was told, "You shouldn't have been Black."

Every time I tried to get a glimpse of an officer's name tag, there was none, only patches that read "CTR/SVSP" and "police." One officer, who came over to where we were waiting to go to the bathroom, however, was recognizable as Third Watch Building

Officer Martinez, a known racist with multiple complaints against him for making racist comments and attempting to incite hostilities between the Black and Latinx populations.

It still remains unclear as to why he, a regular correctional officer, was there dressed as a member of the extraction team. Had he been one of the officers who violently extracted incarcerated people (while sleeping) from their beds in the very building he's responsible for managing five days a week? Is this why they covered their faces and wore no name tags?

But Martinez wanted to be seen. Like a sadistic predator circling back to see its victim, he couldn't help but show his face. However, his presence raises another question: During a pandemic that has forced CDCR officers and officials to take a 10 percent pay cut due to the governor's budget and be prohibited from working overtime, per their agreement, how is it that he was able to work overtime coming to work during non-work hours to play "Army"?

This wasn't just my experience alone. Every other Black person in that dining hall early that morning had a similar, and some an even worse experience. One person who was victimized – Erwin Harris, T25610 – was pulled violently off his top bunk, dragged out of his cell, zip-tied and pushed down a flight of stairs. He had to be taken to medical in a wheelchair.

Another person victimized, Eric Frazier, C62189, also had to be taken to medical in a wheelchair, having been dragged violently out of his cell despite telling his captors he had a pre-existing back and hip injury. He was met with racial slurs while his seemingly lifeless body – according to one eye-witness who wishes to remain anonymous – was dragged to the corridor, when finally a wheelchair was requested.

Another person victimized, Ronald J. Smallwood, C15171, wrote, "At approximately 3:39 a.m., I was awakened by several individuals which I later found out were IGI, ISU and OCS. I was snatched out of my cell in my underwear and NOTHING else. I was then handcuffed with zip-ties and escorted to the chow hall. I sat there for five hours in zip-ties."

Another person victimized, Derrick Porter, A88849, wrote: "On 7-20-20 at 3:30 am my cell door was pulled open while me and my cellie were asleep. We were attacked and assaulted by ISU Squad members. I was violently snatched off the top bunk by masked CDCR employees. I injured my arm, head, neck, and hip.

"Several officers jumped on my back and legs, while one put his knee on the side of my head. I was cuffed in, zip-tied and dragged out the cell. Not one ISU/OCS Task Unit

officer had an identification name tag. I was put in dining hall #1 with no socks, no shoes, no shirt, and no mask.

"It was over 100 Black inmates, all zip-tied and in almost no clothes without masks. We were placed side-by-side and the wall was lined with CDCR employees who wore ISU black patches with CTF/SVSP logos and no name tags. These un-named officers were coughing and sneezing in the dining hall with us in it. SVSP staff came from a prison that has a COVID outbreak amongst staff and inmates. I was scared."

Another person victimized, Marcelle Franklin, J65015, wrote: "At 3:30 am on 7-20-20, I was awakened by unknown individuals wearing helmets and face masks, later identified as CTF/SVSP ISU IGI and OCS. I was forcefully slammed to the ground, zip-tied, and dragged out of my cell by multiple ISU officers, then placed in dining hall #1 without a mask, in nothing but my underwear for over five hours."

*CDCR officials can't wrap their heads around the fact that incarcerated Black people throughout the entire state of California aren't involved in any STG gang activity.*

And lastly, in direct contradiction to what the warden said in an email the following day, attempting to distance himself from having knowledge of our condition, Marcus Harris, O09716, wrote: "On 7-20-20 at about 3:00 am, I was awakened by my cell door being slammed open and being physically snatched out of bed by some unknown persons. I was taken down to the Central Facility dining hall, handcuffed, with nothing on except underwear, and was made to sit on metal stools with no jacket, shoes, t-shirt, or mask for about five and a half hours.

"When I asked to see a doctor, I was told 'No.' After about five hours, the warden came in and started to give officers 'high fives,' telling them 'Good job!' I stood up and said, 'How are you going to give them high fives and tell them good job for messing over a bunch of innocent Black people?'"

But it wasn't over. We were then escorted out of the dining hall, still virtually naked, once again down the central corridor, still zip-tied, officers and free staff now clocking in to work looking at us as if we were animals. We were led one by one into what used to be the counselor's office at the end of the west corridor, where we were interrogated by plain clothed OCS officers.

When we get near the entrance, an OCS officer asked my name and CDCR number before handing the officer escorting me a packet that had my picture. In red letters was the word "Target," below which was a paragraph of which I was only able to read the

first line, which said, "His father is Milton Hayes, a validated associate of the Black Guerilla Family."

If you know me or have read my most recent blog post, "Crying Out From Soledad: An Open Letter to a Lawyer," then you know that this is an issue about which I already have two pending lawsuits for retaliation, racial and religious discrimination against CDCR officers and officials for harassing me since 2011 for being in contact with my father.

They also single me out for my writing and journalism against this racist system, particularly my article in the San Francisco Bay View entitled, "Soledad prison guards refuse to wear safety masks amidst COVID-19 pandemic" for which I was raided less than a week after it was published, and more specifically my last book, "Soledad Uncensored," the forward of which is being published as a series of articles, also in the San Francisco Bay View, entitled, "Soledad uncensored: Racism and the hyper-policing of Black bodies," the entirety of which speaks directly against what was happening to us these early morning hours of July 20, 2020. Had my writings contributed to my being included in this roundup?

I was led to a room where two OCS officers, one white, one Black, were waiting. They told me to face the wall while they cut off my zip-ties and honestly I thought they were going to beat me, or worse. I was so nervous my mouth instantly became dry.



Soledad Correctional Training Facility – Photo: The Salinas Californian

But, frustrated that I was once again – based on what I was able to read from the description below my picture – being harassed because of my father's past, I asked, "What the hell is going on? This is how you guys are getting down now?! Snatching people out of bed at 3:00 in the morning?! You have been harassing me since 2011 because of my father!"

That is when the white officer asked, "Why would you say we were harassing you because of your father?". "Because that's what is says on the paper you just set aside," I responded, noticing the look on his face change when the Black officer chimed in saying, "We're not harassing you. We just want to ask you some questions about Black Lives Matter.

"How do you feel about what happened to George Floyd? I know what the one cop did was wrong and he deserves to go to jail, but all cops aren't bad," he said. That's ironic, considering the fact that here we were, having this conversation about police brutality rooted in racial biases, after approximately 200 Black men were violently snatched from their beds while sleeping – by police.

The premise upon which they sought to base the conversation was disrespectful. We had the whole "a few bad apples" conversation before I got tired and asked them, "So you mean to tell me y'all did all this to ask us about George Floyd and Black Lives Matter?!" when again the Black officer said, "Honestly, you have some tattoos on you that indicate you're BGF!"

I shot back: "I'm not BGF, like I said when I first came in. Y'all have been harassing me since 2011 for being in contact with my father who, according to you, is a validated associate of the Black Guerilla Family. To me he's simply my father who went to prison in '89 and had been out of my life until my sister found him still incarcerated in 2005.

"I have every letter he's ever written me and not one of them is criminal in nature. They are letters from a father trying to mend a broken bond with his son. And about the tattoo you guys have been harassing me about since 2011, everything about it is Islamic." I turned around to show them my back tattoo, which is a dragon with a huge crescent moon and star in the center of it flanked by the sword and staff of the prophet Muhammed, with a verse from the Qur'an over it in Arabic script.

"What about the dragon is Islamic?" they ask. At which point I give them a detailed explanation of a hadith mentioned in S.V. Mr. Ahmed Ali's commentary to chapter 96, verse 6-7, of the Holy Qur'an about an enemy of the prophet Muhammed attempting to harm him while he (Muhammed) was praying, but turning back in fear because he saw that the prophet Muhammed was being protected by a dragon.

After explaining my tattoos for the 20th time, as well as explaining to them how racist it is to assume that a Black person in prison with a tattoo of a dragon – or a gorilla or snake, for that matter – is a member of a prison gang that has used such symbols – I further explained my point by saying that "if I was Asian and had a dragon tattoo it wouldn't be an issue!"

They replied, "But you're not!" and when I asked affirmatively, "So it's because I'm Black?" they, to my surprise said, "Yes." After they "apologized" regarding the misunderstanding of my tattoo, saying, "We hope you can get that cleared up about your tattoo," they told me I could go.

When I returned to my cell, still confused as to why we were kidnapped in the middle of the night just to be questioned about Black Lives Matter, George Floyd, and a prison "gang" from the '70s, I was shocked even further by the way they trashed the cell. Everything was thrown all over the place.

My cellmate, who had returned to the cell before me, was busy separating his remaining property from mine when I noticed that every single piece of paperwork, writing paper, envelopes, every letter, picture, photo album, phone book and book was gone. In the midst of my remaining property was a "Security Squad Receipt" that said the only thing taken was "paperwork."



Soledad CTF prison yard

Later that morning, when everyone was let out of their cells to set up like we do every morning for "cell reading," everyone was shocked that we weren't on "scheduled program," which is the normal protocol when there is a threat, especially one that necessitates a raid. The first step of a "modified program" due to a threat is for the officers to conduct a "threat assessment" by interviewing everyone in the prison one by one, voluntarily.

The fact that they weren't conducting a threat assessment didn't make sense. Obviously, something wasn't right. In the process of cleaning up and preparing for breakfast, someone found paper tags presumed to be place markers used during the raid. One had the words "property team," "tag 1, receipts" and "Charlie" printed over a watermark on the SSU seal. The other has the words, "Charlie wing" which is the unit where the tags were found, as well as the unit I'm housed in.

At the top of this particular tag, however, were words that would explain everything: "Operation Akili." The name of this operation was a Swahili word that means "intelligence," which comes from the Arabic word "Agli," having the same meaning. They were on a fishing expedition, a dragnet – intelligence gathering – which explains why the only thing they took was paperwork, letters, books, pictures and phone books.

There was no threat. Not only did the name of their operation indicate that there was no threat, but the raid itself turned up no weapons, no notes referring to any type of threat or STG (Security Threat Group, the new term for "gang") activity. The reality is, there has been no Black STG activity here at Soledad whatsoever. In fact, ask CDCR and Soledad CTF officials to release a report stating how many weapons Black incarcerated people have been found in possession of and how many STG related incidents in the last 10 years have Black incarcerated people been involved in, and I guarantee the answer will shock you.

I was able to obtain every single Program Status Report (PSR) from 2017 to 2020 and not one single report refers to a single STG activity involving the population of incarcerated Black people, not even in the days surrounding the raid. But herein lies the reason why: CDCR officials can't wrap their heads around the fact that incarcerated Black people throughout the entire state of California aren't involved in any STG gang activity.

As I've been highlighting in my writing these past couple of years, the criminal mentality of old that most people have been conditioned to associate with prison does not exist. Incarcerated people throughout California realize that the days of languishing in prison until one is useless and unable to contribute to society are over.

*It is incarcerated people who promote non-violence that make prisons obsolete.*

Even people who entered the prison system as gang members no longer glorify gang culture or the culture of violence. Not only are "self-help" groups being created by incarcerated people themselves to challenge ideas of toxic masculinity and the culture of violence, such as "success stories," which was recognized by the California Legislature, but laws are being passed that have taken into consideration the work that we are in here doing, which gives incarcerated people hope like we've never had before.

And with the passing of Assembly Concurrent Resolution No. 186, introduced by Assemblymember Kamlager, that "the Legislature recognizes the need for statutory changes to end extreme sentencing," which disproportionately subjects Black people.

It says, "The Black community is disproportionately subjected to extreme sentences, representing less than 15 percent of the national population, but comprising 48.3 percent of people serving life sentences, 55 percent of people serving virtual life sentences, and 56.4 percent of people serving life sentences without the possibility of parole" and that "research has shown that long sentences do not deter future crimes and that there is no reliable evidence showing that any deterrent effect is "sufficiently large to justify the cost of long prison sentences …

"In 2018, only 2.9 percent of people serving life sentences were released and only 0.3 percent of people serving third-strike were released, and … out of 988 people convicted of murder who were released from California prisons over a 20-year period, only 1 percent were arrested for new crimes. None of the 988 people were rearrested for murder and none of them went back to prison over the 20-year period examined."

Understanding this, incarcerated people know that it is counter-productive to commit acts that justify one's incarceration. Not only are incarcerated people politically aware of the effects of violence, but thanks to Black resistance authors such as Bell Hooks, we are aware of the effects of violence in a more holistic way to where non-violence becomes a lifestyle as well as a rock to be used against a system that bases its very existence on our disfunction. It is incarcerated people who promote non-violence that make prisons obsolete.

CDCR officials are aware of this as well. Budgets are already being cut. Prisons are being scheduled to shut down, and employees of these institutions are going to have to find new jobs. However, a certain segment of CDCR have become so accustomed to this sadistic enterprise that they cannot imagine a world without it. They will go to imperceivable lengths to ensure its continued existence.

Since they can no longer use the "violent criminal" as a justification, they have resorted to criminalizing the very existence of incarcerated people. This becomes even more troubling when racism enters into the equation. We know the effects of systemic racism in the police departments and judicial systems, but what many people aren't aware of, by design, are the effects of systemic racism inside the prison system. Guns don't exist in prison (except in strategically placed guntowers) so you aren't going to have "officer involved shootings" of unarmed Black and Latinx people.

Prison is a different kind of monster; the weapon of choice in prison is and always has been "documentation." Michael Foucault wrote in his famous "Discipline and Punish: The Birth of the Prisons," "It must be possible to hold the prisoner under permanent observation; every report that can be made about him must be recorded and compared."

He continues, "No detail is unimportant, but not so much for the meaning that it conceals within it as for the hold it provides for the power that wishes to seize it." Departments of "Corrections" aren't concerned with the accuracy of the information about you so much as they are concerned with how they can use that information to control every aspect of your existence in order to maintain their position of dominance. Their sole concern is to create, on paper, a perpetual criminal, thereby justifying the perpetual existence of prison.

Just two days after the raid, we received our property back. Well, almost all of it. Almost everyone who was raided got a receipt notifying them of certain items not returned "pending investigation." Guess what these items were? Books, newspapers, pictures and quotes from Black historical figures. DOCUMENTATION.

They kept my book "Soledad Uncensored," quotes from George Jackson used for research on my book, a picture of Dr. Angela Davis and Jonathon Jackson protesting in front of Soledad in the '70s – also used for my book – and a letter to a journalist about COVID-19 and anti-Black racism in prison.


Angela Davis and Jonathan Jackson march to free George Jackson and the rest of the Soledad

Their reason for keeping these items, written on the receipt, was: "The aforementioned items will be retained for further investigation into your suspected involvement with the Black Guerilla Family (BGF) Security Threat Group-1 (STG-1)." Everyone else who received a receipt had had the same exact words written on it. Items taken from them include newspaper articles about George Jackson, pictures of the San Quentin 6, and even sheets of paper with book titles written on them: "Blood in My Eye," "The Spook Who Sat By the Door."

This is what we're dealing with, and it can't be described as anything other than racist. Every facet of existence of incarcerated people is criminalized, especially if you're Black. Everything from the books we read to our hairstyles are criminalized.

Hairstyles aren't seen as an attempt to express our individuality in an environment whose intent is to strip us of anything unique, or that points to our being individuals in any way. Instead, our hairstyles are seen by certain elements within CDCR as expressions of "gang culture," despite the fact that in the history of American street gangs, there has never been a single hairstyle associated with an expression as one's affiliation. Even still, young Black men are harassed and even chased down to be given "verbal warnings" for having designs shaved into their heads.

Don't get "caught" with a book by Angela Davis, Marcus Garvey or Malcom X, and you damn sure better not get "caught" with a book by George Jackson – all of which aren't on any official list of prohibited books and are all allowed into the prison through order from Amazon Prime, or any other bookseller. But once an officer sees you with one, you will – if you're Black – immediately be under investigation as a member of the Black Guerilla Family, an organization formed in the '70s in prison that today, in 2020, is virtually nonexistent, except in the minds of correctional officers intent on living in the past.

So what you end up with is young Black men who are afraid to study their history for fear of being labeled, while those who muster up the courage – being dedicated and committed to non-violence – seeking to understand the pitfalls of the past in order to contribute to a society they once took part in destroying, by preventing others from treading the course of violence, through knowledge, they are criminalized.

Before recent events, I thought this targeting was simply because correctional officers didn't understand Black culture, but like the white lady in Central Park, correctional officers aren't acting out of ignorance, but in fact are tapping into the very anti-Black racist ideas that underpin American society.

They know we are not members of the Black Guerilla Family, but they also know that, in a society so deeply connected to racist ideas concerning prison, that incarcerated Black men are seen as perpetually criminal, and thus labeling us as BGF places a stigma on us that will last throughout the duration of our incarceration, and becomes a barrier in the way of our release. These are the lengths they will go to.

Two days after we received our property, people began to receive "validation packets," a process to becoming validated by CDCR as a member or associate of a Security Threat Group. It was only after this point that the spokesperson for Soledad CTR released his

statement to the public that the people who were raided were members of a Security Threat Group. They were trying to cover their asses.

People were being labeled everything from "chief financial officer for BGF" to "BGF foot soldier." I told a friend of mine, "Watch these fools say I have something to do with education," when lo and behold! That same day I received my validation packet saying that I was "the Minister of Education for BGF," but that was only the beginning.

They said the pictures of George Jackson on my Instagram page managed by my family to advertise my writings, was "BGF propaganda." They even went so far as saying about my crescent moon and star tattoo: "It (the star) contains five outer-pointed and five inner-pointed, with each point representing one point of the 10-point party platform of the Black Panther Party (BPP), which is part of the BGF constitution."

But if you thought it couldn't get worse, they had the nerve to say that the Arabic verse from the Qur'an (79.14) on my back "translated into English as 'Assaulter, attacker with alertness.'" I couldn't believe what I was reading. The officer who wrote it was B. Barron.

He wrote: "While conducting photographs of his tattoos (on 4-27-20) specifically on Williams upper back above and below the black dragon, I discovered Arabic writing. I was unable to translate the Arabic writing, therefore, I questioned Williams on the meaning of the tattoos. Williams became defensive and stated, 'You can figure that out. Do your job."

Based on my training and experience, I know Williams becoming defensive about his tattoos means they are indicative of gang membership. Upon discovering the Arabic writing, I contacted the OCS, Correctional Intelligence Task Force (CITF) and Federal Bureau of Investigation's (FBI) Terrorism Task Forces (CT2) to translate the Arabic writing discovered on Williams' tattoos.

"Upon receiving the translation from OCS, the Arabic writing translated to English as 'Assaulter, attacker with alertness' and 'Tajdeed.' This Arabic writing is significant to the BGF also meaning he will conduct assaults on behalf of the BGF. The Arabic writing is also indicative to the membership of the Radical Islamic Group "Tajdeed UL-Islam (TUI)."

I couldn't believe what I was reading. "Tajdid," which is on my lower back, is a concept in Islam that refers to returning back to the original humanistic teachings of Islam, popularly known as Surism. To associate such a term with "radicalism" is disrespectful.

They gave me 72 hours to respond to the allegations in writing, and since they were trying to validate me as a member of BGF, that's what I focused on, saving everything else for the lawsuit. What I wrote in response to the allegations mentioned above (in part) was: "I find it strange that B. Barron only pointed out the star, attempting to link it with BGF via the Black Panther Party. When pictures were taken of my back tattoo between 2015-2019, First Lt. Officer Pearson (?) immediately recognized the crescent moon and star.



Beautiful Big Sur is only 66 road miles from Soledad, much closer as the crow flies, but there are no field trips for prisoners.

"B. Barron's failure to recognize the crescent moon shows that he had his mind set on associating me with BGF. When I said to B. Barron, concerning the Arabic writing on my back, 'You can figure it out. Do your job." I said that out of frustration, having already explained my tattoos at least five times before, and not because B. Barron said, "They are indicative of gang membership."

The Arabic writing across my back is Verse 14 of chapter 79 of the Holy Qur'an that translates into English as, "Then behold they will be upon a wide expanse." Which is a reference to a scene on the Day of Judgment when humanity will be standing "upon a wide expanse" of earth, awaiting God's judgment.

Whoever was responsible for the OCS Correctional Intelligence's Task Force (CITF) needs to be re-trained. B. Barron stated that he "contacted the Federal Bureau of Investigations (FBI) Terrorism Task Force (CT-2) to translate the Arabic writing" but only used "the translation from OCS," which according to them "translated to English as 'Assaulter, attacker with alertness." According to B. Barron, "This Arabic writing is significant to the BGF also meaning he will conduct assaults on behalf of BGF."

The reason B. Barron omitted the translation from the FBI is because they told him it was a verse from the Qur'an, and therefore didn't fit his narrative, just like the huge crescent moon and star didn't fit his narrative, so he omitted mentioning the moon. This is giving him the benefit of doubt.

What I believe is that B. Barron never sent a picture of my tattoo to the OCS or the FBI, but that he himself "translated" the Arabic, and therefore must be investigated for falsifying documents, because there is no way that an expert would have come up with that translation.

This is what racism looks like inside Soledad State Prison. You will be raided in the middle of the night and assaulted by officers, and when media attention is placed on the officers' actions, those same officers will falsify documents in order to cover their asses.

And because we live in a society where incarcerated people are viewed as perpetually criminal, who knows how far into the future, and to what lengths, officers will carry these allegations. Will our families be targeted next?

#BLACKINCARCERATEDLIVESMATTER

#FREETHEMALL

#FREETALIB

*Send our brother some love and light: Talib Williams, V69247, CTF CW-121, P.O. Box 689, Soledad CA 93960. And visit his website, www.talibthestudent.com.*